# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ULLICO INC., <br><br>         **Plaintiff,** <br><br>         v. <br><br> **NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, <u>et al</u>.** <br><br>         **Defendants.** | Civil Action No. 1:06cv0080 (RJL/AK) |
| **NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA and AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,** <br><br>         **Counterclaim Plaintiffs,** <br><br>         v. <br><br> **ULLICO INC.,** <br><br>         **Counterclaim Defendant.** | |

## <u>ULLICO INC.'S RULE 26(A)(2) STATEMENT</u>

Plaintiff/Counterclaim Defendant Ullico Inc. ("Ullico"), by and through its attorneys, submits the following Rule 26(A)(2) Statement pursuant to the Joint Rule 16.3 Report submitted by the parties and adopted by the Court.

      1.      Ullico expects to call John A. Dore as an expert witness at the trial of this action. Attached as Exhibit 1 is a written report signed by Mr. Dore containing a complete statement of the opinions to be expressed and the basis therefore, the information considered in forming the

opinions, the exhibits to be used to support the opinions, the qualifications of Mr. Dore, the

compensation to be paid to Mr. Dore and a description of the other case in which Mr. Dore

provided expert testimony.

      2.     Ullico reserves the right to disclose additional experts and to supplement Mr.

Dore's disclosures in response to any expert disclosed by the other parties in this action.

                  Respectfully submitted,

                  Ullico Inc.

                  By:   /s/ John F. Anderson__
                      One of Its Attorneys

John F. Anderson
D.C. Bar No. 393764
TROUTMAN SANDERS LLP
1660 International Drive, Suite 600
McLean, Virginia 22102
(703) 734-4356

Of Counsel:
Timothy W. Burns
Angela R. Elbert
Cheryl A. Fender
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Suite 2200
Chicago, IL 60602

# EXHIBIT 1

Expert Witness Report of John A. Dore


Robert Hughes Associates Inc.
508 Twilight Trail
Suite 200
Richardson, TX 75080


Prepared For:

Ullico Inc.
And
Neal, Gerber & Eisenberg LLP


September 29, 2006

Written Report of John A. Dore
As Expert Witness

This report is submitted as a summary of my opinions regarding custom and practice in the property and casualty insurance business as they pertain to order of payments when there are multiple insureds claiming reimbursement of defense costs and a self eroding limit of liability that includes defense costs. I was retained to conduct an analysis of these issues and render an opinion by Neal, Gerber & Eisenberg LLP on behalf of Ullico Inc.

# I.    Qualifications

I have worked in the property and casualty insurance business for 32 years. I am associated with the consulting firm of Robert Hughes Associates Inc. where I handle assignments that are offered to me, that fall within my expertise and that I accept. I am an independent contractor. My billing rate at Robert Hughes Associates Inc. is $395 per hour for all work that I will perform.

 I am currently president of Sheridan Ridge Advisers LLC and Sheridan Ridge Corporation. My current occupation is insurance and reinsurance consultant, insurance and reinsurance arbitrator and expert witness. I am associated with an insurance brokerage firm, where I work with employees of the firm to identify prospects for professional liability insurance, directors and officers liability insurance and fiduciary liability insurance (collectively, these policies are referred to as "Management Liability" policies). I am a licensed insurance producer in the state of Illinois. I am also a director of Dearborn Risk Management, Inc. and its subsidiary, Homestead Insurance Company.

For the better part of 21 years, I have been president of a managing general agency and/or president of a property and casualty insurance company. Exhibit A is my current Curriculum Vitae. Exhibit B is the only Expert Witness case where I was deposed. I have never testified at trial. I have not authored any publications in the last 10 years.

I am familiar with Management Liability policies, including fiduciary liability policies, and dealing with claims issues pertaining to policies with defense costs within the limits of liability and claims that involve multiple insureds. I began underwriting professional liability and directors and officers liability insurance policies in 1974. These policies are claims made and had defense costs within the limits of liability (except for certain professional liability policies). In 1974, in response to the enactment of the Employee Retirement Income Security Act of 1974, I was part of a team at Crum & Forster who developed a policy form to provide fiduciary liability coverage. I was involved in day to day underwriting of these Management Liability policies until 1985.

- 2 -

In 1986, I became president of Virginia Surety Company. The company underwrote professional liability and directors and officers liability policies as well as fiduciary liability policies. I was involved in managing the underwriters and claims staff, including certain claims themselves. In 1990, I became president of Financial Institutions Insurance Group, Ltd. The company, through a subsidiary, reinsured directors and officers liability insurance, fiduciary liability insurance and fidelity bonds for financial institutions. In 1992, the company set up a managing general agency for Virginia Surety Company and the company wrote, as insurance, professional liability insurance, directors and officers liability insurance and fiduciary liability insurance. This continued until 1999 when the company was sold. I continued to manage the underwriting and claims staff during that tenure.

From 1996 to the present time, I have been a purchaser of Management Liability policies for Dearborn Risk Management, Inc. From 2000 to 2003, I was involved in the purchase of directors and officers liability and fiduciary liability insurance for American Country Holdings, Inc. From 2004 until the present, I assist insurance brokers regarding issues pertaining to Management Liability policies.

Based on my 32 years in the property and casualty insurance industry, my involvement in the development of a fiduciary liability policy, my underwriting of fiduciary liability policies for many years, my oversight of underwriting and claims management of fiduciary policies when I was president of several companies, my ongoing consulting in Management Liability issues and my recent purchases of Management Liability policies, I am qualified to assist lay persons from outside the insurance industry in understanding fiduciary liability policy issues.

## II.   Documents Reviewed

I have reviewed the documents listed on Exhibit C.

Within the documents that are listed on Exhibit C are two National Union Fire Insurance Company of Pittsburgh, PA "Employee Benefit Plan Fiduciary Liability Insurance" policies issued to Ullico Inc. and its Subsidiaries. The first is policy number 874-44-03, with a policy period from October 30, 2001 to October 30, 2002. The second is policy number 495-38-35, with a policy period from October 30, 2002 to October 30, 2003.

I also reviewed a National Union Fire Insurance Company of Pittsburgh, PA "Employee Benefit Plan Fiduciary Liability Insurance" policy wording with a policy form number and edition date of 77892 (3/01). This policy wording, as presented to me, contained a clause "20.Order of Payments", as part of the 3/01 Employee Benefit Plan Fiduciary Liability Amendatory endorsement. This policy and endorsement were issued to an unknown insured (insured name redacted). This is attached as Exhibit D.

## III.  Analysis

The two policies issued to Ullico Inc. noted above are not identical. The 2001-2002 policy (policy number 874-44-03) has a policy form number and edition date of 63853 (12/95). The second policy, issued for the period 2002-2003 (policy number 495-38-35) has a policy form number and edition date of 77892 (3/01).

As regards the 2001-2002 Employee Benefit Plan Fiduciary Liability Insurance policy (policy number 874-44-03):

- The Insuring Agreement states "This policy shall pay the Loss of each and every Insured arising from a Claim first made against an Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act by any Insured (or by an employee for whom such Insured is legally responsible)".
- The definition of Insured is found in 3. Definitions (h) and states "Insured(s) means (1) any Natural Person Insured; (2) any Plan(s); (3) the Sponsor Organization; (4) any other person or entity in his, her or its capacity as a Fiduciary, Administrator or trustee of a Plan who is included in the definition of 'Insured' by specific written endorsement attached to this policy"
- The Defense Agreement, General Provisions states, in part: "The Insurer shall advance Defense Costs prior to the final disposition of a Claim, subject to the other provisions of this policy".

Ullico Inc. and its subsidiaries are listed as the NAMED SPONSOR on the Declarations page of the policy. Ullico Inc. and its subsidiaries fall within the definition of Insured under this policy. It is my understanding that Ullico Inc. filed a claim under policy number 874-44-03 according to the terms and conditions of the policy.

As regards the 2002-2003 Employee Benefit Plan Fiduciary Liability Insurance Policy (policy number 495-38-35):

- The Insuring Agreement, in part, states " Solely with respect to Claims first made against an Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the Loss for each and every Insured arising from a Claim against an Insured for any actual or alleged Wrongful Act by any such Insured (or by any employee for whom the Insured is legally responsible)".
- The definition of Insured is found in 3. Definitions (page 4 of the policy wording) and states "'Insured(s)' means: (1) any Natural Person Insured; (2) any Plan(s);

- 4 -

   (3) the Sponsor Organization; and (4) any other person or entity in his, her or its capacity as a Fiduciary, Administrator or trustee of a Plan and included in the Definition of Insured by specific written endorsement attached to this policy".

- The Defense Agreement, General Provisions states, in part: "The Insurer shall advance Defense Costs prior to the final disposition of a Claim, subject to the other provisions of this policy".

Ullico Inc. and its subsidiaries are listed as the NAMED SPONSOR on the Declarations page of the policy. Ullico Inc. and its subsidiaries fall within the definition of Insured under this policy. It is my understanding that Ullico Inc. filed a claim under policy number 495-38-35 according to the terms and conditions of the policy.

Both of the Employee Benefit Plan Fiduciary Liability Insurance policies discussed above specify in the Insuring Agreement that "this policy will pay the Loss for **each and every Insured**..." (emphasis added). As noted in the definition of Loss, Loss includes Defense Costs. The Insuring Agreement does not distinguish one type of Insured from another.

The sample policy, Exhibit D, (policy form number and edition date 77892 (3/01), which was provided to me is a copy of a National Union Fire Insurance Company of Pittsburgh, PA Employee Benefit Plan Fiduciary Liability Insurance policy for an unknown Insured (name of Insured redacted). This policy contains an "Order of Payments" clause, found in 3/01 Employee Benefit Plan Fiduciary Liability Amendatory endorsement. This clause states: "In the event of Loss arising from a covered Claim for which payment is due under the provisions of this policy, then the Insurer shall in all events: (a) first, pay Loss for which coverage is provided under this policy for any Natural Person Insured and any covered Plan under this policy; and (b) then, only after payment of Loss has been made pursuant to Clause 20 (a) above, with respect to whatever remaining amount of the Limit of Liability is available after such payment, shall payment for the Sponsoring Organization be made for such other Loss for which coverage is provided under this policy".

This Order of Payments clause does not appear on either of the referenced Ullico Inc. Employee Benefit Plan Fiduciary Liability Insurance policies, as issued by National Union Fire Insurance Company of Pittsburgh, PA.

The concept of the Order of Payments clause came about when bankruptcy trustees were claiming a directors and officers liability policy as an asset of the bankruptcy estate, to the detriment of the individual directors and officers of a company. This occurred on policies where the corporate entity was covered as an Insured. The concept moved into other Management Liability policies, including fiduciary liability policies. This clause is not generally found in the body of policies, but is added as an endorsement. To the best of my knowledge, this is not necessarily applied to all policies by insurance companies that provide this or similar clauses.

# IV.  Opinion

Fiduciary Liability policies are generally issued on a claims made basis and generally have defense costs as part of the limit of liability. Directors and Officers Liability policies as well as some Professional Liability policies are written on the same basis. That is, these types of policies are generally written on a claims made basis and generally have defense costs within the limit of liability.

In my opinion, there is a custom and practice in the property and casualty insurance business regarding the payment of defense costs and other amounts due on Management Liability policies, including Fiduciary Liability policies. That custom and practice is to pay amounts due, including defense costs on a first come first served basis, up to the limit of liability. That is, an Insurer cannot withhold payments from any one Insured, when there are multiple Insureds involved and valid claims are presented by each Insured.

There are several reasons why Insurers should not show preference to one Insured over another Insured in paying defense costs and amounts due under a fiduciary policy or other Management Liability policy. First, in a case such as the Ullico Inc. matter, there is no language in the policy that permits this preference. Second, the policyholder has an expectation that if he, she or it are defined as Insureds, and one of them makes a valid claim, there will be payments, including defense costs paid under a policy without any preferential payment by the Insurer of one Insured over another Insured. Third, an Insurer could be exposed to bad faith claims for permitting this preference.

At the time of a Loss, on occasions, Insureds and Insurers may negotiate a mutual agreement amongst the parties to determine if there will be a preference for the payments. On other occasions, an Insurer may tender the limits of liability to a court and permit the court to determine the allocation. And on other occasions, there may be a predetermined order of payments clause that is endorsed to a policy at the time the policy is issued.

None of the remedies in the preceding paragraph apply to the two Employee Benefit Plan Fiduciary Insurance policies issued by National Union Fire Insurance Company of Pittsburgh, PA and issued to Ullico Inc. and its subsidiaries.

Ullico Inc. is an Insured by virtue of it being the Sponsoring Organization, as defined in the policies. The Natural Persons Insured are defined as Insureds, without any further distinction or preference within the policies. The Insuring Agreements of the two Fiduciary policies issued to Ullico Inc. and its subsidiaries both state: "This policy shall pay the Loss of each and every Insured…". In my review of the policies, I did not find any clause that contradicts Ullico's ability to receive equal treatment to Natural Person Insureds as it related to payment of Defense Costs.

My opinion, based on custom and practice in the property and casualty insurance industry, is that absent a written agreement among the parties, including the Insurer and

the several Insureds, the Insurer is obligated to pay defense costs as bills are presented on a first come first served basis.


_____
      John A. Dore

# Exhibit A

**JOHN A. DORE**
Sheridan Ridge Advisers LLC
150 N. Wacker Drive
Suite 900
Chicago, IL 60606
(312) 543-4159, (847) 446-4604 (Fax)
johndore@sheridanridge.com

---

## EXPERIENCE

**2003 – Present**      **Sheridan Ridge Advisers LLC**

Insurance and reinsurance consulting, including arbitrations and expert witness practice

**2000 – 2003**      **American Country Holdings Inc.**
*Nasdaq-listed insurance holding company until it was acquired by Kingsway Financial Services in 2002*

Chairman, President and Chief Executive Officer
American Country Insurance Company

**1999 – 2000**      **Independent Consultant**

Practice focused on insurance and reinsurance issues

**1990 – 1999**      **The First Reinsurance Company of Hartford**
**Oakley Underwriting Agency, Inc.**
*These two companies were 100% owned by Financial Institutions Insurance Group until 1996, when they were acquired by the private equity firm Castle Harlan. Castle Harlan merged them into another insurance investment and renamed the business Dearborn Risk Management. In 1998, Castle Harlan sold these two companies to Gryphon Holdings, and in 1999 Gryphon Holdings was acquired by Markel Corporation.*

President and Chief Executive Officer

- For the first six years under the ownership of Financial Institution Insurance Group, served as CEO of this Nasdaq-listed company's effort to write reinsurance for financial

institutions business and to expand its business into specialty insurance lines

- For two years under the ownership of Castle Harlan and Dearborn Risk Management, continued to expand its insurance business, including in the excess and surplus lines business through Homestead Insurance Company.

- For seven months under the ownership of Gryphon Holdings, coordinated professional liability expansion within this multi insurance company holding company.

- For three months under the ownership of Markel, worked on the integration of the business into another division of Markel.

1987 – 1990    **Aon Corporation**

President – Virginia Surety Company, Inc.
President – Dearborn Insurance Company

1983 – 1986    **Chicago Underwriting Group, Inc.**
*This company served as an underwriting manager for Old Republic Insurance Company.*

President

Cofounded this joint venture, which underwrote specialty insurance coverages (Professional Liability and Directors and Officers Liability)

1974 – 1983    **Crum & Forster**

Senior Vice President – L.W. Biegler Inc.
Senior Vice President – International Surplus Line Insurance Company

**EDUCATION**

1974 – 1978    MBA, Finance and Marketing
Northwestern University, Kellogg Graduate School of Management
Evanston, IL

1969 – 1973    BA, Psychology Yale University, New Haven, CT

**OTHER ACTIVITIES**

Dearborn Risk Management, Inc., Director
Homestead Insurance Company, Director
Sheridan Ridge Corporation, President

Certified ARIAS Arbitrator and Umpire

Kenilworth Union Church - Member, Board of Trustees
Josephinum Academy – Member, Board of Directors
Yale Alumni Schools Committee – Member

# Exhibit B

Expert Witness Case of John A. Dore

**Insurer v Financial Institution, in Arbitration (2005)**

Testimony: Issue of a policy rescission on the basis of misrepresentations on the application of a Directors and Officers Liability policy.

Retained by: Kerns, Pitrof Frost & Pearlman, counsel for the Insurer

Case disposition: Settled after report and deposition, but prior to hearing testimony.

Note: By order of the Arbitration Panel, this proceeding is confidential. I returned all documents, including the copy of my deposition and the copy of my Expert Witness report.

# Exhibit C

Documents Provided to and Reviewed by John A. Dore

1. ULLICO INC.'S FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF, including Exhibits A-L.

2. DEFENDANTS AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY'S AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA'S ANSWER AND COUNTERCLAIM.

3. ULLICO INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO DEFENDANTS AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY'S AND NATIONAL UNION FIRE INSURANCE COMPANY'S COUNTERCLAIMS.

4. A NATIONAL UNION FIRE INSURANCE COMPANY EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY INSURANCE POLICY FROM AN UNKNOWN INSURED (INSURED NAME REDACTED). POLICY FORM NUMBER AND EDITION DATE 77892 (3/01), INCLUDING A 3/01 EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY INSURANCE AMENDATORY ENDORSEMENT.

# Exhibit D

NATIONAL UNION FIRE INSURANCE COMPANY EMPLOYEE BENEFIT
PLAN FIDUCIARY LIABILITY INSURANCE POLICY FROM AN UNKNOWN
INSURED (INSURED NAME REDACTED). POLICY FORM NUMBER AND
EDITION DATE 77892 (3/01), INCLUDING A 3/01 EMPLOYEE BENEFIT PLAN
FIDUCIARY LIABILITY INSURANCE AMENDATORY ENDORSEMENT
(ATTACHED).

**ENDORSEMENT#**

This endorsement, effective *12:01 am* ▇▇▇▇▇▇▇ forms a part of
policy number ▇▇▇▇▇▇▇
issued to ▇▇▇▇▇▇

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### 3/01 EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY AMENDATORY

In consideration of the premium charged, it is hereby understood and agreed that the
policy (and any endorsement amending the policy) is hereby amended as follows:

Clause 3. DEFINITIONS

1.  The definition of "**Employee Benefit Law**" is deleted in its entirety and
    replaced with the following:

    "**Employee Benefit Law**" means:

    (1)  **ERISA** or any similar common or statutory law of the United States,
         Canada or any state or other jurisdiction anywhere in the world to which
         a **Plan** is subject.

    (2)  Solely with respect to paragraph (2) of the definition of **Wrongful Act**,
         **Employee Benefit Law** shall also include Part 164 of the regulations
         under the Health Insurance Portability and Accountability Act of 1996
         (hereinafter "**HIPAA Privacy Regulations**"), unemployment insurance,
         Social Security, government-mandated disability benefits or similar law.

    (3)  In no event shall **Employee Benefit Law**, other than as set forth in
         paragraph (2) of this definition of **Employee Benefit Law**, include any law
         concerning worker's compensation, unemployment insurance, Social
         Security, government-mandated disability benefits or similar law.

2.  The definition of "**ERISA**" is deleted in its entirety and replaced with the
    following:

    "**ERISA**" means the Employee Retirement Income Security Act of 1974
    (including, but not limited to, amendments relating to the Consolidated
    Omnibus Budget Reconciliation Act of 1985, Health Insurance Portability and
    Accountability Act of 1996 as it relates to Sections 102(b) and 104(b)(1) of
    **ERISA**, the Newborns' and Mothers' Health Protection Act of 1996, the Mental
    Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of
    1998), and including any amendment or revision thereto.

3.  The definition of "**ESOP**" is deleted in its entirety and replaced with the
    following:

    "**ESOP**" means any employee stock ownership plan as defined in **ERISA**, or any
    other **Plan** under which investments are made primarily in securities of or
    issued by (i) the **Sponsor Organization**, (ii) the parent of the **Sponsor
    Organization**, (iii) any acquired **Subsidiary**, or (iv) any parent of any acquired
    **Subsidiary**, or whose assets at any time within twelve months prior to the
    inception date of this policy were comprised of 10% or more of securities of
    the **Sponsor Organization**, the parent of the **Sponsor Organization**, any
    acquired **Subsidiary**, or any parent of any acquired **Subsidiary**.

ENDORSEMENT# ▮ (continued)

4.   The definition of "**Plan**" is amended by deleting paragraphs (2) and (4) in their entirety and replacing *them* with the following:

(2)   if such **Plan** was sold, spun-off or terminated prior to the inception date of this policy the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the inception date of this policy and pay any required premium relating to such **Plan**, unless such sale, spin-off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this policy is a continuous renewal;

(4)   if such **Plan** is an ESOP or stock option plan, the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** and such **Plan** is added to the Definition of Plan by specific written endorsement attached to this policy; or

5.   The definition of "**Wrongful Act**" is deleted in its entirety and replaced with the following:

(1)   as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, but only with respect to a **Plan**; and

(2)   as respects an **Administrator**, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:
    (i)   counseling employees, participants and beneficiaries; or
    (ii)   providing interpretations; or
    (iii)   handling of records; or
    (iv)   activities effecting enrollment, termination or cancellation of employees, participants and beneficiaries under the Plan,
or any matter claimed against an **Insured** solely by reason of his, her or its status as an **Administrator**, but only with respect to a **Plan**;

(3)   as respects a **Natural Person Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any multiemployer plan as defined by ERISA, but only if such service is at the specific written request or direction of the **Sponsor Organization** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a **Natural Person Insured**.

Clause 12. ORGANIZATIONAL CHANGES is amended by deleting paragraph (b) in its entirety and replacing it with the following:

(b)   *Other Organizational Changes*. In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Sponsor Organization** and/or any **Insured** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Sponsor Organization** became a **Sponsor Organization** and such **Insured** became an **Insured**, and

ENDORSEMENT# ███    (continued)

prior to the effective time that such **Sponsor Organization** ceases to be a **Sponsor Organization** or such **Insured** ceases to be an **Insured**.

With regard to any **Plan** that was sold, spun-off or terminated either prior to the inception date of this policy or during the **Policy Period**, this policy shall apply but solely with respect to a **Wrongful Act(s)** that occurred prior to the date of such sale or spin-off, or prior to the date that the **Sponsor Organization** or **Natural Person Insured** ceases to be a **Fiduciary** or **Administrator** of, a sold or spun-off **Plan**, or in the case of a terminated **Plan**, prior to the final date of asset distribution of such **Plan**, provided that in the event of a sale, spin-off or termination prior to the inception of this **Policy Period**, notice of such sale, spin-off or termination is provided to the **Insurer** *prior to the inception of this Policy Period* and any required premium is paid, or, in the event of a sale, spin-off termination during the **Policy Period**, notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**.

The following clause shall be added to the policy:

20.  **ORDER OF PAYMENTS**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this policy, then the **Insurer** shall in all events:

(a)  first, pay **Loss** for which coverage is provided under this policy for any **Natural Person Insured** and any covered **Plan** under this policy; and

(b)  then, only after payment of **Loss** has been made pursuant to Clause 20(a) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, shall payment for the **Sponsor Organization** be made for such other **Loss** for which coverage is provided under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE



**American International Companies**

**Employee Benefit Plan Fiduciary Liability Insurance**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including any attachments and any materials incorporated therein which form a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

    (a)  Solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** against an **Insured** for any actual or alleged **Wrongful Act** by any such **Insured** (or by any employee for whom such **Insured** is legally responsible).

    (b)  Solely with respect to **CAP Penalties** and **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Fiduciary Correction Loss** incurred by an **Insured**, during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** during the **Policy Period** or the **Discovery Period** (if applicable) or within thirty (30) days after the end of the **Policy Period** or the **Discovery Period** (if applicable), and subject to the other terms, conditions and limitations of this policy, this policy shall:

    (i)  pay the **CAP Penalties** and **Delinquent Filer Penalties**; and
    (ii)  reimburse the **Voluntary Fiduciary Correction Loss**,

    of each and every **Insured**, collectively not to exceed the amount of the **Sublimit of Liability** set forth in Item 3(c) of the Declarations; provided that the **Insured** shall select a **Panel Counsel Firm** as provided in Clause 9 of the policy.

The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that a **Voluntary Compliance Loss** results in a **Claim**.

2. **DEFENSE AGREEMENT**

    (a)  **INSURER'S DUTY TO DEFEND**

    Except as hereinafter stated, the **Insurer** shall have both the right and duty to defend any **Claim** against an **Insured** alleging a **Wrongful Act**, even if such **Claim** is groundless, false or fraudulent.

    The **Insured** shall have the right to effectively associate with the **Insurer** in the defense of any **Claim**, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 2. The **Insurer** shall not, however, be obligated to defend any **Claim** after either: (1) the **Limit of Liability** and any additional **Defense Costs** (if any) indicated in Item 3(b) of the Declarations have been exhausted; or (2) after the rejection of a settlement offer, pursuant to the terms of subparagraph (c) of this Clause 2.

    (b)  **INSURED'S OPTION TO ASSUME DEFENSE**

    Notwithstanding the above, the **Insureds** shall have the right to assume the defense of any **Claim** made against them. This right shall be exercised in writing by the **Named Sponsor** on the behalf of all **Insureds** within sixty (60) days of the reporting of the **Claim** to the **Insurer** pursuant to Clause 8 of the policy. Upon receipt of such

written request, the **Insurer** shall tender the defense of the **Claim** to the **Insureds**. Once the defense has been so tendered, the **Insurer** cannot re-assume the defense of the **Claim**.   The **Insurer** shall have the right to effectively associate with the **Insureds** in the defense of any **Claim**, including but not limited to negotiating a settlement.  Provided that the **Insurer** shall be permitted to effectively associate with the **Insureds** in the defense of any **Claim**, including but not limited to negotiating a settlement of any **Claim**, the **Insurer's** consent to settlements, stipulated judgments and **Defense Costs** shall not be unreasonably withheld.

(c)   **GENERAL PROVISIONS (applicable to both (a) and (b) above)**

The **Insurer** shall advance **Defense Costs** prior to the final disposition of a **Claim**, subject to the other provisions of this policy.   Such advance payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests, in the event and to the extent that the **Insureds** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

The **Insured(s)** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to in writing by the **Insurer** shall be recoverable as **Loss** under the terms of this policy.

The **Insured(s)** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require.  The **Insurer** may make any settlement of any **Claim** it deems expedient with respect to any **Insured**, subject to such **Insured's** written consent.  If any **Insured** withholds consent to such settlement, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed the amount for which the **Insurer** could have settled such **Claim**, plus **Defense Costs**  incurred as of the date such settlement was proposed in writing by the **Insurer**. Further, in the event the **Insurer** is defending the **Claim** pursuant to Clause 2(a) above, then the **Insurer** shall tender the **Claim** to the **Insureds** who shall thereafter at their own expense and on their own behalf negotiate and defend such **Claim** independently of the **Insurer**.

Selection of counsel to defend the **Claim** made against the **Insureds** shall be governed by Clause 9 of the policy (if applicable).

3.   **DEFINITIONS**

"**Administrator**" means an **Insured** with respect to any **Wrongful Act** described in subparagraph (2) of the Definition of **Wrongful Act**.

"**Benefits**" means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

"**Breach of Fiduciary Duty**" means a violation of the responsibilities, obligations or duties imposed upon **Insureds** by ERISA.

"**Cafeteria Plan**" means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

"**CAP Penalties**" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the Internal Revenue Service (IRS) pursuant to a written agreement to correct an inadvertent **Plan** defect under an Employee Plans Compliance Resolution System, provided that such agreement to

correct such **Plan** defect was entered into in writing by the **Insured** with the IRS during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

"**Claim**" means:

(1) a written demand for monetary, non-monetary or injunctive relief; or

(2) a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:

    (i) service of a complaint or similar pleading; or

    (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or

    (iii) receipt or filing of a notice of charges; or

(3) a formal agency or regulatory adjudicative proceeding to which an **Insured** is subject; or

(4) any fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency which is located outside of the United States.

"**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

"**Consulting Fees**" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs or expenses associated with: (i) a **Plan** audit; or (ii) identifying, finding or assessing such **Breach of Fiduciary Duty**.

"**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to in writing by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**, whether incurred under Clause 2(a), (b) or (c) of this policy, but excluding any compensation of **Natural Person Insureds** or employees of an **Insured**.

"**Defense Expenses**" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the **Insurer** resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs and expenses associated with finding or assessing such **Breach of Fiduciary Duty** and any compensation of **Natural Person Insureds** or employees of an **Insured**.

"**Delinquent Filer Penalties**" means penalties assessed by the U.S. Department of Labor or the IRS under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

"**Dependent Care Assistance Program**" means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

"**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Named Sponsor** or any **Subsidiary**.

"**Employee Benefit Law**" means ERISA or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a **Plan** is subject. Except to the extent set forth in subparagraph (2) of the Definition of **Wrongful Act**, **Employee Benefit Law** shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.



"ERISA" means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

"ESOP" means any employee stock ownership plan as defined in ERISA, or any other Plan under which investments are made primarily in securities of the Sponsor Organization or whose assets at any time within twelve months prior to the inception date of this policy were comprised of 20% or more of securities of the Sponsor Organization.

"Fiduciary" means a fiduciary as defined in an Employee Benefit Law (if applicable), with respect to a Plan, or a person or entity who exercises discretionary control as respects the management of a Plan or the disposition of its assets.

"Foreign Jurisdiction" means any jurisdiction, other than the United States or any of its territories or possessions.

"Foreign Policy" means the Insured's or any other member company of American International Group, Inc.'s (AIG) standard fiduciary or pension trust liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a Foreign Jurisdiction, that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then Foreign Policy means the standard policy most recently registered in the local language of the Foreign Jurisdiction, or if no such policy has been registered, then the policy most recently registered in that Foreign Jurisdiction. The term Foreign Policy shall not include any directors and officers, partnership, managerial, comprehensive general liability, employment practices liability or professional liability coverage.
"Fringe Benefit" means any plan or benefit described in Section 132 of the Internal Revenue Code of 1986, as amended.

"Indemnifiable Loss" means Loss for which the Sponsor Organization has indemnified or is permitted or required to indemnify any natural person Insured.

"Insured(s)" means:

    (1) any Natural Person Insured;
    (2) any Plan(s);
    (3) the Sponsor Organization; and
    (4) any other person or entity in his, her or its capacity as a Fiduciary, Administrator or trustee of a Plan and included in the Definition of Insured by specific written endorsement attached to this policy.

"Loss" means damages, judgments (including pre/post-judgment interest on a covered judgment), settlements and Defense Costs; however, Loss shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in Item 3(c) of the Declarations page for Voluntary Compliance Loss, (ii) UK Fines and Penalties, (iii) the five percent or less civil penalty imposed upon an Insured under Section 502(i) of ERISA, and (iv) the 20 percent or less penalty imposed upon an Insured under Section 502(l) of ERISA, with respect to covered settlements or judgments; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an Insured is not financially liable or which is without legal recourse to the Insured; (5) Benefits, or that portion of any settlement or award in an amount equal to such Benefits, unless and to the extent that recovery of such Benefits is based upon a covered Wrongful Act and is payable as a personal obligation of a Natural Person Insured; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Where permitted by law, **Loss** shall include punitive or exemplary damages imposed upon any **Insured** (subject to the policy s other terms, conditions and exclusions, including but not limited to exclusions relating to profit, deliberate fraud or criminal acts and knowing or willful violation of any statute, rule or law, including but not limited to **Employee Benefit Law**).

**Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (1)-(6) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall include **Voluntary Compliance Loss**.

"**Management Control**" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; the general partners of a limited partnership; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the **Named Sponsor**, to elect, appoint or designate a majority of the Board of Directors of a corporation, the management committee of a joint venture, the general partners of a limited partnership, or the management board of a limited liability company.

"**Natural Person Insured**" means any:

(1) past, present or future natural person director, officer, governor, general partner, management committee member, member of the board of managers or employee of a **Sponsor Organization** or if applicable, of a **Plan**, and as to all of the above in his or her capacity as a **Fiduciary**, **Administrator** or trustee of a **Plan**; or

(2) past, present or future natural person in a position equivalent to a position listed in subparagraph (1) of this Definition in the event that the **Sponsor Organization** is operating in a **Foreign Jurisdiction**.

"**Non-qualified Plan**" means any of the following plans for a select group of management or highly compensated directors, officers and/or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan.
"**Pension Plan**" means a pension plan as defined in any **Employee Benefit Law**.

"**Plan**" means automatically, any qualified plan, fund, trust or program (including, but not limited to, any **Pension Plan**, **Welfare Plan**, **Cafeteria Plan**, **Dependent Care Assistance Program**, **Fringe Benefit**, and **VEBA**) or **Non-qualified Plan**, established anywhere in the world, which was, is or shall be sponsored solely by the **Sponsor Organization**, or sponsored jointly by the **Sponsor Organization** and a labor organization, solely for the benefit of the employees and/or the directors, officers, governors, management committee members, members of the board of managers or natural person general partners of the **Sponsor Organization**, subject to the following provisions:

(1) if such **Plan** is a **Pension Plan(s)**, other than an **ESOP**, stock option plan or **Pension Plan** described in subparagraphs (5)(a) and 5(b) below, then the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** prior to the inception date of this policy, unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal;

(2) if such **Plan** was sold, spun-off or terminated prior to the inception date of this policy the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the inception date of this policy, unless such sale, spin-off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this policy is a continuous renewal;

(3) if such **Plan** is sold, spun-off or terminated during the **Policy Period**, the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the end of the **Policy Period**;

(4) if such **Plan** is an **ESOP** or stock option plan, the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal and such **Plan** is added to the Definition of **Plan** by specific written endorsement attached to this policy; or

(5) if such **Plan** is a **Pension Plan** (other than an **ESOP**, or stock option plan) and:

    (a) is acquired during the **Policy Period** as a result of the **Sponsor Organization's** acquisition of a **Subsidiary** whose assets total more than 25% of the total consolidated assets of the **Sponsor Organization** as of the inception date of this policy; or

    (b) is acquired during the **Policy Period** and such **Plan's** assets total more than 25% of the total consolidated assets of all covered **Pension Plans** as of the inception date of this policy,

then, this policy shall apply to such **Plan** (but solely with respect to a **Wrongful Act(s)** occurring after the date of such acquisition), but only upon the condition that within 90 days of its acquisition, the **Named Sponsor** shall have provided the **Insurer** with a completed application for such new **Plan** and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new **Plan**. The 90 day reporting condition shall not apply if such new **Plan** does not constitute one of the five largest **Pension Plans** of the **Sponsor Organization** and the failure to report such **Plan** within the 90 day reporting period was due to inadvertent omission by the **Named Sponsor** and upon discovery of such **Plan**, the **Named Sponsor** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

The Definition of **Plan** shall also include: (i) the following government–mandated programs: unemployment insurance, Social Security, or disability benefits, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the Definition of **Wrongful Act** in this policy; (ii) any **Pension Plan** (other than an **ESOP** or stock option plan) considered or created by the **Sponsor Organization** during the **Policy Period**; or (iii) any other plan, fund or program, which is included in the Definition of **Plan** by specific written endorsement attached to this policy.

In no event, however, shall the Definition of **Plan** include any multiemployer plan as defined in **Employee Benefit Law**.

"**Policy Period**" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

"**Pollutants**" include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

"**Sponsor Organization**" means the **Named Sponsor** designated in Item 1 of the Declarations and any **Subsidiary** thereof; and, in the event any bankruptcy proceeding shall be instituted by or against the **Named Sponsor** or any **Subsidiary** thereof, the resulting debtor in possession (or equivalent status outside the United States), if any.

"**Subsidiary**" means any past, present or future: (1) for–profit entity of which the **Named Sponsor** has **Management Control** either directly or indirectly through one or more other **Subsidiaries**; and (2) not–for–profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the **Named Sponsor**. The term **Subsidiary** shall automatically apply to any new **Subsidiary** acquired or created during the **Policy Period**.

6

A for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer maintains **Management Control** of such **Subsidiary**. A not-for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer exclusively sponsors such **Subsidiary**.

"**UK Fines and Penalties**" means civil fines and penalties assessed against an **Insured** by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom or by the Occupational Pensions Regulatory Authority in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of the policy.

"**VEBA**" means a voluntary employees beneficiary association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended and the regulations thereunder, the purpose of which is to provide for life, sickness, accident or other benefits and that is funded solely by the **Sponsor Organization**, and provides benefits for voluntary members who are employees or former employees of the **Sponsor Organization** and/or their beneficiaries.

"**Voluntary Compliance Loss**" means **CAP Penalties**, **Delinquent Filer Penalties** and **Voluntary Fiduciary Correction Loss**.

"**Voluntary Fiduciary Correction Loss**" means damages, **Defense Expenses** and **Consulting Fees** incurred in connection with the U.S. Department of Labor's ("DOL") Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent **Breach of Fiduciary Duty** occurring during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal), provided that such compliance with the DOL'S Voluntary Fiduciary Correction Program results in the **Insured** obtaining a "No Action" letter from the DOL; however, **Voluntary Fiduciary Correction Loss** shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (6) **Benefits**, or that portion of damages equal to such **Benefits**; (7) matters of which the **Insured** had knowledge prior to the inception date of this policy or the first policy issued by the **Insurer** to the **Named Sponsor** of which this policy is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

"**Welfare Plan**" means a welfare plan as defined in **Employee Benefit Law**.

"**Wrongful Act**" means:

(1)  as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**; and

(2)  as respects an **Administrator**, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:

(i)   counseling employees, participants and beneficiaries; or
(ii)  providing interpretations; or
(iii) handling of records; or
(iv)  activities affecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**,

or any matter claimed against an **Insured** solely by reason of his, her or its status as an **Administrator**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**;

(3)  as respects a **Natural Person Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any



multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Sponsor Organization** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a **Natural Person Insured.**

4. **WORLDWIDE EXTENSION**

Where legally permissible, this policy shall apply to a **Claim** made against any **Insured** anywhere in the world.

With regard to a **Claim(s)** brought and maintained solely in a **Foreign Jurisdiction** against an **Insured** formed and operating in such **Foreign Jurisdiction**, the Insurer shall apply to such **Claim(s)** those terms and conditions (and related provisions) of the **Foreign Policy** registered with the appropriate regulatory body in such **Foreign Jurisdiction** that are more favorable to such **Insured** than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1, 3–5, 9–13, and 16–19 of this policy and the comparable provisions of the **Foreign Policy**. In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Sponsor**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

5. **EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with a **Claim** made against an **Insured(s)**:

(a)  arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an **Insured** was not legally entitled;

(b)  arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law;**

    [The **Wrongful Act** of any **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the foregoing exclusions 5(a) and 5(b).]

(c)  for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of **Employee Benefit Law;**

(d)  alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Act** alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)  alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f)    for failure to fund a **Plan** in accordance with **Employee Benefit Law** or the **Plan** Instrument, or the failure to collect contributions owed to the Plan; except that this exclusion shall not apply to Defense Costs;

(g)    alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a **Fiduciary** or **Administrator** of any plan, fund or program, other than a **Plan** as defined in this policy, or by reason of his, her or its status as a **Fiduciary** or **Administrator** of such other plan, fund or program;

(h)    for bodily injury, sickness, disease, or death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof; except that this exclusion shall not apply to **Defense Costs** incurred in the defense of a **Claim** for Breach of Fiduciary Duty;

(i)    alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Sponsor Organization** did not sponsor such **Plan** or when the **Natural Person Insured** was not a **Fiduciary, Administrator,** trustee, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the **Sponsor Organization** or if applicable, a **Plan;**

(j)    alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly: (1) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants;** or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants;** provided, however, that this exclusion shall not apply to non–**Indemnifiable Loss** arising from a **Claim** alleging damage to a **Plan,** other than non–**Indemnifiable Loss** constituting **Cleanup Costs;**

6.    LIMIT OF LIABILITY  (FOR ALL LOSS – INCLUDING DEFENSE COSTS)

The **Limit of Liability** stated in Item 3(a) of the Declarations is the limit of the **Insurer's** liability for all **Loss,** including Defense Costs, under this policy arising out of all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** stated in Item 3(b) of the Declarations, if any, shall be an additional **Limit of Liability** for that part of **Loss** constituting **Defense Costs** incurred in connection with all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** for **Defense Costs** stated in Item 3(b) shall be in addition to and not part of the **Limit of Liability** stated in Item 3(a) of the Declarations.  **Loss** constituting **Defense Costs** shall first reduce the additional **Limit of Liability** stated in Item 3(b). Should the **Limit of Liability** stated in Item 3(b) of the Declarations become exhausted, or should the **Limit of Liability** stated in Item 3(b) of the Declarations be stated as "none", then subsequent **Defense Costs** will reduce the **Limit of Liability** stated in Item 3(a).

The **Sublimit of Liability** set forth in Item 3(c) of the Declarations shall be part of and not in addition to the **Limit of Liability** set forth in Item 3(a).

The **Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Limit of Liability** for the **Policy Period.**  Further, any **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable), which pursuant to Clause 8(b) or 8(c) is considered made during the **Policy Period** or **Discovery Period,** shall also be subject to the aggregate Limit(s) of **Liability** stated in Item 3 of the Declarations.

**Defense Costs,** whether incurred under Clause 2(a), (b) or (c) of this policy, are not payable by the **Insurer** in addition to the **Limit of Liability;** except that the separate limit, if any, listed in Item 3(b) of the Declarations shall be in addition to the aggregate **Limit of Liability** stated in Item 3(a) of the Declarations.  **Defense Costs** are part of **Loss** and as such are subject to the **Limit of Liability** for **Loss.**



In the event the Insurer is operating under a duty to defend pursuant to Clause 2(a) of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. Upon the written request of the Named Sponsor, the Insurer may consent to a different Panel Counsel Firm selected by the Named Sponsor to defend the Insureds, which consent shall not be unreasonably withheld.

In the event the Insureds have assumed the defense of the Claim pursuant to Clause 2(b) of the policy, then the Insureds shall select a Panel Counsel Firm to defend the Insured. In addition, with the express prior written consent of the Insurer, which consent shall not be unreasonably withheld, the Insured may select a Panel Counsel Firm different from that selected by other Insureds if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The selection of a Panel Counsel Firm from the attached list to defend the Claim against the Insureds shall not be restricted to the jurisdiction in which the Claim is brought.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Sponsor. At the request of the Named Sponsor, the Insurer may in its discretion add one or more law firms to the attached list of Panel Counsel Firms for the purposes of defending the Claim made against the Insureds. The list of Panel Counsel Firms may also be amended to add, at the sole discretion of the Insurer, a non–Panel Counsel Firm for the purpose of acting as "local counsel" to assist an existing Panel Counsel Firm, which Panel Counsel Firm will act as "lead counsel" in conducting the defense of the Claim, for Claims brought in a jurisdiction in which the chosen Panel Counsel Firm does not maintain an office.

10.  **DISCOVERY CLAUSE**

Except as indicated below, if the Named Sponsor shall cancel or the Named Sponsor or the Insurer shall refuse to renew this policy, the Named Sponsor shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal ("Discovery Period"), upon payment of the respective "Additional Premium Amount" described below, in which to give to the Insurer written notice pursuant to Clauses 8(a) and 8(c) of the policy of: (i) Claims first made against an Insured; and (ii) circumstances of which the Natural Person Insured or an Insured shall become aware, in either case during said Discovery Period and solely with respect to a Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy.

The **Additional Premium Amount** for: (1) one year shall be no more than 75% of the **Full Annual Premium**; (2) two years shall be no more than 150% of the **Full Annual Premium**; and (3) three years shall be no more than 225% of the **Full Annual Premium**. As used herein, "Full Annual Premium" means the premium level in effect immediately prior to the end of the **Policy Period**.

Notwithstanding the first paragraph of Clause 6, if the Named Sponsor shall cancel or the Insurer or the Named Sponsor shall refuse to renew this policy, then the Named Sponsor shall also have the right to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the end of the Policy Period) with an aggregate limit of liability applicable to Claims made against the Insured during such Discovery Period which is in addition to, and not part of, the applicable Limit of Liability set forth in Item 3 of the Declarations. The Insurer shall quote such a Discovery Period pursuant to such terms, conditions, exclusions and additional premium as it deems appropriate in its sole and absolute discretion.

In the event of a **Transaction**, as defined in Clause 12(a), the **Named Sponsor** shall have the right to request an offer from the **Insurer** of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period**, together with any additional premium due, is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

11.  **CANCELLATION CLAUSE**

This policy may be canceled by the **Named Sponsor** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent. This policy may only be canceled by or on behalf of the **Insurer** in the event of non-payment of premium by the **Named Sponsor**. In the event of non-payment of premium by the **Named Sponsor**, the **Insurer** may cancel this policy by delivering to the **Named Sponsor** or by mailing to the **Named Sponsor**, by registered, certified, or other first class mail, at the **Named Sponsor**'s address as shown in Item 1 of the Declarations, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy shall be canceled by the **Named Sponsor**, the **Insurer** shall retain the customary short rate proportion of the premium herein. If the period of limitation relating to the giving of notice as set forth in this Clause 11 is also set forth in any law controlling the construction thereof, then such period shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

12.  **ORGANIZATIONAL CHANGES**

(a)  If during the **Policy Period**:

   (1)  the **Named Sponsor** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   (2)  any person or entity or group of persons or entities acting in concert shall acquire **Management Control of the Named Sponsor**;

(any of such events being a "Transaction"), then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and the entire premium for this policy shall be deemed earned as of such time. The **Named Sponsor** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 10 of this policy.

(b) *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Sponsor Organization** and/or any **Insured** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Sponsor Organization** became a **Sponsor Organization** and such **Insured** became an **Insured**, and prior to the effective time that such **Sponsor Organization** ceases to be a **Sponsor Organization** or such **Insured** ceases to be an **Insured**.

With regard to any **Plan** that was sold, spun-off or terminated either prior to the inception date of this policy or during the **Policy Period**, this policy shall apply but solely with respect to a **Wrongful Act(s)** that occurred prior to the date of such sale or spin-off, or prior to the date that the **Sponsor Organization** or **Natural Person Insured** ceases to be a **Fiduciary** or **Administrator** of, a sold or spun-off **Plan**, or in the case of a terminated **Plan**, prior to the final date of asset distribution of such **Plan**, provided that notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**.

## 13. SUBROGATION AND WAIVER OF RECOURSE

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery thereof, and the **Insureds** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of the **Insureds**. In no event shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless such **Insured** has been convicted of a criminal act, or been determined to have in fact committed a deliberate fraudulent act or knowingly or willingly violated any statute, rule or law (including but not limited to **Employee Benefit Law**), or been determined to have in fact obtained any profit or advantage to which such **Insured** was not legally entitled.

In the event this policy has been purchased by an **Insured** other than a **Plan**, the **Insurer** shall have no right of recourse against an **Insured**. Notwithstanding the foregoing, the **Insurer** shall have a right of recourse against an **Insured** arising out of a **Claim** by an **Insured** against another **Insured** unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, assistance of or active participation by the **Insured** claimed against.

It is further provided that in the event of any recovery under this Clause 13, the **Limit of Liability** of this policy shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the **Insurer** in connection therewith.

## 14. OTHER INSURANCE

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the **Limit of Liability** provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

## 15. NOTICE AND AUTHORITY

It is agreed that the **Named Sponsor** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of **Claim**, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right under Clause 2(b) or Clause 10 of this policy.

16. **ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

17. **ACTION AGAINST INSURER**

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against any Insured to determine the Insured's liability, nor shall the Insurer be impleaded by any Insured or his or her spouse or Domestic Partner or his, her or its legal representatives. Bankruptcy or insolvency of any Insured or of his, her or its estate shall not relieve the Insurer of any of its obligations hereunder.

18. **SPOUSAL, DOMESTIC PARTNER AND LEGAL REPRESENTATIVE EXTENSION**

If a Claim against a Natural Person Insured includes a Claim against: (i) the lawful spouse or Domestic Partner of such Natural Person Insured; or (ii) a property interest of such spouse or Domestic Partner, and such Claim arises from any actual or alleged Wrongful Act of such Natural Person Insured, this policy shall cover Loss arising from the Claim made against that spouse or Domestic Partner or the property of that spouse or Domestic Partner to the extent that such Loss does not arise from a Claim for any actual or alleged act, error or omission of such spouse or Domestic Partner. This policy shall cover Loss arising from a Claim made against the estate, heirs, or legal representatives of any deceased Natural Person Insured, and the legal representatives of any Natural Person Insured, in the event of incompetency, insolvency or bankruptcy, who was a Natural Person Insured at the time the Wrongful Act(s) upon which the Claim is based was committed.

19. **HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.