# EXHIBIT B

# American International Companies

### Employee Benefit Plan Fiduciary Liability Insurance

POLICY NUMBER: *495-38-35*
RENEWAL OF: *874-44-03*

| | |
|---|---|
| ☐ AIU Insurance Company | ☐ Granite State Insurance Company |
| ☐ American Home Assurance Company | ☐ Illinois National Insurance Company |
| ☐ American International Pacific Insurance Company | ☐ National Union Fire Insurance Company of Louisiana |
| ☐ American International South Insurance Company | ☒ National Union Fire Insurance Co. of Pittsburgh, Pa. |
| ☐ Birmingham Fire Insurance Company of Pennsylvania | ☐ New Hampshire Insurance Company |

(each of the above being a capital stock company)

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: EXCEPT AS SET FORTH IN ITEM 3(b) OF THE DECLARATIONS, THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER HAS THE DUTY TO DEFEND; HOWEVER, THE INSURED MAY ELECT TO ASSUME THE DUTY TO DEFEND. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

**NOTICE: TERMS APPEARING IN BOLD FACE TYPE HAVE SPECIAL MEANING. SEE CLAUSE 3 OF THE POLICY.**

### DECLARATIONS

| ITEMS | |
|---|---|
| | (herein **Named Sponsor**") |
| 1 | **NAMED SPONSOR:** *ULLICO INC. AND ITS SUBSIDIARIES* |
| 1(a) | **MAILING ADDRESS:** *111 MASSACHUSETTS AVE NW WASHINGTON, DC 20001* |
| 1(b) | **SUBSIDIARY COVERAGE:**   Any past, present or future **Subsidiary** of the **Named Sponsor** |
| 1(c) | **PLAN COVERAGE:**   Any past, present or future **Plan** |
| 2 | **POLICY PERIOD:**   From: *October 30, 2002*   To: *October 30, 2003* 12:01 A.M. standard time at the address stated in Item 1(a) of the Declarations. |
| 3(a) | **POLICY AGGREGATE LIMIT OF LIABILITY (herein "Limit of Liability")** For all **Loss**, in the aggregate, under this policy including **Defense Costs** (other than **Defense Costs** (if any) set forth in Item 3(b) of the Declarations): *$5,000,000* |

*138200*

| ITEMS (Continued) | |
|---|---|
| 3(b) | **ADDITIONAL LIMIT OF LIABILITY FOR DEFENSE COSTS:** *$0* |
| 3(c) | **SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS**<br>For all **Voluntary Compliance Loss**, in the aggregate, ☐ See endorsement #<br>under this policy including **Defense Expenses**  ☒ None<br><br>This Sublimit of Liability shall be part of and not in addition to the **Policy Aggregate Limit of Liability** set forth in Item 3(a) of the Declarations. |
| 4 | **RETENTION:**   Not applicable to: (i) non-**Indemnifiable Loss** of a Natural Person Insured (ii) judgments and settlements (all Coverages); and (iii) **Voluntary Compliance Loss** |
| 4(a) | **Defense Costs:** *$50,000*<br>☐ None |
| 5 | **CONTINUITY DATE:** *October 30, 1998* |
| 6 | **PREMIUM:**        *$40,000* |
| 7 | **NAME AND ADDRESS OF INSURER** (herein "**Insurer**"):<br>*National Union Fire Insurance Company of Pittsburgh, Pa.*<br>*175 Water Street*<br>*New York, NY 10038*<br><br>This policy is issued only by the insurance company indicated in this Item 7. |

*138200*

77893 (3/01)   *COPY*                    2

**IN WITNESS WHEREOF**, the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_

SECRETARY

PRESIDENT

AUTHORIZED REPRESENTATIVE

COUNTERSIGNATURE DATE                COUNTERSIGNED AT

ARC EXCESS & SURPLUS INC
1122 FRANKLIN AVENUE, 3RD FL
GARDEN CITY, NY 11530

138200

77893 (3/01)    **COPY**

American International Companies

**Employee Benefit Plan Fiduciary Liability Insurance**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including any attachments and any materials incorporated therein which form a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

    (a)  Solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** against an **Insured** for any actual or alleged **Wrongful Act** by any such **Insured** (or by any employee for whom such **Insured** is legally responsible).

    (b)  Solely with respect to **CAP Penalties** and **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Fiduciary Correction Loss** incurred by an **Insured**, during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** during the **Policy Period** or the **Discovery Period** (if applicable) or within thirty (30) days after the end of the **Policy Period** or the **Discovery Period** (if applicable), and subject to the other terms, conditions and limitations of this policy, this policy shall:

    (i)   pay the **CAP Penalties** and **Delinquent Filer Penalties**; and
    (ii)  reimburse the **Voluntary Fiduciary Correction Loss**,

    of each and every **Insured**, collectively not to exceed the amount of the **Sublimit of Liability** set forth in Item 3(c) of the Declarations; provided that the **Insured** shall select a **Panel Counsel Firm** as provided in Clause 9 of the policy.

The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that a **Voluntary Compliance Loss** results in a **Claim**.

2. **DEFENSE AGREEMENT**

    (a)  **INSURER'S DUTY TO DEFEND**

    Except as hereinafter stated, the **Insurer** shall have both the right and duty to defend any **Claim** against an **Insured** alleging a **Wrongful Act**, even if such **Claim** is groundless, false or fraudulent.

    The **Insured** shall have the right to effectively associate with the **Insurer** in the defense of any **Claim**, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 2. The **Insurer** shall not, however, be obligated to defend any **Claim** after either: (1) the **Limit of Liability** and any additional **Defense Costs** (if any) indicated in Item 3(b) of the Declarations have been exhausted; or (2) after the rejection of a settlement offer, pursuant to the terms of subparagraph (c) of this Clause 2.

    (b)  **INSURED'S OPTION TO ASSUME DEFENSE**

    Notwithstanding the above, the **Insureds** shall have the right to assume the defense of any **Claim** made against them. This right shall be exercised in writing by the **Named Sponsor** on the behalf of all **Insureds** within sixty (60) days of the reporting of the **Claim** to the **Insurer** pursuant to Clause 8 of the policy. Upon receipt of such

written request, the **Insurer** shall tender the defense of the **Claim** to the **Insureds**. Once the defense has been so tendered, the **Insurer** cannot re-assume the defense of the **Claim**. The **Insurer** shall have the right to effectively associate with the **Insureds** in the defense of any **Claim**, including but not limited to negotiating a settlement. Provided that the **Insurer** shall be permitted to effectively associate with the **Insureds** in the defense of any **Claim**, including but not limited to negotiating a settlement of any **Claim**, the **Insurer's** consent to settlements, stipulated judgments and **Defense Costs** shall not be unreasonably withheld.

(c)   **GENERAL PROVISIONS (applicable to both (a) and (b) above)**

The **Insurer** shall advance **Defense Costs** prior to the final disposition of a **Claim**, subject to the other provisions of this policy. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests, in the event and to the extent that the **Insureds** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

The **Insured(s)** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to in writing by the **Insurer** shall be recoverable as **Loss** under the terms of this policy.

The **Insured(s)** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require. The **Insurer** may make any settlement of any **Claim** it deems expedient with respect to any **Insured**, subject to such **Insured's** written consent. If any **Insured** withholds consent to such settlement, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed the amount for which the **Insurer** could have settled such **Claim**, plus **Defense Costs** incurred as of the date such settlement was proposed in writing by the **Insurer**. Further, in the event the **Insurer** is defending the **Claim** pursuant to Clause 2(a) above, then the **Insurer** shall tender the **Claim** to the **Insureds** who shall thereafter at their own expense and on their own behalf negotiate and defend such **Claim** independently of the **Insurer**.

Selection of counsel to defend the **Claim** made against the **Insureds** shall be governed by Clause 9 of the policy (if applicable).

3.   **DEFINITIONS**

"**Administrator**" means an **Insured** with respect to any **Wrongful Act** described in subparagraph (2) of the Definition of **Wrongful Act**.

"**Benefits**" means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

"**Breach of Fiduciary Duty**" means a violation of the responsibilities, obligations or duties imposed upon **Insureds** by ERISA.

"**Cafeteria Plan**" means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

"**CAP Penalties**" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the Internal Revenue Service (IRS) pursuant to a written agreement to correct an inadvertent **Plan** defect under an Employee Plans Compliance Resolution System, provided that such agreement to

correct such **Plan** defect was entered into in writing by the **Insured** with the IRS during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

"**Claim**" means:

   (1)  a written demand for monetary, non-monetary or injunctive relief; or
   (2)  a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:
       (i)  service of a complaint or similar pleading; or
      (ii)  return of an indictment, information or similar document (in the case of a criminal proceeding); or
     (iii)  receipt or filing of a notice of charges; or
   (3)  a formal agency or regulatory adjudicative proceeding to which an **Insured** is subject; or
   (4)  any fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency which is located outside of the United States.

"**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

"**Consulting Fees**" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs or expenses associated with: (i) a **Plan** audit; or (ii) identifying, finding or assessing such **Breach of Fiduciary Duty**.

"**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to in writing by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**, whether incurred under Clause 2(a), (b) or (c) of this policy, but excluding any compensation of **Natural Person Insureds** or employees of an **Insured**.

"**Defense Expenses**" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the **Insurer** resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs and expenses associated with finding or assessing such **Breach of Fiduciary Duty** and any compensation of **Natural Person Insureds** or employees of an **Insured**.

"**Delinquent Filer Penalties**" means penalties assessed by the U.S. Department of Labor or the IRS under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

"**Dependent Care Assistance Program**" means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

"**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Named Sponsor** or any **Subsidiary**.

"**Employee Benefit Law**" means ERISA or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a **Plan** is subject. Except to the extent set forth in subparagraph (2) of the Definition of **Wrongful Act**, **Employee Benefit Law** shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

"**ESOP**" means any employee stock ownership plan as defined in ERISA, or any other **Plan** under which investments are made primarily in securities of the **Sponsor Organization** or whose assets at any time within twelve months prior to the inception date of this policy were comprised of 20% or more of securities of the **Sponsor Organization**.

"**Fiduciary**" means a fiduciary as defined in an **Employee Benefit Law** (if applicable), with respect to a **Plan**, or a person or entity who exercises discretionary control as respects the management of a **Plan** or the disposition of its assets.

"**Foreign Jurisdiction**" means any jurisdiction, other than the United States or any of its territories or possessions.

"**Foreign Policy**" means the **Insured's** or any other member company of American International Group, Inc.'s (AIG) standard fiduciary or pension trust liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a **Foreign Jurisdiction**, that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then **Foreign Policy** means the standard policy most recently registered in the local language of the **Foreign Jurisdiction**, or if no such policy has been registered, then the policy most recently registered in that **Foreign Jurisdiction**. The term **Foreign Policy** shall not include any directors and officers, partnership, managerial, comprehensive general liability, employment practices liability or professional liability coverage.

"**Fringe Benefit**" means any plan or benefit described in Section 132 of the Internal Revenue Code of 1986, as amended.

"**Indemnifiable Loss**" means Loss for which the **Sponsor Organization** has indemnified or is permitted or required to indemnify any natural person **Insured**.

"**Insured(s)**" means:

    (1)  any **Natural Person Insured**;
    (2)  any **Plan(s)**;
    (3)  the **Sponsor Organization**; and
    (4)  any other person or entity in his, her or its capacity as a **Fiduciary, Administrator** or trustee of a **Plan** and included in the Definition of **Insured** by specific written endorsement attached to this policy.

"**Loss**" means damages, judgments (including pre/post-judgment interest on a covered judgment), settlements and **Defense Costs**; however, **Loss** shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in Item 3(c) of the Declarations page for **Voluntary Compliance Loss**, (ii) **UK Fines and Penalties**, (iii) the five percent or less civil penalty imposed upon an **Insured** under Section 502(i) of ERISA, and (iv) the 20 percent or less penalty imposed upon an **Insured** under Section 502(l) of ERISA, with respect to covered settlements or judgments; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (5) **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of a **Natural Person Insured**; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Where permitted by law, **Loss** shall include punitive or exemplary damages imposed upon any **Insured** (subject to the policy s other terms, conditions and exclusions, including but not limited to exclusions relating to profit, deliberate fraud or criminal acts and knowing or willful violation of any statute, rule or law, including but not limited to **Employee Benefit Law**).

**Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (1)–(6) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall include **Voluntary Compliance Loss**.

"**Management Control**" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; the general partners of a limited partnership; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the **Named Sponsor**, to elect, appoint or designate a majority of the Board of Directors of a corporation, the management committee of a joint venture, the general partners of a limited partnership, or the management board of a limited liability company.

"**Natural Person Insured**" means any:

(1) past, present or future natural person director, officer, governor, general partner, management committee member, member of the board of managers or employee of a **Sponsor Organization** or if applicable, of a **Plan**, and as to all of the above in his or her capacity as a **Fiduciary**, **Administrator** or trustee of a **Plan**; or

(2) past, present or future natural person in a position equivalent to a position listed in subparagraph (1) of this Definition in the event that the **Sponsor Organization** is operating in a **Foreign Jurisdiction**.

"**Non-qualified Plan**" means any of the following plans for a select group of management or highly compensated directors, officers and/or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan.

"**Pension Plan**" means a pension plan as defined in any **Employee Benefit Law**.

"**Plan**" means automatically, any qualified plan, fund, trust or program (including, but not limited to, any **Pension Plan**, **Welfare Plan**, **Cafeteria Plan**, **Dependent Care Assistance Program**, **Fringe Benefit**, and **VEBA**) or **Non-qualified Plan**, established anywhere in the world, which was, is or shall be sponsored solely by the **Sponsor Organization**, or sponsored jointly by the **Sponsor Organization** and a labor organization, solely for the benefit of the employees and/or the directors, officers, governors, management committee members, members of the board of managers or natural person general partners of the **Sponsor Organization**, subject to the following provisions:

(1) if such **Plan** is a **Pension Plan(s)**, other than an **ESOP**, stock option plan or **Pension Plan** described in subparagraphs (5)(a) and 5(b) below, then the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** prior to the inception date of this policy, unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal;

(2) if such **Plan** was sold, spun-off or terminated prior to the inception date of this policy the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the inception date of this policy, unless such sale, spin-off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this policy is a continuous renewal;

(3) if such **Plan** is sold, spun-off or terminated during the **Policy Period**, the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the end of the **Policy Period**;

(4) if such **Plan** is an **ESOP** or stock option plan, the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal and such **Plan** is added to the Definition of **Plan** by specific written endorsement attached to this policy; or

(5) if such **Plan** is a **Pension Plan** (other than an **ESOP**, or stock option plan) and:

    (a) is acquired during the **Policy Period** as a result of the **Sponsor Organization's** acquisition of a **Subsidiary** whose assets total more than 25% of the total consolidated assets of the **Sponsor Organization** as of the inception date of this policy; or

    (b) is acquired during the **Policy Period** and such **Plan's** assets total more than 25% of the total consolidated assets of all covered **Pension Plans** as of the inception date of this policy,

then, this policy shall apply to such **Plan** (but solely with respect to a **Wrongful Act(s)** occurring after the date of such acquisition), but only upon the condition that within 90 days of its acquisition, the **Named Sponsor** shall have provided the Insurer with a completed application for such new **Plan** and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new **Plan**. The 90 day reporting condition shall not apply if such new **Plan** does not constitute one of the five largest **Pension Plans** of the **Sponsor Organization** and the failure to report such **Plan** within the 90 day reporting period was due to inadvertent omission by the **Named Sponsor** and upon discovery of such **Plan**, the **Named Sponsor** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

The Definition of **Plan** shall also include: (i) the following government-mandated programs: unemployment insurance, Social Security, or disability benefits, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the Definition of **Wrongful Act** in this policy; (ii) any **Pension Plan** (other than an **ESOP** or stock option plan) considered or created by the **Sponsor Organization** during the **Policy Period**; or (iii) any other plan, fund or program, which is included in the Definition of **Plan** by specific written endorsement attached to this policy.

In no event, however, shall the Definition of **Plan** include any multiemployer plan as defined in **Employee Benefit Law**.

"**Policy Period**" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

"**Pollutants**" include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

"**Sponsor Organization**" means the **Named Sponsor** designated in Item 1 of the Declarations and any **Subsidiary** thereof; and, in the event any bankruptcy proceeding shall be instituted by or against the **Named Sponsor** or any **Subsidiary** thereof, the resulting debtor in possession (or equivalent status outside the United States), if any.

"**Subsidiary**" means any past, present or future: (1) for-profit entity of which the **Named Sponsor** has **Management Control** either directly or indirectly through one or more other **Subsidiaries**; and (2) not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the **Named Sponsor**. The term **Subsidiary** shall automatically apply to any new **Subsidiary** acquired or created during the **Policy Period**.

77892 (3/01)    **COPY**                                   6

A for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer maintains **Management Control** of such **Subsidiary**. A not-for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer exclusively sponsors such **Subsidiary**.

"**UK Fines and Penalties**" means civil fines and penalties assessed against an **Insured** by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom or by the Occupational Pensions Regulatory Authority in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of the policy.

"**VEBA**" means a voluntary employees beneficiary association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended and the regulations thereunder, the purpose of which is to provide for life, sickness, accident or other benefits and that is funded solely by the **Sponsor Organization**, and provides benefits for voluntary members who are employees or former employees of the **Sponsor Organization** and/or their beneficiaries.

"**Voluntary Compliance Loss**" means **CAP Penalties**, **Delinquent Filer Penalties** and **Voluntary Fiduciary Correction Loss**.

"**Voluntary Fiduciary Correction Loss**" means damages, **Defense Expenses** and **Consulting Fees** incurred in connection with the U.S. Department of Labor's ("DOL") Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent **Breach of Fiduciary Duty** occurring during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal), provided that such compliance with the DOL'S Voluntary Fiduciary Correction Program results in the **Insured** obtaining a "No Action" letter from the DOL; however, **Voluntary Fiduciary Correction Loss** shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (6) **Benefits**, or that portion of damages equal to such **Benefits**; (7) matters of which the **Insured** had knowledge prior to the inception date of this policy or the first policy issued by the **Insurer** to the **Named Sponsor** of which this policy is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

"**Welfare Plan**" means a welfare plan as defined in **Employee Benefit Law**.

"**Wrongful Act**" means:

(1) as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**; and

(2) as respects an **Administrator**, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:
   (i) counseling employees, participants and beneficiaries; or
   (ii) providing interpretations; or
   (iii) handling of records; or
   (iv) activities affecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**,
   or any matter claimed against an **Insured** solely by reason of his, her or its status as an **Administrator**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**;

(3) as respects a **Natural Person Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any

multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Sponsor Organization** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a **Natural Person Insured**.

4. **WORLDWIDE EXTENSION**

Where legally permissible, this policy shall apply to a **Claim** made against any **Insured** anywhere in the world.

With regard to a **Claim(s)** brought and maintained solely in a **Foreign Jurisdiction** against an **Insured** formed and operating in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claim(s)** those terms and conditions (and related provisions) of the **Foreign Policy** registered with the appropriate regulatory body in such **Foreign Jurisdiction** that are more favorable to such **Insured** than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1, 3–5, 9–13, and 16–19 of this policy and the comparable provisions of the **Foreign Policy**. In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Sponsor**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

5. **EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with a **Claim** made against an **Insured(s)**:

(a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an **Insured** was not legally entitled;

(b) arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law**;

   [The **Wrongful Act** of any **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the foregoing exclusions 5(a) and 5(b).]

(c) for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of **Employee Benefit Law**;

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Act** alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f)    for failure to fund a **Plan** in accordance with **Employee Benefit Law** or the **Plan** instrument, or the failure to collect contributions owed to the **Plan**; except that this exclusion shall not apply to **Defense Costs**;

(g)    alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a Fiduciary or Administrator of any plan, fund or program, other than a **Plan** as defined in this policy, or by reason of his, her or its status as a Fiduciary or Administrator of such other plan, fund or program;

(h)    for bodily injury, sickness, disease, or death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof; except that this exclusion shall not apply to **Defense Costs** incurred in the defense of a **Claim** for Breach of Fiduciary Duty;

(i)    alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Sponsor Organization** did not sponsor such **Plan** or when the **Natural Person Insured** was not a **Fiduciary**, **Administrator**, trustee, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the **Sponsor Organization** or if applicable, a **Plan**;

(j)    alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly: (1) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, that this exclusion shall not apply to non-**Indemnifiable Loss** arising from a **Claim** alleging damage to a **Plan**, other than non-**Indemnifiable Loss** constituting **Cleanup Costs**;

6.   **LIMIT OF LIABILITY  (FOR ALL LOSS – INCLUDING DEFENSE COSTS)**

The **Limit of Liability** stated in Item 3(a) of the Declarations is the limit of the **Insurer's** liability for all **Loss**, including **Defense Costs**, under this policy arising out of all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** stated in Item 3(b) of the Declarations, if any, shall be an additional **Limit of Liability** for that part of **Loss** constituting **Defense Costs** incurred in connection with all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** for **Defense Costs** stated in Item 3(b) shall be in addition to and not part of the **Limit of Liability** stated in Item 3(a) of the Declarations. **Loss** constituting **Defense Costs** shall first reduce the additional **Limit of Liability** stated in Item 3(b). Should the **Limit of Liability** stated in Item 3(b) of the Declarations become exhausted, or should the **Limit of Liability** stated in Item 3(b) of the Declarations be stated as "none", then subsequent **Defense Costs** will reduce the **Limit of Liability** stated in Item 3(a).

The **Sublimit of Liability** set forth in Item 3(c) of the Declarations shall be part of and not in addition to the **Limit of Liability** set forth in Item 3(a).

The **Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Limit of Liability** for the **Policy Period**. Further, any **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable), which pursuant to Clause 8(b) or 8(c) is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the aggregate **Limit(s)** of **Liability** stated in Item 3 of the Declarations.

**Defense Costs**, whether incurred under Clause 2(a), (b) or (c) of this policy, are not payable by the **Insurer** in addition to the **Limit of Liability**; except that the separate limit, if any, listed in Item 3(b) of the Declarations shall be in addition to the aggregate **Limit of Liability** stated in Item 3(a) of the Declarations. **Defense Costs** are part of **Loss** and as such are subject to the **Limit of Liability** for **Loss**.

77892 (3/01)   *COPY*                              9

7. **RETENTION CLAUSE**

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the Retention amount stated in Item 4 of the Declarations, such Retention amount to be borne by the **Insured** and shall remain uninsured, with regard to all **Defense Costs** other than: (1) non-**Indemnifiable Loss** of a **Natural Person Insured**; and (2) **Voluntary Compliance Loss**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

8. **NOTICE/CLAIM REPORTING PROVISIONS**

Notice hereunder shall be given in writing to the **Insurer** named in Item 7 of the Declarations at the address indicated in Item 7 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

(a) The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of a **Claim** made against an **Insured** as soon as practicable after the **Named Sponsor**'s risk manager or general counsel (or if no such position exists, then such equivalent position) first becomes aware of the **Claim**, but in all events no later than either:

   (1) the end of the **Policy Period** or during the **Discovery Period** (if applicable); or

   (2) within thirty (30) days after the end of the **Policy Period** or the **Discovery Period** (if applicable), as long as such **Claim** was first made against an **Insured** within the final thirty (30) days of the **Policy Period** or the **Discovery Period** (if applicable).

(b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 8(a) above, then a **Claim** which is subsequently made against an **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, shall be considered related to the first **Claim** and made at the time such notice was given.

(c) If during the **Policy Period** or during the **Discovery Period** (if applicable) the **Sponsor Organization** or an **Insured(s)** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then a **Claim** which is subsequently made against such **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

9. **PRE-AUTHORIZED DEFENSE ATTORNEYS**

This Clause 9 applies only to: (1) a **Claim** brought by any government entity; (2) a request for coverage for a **Voluntary Compliance Loss**; or (3) a **Claim** brought in the form of a class or representative action.

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("Panel Counsel Firm(s)") from which a selection of legal counsel shall be made to conduct the defense of any **Claim** against an **Insured** to which this Clause 9 applies and pursuant to the terms set forth below:

In the event the **Insurer** is operating under a duty to defend pursuant to Clause 2(a) of this policy, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. Upon the written request of the **Named Sponsor**, the **Insurer** may consent to a different **Panel Counsel Firm** selected by the **Named Sponsor** to defend the **Insureds**, which consent shall not be unreasonably withheld.

In the event the **Insureds** have assumed the defense of the **Claim** pursuant to Clause 2(b) of the policy, then the **Insureds** shall select a **Panel Counsel Firm** to defend the **Insured**. In addition, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, the **Insured** may select a **Panel Counsel Firm** different from that selected by other **Insureds** if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The selection of a **Panel Counsel Firm** from the attached list to defend the **Claim** against the **Insureds** shall not be restricted to the jurisdiction in which the **Claim** is brought.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made to the specific list attached to this policy during the **Policy Period** without the consent of the **Named Sponsor**. At the request of the **Named Sponsor**, the **Insurer** may in its discretion add one or more law firms to the attached list of **Panel Counsel Firms** for the purposes of defending the **Claim** made against the **Insureds**. The list of **Panel Counsel Firms** may also be amended to add, at the sole discretion of the **Insurer**, a non–**Panel Counsel Firm** for the purpose of acting as "local counsel" to assist an existing **Panel Counsel Firm**, which **Panel Counsel Firm** will act as "lead counsel" in conducting the defense of the **Claim**, for **Claims** brought in a jurisdiction in which the chosen **Panel Counsel Firm** does not maintain an office.

## 10.  DISCOVERY CLAUSE

Except as indicated below, if the **Named Sponsor** shall cancel or the **Named Sponsor** or the **Insurer** shall refuse to renew this policy, the **Named Sponsor** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal ("**Discovery Period**"), upon payment of the respective "**Additional Premium Amount**" described below, in which to give to the **Insurer** written notice pursuant to Clauses 8(a) and 8(c) of the policy of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which the **Natural Person Insured** or an **Insured** shall become aware, in either case during said **Discovery Period** and solely with respect to a **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.

The **Additional Premium Amount** for: (1) one year shall be no more than 75% of the **Full Annual Premium**; (2) two years shall be no more than 150% of the **Full Annual Premium**; and (3) three years shall be no more than 225% of the **Full Annual Premium**. As used herein, "**Full Annual Premium**" means the premium level in effect immediately prior to the end of the **Policy Period**.

Notwithstanding the first paragraph of Clause 6, if the **Named Sponsor** shall cancel or the **Insurer** or the **Named Sponsor** shall refuse to renew this policy, then the **Named Sponsor** shall also have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the end of the **Policy Period**) with an aggregate limit of liability applicable to **Claims** made against the **Insured** during such **Discovery Period** which is in addition to, and not part of, the applicable **Limit of Liability** set forth in Item 3 of the Declarations. The **Insurer** shall quote such a **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as it deems appropriate in its sole and absolute discretion.

In the event of a **Transaction**, as defined in Clause 12(a), the **Named Sponsor** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period**, together with any additional premium due, is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the **Named Sponsor** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent. This policy may only be canceled by or on behalf of the **Insurer** in the event of non-payment of premium by the **Named Sponsor**. In the event of non-payment of premium by the **Named Sponsor**, the **Insurer** may cancel this policy by delivering to the **Named Sponsor** or by mailing to the **Named Sponsor**, by registered, certified, or other first class mail, at the **Named Sponsor's** address as shown in Item 1 of the Declarations, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy shall be canceled by the **Named Sponsor**, the **Insurer** shall retain the customary short rate proportion of the premium herein. If the period of limitation relating to the giving of notice as set forth in this Clause 11 is also set forth in any law controlling the construction thereof, then such period shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

## 12. ORGANIZATIONAL CHANGES

(a) If during the **Policy Period**:

    (1) the **Named Sponsor** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

    (2) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Sponsor**;

(any of such events being a "**Transaction**"), then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and the entire premium for this policy shall be deemed earned as of such time. The **Named Sponsor** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 10 of this policy.

(b) *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Sponsor Organization** and/or any **Insured** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Sponsor Organization** became a **Sponsor Organization** and such **Insured** became an **Insured**, and prior to the effective time that *such* **Sponsor Organization** ceases to be a **Sponsor Organization** or such **Insured** ceases to be an **Insured**.

With regard to any **Plan** that was sold, spun-off or terminated either prior to the inception date of this policy or during the **Policy Period**, this policy shall apply but solely with respect to a **Wrongful Act(s)** that occurred prior to the date of such sale or spin-off, or prior to the date that the **Sponsor Organization** or **Natural Person Insured** ceases to be a **Fiduciary** or **Administrator** of, a sold or spun-off **Plan**, or in the case of a terminated **Plan**, prior to the final date of asset distribution of such **Plan**, provided that notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**.

13. **SUBROGATION AND WAIVER OF RECOURSE**

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery thereof, and the **Insureds** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of the **Insureds**. In no event shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless such **Insured** has been convicted of a criminal act, or been determined to have in fact committed a deliberate fraudulent act or knowingly or willingly violated any statute, rule or law (including but not limited to **Employee Benefit Law**), or been determined to have in fact obtained any profit or advantage to which such **Insured** was not legally entitled.

In the event this policy has been purchased by an **Insured** other than a **Plan**, the **Insurer** shall have no right of recourse against an **Insured**. Notwithstanding the foregoing, the **Insurer** shall have a right of recourse against an **Insured** arising out of a **Claim** by an **Insured** against another **Insured** unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, assistance of or active participation by the **Insured** claimed against.

It is further provided that in the event of any recovery under this Clause 13, the **Limit of Liability** of this policy shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the **Insurer** in connection therewith.

14. **OTHER INSURANCE**

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the **Limit of Liability** provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

15. **NOTICE AND AUTHORITY**

It is agreed that the **Named Sponsor** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of **Claim**, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right under Clause 2(b) or Clause 10 of this policy.

**16. ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

**17. ACTION AGAINST INSURER**

No action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial or by written agreement of the **Insureds**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against any **Insured** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by any **Insured** or his or her spouse or **Domestic Partner** or his, her or its legal representatives. Bankruptcy or insolvency of any **Insured** or of his, her or its estate shall not relieve the **Insurer** of any of its obligations hereunder.

**18. SPOUSAL, DOMESTIC PARTNER AND LEGAL REPRESENTATIVE EXTENSION**

If a **Claim** against a **Natural Person Insured** includes a **Claim** against: (i) the lawful spouse **or Domestic Partner** of such **Natural Person Insured**; or (ii) a property interest of such spouse or **Domestic Partner**, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Natural Person Insured**, this policy shall cover **Loss** arising from the **Claim** made against that spouse or **Domestic Partner** or the property of that spouse or **Domestic Partner** to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse or **Domestic Partner**. This policy shall cover **Loss** arising from a **Claim** made against the estate, heirs, or legal representatives of any deceased **Natural Person Insured**, and the legal representatives of any **Natural Person Insured**, in the event of incompetency, insolvency or bankruptcy, who was a **Natural Person Insured** at the time the **Wrongful Act(s)** upon which the **Claim** is based was committed.

**19. HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

# APPENDIX A

## PANEL COUNSEL
## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

- 1 -

### ARIZONA

Snell & Wilmer
One Arizona Center
Phoenix, AZ 85004-0001
Primary Contact:
Katherine M. Harmeyer (602) 382-6357

### CALIFORNIA

Lillick & Charles, L.L.P.
Two Embarcadero Center, Suite 2700
San Francisco, CA 94111
Primary Contact:
D. Ward Kallstrom (415) 984-8282

Pillsbury Madison & Sutro, L.L.P.
235 Montgomery Street
P.O. Box 7880
San Francisco, CA 94120
Primary Contact:
Robert A. Gordon (415) 983-1782

Sedgwick, Detert, Moran & Arnold
One Embarcadero Center, 16th Floor
San Francisco, CA 94111-3765
Primary Contact:
Julia A. Molander (415) 627-1424

### DISTRICT OF COLUMBIA

Arent, Fox, Kintner, Plotkin & Kahn
1050 Connecticut Avenue, NW
Washington, DC 20036-5339
Primary Contact:
Carol Connor Flowe (202) 857-6054

Arnold & Porter
555 12th Street, NW
Washington, DC 20004-1206
Primary Contact:
Scott B. Schreiber (202) 942-5000

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
Primary Contact:
William J. Kilberg, P.C. (202) 955-8573

Groom and Nordberg
1701 Pennsylvania Avenue, NW, Suite 1200
Washington, DC 20006
Primary Contact:
Robert Gallagher (202) 857-0620

Kilpatrick Stockton L.L.P.
700 13th Street, NW, Suite 800
Washington, DC 20005-5923
Primary Contact:
Steven J. Sacher (202) 508-5840

O'Melveny & Myers LLP
555 13th Street, NW, Suite 500 West
Washington, DC 20004-1109
Primary Contact:
Robert N. Eccles (202) 383-5300

Patton Boggs, L.L.P.
2550 M Street, N.W.
Washington, DC 20037
Primary Contact:
Michael A. Curto (202) 457-5611

Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Primary Contact:
Paul J. Ondrasik, Jr. (202) 429-8088

Verner, Liipfert, Bernhard, McPherson & Hand
901 15th Street, NW, Suite 700
Washington, DC 20005
Primary Contact:
Ronald B. Natalie (202) 371-6028

### GEORGIA

Alston & Bird
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309-3424
Primary Contact:
Gregory C. Braden (404) 881-7497

King & Spalding
191 Peachtree Street
Atlanta, GA 30303-1763
Primary Contact:
Lara B. Robinson (404) 572-3567

*COPY*

# APPENDIX A
# PANEL COUNSEL
## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

~ 2 ~

**ILLINOIS**

Baker & McKenzie
130 East Randolph Drive
Chicago, IL 60601
Primary Contact:
Michael A. Pollard, Esq. (312) 861-2786

Mayer, Brown & Platt
190 South La Salle Street
Chicago, IL 60603-3441
Primary Contact:
William A. Gordon (312) 701-7164

McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096
Primary Contact:
Bill Boies, P.C. (312) 984-7686

Seyfarth, Shaw, Fairweather & Geraldson
55 East Monroe, Suite 4200
Chicago, IL 60603
Primary Contact:
Thomas J Piskorski (312) 269-8925

Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street
Chicago, IL 60601
Primary Contact:
Charles B. Wolf (312) 609-7888

**MASSACHUSETTS**

Hale & Dorr LLP
60 State Street
Boston, MA 02109-1803
Primary Contact:
Neil Jacobs (617) 526-6970

Murphy, Hesse, Toomey & Lehane
44 Farnsworth Street
Boston, MA 02210
Primary Contact:
Katherine A. Hesse, CEBS (617) 479-5000

Peabody & Arnold
50 Rowes Wharf
Boston, MA 02110
Primary Contact:
Robert T. Gill, P.C. (617) 951-4706

**LOUISIANA**

McCalla, Thompson, Pyburn, Hymowitz & Shapiro
650 Poydras Street, Suite 2800
New Orleans, LA 70130
Primary Contact:
Howard Shapiro (504) 524-2499

**MAINE**

MMMB Group
22 Free Street, Suite 201
P.O. Box 17594
Portland, ME 04112-8594
Primary Contact:
Stephan G. Bachelder (207) 761-8100

Pierce Atwood
One Monument Square
Portland, ME 04101
Primary Contact:
William J. Kayatta, Jr (207) 791-1238

**MICHIGAN**

Miller, Canfield, Paddock & Stone, PLC
1200 Campau Square Plaza
99 Monroe Avenue, NW
Grand Rapids, MI 49503
Primary Contact:
Charles S. Mishkind (616) 454-8656

**MINNESOTA**

Dorsey & Whitney L.L.P.
Pillsbury Center South
220 South 6th Street, Suite 1300
Minneapolis, MN 55402-1498
Primary Contact:
Stephen P. Lucke (612) 343-7947

Faegre & Benson, LLP
2200 Norwest Center
90 South Seventh Street
Minneapolis, MN 55402
Primary Contact:
Hubert V. Forcier (612) 336-3000

*COPY*

# APPENDIX A
## PANEL COUNSEL
## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

– 3 –

**NORTH CAROLINA**

Poyner & Spruill, LLP
3600 Glenwood Avenue
Raleigh, NC 27612
Primary Contact:
Susanna G. Gibbons (919) 783-6400

**NEW YORK**

Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177-0077
Primary Contact:
Howard Pianko (212) 351-4591

Kramer, Levin, Naftalis & Frankel
919 Third Avenue
New York, NY 10022
Primary Contact:
Michael J. Dell (212) 715-9100

Winthrop, Stimson, Putnam & Roberts
One Battery Park Plaza
New York, NY 10004
Primary Contact:
Susan P. Serota (212) 858-1125

**PENNSYLVANIA**

Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Primary Contact:
Mary McLaughlin (215) 994-2958

Pepper, Hamilton & Scheetz LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2799
Primary Contact:
Susan Katz Hoffman (215) 981-4000

**TEXAS**

Baker & Botts, L.L.P.
910 Louisiana
Houston, TX 77002-4995
Primary Contact:
James R. Raborn (713) 229-1234

Fulbright & Jaworski L.L.P.
1301 McKinney Street, Suite 5100
Houston, TX 77010
Primary Contact:
A.J. Harper II (713) 651-5442

**WASHINGTON**

Perkins Coie
1201 Third Avenue, 40th Floor
Seattle, WA 98101-3099
Primary Contact:
Bruce D. Corker (206) 583-8538

**WISCONSIN**

Reinhart, Boerner, Van Deuren, Norris
& Rieselbach, SC
1000 North Water Street, Suite 2100
P.O. Box 92900
Milwaukee, WI 53202-0900
Primary Contact:
Richard P. Carr (414) 298-8139

*COPY*

**ENDORSEMENT# _1_**

This endorsement, effective _12:01 am_     _October 30, 2002_     forms a part of policy number   _495-38-35_
issued to _ULLICO INC. AND ITS SUBSIDIARIES_

by    _National Union Fire Insurance Company of Pittsburgh, Pa._

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

**WASHINGTON, D.C.**
**CANCELLATION/NONRENEWAL ENDORSEMENT**

In consideration of the premium charged, it is understood and agreed that the cancellation/nonrenewal provisions of this policy are amended to read as follows:

A)    Cancellation

    If this policy has been in effect for thirty (30) days or more, the Insurer may cancel this policy only if one or more of the following reasons apply:

    1)    Insured has refused or failed to pay a premium due under the terms of the policy;

    2)    Insured or Other Insured(s) have made a material and willful misstatement or omission of fact to the Insurer or its employees, agents or brokers in connection with any application to, or claim against the Insurer; or

    3)    Property or other interest of the Insured shall have been transferred to a person other than the Insured or beneficiary, unless the transfer is permissible under the terms of the policy, or unless the property, interest or use thereof shall have materially changed with respect to its insurability.

    The Insurer will mail or deliver to the named Insured notice of cancellation at least thirty (30) days prior to the date of cancellation. For cancellation as described under 2) and 3) above, the Insurer will mail or deliver a copy of the notice to the Superintendent of Insurance at least thirty (30) days before the date of cancellation.

B)    Nonrenewal

    If the Insurer decides not to renew this policy the Insurer will mail or deliver to the named Insured the Insurer's notice of nonrenewal at least thirty (30) days before the end of the policy period.

The Insurer will mail or deliver notice of cancellation or nonrenewal to the agent or broker at least five (5) days prior to the Insurer's mailing of notice to the named Insured.

**END 001**

52 136 (8/95)    *COPY*                    - 1 -

**ENDORSEMENT# _1_**    (continued)

The Notice of cancellation or nonrenewal will be mailed or delivered to Insured's last known address and will include the reason(s) for cancellation or nonrenewal. The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

All other terms, conditions and exclusions shall remain the same.

_____

AUTHORIZED REPRESENTATIVE

**_END 001_**

52136 (8/95)    *COPY*                              – 2 –

**ENDORSEMENT# *2***

This endorsement, effective *12:01 am      October 30, 2002*      forms a part of

policy number    *495-38-35*

issued to   *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**Failure to Effect/Or Maintain Insurance Exclusion**

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** made against any **Insured** alleging, arising out of, based upon, attributable to any failure or omission on the part of the **Insureds** or the **Sponsor Organization** to effect or maintain adequate insurance.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*END 2*

*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

## ENDORSEMENT# *3*

This endorsement, effective *12:01 am*    *October 30, 2002*    forms a part of
policy number    *495-38-35*
issued to    *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### Discovery Amended

In consideration of the premium charged, it is hereby understood and agreed that the policy (and any endorsement amending **Clause 10. DISCOVERY CLAUSE**) is hereby amended to the extent necessary for the policy to provide the following:

1.  **Clause 10. DISCOVERY CLAUSE** is deleted in its entirety and replaced with the following:

    Except as indicated below, if the **Insurer** shall refuse to renew this policy, the **Named Sponsor** shall have the right to a period of one year following the effective date of such nonrenewal (" **Discovery Period**"), upon payment of the respective " **Additional Premium Amount**" described below, in which to give to the **Insurer** written notice pursuant to Clauses 8(a) and 8(c) of the policy of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which the **Natural Person Insured** or an **Insured** shall become aware, in either case during said **Discovery Period** and solely with respect to a **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.

    The **Additional Premium Amount** for one year shall be no more than 200% of the **Full Annual Premium**. As used herein, " **Full Annual Premium**" means the premium level in effect immediately prior to the end of the **Policy Period**.

    In the event of a **Transaction**, as defined in Clause 12(a), the **Named Sponsor** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

    The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period**, together with any additional premium due, is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 3*
                                            ———————————————————
                                            AUTHORIZED REPRESENTATIVE
(2/90)    *COPY*

**ENDORSEMENT# *4***

**This endorsement, effective** *12:01 am    October 30, 2002*    forms a part of
**policy number**   *495-38-35*
**issued to**   *ULLICO INC. AND ITS SUBSIDIARIES*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### TIE-IN OF LIMITS ENDORSEMENT

### (COMMON CLAIM)

In consideration of the premium charged, it is hereby understood and agreed that with respect to any **Claim(s)** alleging the same **Wrongful Act** or related **Wrongful Act(s)**, in which at least one person/entity claimed against is an **Insured** under this policy, and at least one person/entity claimed against is an **Insured** under the Directors, Officer and Private Company Liability Insurance Policy, 4953684 (or any successor or replacement thereof), issued by the **Insurer** to ULLICO INC., the combined limit of liability under both policies for such **Claim(s)** shall be $10,000,000. This limitation shall apply even if both policies have been triggered due to a **Claim** against the same person/entity but alleging **Wrongful Act(s)** both in his/her/its capacity as an **Insured** of ULLICO INC. and as an Insured of the **Sponsor Organization**.

Nothing in this endorsement shall be construed to increase the **Insurer's Limit of Liability** under this policy as stated in Item 3. of the Declarations page, which shall remain $5,000,000.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 4*
*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

*END 3*
*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# *5***

This endorsement, effective *12:01 am    October 30, 2002*    forms a part of
policy number *495-38-35*
issued to   *ULLICO INC. AND ITS SUBSIDIARIES*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SPONSOR ORGANIZATION SECURITIES
### SEPARATE RETENTION

In consideration of the premium charged herein, it is understood and agreed that the policy
is amended as follows:

1. Item 4. of the Declarations is amended by addition of the following at the end thereof:

| | |
|---|---|
| 4(b) | **RETENTION:** Sponsor Organization, Plan, or<br>Natural Person Insured for Indemnifiable Loss: $250,000<br><br>For all **Loss** in connection with any **Claim(s)** made against any<br>**Insured**, including but not limited to any derivative or<br>representative class action, arising out of, based upon,<br>attributable to or in any way related to any securities issued by<br>the **Sponsor Organization** |

2. Clause 7. RETENTION CLAUSE is deleted in its entirety and replaced with the
   following:

   **7.    RETENTION CLAUSE**

   The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim**
   which is in excess of the Retention amount stated in Item 4(a) and 4(b) of
   the Declarations, such Retention amount to be borne by the **Insured** and
   shall remain uninsured, with regard to all **Defense Costs** under Item 4(a) and
   with regard to all **Loss** under Item 4(b), other than: (1) non- **Indemnifiable
   Loss** of a **Natural Person Insured**; and (2) **Voluntary Compliance Loss.** A
   single Retention amount shall apply to **Loss** arising from all **Claims** alleging
   the same **Wrongful Act** or related **Wrongful Acts.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 5*

_____
AUTHORIZED REPRESENTATIVE

(2/90)    *COPY*

| MEMO | | | Page 1 |
|---|---|---|---|
| ULL0001 | BM | 03/28/2003 | |
| 494-38-35 | | | |
| FRIP | | 10/30/2002 | 10/30/2003 |

**The McLaughlin Company**
1725 DeSales St. NW
Washington, DC 20036
Phone: 202-293-5566   Fax: 202-857-8355

**Diane Murphy**
445 Cross Creek Drive
Hungtington, MD 20639

CUSTOMER:  ULLICO Inc.
                Patrick Montgomery

CONVERSATION

Here is our copy so you can do letters and add to schedule

**Brenda**

# A**I**G American International Companies@

## Employee Benefit Plan Fiduciary Liability Insurance Renewal Application

### NATIONAL UNION FIRE

Name of Insurance Company To Which Application Is Made
(herein called the "Insurer")

**NOTICE: THE POLICY PROVIDES THAT THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

IF A POLICY IS ISSUED, IT WILL BE ON A CLAIMS-MADE BASIS

1. **Applicant**

   a. Sponsor Organization: __ULLICO Inc. and its subsidiaries__

   b. Address: __111 Massachusetts Ave., NW Washington, DC  20001__

   c. Nature of business (include primary SIC code): __Financial Services and Insurance__

   d. State (or jurisdiction) of Incorporation: __Maryland__

   e. Total assets of the Sponsor Organization: $ __3.7 Billion__

   f. Total assets of all plans: $ __175 Million__

   g. Amount of Insurance requested $ __5,000,000__

   h. Self-insured retention requested (each loss): $ __100,000__

2. Are there any plans, other than welfare plans, not previously reported to the Insurer for which coverage is now being requested? Yes _____ No _X_ (If "Yes," submit main form application and underwriting particulars with respect to such plans.)

3. During the last year, has there been any change in any plan's investment manager or investment management guidelines? Yes _____ No _X_ (If "Yes," provide details of any such change.)

4. In the past 12 months has the name of any plan changed? Yes __X_ No _____ . (If "Yes," attach details.)

On April 1, 02 the four separate 401(K) Plans were merged to become the ULLICO Inc. 401(K) Plan and Trust.

5. Does any plan(s) hold any contract with a guaranteed return (including Guaranteed Investment Contracts (GICs), Guaranteed Annuity Contracts (GACs) or Bank Investment Contracts (BICs))? Yes XNo . (If "Yes," please attach complete details for each such plan, including plan name, name of contract provider, the market value of each contract and the date(s) the contract(s) expires.) **Federated Capital Preservation Fund (approximately $21 million), which is an investment option in 401(k) invests in GIC's.**

6. In the last 12 months, has there been any amendment(s) to any plan(s) that has resulted in or may result in any change or reduction of benefits, including but not limited to an increase in participants' share of costs? Yes X No . (If "Yes," attach a description of the amendment(s).)
**ULLICO Pension Plan increased benefits from 2% to 2.5%**

7. Has any plan (or portion of any plan) for which coverage is provided under the expiring policy been spun off (sold), transferred, or terminated? Yes X No . (If "Yes," attach the following information for such plan(s): Date of sale or termination, whether assets have been fully distributed or reverted to a party other than the plan participants and name of annuity provider if benefits have been secured by annuities.)
**AMI Capital was sold 6/30/01.**

8. In the last 12 months has there been, or is there now under consideration, any merger, acquisition, restructuring or consolidation of or by the sponsor organization or any of its subsidiaries that has resulted in or may result in plan participants transferring to another plan, company or subsidiary? Yes No X . (If "Yes" attach complete details including copies of materials distributed to employees relating to such transfer(s), date or expected date of the transfer(s), and most recent financial statements for any created or acquired subsidiaries.)

9. In the last 12 months, has there been any change in Risk Manager, General Counsel or outside law firm for benefits or ERISA litigation matters? Yes No X (If "Yes," attach complete details.)

**Please submit the following:**

- For the five largest pension plans (in terms of total assets), copies of the latest CPA-audited financial statements with investment portfolios. (If plan assets are held in a master trust, submit master trust investment portfolio.);

- For each plan (or plan feature) that is designed to invest primarily in securities of the Sponsor Organization, the latest CPA-audited financial statement (with investment portfolio) and a completed ESOP Questionnaire;

- Written plan description(s) and latest financial statement(s), if applicable, for any non-qualified plan(s);

- Latest annual report for the Sponsor Organization;

- Latest interim financial statements for the Sponsor Organization.

IN GRANTING COVERAGE TO ANY OF THE INSUREDS, THE INSURER HAS RELIED UPON THE DECLARATIONS AND STATEMENTS IN THIS APPLICATION FOR COVERAGE. ALL SUCH DECLARATIONS AND STATEMENTS ARE THE BASIS OF COVERAGE AND SHALL BE CONSIDERED INCORPORATED IN AND CONSTITUTING PART OF THE POLICY SHOULD ONE BE ISSUED. WITH RESPECT TO SUCH DECLARATIONS AND STATEMENTS, NO STATEMENTS MADE OR KNOWLEDGE POSSESSED BY ANY INSURED (OTHER THAN KNOWLEDGE OR INFORMATION POSSESSED BY THE PERSON(S) ACTUALLY EXECUTING THE APPLICATION) SHALL BE IMPUTED TO ANY OTHER INSURED TO DETERMINE WHETHER COVERAGE IS AVAILABLE FOR ANY CLAIM MADE AGAINST SUCH OTHER INSURED.

THE UNDERSIGNED AUTHORIZED FIDUCIARY HEREBY DECLARES THAT THE STATEMENTS SET FORTH HEREIN ARE TRUE. THE UNDERSIGNED AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, HE/SHE

: MCLHUGHLIN CO      1D-2028578355        SEP 06 02   10:03 NO.001 P.04

(UNDERSIGNED) WILL, IN ORDER FOR THE INFORMATION TO BE ACCURATE ON THE EFFECTIVE DATE OF THE INSURANCE, IMMEDIATELY NOTIFY THE INSURER OF SUCH CHANGES AND THE INSURER MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS AND/OR AUTHORIZATION OR AGREEMENTTO BIND THE INSURANCE.

SIGNING OF THIS APPLICATION DOES NOT BIND THE APPLICANT OR THE INSURER TO COMPLETE THE INSURANCE, BUT IT IS AGREED THAT THIS APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND IT WILL BE ATTACHED TO AND BECOME PART OF THE POLICY.

ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION AND MADE A PART HEREOF. NOTHING CONTAINED HEREIN OR INCORPORATED HEREIN BY REFERENCE SHALL CONSTITUTE NOTICE OF A CLAIM OR POTENTIAL CLAIM SO AS TO TRIGGER COVERAGE UNDER ANY CONTRACT OF INSURANCE.

PLEASE READ THE FOLLOWING STATEMENT CAREFULLY AND SIGN BELOW WHERE INDICATED. IF A POLICY IS ISSUED THIS STATEMENT IS INCORPORATED IN AND BECOMES A PART OF SUCH POLICY.

The undersigned authorized fiduciary hereby acknowledges that he/she is aware that the limit of liability contained in this policy shall be reduced, and may be completely exhausted, by the costs of legal defense and, in such event, the insurer shall not be liable for the costs of legal defense or for the amount of any judgment or settlement to the extent that such exceeds the limit of liability of this policy.

The undersigned authorized fiduciary hereby further acknowledges that he/she is aware that legal defense costs that are incurred shall be applied against the retention amount.

SIGNED _____   DATE ___9/6/02___

PRINT NAME __PATRICK MONTGOMERY__   ATTEST _____

TITLE __VP-FINANCE__   BROKER _____
　　　　(Must be signed by a current fiduciary)

ADDRESS _____

_____

84257 (16/04)                    – 3 –

NOTICE TO FLORIDA APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY IN THE THIRD DEGREE."

NOTICE TO KENTUCKY APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

NOTICE TO MINNESOTA APPLICANTS: "A PERSON WHO SUBMITS AN APPLICATION OR FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME."

NOTICE TO NEW JERSEY APPLICANTS: "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

NOTICE TO NEW YORK APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

NOTICE TO OHIO APPLICANTS: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

FOR PENNSYLVANIA APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."


SIGNED: _____

PRINT NAME: _____

TITLE: _____
      (Must be signed by a current fiduciary)

DATE: _____

MEETING OF THE BENEFITS COMMITTEE
OF
ULLICO INC.
Held July 24, 2001
At 111 Massachusetts Avenue, N. W.
Washington, D.C.
9:00 a.m.

ATTENDEES:

Robert A. Georgine
Joseph A. Carabillo
John K. Grelle
James W. Luce
Grover McKean

OTHERS IN ATTENDENCE:

Blaine Barham
William Blanton
Louis Hejl
Craig W. Patenaude
Richard A. Silas

Chairman Georgine called the meeting to order. The Committee reviewed the minutes for the Meeting of May 4, 2001 distributed previously. A motion was requested to approve the minutes. It was

RESOLVED: " That the minutes of the Committee meeting on May 4, 2001 are approved."

Motion was made, seconded and approved.

Mr. Blanton and Mr. Barham reviewed the impact on FAS 87 expenses and the funding surplus of changes in the benefit accrual rates for Sponsoring Employer ULLICO Group Participants in the ULLICO Inc. Pension Plan ("Plan"). Mr. Hejl reported on comparisons between various benefit features of the Plan and those of several other union affiliated and corporate defined benefit retirement plans. He also discussed the increase in FAS 87 expenses associated with additional changes in Plan benefits, including allowing employees to retire with or without reduction of benefits at age 62 and increasing the spousal death benefit from fifty (50%) to seventy-five (75%). The Committee then discussed a number of alternatives for changes in Plan Benefits and the financial impact of those changes. It was

1

RESOLVED: "That the percentage of a Sponsoring Employer ULLICO Group Participants Average Salary used to determine his monthly retirement benefit under the ULLICO Inc. Pension Plan be increased from two percent (2%) to two and one-half percent (2.5%) for all Years of Benefit Service effective January 1, 2002. This change in benefits will not apply to a Sponsoring Employer ULLICO Group Participant covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU Local 153."

FURTHER RESOLVED: "That the amount of the Qualified Preretirement Survivor Annuity payable upon the death of a Sponsoring Employer ULLICO Group Participant under the ULLICO Inc. Pension Plan be increased from fifty percent (50%) to seventy-five percent (75%) effective January 1, 2002. This change in benefits will not apply to a Sponsoring Employer ULLICO Group Participant covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU Local 153."

FURTHER RESOLVED: "That a Sponsoring Employer ULLICO Group Participant shall be eligible for an unreduced early retirement benefit upon attainment of age 62 under the ULLICO Inc. Pension Plan effective January 1, 2002. This change in benefits will not apply to a Sponsoring Employer ULLICO Group Participant covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU Local 153."

Motion was made, seconded and approved.

Mr. Hejl updated the Committee on the status of the search for a new recordkeeper for the ULLICO Inc. 401(k) Plan. He reported that site visits and due diligence of 4 of the 5 remaining candidates had been completed and that within several more weeks he would recommend two final candidates to give oral presentations to the Committee. It was suggested that the presentations be limited to 20 minutes each and that they be given at a Committee meeting to be scheduled in three to four weeks.

The meeting was adjourned at 11:15 a.m.

2



**EXCESS & SURPLUS, LLC**

1122 Franklin Avenue, 3rd Floor, P.O. Box 9240, Garden City, New York 11530-9240
(516) 747-4100 • Facsimile (516) 747-3633
Visit our Website: www.arcbrokers.com

November 25, 2002

Ms. Diane Murphy
The McLaughlin Company
1725 DeSales Street, NW
Washington, DC 20036

*RE:*    *ULLICO, INC. AND ITS SUBSIDIARIES*
       *Pension Trust Fiduciary*
       *Policy No.: 495-38-35*
       *Policy Period: October 30, 2002 to October 30, 2003*

Dear Diane:

Enclosed please find the original and one copy of the above referenced policy. I have taken the time to review it for accuracy and everything appears to be in order. However, should you discover something I may have overlooked or have any questions, please let me know immediately.

As a reminder, please note this is a Claims Made policy that contains a provision stating that this policy applies only to any claim first made against the Insured during the policy period. Claims under this policy must be submitted by the Insured to the carrier during the policy period (as outlined within the Loss Notification Clause within the policy) in order for coverage to apply. Please be aware that late reporting could result in a disclaimer of coverage letter from the insurer.

I trust this meets with your approval, and please give me a call or e-mail me if you have any questions.

Best regards,

Joseph Vaccaro
ARC Excess & Surplus, LLC
The ARC Group, LLC
(516) 747-4100 ext. 168
jvaccaro@arcxs.com
sfuller@arcxs.com

JV/SMF
Enclosure



**THE
McLAUGHLIN
COMPANY**

INSURANCE SINCE 1929

April 9, 2003

Patrick Montgomery, Vice President
ULLICO Inc.
111 Massachusetts Avenue, N.W.
Washington DC, 20001

Re:  Employee Benefit Fiduciary Liability Policy #494-38-35
     Effective Date:    10/30/02 – 10/30/03

Dear Patrick:

We are pleased to enclose the renewal of the above captioned Fiduciary Liability Policy.  Please take some time to review the policy.  If you have any questions regarding the coverage or find any errors in the policy, please contact us immediately.

During the course of the policy year, there are certain events that may take place that would require you to notify us.  These events include the following:

   ~ *Creation of a new plan (notify The McLaughlin Co.)*
   ~ *Change of address/correspondent (notify The McLaughlin Co.)*
   ~ *Merger or acquisition (notify The McLaughlin Co.)*
   ~ *Litigation that you wish to file as a claim (see below)*

Please direct all claims to our attention at the address below.  We will then forward the claim to the appropriate carrier and notify you once this has been done.

                    Brenda Mantz
                    The McLaughlin Company
                    1725 DeSales St., NW
                    Washington, DC 20036

Include with your claim a covering letter giving a brief summary of the particulars of the claim.

Thank you for your patience and your assistance.

Sincerely,

Diane S. Murphy, CPCU
Account Manager

November 1, 2002

Mr. Patrick Montgomery, Vice President
ULLICO, Inc.
111 Massachusetts Ave. NW
Washington, DC 20001

Re: Employment Benefit Plan Fiduciary Liability Insurance
    National Union Fire Insurance Policy # 494-38-35
    Policy Period: October 30, 2002 – October 30, 2003

Dear Pat:

Pursuant to your instructions, we have bound the October 30, 2002 renewal of the above captioned policy with the National Union Fire Insurance Company (AIG) subject to receipt, review and acceptance of the following:

    1.  2001 Audited Plan Financial Statements

|  | 2002 – 2003 |
|---|---|
| Limit of Liability | $5,000,000 |
| Retention | $50,000 |
| Premium | $40,000 |

Continuity Date: 10/30/1998

*Employment Benefit Plan Fiduciary Liability Insurance Policy* 77892 (03/01) will provide the basic contract. This is a new policy form this year and appears to be more comprehensive than the expiring form. The following endorsements will be added to the policy (copies of forms enclosed):

1. DC Cancellation/Nonrenewal
2. Failure to Effect/Or Maintain Insurance Exclusion
3. Discovery Amended – One-Year Unilateral *no more than 200%*
4. Tie-In of Limits Endorsement – Common Claims
5. Sponsor Organization Securities Separate Retention - $250,000

The following will also be attached to the policy:

1. Appendix A Employee Benefit Plan Fiduciary Liability Panel Counsel List

The renewal invoice is enclosed. Please forward the 2001 Audited financial statements for the plans as soon as they are available. Please feel free to call with any questions or if I can be of additional assistance.

Best regards,


Diane Murphy, CPCU
Account Manager

**The McLaughlin Company**
1725 DeSales St. NW
Washington, DC 20036
Phone: 202-293-5566   Fax: 202-857-8355

| MEMO | | Page 1 |
|---|---|---|
| ULL0001 | BM | 03/28/2003 |
| 494-38-35 | | |
| FRIP | | 10/30/2002  10/30/2003 |

**Diane Murphy**
445 Cross Creek Drive
Hungtington, MD  20639

CUSTOMER:  ULLICO Inc.
          Patrick Montgomery



FRIP                                Re: [CONVERSATIO]

Here is our copy so you can do letters and add to schedule



Brenda