UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

*In re*                                          )
      ULLICO INC. LITIGATION )
                    )     MASTER DOCKET AND
                    )     CASE NUMBER:  1:03CV01556(RJL)

---

                    )
RELATED TO:  1:03cv01556-RJL  )
            1:04cv00118-RJL  )
            1:04cv00776-RJL  )

---

## CONSOLIDATED ANSWER AND COUNTERCLAIM

## ULLICO'S CONSOLIDATED ANSWER AND COUNTERCLAIM

In response to the Consolidated Complaint filed herein, Defendants and Counterclaim Plaintiffs ULLICO Inc., the ULLICO Inc. Pension Plan and Trust, the Administrator of the ULLICO Inc. Pension Plan and Trust, the Plan Administration Committee of the ULLICO Inc. Pension Plan and Trust, the ULLICO Inc. Employees' Life and Health Welfare Plan, the Administrator of the ULLICO Inc. Employees' Life and Health Welfare Plan, The Union Labor Life Insurance Company, The Union Labor Life Auxiliary Retirement Benefits Plan, the Administrator of The Union Labor Life Auxiliary Retirement Benefits Plan, The ULLICO Inc. Non-Qualified Deferred Compensation Plan, and Mark Singleton in his capacity as a Plan Administrator file this Consolidated Answer and Counterclaim.

## CONSOLIDATED ANSWER

### FIRST DEFENSE

Plaintiffs fail to state a claim upon which relief can be granted.

## SECOND DEFENSE

Carabillo, Grelle and Georgine have failed to exhaust their administrative remedies.

## THIRD DEFENSE

Carabillo, Grelle and Georgine failed to satisfy the conditions to receive, and have not otherwise qualified to receive, the benefits claimed.

## FOURTH DEFENSE

Plaintiffs have engaged in *ultra vires* acts and material breaches of their duties and obligations and are therefore precluded and otherwise barred from obtaining the relief sought.

## FIFTH DEFENSE

Plaintiffs materially breached their duties and obligations to the ULLICO Inc. Qualified Pension Plan and Trust (the "Qualified Plan"), The Union Labor Life Auxiliary Retirement Benefits Plan (the "Auxiliary Plan"), the ULLICO Inc. Employees' Life and Health Welfare Plan ("the Welfare Plan"), The ULLICO Inc. Non-Qualified Deferred Compensation Plan ("the Deferred Compensation Plan"), the Supplemental Executive Retirement Plan ("the SERP"), and ULLICO Inc. (which is responsible for funding all benefits under the Auxiliary, Welfare, Deferred Compensation and SERP Plans) and therefore have forfeited all or part of any benefits they would otherwise be entitled to receive under those Plans.

## SIXTH DEFENSE

The Amendments to the Qualified Plan upon which Plaintiffs rely to establish their claims for benefits under the Qualified and Auxiliary Plans were not validly adopted and are otherwise unenforceable by Plaintiffs.

2

### SEVENTH DEFENSE

The Deferred Compensation Plan, SERP and Split-Dollar Life Insurance Agreement were not validly adopted and are otherwise unenforceable by Plaintiffs.

### EIGHTH DEFENSE

Plaintiffs' benefits under the Qualified Plan are subject to offset because of Plaintiffs' breaches of fiduciary duties to the Qualified Plan.

### TENTH DEFENSE

Plaintiffs benefits under the Auxiliary Plan, the Deferred Compensation Plan, the Welfare Plan, the SERP and the Split Dollar Life Insurance Agreement are subject to recoupment, setoff and/or forfeiture because of Plaintiffs' breaches of fiduciary duty to ULLICO Inc.

### ELEVENTH DEFENSE

Plaintiffs have failed to join necessary parties.

### TWELFTH DEFENSE

Plaintiffs are barred from obtaining any equitable relief based on the doctrine of unclean hands.

### THIRTEENTH DEFENSE

Responding to the specific allegations of the Consolidated Complaint, Defendants:

### I.    PRELIMINARY STATEMENT

1.    Affirmatively aver that the allegations of paragraph 1 are legal conclusions to which no response is necessary, but to the extent that there are any allegations of wrongdoing, improper conduct or causation such allegations are denied.

3

## II. JURISDICTION AND VENUE

2.      Admit that this Court has jurisdiction over this dispute, and otherwise affirmatively aver that the allegations of paragraph 2 are legal conclusions to which no response is necessary.

3.      Affirmatively aver that the allegations of paragraph 3 are legal conclusions to which no response is necessary; and deny the allegations of paragraph 3 to the extent it alleges any right to the affirmative relief sought.

4.      Admit that venue is proper in this Court, and otherwise affirmatively aver that the allegations of paragraph 4 are legal conclusions to which no response is necessary.

## III. CARABILLO'S COMPLAINT

5.      Admit the allegations of paragraph 5.

6.      Admit the allegations of paragraph 6.

7.      Affirmatively aver that the Qualified Plan is administered by a Plan Administrator, and that the Plan Administrator is the Employee Benefit Plans Administrative Committee (the "Benefits Committee") appointed by ULLICO Inc., the Plan Sponsor, that members of the Benefits Committee serve as fiduciaries of the Qualified Plan as defined by ERISA §3(21)(A), and deny the remaining allegations of paragraph 7.

8.      Affirmatively aver that the Qualified Plan is administered by a Plan Administrator, and that the Plan Administrator of the Qualified Plan is a Benefits Committee appointed by ULLICO Inc., the Plan Sponsor, and that members of the Benefits Committee serve as fiduciaries of the Qualified Plan as defined by ERISA §3(21)(A), and deny the remaining allegations of paragraph 8.

4

9.    Do not have knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9.

10.    Admit that the Welfare Plan is an employee benefit plan within the meaning of ERISA §3(3), and a welfare benefit plan within the meaning of ERISA §3(1); affirmatively aver that the Welfare Plan maintains insurance policies that, *inter alia*, provide medical and life insurance coverage to Welfare Plan participants, and further aver that all premiums for said policies are paid by and from the general accounts of the Welfare Plan Sponsor, ULLICO Inc. Admit that the Welfare Plan is administered in the District of Columbia; and deny the remaining allegations of paragraph 10.

11.    Affirmatively aver that the Welfare Plan is administered by the Benefits Committee appointed by ULLICO Inc., the Plan Sponsor, and that the Benefits Committee is an administrator of the Welfare Plan as defined by ERISA § 3(16)(A); and members of the Benefits Committee serve as fiduciaries of the Welfare Plan as defined by ERISA §3(21)(A), and deny the remaining allegations of paragraph 11.

12.    Affirmatively aver that any amounts due under the Auxiliary Plan are paid from the general accounts of the Plan Sponsor, ULLICO Inc; and admit the allegations of paragraph 12.

13.    Affirmatively aver that the Auxiliary Plan is administered by the Benefits Committee appointed by ULLICO Inc., the Plan Sponsor, and that the Benefits Committee is an administrator of the Auxiliary Plan as defined by ERISA §3(16)(A); and deny the remaining allegations of paragraph 13.

14.    Admit that ULLICO Inc. is a corporation formed under Maryland law with its principal place of business in the District of Columbia; that ULLICO Inc. is the Plan Sponsor for

5

the Qualified Plan, Auxiliary Plan and Welfare Plan within the meaning of 29 U.S.C.

§ 1002(16)(b)(i); and affirmatively aver that, as a plan sponsor of the Plans, ULLICO Inc. is a

necessary party to these proceedings.

15.     Admit that Carabillo was employed by ULLICO from March 1987, until May 30,

2003; and that during the term of his employment Carabillo was a participant in the Qualified

Plan, Auxiliary Plan, and Welfare Plan; deny that Carabillo is currently entitled to benefits under

those plans; and affirmatively aver that, by virtue of Carabillo's breach of fiduciary duty to the

plans and Plan Sponsor ULLICO Inc., Carabillo is not entitled to and has otherwise forfeited his

rights to any benefits under the plans, and deny the remaining allegations of paragraph 15.

16.     Admit the allegations of paragraph 16, and affirmatively aver that the "June 1,

2003 Early Retirement Program" is also referred to as the "Special Early Retirement Program."

17.     Admit that to be eligible to participate in the Special Early Retirement Program a

person, among other things, had to be a participant in the Qualified Plan, either 55 with 15 years

of service or 65 with 5 years of service by June 1, 2003, elect retirement by June 1, 2003, and

execute an Election and Release Form approved by the Plan Sponsor; affirmatively aver that, in

addition to these requirements, to be eligible to participate in the Special Early Retirement

Program a person had to actually voluntarily terminate employment and in fact retire on June 1,

2003, and deny the remaining allegations of paragraph 17.

18.     Deny the allegations of paragraph 18.

19.     Admit the allegations of paragraph 19.

20.     Do not have knowledge or information sufficient to form a belief with respect to

all participants as to the truth of the allegation that "[t]he Early Retirement Program therefore

provided a distinct advantage over the Qualified Plan's regular early retirement benefit"; admit

that, under the normal early retirement provisions of the Qualified Plan, participants who retire before age sixty have their benefits calculated by determining the participant's benefit had he retired at the Normal Retirement Age, and then reducing that amount by 0.3% for each month prior to age 65 that benefits commence; and deny the remaining allegations of paragraph 20.

21.    Affirmatively aver that paragraph 21 is a legal conclusion to which no response is required.

22.    Admit the allegations of paragraph 22.

23.    Affirmatively aver that Carabillo by virtue of his breach of fiduciary duties to the Plans and ULLICO Inc. is not, under any circumstances, entitled to benefits under the Auxiliary Plan; and admit the allegations of paragraph 23

24.    Admit that the Early Retirement Program, as defined in the Complaint and hereinafter referring to the June 1, 2003 Special Early Retirement Program, resulted in eligible participants receiving as part of that program those benefits under the Welfare Plan that would have been payable as part of their normal retirement under the Qualified Plan; and deny remaining allegations of paragraph 24.

25.    Admit that ULLICO sent Carabillo a letter dated April 17, 2003; that the letter was addressed from Louis Hejl; that the letter discussed ULLICO Inc.'s Early Retirement Program; that ULLICO sent a letter to Carabillo on April 21, 2003, which was addressed from Louis Hejl; that the April 21, 2003, letter also enclosed an "Election and Release Form" related to the Early Retirement program; affirmatively aver that the alleged letters and forms speak for themselves, the substance of which are not completely alleged and deny the remaining allegation of paragraph 25.

26.    Admit the allegations of paragraph 26.

27.    Do not have knowledge or information sufficient to form a belief as to the truth of

Carabillo's allegation as to when Carabillo signed and dated the Election and Release form;

admit that the executed form was faxed to Lou Hejl on May 7, 2003; that Mr. Hejl informed

Carabillo that he needed to forward the original executed copy of the Election and Release form;

that Carabillo delivered the original form on May 8, 2003, to, and was given a copy of the

executed form by, Mr. Hejl; that Mr. Hejl signed and dated the Election and Release form and

provided a copy to Carabillo; and deny the remaining allegations of paragraph 27.

28.    Affirmatively allege that the Election and Release Form speaks for itself, that the

contents of the Form are not completely stated and are taken out of context; admit that the Form

contains the alleged language and deny the remaining allegations of paragraph 28.

29.    Admit the allegations of paragraph 29.

30.    Affirmatively allege that the alleged letter speaks for itself and that its contents

are not quoted in its entirety; admit that defendants sent Carabillo a letter dated May 22, 2003,

addressed from Jennifer Shea, the Health & Life Benefits Administrator, and Christine Bellotti,

the Retirement Benefits Administrator; and that the letter contains the quoted language; and deny

the remaining allegations of paragraph 30.

31.    Admit that it appears that $1 was deposited to Carabillo's checking account at

First Union Bank on or about May 27, 2003, and do not have knowledge or information

sufficient to form a belief as to the truth of the remaining allegations.

32.    Affirmatively aver that the alleged letter speaks for itself and that the contents of

that letter is not quoted in its entirety or accurately; admit that Edward Grebow executed a letter

dated May 30, 2003, informing Carabillo that he was being terminated for cause; and that the

letter contains the quoted language; affirmatively aver that this letter was sent via overnight

delivery service to Carabillo at 37437 Quanbeck Lane, Middleburg, Virginia 20117, his address

of record and last known address; and deny the remaining allegations of paragraph 32.

33.     Admit that on June 16, 2003 Louis Hejl received an email purporting to be from

Carabillo; that the email stated, *inter alia*, that Carabillo had not yet received retirement benefits;

and do not have knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of paragraph 33.

34.     Admit that the email received by Louis Hejl on June 16, 2003, requested that,

under certain circumstances, it be considered "an appeal under the plan"; and deny the remaining

allegations of paragraph 34.

35.     Affirmatively aver that the alleged letter speaks for itself and that the contents are

not quoted in its entirety; admit that a letter dated August 13, 2003, was sent to Carabillo, that

the letter was addressed from Louis Hejl and that the letter contains the quoted language and

deny the remaining allegations of paragraph 35.

36.     Affirmatively aver that the August 13, 2003, letter was sent on or about August

13, 2003, to Carabillo's last known address and that the letter was subsequently provided to UPS

on August 29, 2003, for delivery to Carabillo, after Carabillo's then current mailing address was

learned; and deny the remaining allegations of paragraph 36.

37.     Deny the allegations of paragraph 37.

38.     Affirmatively aver that the provisions of the Qualified Plan, and Section 9.1

thereof, speak for themselves; admit that Article 9.1 states that any determination as to benefits

under the Plan is to be made by the Plan Administrator and that Article 9.2 of the Qualified Plan

states that the denial of benefits under the Qualified Plan is to be provided to a participant in

writing by the Plan Administrator within a reasonable time; and deny the remaining allegations of paragraph 38.

39.    Admit that Section 9.3 contains the quoted language; and deny the remaining allegations of paragraph 39.

40.    Deny the allegations of paragraph 40.

41.    Deny the allegations of paragraph 41.

42.    Deny the allegations of paragraph 42.

43.    Deny the allegations of paragraph 43.

44.    Deny, as framed, the allegations of paragraph 44.

45.    Deny the allegations of paragraph 45.

46.    Affirmatively aver that the allegations of paragraph 46 are a legal conclusion to which no response is required; but to the extent a response is required, deny the allegations of paragraph 46.

47.    Deny the allegations of paragraph 47.

48.    Deny the allegations of paragraph 48.

49.    Affirmatively aver that the allegations of paragraph 49 are a legal conclusion to which no response is required; admit that the alleged section contains the quoted language and deny the remaining allegations of paragraph 49.

50.    Deny the allegations of paragraph 50.

**As to First Claim for Relief – Benefits Under the Terms of the Qualified Plan:**

51.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-50 in response to the allegations of paragraph 51.

52.    Affirmatively aver that the definition of "retirement" set forth in Section 2.49 does not apply to the Early Retirement Program; and deny the allegations of paragraph 52.

53.    Admit that Carabillo was terminated "for cause" on May 30, 2003, and affirmatively aver that Carabillo had been on "administrative leave" since March 28, 2003, and had not been regularly present at Defendants' office since that time; and deny the remaining allegations of paragraph 53.

54.    Deny the allegations of paragraph 54.

55.    Deny the allegations of paragraph 55.

56.    Deny the allegations of paragraph 56.

57.    Admit that Carabillo executed an Election and Release Form relating to the Special Early Retirement Program; and deny the remaining allegations of paragraph 57.

**As to Second Claim for Relief – Interest on Retroactive Benefits Under the Terms of the Qualified Plan:**

58.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-57 in response to the allegations of paragraph 58.

59.    Deny the allegations of paragraph 59.

**As to Third Claim for Relief – Benefits from the Welfare Plan:**

60.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-59 in response to the allegations of paragraph 60.

61.    Deny the allegations of paragraph 61.

**As to Fourth Claim for Relief – Refund of all COBRA Payments Made for Continued Coverage Under the Welfare Plan and Private Insurance Premiums Paid thereafter with Interest:**

62.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-61 in response to the allegations of paragraph 62.

63.    Admit that Carabillo was denied benefits under the Early Retirement Program, and was not provided with retiree benefits under the Welfare Plan; affirmatively aver that Carabillo is not eligible to receive benefits under either the Early Retirement Program or the Welfare Plan; and deny the remaining allegation of paragraph 63.

64.    Do not have knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 64.

65.    Deny the allegations of paragraph 65.

**As to Fifth Claim for Relief – Benefits under the Terms of the Auxiliary Plan:**

66.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-65 in response to the allegations of paragraph 66.

67.    Deny the allegations of paragraph 67.

**As to Sixth Claim for Relief – Interest on Retroactive Benefits from the Auxiliary Plan:**

68.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-67 in response to the allegations of paragraph 68.

69.    Deny the allegations of paragraph 69.

**As to Seventh Claim for Relief – Termination of Employment to Prevent Qualification for Benefits under the Early Retirement Program:**

70.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-69 in response to the allegations of paragraph 70.

71.    Deny the allegations of paragraph 71.

72.    Deny the allegations of paragraph 72.

**As to Eighth Claim for Relief – Attorney's Fees and Costs:**

73.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-72 in response to the allegations of paragraph 73.

74.    Affirmatively aver that the allegations of paragraph 74 are a legal conclusion to which no response is required; but to the extent that there is allegation that Carabillo is entitled to recover legal fees or expenses, deny the allegations of paragraph 74.

### IV. LUCE'S COMPLAINT

1.    Deny that Luce retired on May 31, 2003 and affirmatively aver that Luce retired on June 1, 2003; and admit the remaining allegations of paragraph 1.

2.    Admit the allegations of paragraph 2.

3.    Admit that the ULLICO Inc. Non-Qualified Deferred Compensation Plan is an employee benefits plan, purportedly established by ULLICO Inc., effective as of August 1, 1998; affirmatively aver that the Deferred Comp Plan was enacted without Board approval and was otherwise enacted in violation of Plaintiff Luce and others' fiduciary duties owed to ULLICO; and deny the remaining allegations of paragraph 3.

4.    Admit that Defendant The Union Labor Life Insurance Company is a Maryland corporation, that it created the Auxiliary Plan and has the right to amend or terminate the Auxiliary Plan; and deny the remaining allegations of paragraph 4.

5.    Admit that Defendant ULLICO Inc. is a Maryland corporation incorporated in 1987 as a holding company for Defendant The Union Labor Life Insurance Company and other affiliated corporations, that Defendant ULLICO Inc. owns all the issued and outstanding stock of Defendant The Union Labor Life Insurance Company, that ULLICO Inc. purportedly created the Deferred Comp Plan, has the right to amend or terminate the Deferred Comp Plan, and is responsible for payment of benefits under the Deferred Comp Plan; affirmatively aver that the Deferred Comp Plan was enacted without Board approval and was otherwise enacted in violation

of Plaintiff Luce and others' fiduciary duties owed to ULLICO; and deny the remaining

allegations of paragraph 5.

6.    Admit the allegations of paragraph 6 to the extent the obligations of the Auxiliary

Plan are enforceable by Luce; and otherwise deny the remaining allegations of paragraph 6.

7.    Admit the allegations of paragraph 7 to the extent the obligations of the Deferred

Compensation Plan are enforceable by Luce; and otherwise deny the remaining allegations of

paragraph 7.

8.    Admit that this Court has subject matter jurisdiction over this dispute, and deny

the remaining allegations of paragraph 8.

9.    Admit that venue is proper in this judicial district, and deny the remaining

allegations of paragraph 9.

10.    Admit the allegations of paragraph 10.

11.    Admit the allegations of paragraph 11.

12.    Admit the allegations of paragraph 12.

13.    Admit the allegations of paragraph 13.

14.    Admit the allegations of paragraph 14.

15.    Admit the allegations of paragraph 15.

16.    Affirmatively aver that the Benefits Committee was not authorized to amend the

terms of the Qualified Plan; and with that caveat, admit the allegations of paragraph 16.

17.    Admit that by action of the Executive Committee of the Board of Directors of

ULLICO Inc. taken on May 5, 1997, the Benefits Committee of ULLICO was created and

delegated certain authority with respect to the Qualified Plan and that on that date the Executive

Committee also authorized a resolution, portions of which are quoted; affirmatively aver that the

14

Benefits Committee's delegated authority was limited to administrative and fiduciary functions and did not include the authority to amend the terms of the employee benefit plan, a "settlor" function that was reserved under the terms of the Qualified Plan to the Board of ULLICO and not delegated to the Benefits Committee which consisted of certain officers of ULLICO; and deny the remaining allegations of paragraph 17.

18.    Admit that for Plan years 2000, 2001 and 2002, Luce received incentive compensation for services rendered to ULLICO; and deny the remaining allegations of paragraph 18.

19.    Admit that Luce received incentive compensation in 2000, 2001, and 2002; and deny the remaining allegations of paragraph 19.

20.    Admit that on April 29, 2002 the ULLICO Inc. Board of Directors hired former Illinois Governor James Thompson as Special Counsel; admit that the Thompson investigation took several months, involved many witness interviews, and cost ULLICO over a million dollars; admit that the Thompson Report is dated November 26, 2002 and admit that it was delivered to the ULLICO, Inc. Board of Directors shortly thereafter; affirmatively aver that the Thompson Report speaks for itself and that it is not quoted and described completely; and deny as framed the remaining allegations of paragraph 20.

21.    Affirmatively aver that the Thompson Report speaks for itself and that it is not accurately summarized; and therefore deny as framed the allegations of paragraph 21.

22.    Admit that on December 2, 2002 the ULLICO Inc. Board of Directors created a Special Committee, that the Special Committee was authorized to independently review the Thompson Report, and that the Special Committee tendered its Report to the Board of Directors on March 25, 2003; and deny the remaining allegations of paragraph 22.

23.     Admit the allegations of paragraph 23.

24.     Deny that the Early Retirement Program was adopted by the Board of Directors on April 16, 2002; affirmatively aver that the Early Retirement Program was adopted by the Board of Directors on April 16, 2003; deny that a draft of the Board resolution is attached; and admit the remaining allegations of paragraph 24.

25.     Admit the allegations of paragraph 25.

26.     Admit that Luce delivered to Louis J. Hejl, the Director of Corporate Benefits for ULLICO a memo dated May 5, 2003 concerning his pension benefits; affirmatively aver that the memo speaks for itself and is not stated in full; and therefore deny as framed the remaining allegations of paragraph 26.

27.     Admit that Hejl wrote a memorandum dated May 6, 2003 to Luce with respect to the Early Retirement Program; affirmatively aver that the memorandum speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 27.

28.     Admit that Teresa E. Valentine wrote a memo dated May 8, 2003 to Luce with respect to the Deferred Comp Plan; affirmatively aver that the memo speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 28.

29.     Affirmatively aver that Grelle made a lump-sum withdrawal of all amounts in his deferred compensation account in March 28, 2003, that the withdrawal was authorized by Joseph Carabillo, ULLICO's Chief Legal Officer, on the same day he went on "administrative leave," and that Carabillo was subsequently terminated by ULLICO "for cause"; and deny the remaining allegations of paragraph 29.

16

30.    Admit that Luce retired as the Executive Vice President of ULLICO as of June 1, 2003; and deny the remaining allegations of paragraph 30.

31.    Admit that Luce was not terminated as an employee of ULLICO Inc. or The Union Labor Life Insurance Company, or removed as an officer of ULLICO Inc., prior to his retirement on June 1, 2003; and deny the remaining allegations of paragraph 31.

32.    Admit that Luce was asked to enter into a two-month consulting agreement by Ed Grebow; and deny the remaining allegations of paragraph 32.

33.    Admit that ULLICO Inc. terminated Joseph Carabillo; and deny the remaining allegations of paragraph 33.

34.    No response is required as there is no paragraph 34 in the Luce's Complaint.

35.    Deny the allegations of paragraph 35.

36.    Admit the allegations of paragraph 36.

37.    Admit the allegations of paragraph 37.

38.    Admit that ULLICO did not pay auxiliary retirement benefits to Luce on June 1, July 1, August 1, September 1, or October 1 of 2003; and deny the remaining allegations of paragraph 38.

39.    Do not have knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39.

40.    Admit that a meeting took place between Luce, Ed Grebow, the Acting President of ULLICO and Damon Silvers on July 8, 2003 to discuss his benefits under the Auxiliary Plan and that Luce was advised that Auxiliary Plan payments to former senior officers were frozen pending a review by Plan counsel and the submission of recommendations to the Board of

17

Directors of ULLICO; and do not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 40.

41.     Do not have knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 41.

42.     Do not have knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 42.

43.     Admit that by letter dated July 28, 2003 Luce wrote to Terrence M. O'Sullivan; affirmatively aver that Luce's letter speaks for itself and that the contents of the letter are not completely stated; and therefore deny as framed the remaining allegations of paragraph 43.

44.     Admit that Luce wrote letters dated July 29 and September 5, 2003 with respect to the Deferred Comp Plan; affirmatively aver that the letters speak for themselves and that they are not quoted completely; and therefore deny as framed the remaining allegations of paragraph 44.

45.     Admit that Ted Green wrote a letter dated September 11, 2003 to Luce with respect to the Deferred Comp Plan and the Early Retirement Program; affirmatively aver that the letter speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 45.

46.     Affirmatively aver that the letter speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 46.

47.     Affirmatively aver that the letter speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 47.

48.     Admit that O'Sullivan wrote a letter dated September 11, 2003 to Luce; affirmatively aver that the letter speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 48.

49.     Admit that any money allegedly owed by Defendants to Luce is subject to set-off based upon claims asserted by ULLICO; and deny the remaining allegations of paragraph 49.

50.     Deny the allegations of paragraph 50.

51.     Deny the allegations of paragraph 51.

52.     Deny the allegations of paragraph 52.

53.     Deny the allegations of paragraph 53.

54.     Affirmatively aver that the allegations of paragraph 54 are not factual allegations to which a response is necessary, but to the extent a response is necessary Defendants state that there is an actual, justiciable controversy and that the Court has jurisdiction to resolve the dispute set forth in this action.

55.     Admit that the Plan has paid and has continued to pay certain Auxiliary Plan benefits; and deny the remaining allegations of paragraph 55.

56.     Deny the allegations of paragraph 56.

57.     Deny the allegations of paragraph 57.

58.     Affirmatively aver that the allegations of paragraph 58 are not factual allegations to which a response is necessary, but to the extent a response is necessary Defendants state that there is an actual, justiciable controversy and that the Court has jurisdiction to resolve the dispute set forth in this action; and deny the remaining allegations of paragraph 58.

59.     Admit that an actual, justiciable  controversy exists as between Luce and Defendants; and deny the remaining allegations of paragraph 59.

**As to Count I:**

60.     Incorporate herein by reference and makes a part hereof their responses to paragraphs 1 through 59 in response to the allegations of paragraph 60.

61.     Deny the allegations of paragraph 61.

62.     Deny the allegations of paragraph 62.

63.     Deny the allegations of paragraph 63.

64.     Deny the allegations of paragraph 64.

65.     Affirmatively aver that Article 7 of the Auxiliary Plan speaks for itself and that Luce's summary is not the complete recitation of the alleged provision, and therefore deny as framed the allegations of paragraph 65.

66.     Deny the allegations of paragraph 66.

67.     Admit that the dispute between the parties, as pleaded, appears to be whether the October 20, 1999 Amendment to the definition of compensation is a validly adopted Plan Amendment; and deny the remaining allegations of paragraph 67.

68.     Deny the allegations of paragraph 68.

69.     Affirmatively aver that Article 9 of the Auxiliary Plan speaks for itself and that Luce's summary is not the complete recitation of the alleged provision, and therefore deny as framed the allegations of paragraph 69.  Defendants further affirmatively aver that Luce's conduct as a member of the Benefits Committee in approving the Plan Amendments at issue, which necessarily increased his benefits under the Auxiliary Plan and those of other members of the Benefits Committee, was an *ultra vires* act and a breach of his fiduciary duties that disqualify him from receiving any benefits under the Auxiliary Plan pursuant to the Plan Amendments at issue.

70.    Admit that Luce is a participant receiving benefits under the Qualified Plan and those benefits are attributable to service prior to his retirement date of June 1, 2003; and deny any remaining allegations of paragraph 70.

71.    Deny the allegations of paragraph 71.

72.    Do not have knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 72.

73.    Deny the allegations of paragraph 73.

74.    Deny the allegations of paragraph 74.

75.    Deny the allegations of paragraph 75.

76.    Deny the allegations of paragraph 76.

77.    Admit the allegations of paragraph 77.

**As to Count II:**

78.    Incorporate herein by reference and makes a part hereof their responses to paragraphs 1 through 59 in response to the allegations of paragraph 78.

79.    Deny the allegations of paragraph 79.

80.    Deny the allegations of paragraph 80.

81.    Admit that the Auxiliary Plan and ULLICO have refused to pay Luce monthly retirement benefits under the Auxiliary Plan; and deny the remaining allegations of paragraph 81.

82.    Deny the allegations of paragraph 82.

83.    Deny the allegations of paragraph 83.

84.    Admit the allegations of paragraph 84.

**As to Count III:**

85.    Incorporate herein by reference and makes a part hereof their responses to paragraphs 1 through 59 in response to the allegations of paragraph 85.

86.    Deny the allegations of paragraph 86.

87.    Deny the allegations of paragraph 87.

88.    Admit that ULLICO Inc. wrote a letter dated September 11, 2003 to Luce; affirmatively aver that the letter speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 88.

89.    Deny the allegations of paragraph 89.

90.    Admit that the dispute between the parties, as pleaded, appears to be whether the Deferred Comp Plan is a validly adopted Plan and whether Luce's benefits under such Plan are subject to offset or forfeiture; and deny the remaining allegations of paragraph 90.

91.    Deny the allegations of paragraph 91.

92.    Deny the allegations of paragraph 92.

93.    Admit the allegations of paragraph 93.

**As to Count IV:**

94.    Incorporate herein by reference and makes a part hereof their responses to paragraphs 1 through 59 in response to the allegations of paragraph 94.

95.    Deny the allegations of paragraph 95.

96.    Deny the allegations of paragraph 96.

97.    Admit that the Deferred Comp Plan and ULLICO Inc. have refused to pay Luce deferred compensation benefits under the Deferred Comp Plan; and deny the remaining allegations of paragraph 97.

22

98.     Deny the allegations of paragraph 98.

99.     Admit the allegations of paragraph 99.

### III. GRELLE'S COMPLAINT

1.     Admit the allegations of paragraph 1.

2.     Admit the allegations of paragraph 2.

3.     Admit the allegations of paragraph 3.

4.     Admit that the ULLICO Inc. Non-Qualified Deferred Compensation Plan is an
employee benefits plan, purportedly established by ULLICO Inc., effective as of August 1, 1998;
affirmatively aver that the Deferred Compensation Plan was enacted without Board approval and
was otherwise enacted in violation of Grelle and others' fiduciary duties owed to ULLICO; and
deny the remaining allegations of paragraph 4.

5.     Admit the allegations of paragraph 5.

6.     Admit the allegations in the first sentence of paragraph 6; and affirmatively aver
that the second sentence does not require a response.

**As to Second [sic] Claim of Relief – Declaratory Judgment re: Auxiliary Plan:**

7.     Incorporate herein by reference and makes a part hereof their responses to
paragraphs 1 through 6 in response to the allegations of paragraph 7.

8.     Admit the allegations of paragraph 8.

9.     Admit the allegations of paragraph 9.

10.     Admit the allegations of paragraph 10.

11.     Admit the allegations of paragraph 11.

12.     Admit the allegations of paragraph 12.

13.    Admit that by action of the Executive Committee of the Board of Directors of

ULLICO Inc. taken on May 5, 1997, the Benefits Committee of ULLICO was created and

delegated certain authority with respect to the Qualified Plan; affirmatively aver that the Benefits

Committee's delegated authority was limited to administrative and fiduciary functions and did

not include the authority to amend the terms of the employee benefit plans, a "settlor" function

that was reserved under the terms of the Qualified Plan to the Board of ULLICO and not

delegated to the Benefits Committee which consisted of certain officers of ULLICO; and deny

the remaining allegations of paragraph 13.

14.    Admit the allegations of paragraph 14.

15.    Affirmatively aver that the Benefits Committee was not authorized to amend the

terms of the Qualified Plan; and with that caveat, admit the allegations of paragraph 15.

16.    Admit that for Plan years 2000, 2001 and 2002, Grelle received incentive

compensation for services rendered to ULLICO Inc.; and deny the remaining allegations of

paragraph 16.

17.    Admit the allegations of paragraph 17 as to Grelle; affirmatively aver that the

allegations of paragraph 17 are vague and ambiguous and therefore do not have knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of paragraph

17.

18.    Admit that there exists an actual, ripe, justiciable controversy; and deny the

remaining allegations of the eighteenth paragraph of Grelle's Complaint which is numbered

"19."

19.    Deny the allegations of paragraph 19.

## IV.  GEORGINE'S COMPLAINT

1.      Affirmatively aver that the allegations of paragraph 1 are legal conclusions to
which no response is necessary, but to the extent that there are any allegations of wrongdoing,
improper conduct or causation such allegations are denied.

2.      Admit that Georgine is a natural person and do not have knowledge or
information sufficient to form a belief as to the truth of the remaining allegations of paragraph 2.

3.      Admit that ULLICO Inc. is a corporation incorporated under the laws of
Maryland with its principal place of business in the District of Columbia; that ULLICO Inc. is
the Plan Sponsor of the Qualified Plan, Auxiliary Plan and Deferred Compensation Plan; and
deny the remaining allegations of paragraph 3.

4.      Admit the allegations of paragraph 4.

5.      Affirmatively aver that the Qualified Plan is administered by a Plan
Administrator, and that the Plan Administrator is the Employee Benefit Plans Administrative
Committee (the "Benefits Committee") appointed by ULLICO Inc., the Plan Sponsor, that
members of the Benefits Committee serve as fiduciaries of the Qualified Plan as defined by
ERISA §3(21)(A), and deny the remaining allegations of paragraph 5.

6.      Affirmatively aver that the Qualified Plan is administered by a Plan
Administrator, and that the Plan Administrator of the Qualified Plan is the Benefits Committee
appointed by ULLICO Inc., the Plan Sponsor, that members of the Benefits Committee serve as
fiduciaries of the Qualified Plan as defined by ERISA §3(21)(A), and deny the remaining
allegations of paragraph 6.

7.      Do not have knowledge or information sufficient to form a belief as to the truth of
the allegations of paragraph 7.

8.    Admit the allegations of paragraph 8.

9.    Affirmatively aver that any amounts due under the Auxiliary Plan are paid from the general accounts of the Plan Sponsor, ULLICO Inc; and admit the allegations of paragraph 9.

10.    Affirmatively aver that the Auxiliary Plan is administered by the Benefits Committee appointed by ULLICO Inc., the Plan Sponsor, and that the Benefits Committee is an administrator of the Auxiliary Plan as defined by ERISA §3(16)(A); and deny the remaining allegations of paragraph 10.

11.    Admit the allegations of paragraph 11.

12.    Admit that ULLICO Inc. Non-Qualified Deferred Compensation Plan is an employee benefits plan, purportedly established by ULLICO Inc., effective as of August 1, 1998; affirmatively aver that the Deferred Compensation Plan was enacted without Board approval and was otherwise enacted in violation of Georgine and others' fiduciary duties owed to ULLICO; and deny the remaining allegations of paragraph 12.

13.    Admit the allegations of paragraph 13.

14.    Admit the allegations of paragraph 14.

15.    Admit the allegations of paragraph 15.

16.    Admit the allegations of paragraph 16.

17.    Affirmatively aver that the SERP speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 17.

18.    Affirmatively aver that the May 31, 2001 election speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 18.

19.    Affirmatively aver that the August 31, 1998 Deferred Compensation Agreement speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 19.

20.    Affirmatively aver that the August 31, 1998 Deferred Compensation Agreement speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 20.

21.    Affirmatively aver that ULLICO Inc. and the Robert A. and Mary Rita Georgine Life Insurance Trust entered into a Split Dollar Life Insurance Agreement dated February 9, 2000; and deny as framed the remaining allegations of paragraph 21.

22.    Affirmatively aver that the Split Dollar Life Insurance Agreement speaks for itself and that it is not quoted completely; and therefore deny as framed the remaining allegations of paragraph 22.

23.    Admit the allegations of paragraph 23.

24.    Affirmatively aver that paragraph 24 is a legal conclusion to which no response is required.

25.    Admit the allegations of paragraph 25.

26.    Admit the allegations of paragraph 26.

27.    Admit that by action of the Executive Committee of the Board of Directors of

ULLICO Inc. taken on May 5, 1997, the Benefits Committee of ULLICO was created and

delegated certain authority with respect to ULLICO's Qualified Plan and that on that date the

Executive Committee also authorized a resolution, portions of which are quoted; affirmatively

aver that the Benefits Committee's delegated authority was limited to administrative and

fiduciary functions and did not include the authority to amend the terms of the employee benefit

plan, a "settlor" function that was reserved under the terms of the Qualified Plan to the Board of

ULLICO and not delegated to the Benefits Committee which consisted of certain officers of

ULLICO Inc.; and deny the remaining allegations of paragraph 27.

28.    Affirmatively aver that the Benefits Committee was not authorized to amend the

terms of the Qualified Plan; and with that caveat, admit the allegations of paragraph 28.

29.    Admit that for Plan years 2000, 2001 and 2002, Georgine received incentive

compensation for services rendered to ULLICO; and deny the remaining allegations of paragraph

29.

30.    Admit the allegations of paragraph 30.

## As to First Claim for Relief – Benefits Under the Terms of the Qualified Pension Plan and Trust:

31.    Incorporate herein by reference and makes a part hereof their responses to

paragraphs 1 through 30 in response to the allegations of paragraph 31.

32.    Admit the allegations of paragraph 32 to the extent the obligations of the

Qualified Plan are enforceable by Georgine; and otherwise deny the remaining allegations of

paragraph 32.

33.    Admit the allegations of paragraph 33.

34.    Deny the allegations of paragraph 34.

35.    Deny the allegations of paragraph 35.

36.    Deny the allegations of paragraph 36.

**As to Second Claim for Relief – Benefits Under the Terms of the Union Labor Life Auxiliary Retirement Benefits Plan:**

37.    Incorporate herein by reference and makes a part hereof their responses to

paragraphs 1 through 36 in response to the allegations of paragraph 37.

38.    Admit the allegations of paragraph 38 to the extent the obligations of the

Auxiliary Plan are enforceable by Georgine; and otherwise deny the remaining allegations of

paragraph 38.

39.    Admit the allegations of paragraph 39.

40.    Deny the allegations of paragraph 40.

41.    Deny the allegations of paragraph 41.

42.    Deny the allegations of paragraph 42.

**As to Third Claim for Relief – Benefits Under the Terms of the SERP:**

43.    Incorporate herein by reference and makes a part hereof their responses to

paragraphs 1 through 42 in response to the allegations of paragraph 43.

44.    Deny the allegations of paragraph 44.

45.    Deny the allegations of paragraph 45.

46.    Deny the allegations of paragraph 46.

47.    Deny the allegations of paragraph 47.

48.    Deny the allegations of paragraph 48.

## As to Fourth Claim for Relief – Benefits Under the Terms of the Deferred Compensation Plan:

49.     Incorporate herein by reference and makes a part hereof their responses to

paragraphs 1 through 48 in response to the allegations of paragraph 49.

50.     Admit the allegations of paragraph 50 to the extent the obligations of the Deferred

Compensation Plan are enforceable by Georgine; and otherwise deny the remaining allegations

of paragraph 50.

51.     Admit the allegations of paragraph 51.

52.     Deny the allegations of paragraph 52.

53.     Deny the allegations of paragraph 53.

54.     Deny the allegations of paragraph 54.

## As to Fifth Claim for Relief – Benefits Under the Terms of the Split Dollar Life Insurance Agreement:

55.     Incorporate herein by reference and makes a part hereof their responses to

paragraphs 1 through 54 in response to the allegations of paragraph 55.

56.     Deny the allegations of paragraph 56.

57.     Deny the allegations of paragraph 57.

58.     Admit the allegations of paragraph 58.

59.     Deny the allegations of paragraph 59.

## As to Sixth Claim for Relief – Attorney's Fees and Costs:

60.     Incorporate herein by reference and makes a part hereof their responses to

paragraphs 1 through 59 in response to the allegations of paragraph 60.

61.    Affirmatively aver that the allegations of paragraph 61 are a legal conclusion to which no response is required; but to the extent that there is allegation that Georgine is entitled to recover legal fees or expenses, deny the allegations of paragraph 61.

62.    Deny the allegations of paragraph 62.

### FOURTEENTH DEFENSE

Plaintiffs are not entitled to the relief sought.

### CONSOLIDATED COUNTERCLAIM

1.    This consolidated counterclaim seeks compensatory and equitable relief in connection with counterclaim defendants Joseph Carabillo ("Carabillo"), Robert A. Georgine ("Georgine"), John K. Grelle ("Grelle") and James A. Luce's ("Luce") breaches of fiduciary duties to Counterclaim Plaintiffs.

### Jurisdiction and Venue

2.    This Court has jurisdiction pursuant to Fed. R. Civ. P 13, 19 and 20, 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1332 (diversity of citizenship), 29 U.S.C. § 1132(a)(3) (ERISA), 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 2201 (Declaratory Judgment) and also under the doctrines of pendent and ancillary jurisdiction.  The amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and 29 U.S.C. § 1132(e)(2).  This Court has personal jurisdiction over the counterclaim defendants pursuant to Fed. R. Civ. P. 4(e) and (k) and 13, and D.C. Code §13-423.

### Parties

3.    Counterclaim Plaintiff ULLICO Inc. is a corporation formed under the laws of the state of Maryland, with its principal place of business in the District of Columbia ("ULLICO").

31

ULLICO was created in 1987 as a holding company in order to raise capital for its various

subsidiaries that provide insurance, pension, health and management and lending services to

unions, union members and their families, and benefit funds. Its subsidiaries include

counterclaim plaintiff The Union Labor Life Insurance Company, formed in 1925, to provide life

insurance to union members in high-risk jobs. ULLICO's Board of Directors has historically

consisted primarily of present or former officers of unions affiliated with the AFL-CIO and their

affiliated Taft-Hartley funds, who are major ULLICO shareholders.

       4.      Counterclaim Plaintiff The Union Labor Life Insurance Company ("Union Labor

Life") is a Maryland corporation with its principle place of business in the District of Columbia,

and created The Union Labor Life Auxiliary Retirement Benefits Plan.

       5.      Counterclaim Plaintiff The ULLICO Inc. Pension Plan and Trust (the "Qualified

Plan") is a qualified pension and retirement plan. The Qualified Plan is sponsored by ULLICO.

       6.      Counterclaim Plaintiff ULLICO Inc. Employees' Life and Health Welfare Plan

(the "Welfare Plan"), is an employee benefit plan and an employee welfare plan. The Welfare

Plan is sponsored by ULLICO.

       7.      Counterclaim Plaintiff Union Labor Life Auxiliary Retirement Benefits Plan (the

"Auxiliary Plan") is an employee benefits plan, sponsored by ULLICO.

       8.      Counterclaim Plaintiff ULLICO Inc. Non-Qualified Deferred Compensation Plan

(the "Deferred Compensation Plan") is an employee benefits plan, purportedly established by

ULLICO, effective as of August 1, 1998.

       9.      Counterclaim Plaintiff Mark Singleton is the Chief Financial Officer of ULLICO,

serves as a member of the Employee Benefit Plans Administrative Committee (the "Benefits

Committee"), the Plan Administrator for the Qualified Plan, Welfare Plan, Auxiliary Plan, and

Deferred Compensation Plan, and joins as a counterclaim plaintiff solely in his capacity as a Plan
Administrator.

10.     Counterclaim Defendant Robert Georgine ("Georgine") is, upon information and
belief, a citizen of the State of Florida and served as Chairman of the Board of Directors of
ULLICO and its Executive Committee. He was employed by ULLICO as its Chairman
beginning on December 5, 1990, and as President and Chief Executive Officer beginning on May
6, 1997, until May 8, 2003, when he ceased to serve as Chairman and CEO and resigned as
President under the imminent threat of dismissal for cause. At all material times herein,
Georgine served as a member of the Benefits Committee that served as Plan Administrator of the
Qualified Plan, Welfare Plan, Auxiliary Plan, and Deferred Compensation Plan (hereinafter
referred to collectively as "the Plans").

11.     Counterclaim Defendant Joseph Carabillo ("Carabillo") is a citizen of the
Commonwealth of Virginia and was employed by ULLICO as the Company's Chief Legal
Officer from March 2, 1987 until he was terminated for cause on May 30, 2003. At all material
times herein, Carabillo served as a member of the Benefits Committee that served as Plan
Administrator for the Plans.

12.     Counterclaim Defendant John K. Grelle ("Grelle") is a citizen of the
Commonwealth of Virginia and was employed by ULLICO as a Senior Vice President and Chief
Financial Officer of the Company from January 2, 1996, until his resignation on February 25,
2003. At all material times herein, Grelle served as a member of the Benefits Committee that
served as Plan Administrator for the Plans.

13.     Counterclaim Defendant James W. Luce ("Luce") is a citizen of the
Commonwealth of Virginia and was employed by ULLICO as an Executive Vice President of

33

the Company from February 14, 1983, until his retirement, effective June 1, 2003. At all

material times herein, Luce served as a member of the Benefits Committee that served as Plan

Administrator for the Plans. For the purposes of the counterclaim, counterclaim defendants

Georgine, Carabillo, Grelle and Luce are collectively referred to as the "counterclaim defendant

officers."

**Facts**

14.    During the relevant period, ULLICO was a privately held corporation with three

classes of stock that consist of (i) voting Capital Stock; (ii) Class A voting stock; and (iii) Class

B non-voting stock. By June 1998, ULLICO had issued and outstanding approximately 256,000

shares of Capital Stock, 6.7 million shares of Class A stock, and 753,000 shares of Class B stock.

**ULLICO Invests in Global Crossing**

15.    In February 1997, the Board approved as part of a private equity investment

program an investment of $7.6 million in a new non-public company called Nautilus LLC, the

predecessor of Global Crossing.

16.    In August 1998, Global Crossing became a publicly traded company with its

initial public offering, at which time ULLICO's share of Global Crossing was worth more than

30 times its initial investment; over the life of that investment, ULLICO realized a gross profit of

approximately $486 million on its original investment.

17.    Throughout 1998 and 1999, Global Crossing's value continued to rise

dramatically so that by the end of 1999, ULLICO's unrealized and after tax realized gains on its

Global Crossing investment was more than $1 billion or 85% of ULLICO's total stockholders'

equity. Because of the skyrocketing value of Global Crossing stock, the book value of

ULLICO's stock increased nearly 600% between December 31, 1997 and December 31, 1999.

34

## ULLICO Adopts a Formal Repurchase Program in 1997

18.    Before 1997, ULLICO paid high annual cash and stock dividends, typically in the range of an annual 8% cash and 10% stock dividend. However, in the spring of 1997 the Board decided to use a share redemption program to replace dividends as the principal means to distribute to shareholders a return on their investment and also to provide liquidity for ULLICO's larger shareholders.

19.    In May 1997, in order to implement its decision to transition away from dividends to shareholder distributions through stock redemptions, the ULLICO Board approved a formal stock repurchase program, under which ULLICO would repurchase shares of ULLICO Class A and B stock that had been acquired through what had been known as the preferred certificate program (the "1997 Repurchase Program"). The 1997 Repurchase Program envisioned that ULLICO would be allowed to repurchase $180 million in Class A and B stock over 11 years, with $30 million of stock being repurchased in 1997 and $15 million in each of the following 10 years. Consistent with the business purpose for the 1997 Repurchase Program, ULLICO decreased its dividend from 8% in 1996 to 2% in 1997 and 1998 and eliminated dividends completely in 1999.

20.    Consistent with its business objective to replace dividends with other types of distributions, the Board envisioned that to the extent more shares were tendered than could be repurchased with the funds allocated for any particular repurchase program, the share redemptions would be prorated based on the total number of shares tendered, thereby ensuring the proportionate and equitable distribution of ULLICO's funds among shareholders. The only exception authorized by the Board would be among holders of 10 or fewer shares who tendered shares, all of which would be repurchased without proration. However, prior to the actual

35

commencement of the 1997 Repurchase Program, the proration threshold was raised from 10 to 10,000 shares. This change in threshold was never approved by the Board or the Executive Committee.

### ULLICO Adopts a New Share Price Valuation System in Connection With the 1997 Repurchase Program

21.    Historically, the price of ULLICO's stock had been set at $25 per share. In order to facilitate the 1997 Repurchase Program, the Board decided that beginning in May 1997, it would abandon its method of valuing its stock at $25 per share, and would set the price per share annually under a "book value" method based on ULLICO's prior year-end audited book value per share. Under this method, the stock price was determined by taking the "Total Shareholder Equity," as reflected on the Company's audited December 31 balance sheet, and dividing it by the total number of outstanding shares of Capital, Class A and B stock. The initial price set in May 1997, based on the book value of the stock as of December 1, 1996, was $27.06 per share.

22.    Based on the pricing formula adopted in connection with the 1997 Repurchase Program, ULLICO adopted the following prices per share for the period 1997 – 2003:

  a.    May, 1997 - May, 1998:  $27.06

  b.    May, 1998 - May, 1999:  $28.70

  c.    May, 1999 - May, 2000:  $53.94

  d.    May, 2000 - May, 2001:  $146.04

  e.    May, 2001 - May, 2002:  $74.87

  f.    May, 2002 - May, 2003:  $46.58

**Corporate Insiders Utilize the New Price Formula**
**to Reap Personal Benefits from the Run Up of ULLICO Stock**

23.    With the clear prospects for the dramatic rise in ULLICO stock as a result of the

Global Crossing investment, a series of programs were put into place that allowed the senior

officers and directors of ULLICO to unjustly enrich themselves by exploiting for purposes

never intended ULLICO's method of determining share value in connection with the 1997

Repurchase Program.  These programs were either to the exclusion of ULLICO's other

shareholders or structured to benefit counterclaim defendant officers and other insiders

disproportionately in relationship to other larger shareholders and were proposed and

implemented either through *ultra vires* or other improper actions, including without limitation,

material misrepresentations and omissions in certain legally required disclosures.

24.    Beginning in 1998, the management of ULLICO, acting principally through

Georgine and Carabillo, designed, sponsored, endorsed, and implemented a series of programs

and transactions to divert to the senior officers and directors of the company corporate profits

and other distributions generated by the Global Crossing investment.  These programs included:

(1)    the 1998 and 1999 Stock Offer Programs, available only to senior officers
and directors;

(2)    the 1998, 1999, 2000, and 2001 Formal Repurchase Programs, which had
the effect of exempting officers and directors from any proration and
which, in fact, allowed certain officers and directors, including the
counterclaim defendant officers, to receive disproportionate distributions
of ULLICO funds;

(3)    an improperly authorized program of "discretionary" repurchases in 2000
and 2001, under which Georgine and Carabillo caused ULLICO to

37

repurchase nearly $15 million of ULLICO stock from corporate insiders, including all of the counterclaim defendant officers;

(4)    a non-qualified "Top Hat" Deferred Compensation Plan, under which certain corporate officers could "defer" portions of their compensation, including incentive payments, into "deemed investments" of ULLICO stock that was "deemed" purchased and sold using the price formula adopted for the 1997 Repurchase Program;

(5)    special Global Crossing "incentive payments" to the most senior officers, under which more than $4.75 million was paid to counterclaim defendant officers as bonuses;

(6)    expanded retirement benefits for the senior most corporate officers under the Qualified and Auxiliary Plans, accomplished through purported Amendments of the Qualified Plan, adopted by the counterclaim defendant officers without Board or Executive Committee approval; and

(7)    a Stock Purchase and Credit Agreement for Georgine, never approved by the Board or Executive Committee, under which Georgine received without cost 40,000 shares of ULLICO stock, with special "put" provisions obligating ULLICO to repurchase those shares at Georgine's request.

A key feature to many of these programs was the use of the price formula, adopted by the Board in May 1997 for the purpose of distributing to shareholders a return on their investment in replacement of dividend distribution, to improperly direct millions of dollars to corporate insiders.

## The 1998 and 1999 Stock Offer Programs to Corporate Insiders

25.     On February 11, 1998, the Board's Executive Committee, headed by Georgine

and with Carabillo's endorsement, appointed purportedly pursuant to Article VI, Section 1 of the

By-Laws, a Compensation Committee to ". . . act on all matters concerning compensation and

the establishment and administration of all programs and agreements relating to compensation,

whether current or deferred," provided, however, that "[n]o member of the Committee shall

participate in the determination of any matter affecting his own compensation."

26.     On July 27, 1998, purportedly pursuant to the Executive Committee's February

11, 1998 resolution, and motivated by the remarkable performance of ULLICO's Global

Crossing investment, the Compensation Committee, at the request and with the approval of

Georgine and Carabillo, authorized the offer of up to 2,000 shares of Class A stock to each

director and officer of ULLICO and directed Georgine to implement the program "at the earliest

opportunity" (the "1998 Stock Offer Program").

27.     On February 13, 1999, the Executive Committee again appointed a Compensation

Committee to act on all matters concerning the compensation of officers and employees

(omitting any mention of directors); and on May 13, 1999, the Compensation Committee

authorized defendant Georgine to offer up to 4,000 shares of ULLICO stock to senior officers

and directors at "book value" of $53.94 per share based on the Company's 1998 year-end

financials, (the "1999 Stock Offer Program"). The offers were to occur at "some time during the

course of the year 1999 at the Chairman's [Georgine's] discretion."

28.     On December 17, 1999, despite warning from outside counsel that there were

"issues involved in any sale" of ULLICO stock to officers and directors, Georgine with

39

Carabillo's approval offered each senior officer and director the right to purchase up to 4,000 shares of Class A stock at $53.94 per share.

      29.     In connection with the 1999 Stock Offer Program, Georgine and Carabillo, without any Board or Compensation Committee approval, caused ULLICO to enter into certain stock buy-back agreements with lenders to whom ULLICO stock had been pledged as security in order to provide credit support for loans to counterclaim defendants Georgine, Carabillo and Grelle for the purchase of ULLICO stock.

      30.     Because the members of the Compensation Committee were eligible to participate in the 1998 and 1999 Stock Offer Programs, the actions of the Compensation Committee violated the February 11, 1998 and February 13, 1999 Executive Committee resolutions that expressly prohibited the Compensation Committee from participating in matters directly affecting their own compensation. In addition, the Compensation Committee exceeded the delegation of authority pursuant to the February 13, 1999, Executive Committee resolution when it included directors as eligible participants under the 1999 Stock Offer Program.

      31.     In addition to its aforesaid *ultra vires* actions , the Compensation Committee also exceeded the scope of permissible activity with respect to the 1998 and 1999 Stock Offer Programs under Article VI, Section 2 of ULLICO's by-laws. Under that provision of the by-laws, the Executive Committee, which established the Compensation Committee, did not have the authority to authorize the issuance of stock and therefore could not have delegated any such authority to the Compensation Committee. Moreover, prior Board resolutions and other provisions of ULLICO's by-laws allowed only those directors and officers that had been granted the right of purchase to buy ULLICO stock; and none of the directors or officers that were eligible to participate in the 1998 and 1999 Stock Offer Programs had been so designated.

32.     Following the actions of the Compensation Committee with respect to the 1998
and 1999 Stock Offer Programs as aforesaid, Georgine and Carabillo offered to each director and
senior officer of ULLICO the opportunity to buy 2,000 shares of ULLICO stock in July 1998
and an additional 2,000 shares in October 1998 at a price of $28.70, and an additional 4,000
shares in December 1999 at a price of $53.94. These prices were based on the book value price
for the shares as of December 31 preceding the actual dates of purchase.

33.     All of the counterclaim defendant officers purchased stock pursuant to the 1998
and 1999 Stock Offer Programs. The counterclaim defendant officers were able to purchase
ULLICO stock with knowledge that the purchase price was substantially below the book value
that would likely be determined as of December 31, 1998 and 1999 and adopted by the Board the
following May as the price for ULLICO stock.

34.     The 1998 and 1999 Stock Purchase Programs approved by the Compensation
Committee resulted in self-interested transactions between ULLICO and its officers and directors
in violation of Maryland law and the fiduciary duties of those directors who participated in the
Compensation Committee decision. Specifically, the Programs were used for the purposes of
providing corporate insiders with an opportunity not available to other shareholders generally to
buy stock and realize large quick profits with little or no risk by using a pricing formula that had
been adopted by the Board to replace dividend distributions to shareholders and to provide a
return on shareholders' investment.

35.     The actions of the Compensation Committee in approving the 1998 and 1999
stock offers were not reported to ULLICO's Board of Directors or Executive Committee, were
not approved by either the Board or its Executive Committee, and to the extent that the
Compensation Committee was deemed to have been delegated such authority, that delegation

constituted a violation of Section 2-411 of the Maryland Code and otherwise violated the

standards for fiduciary duties under Section 2-405.1.

<u>**The 1998, 1999, 2000 and 2001 Repurchase Programs**</u>

36.    On May 4, 1998, the Executive Committee, headed by Georgine and with the

approval of Carabillo, authorized a $15 million repurchase program for Class A and B stock at

$28.70 a share – the book value as of December 31, 1997. On June 30, 1998, Georgine, with

Carabillo's endorsement, sent a letter to company shareholders announcing the program; and on

November 9, 1998, Georgine, again with Carabillo's approval, formally offered to repurchase

stock under the program. As in 1997, the 1998 repurchase program included a provision

exempting holders of 10,000 or fewer shares from the program's proration provisions.

37.    On May 17, 1999, the Executive Committee – again headed by Georgine and with

the approval of Carabillo – authorized a $15 million repurchase of ULLICO stock at the "book

value" price of $53.94 per share. On November 16, 1999, Georgine formally offered to

repurchase $15 million of Class A and B stock at $53.94 a share. The repurchase offer closed on

December 17, 1999, the same day Georgine offered stock to senior officers and directors under

the 1999 stock offering. Like the 1997 and 1998 repurchase programs, the 1999 repurchase

program again exempted from proration holders of fewer than 10,000 shares who tendered such

shares. The repurchase offer was oversubscribed, and resulted in shareholders of more than

10,000 shares being allowed to redeem only 91.93% of shares tendered. Despite the doubling of

Company stock price in a single year, no officer or director sold stock acquired pursuant to the

1998 stock offer in the 1999 Repurchase Program.

38.    As of December 31, 1999, Global Crossing stock had risen to approximately $50

per share ($100 per share before adjustments for stock splits). However, by May, 2000, Global

42

Crossing stock had fallen to nearly half its December 31, 1999 price levels and accordingly the actual book value of ULLICO was falling precipitously.

39.     Despite the quickly declining value of ULLICO's Global Crossing investment, on May 10, 2000, the Executive Committee of the Board led by Georgine, and with the approval of Carabillo, once again set the price of ULLICO stock based on its book value as of the preceding December 31, and thereby approved a record high ULLICO stock price of $146.04 per share, a price nearly three times the price of $53.94 adopted by the Board the previous May.

40.     In light of the declining value of ULLICO's Global Crossing investment and its predictable effect on the value of ULLICO stock, the Executive Committee recognized that the stock price of $146.04 represented a premium over its actual value and on May 10, 2000, approved an "extraordinary" repurchase program in order to distribute equitably to all shareholders some of the returns on the Global Crossing investment (the "extraordinary" repurchase plan).

41.     Under the "extraordinary" repurchase plan, ULLICO would repurchase up to 20% of ULLICO's outstanding stock, including Capital Stock, from all shareholders. The program had an aggregate value of approximately $240 million and ULLICO planned to sell $360 million of its shares of Global Crossing by the end of 2000 in order to obtain the necessary cash to implement the program.

42.     The "extraordinary" repurchase plan was subject to a number of conditions, including that the market price of Global Crossing stock, then trading at about $33 per share, had to be not less than $43 per share, a price within approximately 15% of Global Crossing's stock price on December 31, 1999. In the event that the program was oversubscribed, which was anticipated, all shareholders, including officers and directors, would be treated equally by having

43

the same percentage of their stock holdings redeemed, except that tenders of shares by
shareholders holding 100 shares or less would be accepted in total, without proration.

43.     On May 11, 2000, the Board approved this "extraordinary" repurchase plan with
the conditions established by the Executive Committee after receiving from Credit Suisse First
Boston an opinion that the program was favorable to stockholders and has been balanced in a
manner so that it will not jeopardize ULLICO's "well-being."

44.     By the end of August 2000, the market value of ULLICO's Global Crossing
investment had lost over $475 million since December 31, 1999. By November, 2000, the stock
price of Global Crossing had failed to reach the $43 level; and on November 3, 2000, with
Global Crossing stock trading at only $23 5/8 per share, the Board abandoned the
"extraordinary" repurchase program. In its place, the Board approved a $30 million repurchase
program at $146.04 per share, limited to holders of Class A and Class B shares (the "Actual 2000
Repurchase Program"). This Program together with Georgine's unprecedented use of
"discretionary" repurchases, discussed infra, provided grossly disproportionate redemptions to
senior officers and directors.

45.     The Actual 2000 Repurchase Program had a number of features that worked to
counterclaim defendant officers' benefit. In order to implement the program, all shareholders
holding more than 2% of outstanding Class A and Class B Stock had to tender 100% of their
holdings. Given the high premium reflected in the purchase price of $146.04 and the 2% rule, it
was likely that over $800 million of stock would be tendered in an offering capped at $30
million, and that as a result, severe proration would occur. Nevertheless, with Georgine and
Carabillo's approval, an exemption from proration was adopted for shareholders owning 10,000
shares or less. Moreover, Georgine, at his "discretion", further benefited such insiders by

44

agreeing to repurchase ULLICO shares (at $146.04 per share), outside the formal repurchase

program, from May to October 2000, even though none of the counterclaim defendant officers

ever disclosed the details of those discretionary repurchases to the Board.

       46.     On November 21, 2000, Georgine, with Carabillo's approval, sent a letter to

ULLICO's shareholders announcing the Actual 2000 Repurchase Program. In his letter,

Georgine misrepresented that all shareholders would "share ratably in the offering" and failed to

disclose that shareholders holding fewer than 10,000 shares could avoid proration or that such

shareholders could sell their shares outside the program at Georgine's "discretion" at the price of

$146.04. On the contrary, Georgine stated that the company "continues to reserve its right,

pursuant to the bylaws, to repurchase shares outside the Repurchase Program at $25 per share."

       47.     On December 14, 2000, ULLICO, through Georgine and with Carabillo's

approval, formally offered to repurchase $30 million of Class A and Class B Stock, but not

Capital Stock. In the legally required tender offer documents that accompanied the offer, the

exemption from proration for holders of less than 10,000 shares was disclosed, although there

was no disclosure that Georgine intended or might repurchase shares from holders of 10,000 or

less shares outside the formal program at $146.04, that all ULLICO senior officers and directors

except Georgine held less than 10,000 shares, and that several senior officers and directors,

including Georgine, had already redeemed shares at $146.04 through various "discretionary"

repurchases in 2000 before the tender offer commenced. To the contrary, the tender offer

documents represented that "[t]he Company has not been advised that any of its directors and

executive officers presently intend to tender any Shares personally owned by them pursuant to

the Offer" and that shares of the company "represented[ed] an excellent long-term investment

opportunity."

48.     As one would have expected, the Actual 2000 Repurchase Program was wildly

oversubscribed and, as a result, under the Program's proration rules ULLICO could only

repurchase 2.2% of the stock tendered by each shareholder owning more than 10,000 shares.  In

contrast, the senior officers and directors who tendered shares had all of their shares repurchased

without proration at $146.04.  As a result, those senior officers and directors who tendered shares

received more under the $30 million Actual 2000 Repurchase Program than they would have

received under the abandoned $240 million "extraordinary" repurchase plan, which did not

provide for any significant proration.

49.     Because the Qualified Plan held more than 2% of ULLICO's outstanding stock at

the time of the Actual 2000 Repurchase Program, the Qualified Plan potentially had the ability to

prevent the tender offer from taking place by withholding its shares from the tender offer.

However, rather than taking steps to protect the best interest of the Qualified Plan by objecting to

the structure of the Actual 2000 Repurchase Program and refusing to tender its shares into that

unfairly structured tender offer, the counterclaim defendant officers caused the Qualified Plan to

tender its stock without objection during the Actual 2000 Repurchase Program, thereby ensuring

that every holder of more than 2% of ULLICO stock tendered, and allowing 100% of the stock

tendered by Carabillo, Grelle, and Luce to be repurchased in the Actual 2000 Repurchase

Program while the Qualified Plan and other large shareholders were prorated and had only

approximately 2.2% of their tendered shares redeemed.

50.     The Actual 2000 Repurchase Program was adopted in violation of the fiduciary

duties and obligations owed to the Board and ULLICO by the senior executives who sponsored

and presented those proposals to the Board, specifically counterclaim defendants Georgine and

Carabillo.  As in the 1998 and 1999 Stock Offer Programs, it used the same price formula to

provide a return on investments to shareholders in lieu of dividends to provide windfall profits
and disproportionate corporate distribution to shareholders who were corporate insiders. It
resulted in substantial self-interested transactions disproportionately benefiting the counterclaim
defendant officers.

<strong>Georgine's "Discretionary" Repurchases in 2000-2001</strong>

51.    There had existed for some time an informal "discretionary" repurchase program,
whereby ULLICO stock was eligible for repurchase at the discretion of the Board Chairman.
Historically, this "discretionary" program had been used to address unusual situations such as
shareholder emergencies or hardship, or to redeem shares upon the death of a shareholder.
Though in existence for many years, this discretionary program was not formally presented to
the Board for approval until November 2000.

52.    Following the Board's adoption of the $240 million "extraordinary" repurchase
plan in May 2000 (which would have exempted from proration only holders of 100 or less
shares) but before the satisfaction of those conditions imposed on that program, such as a rise in
Global Crossing stock to $43 per share, and in advance of any authorization to go forward with
any replacement repurchase program, Georgine undertook a series of unprecedented
"discretionary" repurchases of ULLICO stock, where, at his sole discretion, the company
repurchased shares from certain officers and directors at a price Georgine determined to be
appropriate.

53.    Between May 2000 and November 2000, when the Actual 2000 Repurchase
Program was authorized, Georgine, pursuant to this "discretionary" program, caused ULLICO to
repurchase nearly 30,000 shares of company stock from senior officers and directors at $146.04
per share, including the repurchase of his own shares. None of these purchases were ever

disclosed to the full Board or to the shareholders in the tender offer documents that accompanied

the later Actual 2000 Repurchase Program. In addition, Georgine knew, or should have known,

at the time these discretionary repurchases were made, that Global Crossing stock had not

reached the price level on which the Board conditioned the "extraordinary" repurchase of

ULLICO stock at $146.04 per share.

54.    Following the expiration of the Actual 2000 Repurchase Program on January 16,

2001, and before the May 2001 Board meeting at which a substantially lower ULLICO share

price was adopted, Georgine, with Carabillo's approval, continued to exercise his "discretion"

and caused ULLICO to repurchase an additional 31,212 shares of ULLICO stock at $146.04 per

share, including shares of Capital Stock, from corporate insiders. Even after the May 2001

Board meeting, Georgine continued to exercise his "discretion" and caused ULLICO to

repurchase additional shares of ULLICO stock at $146.04 per share.

55.    The existence of these discretionary repurchases was not advertised to ULLICO

shareholders, nor was it ever adequately disclosed to the full Board. At the November 3, 2000,

Board meeting, an attempt was made to authorize these discretionary repurchases by passing

resolutions permitting Georgine to approve stock repurchases outside the formal programs and

ratifying "any and all actions taken by the Chairman or other appropriate officers of the

Corporation falling within the scope of any of the preceding resolutions . . . taken at any time."

However, details concerning the specific discretionary purchases purportedly ratified were never

disclosed to the Board in connection with the ratification.

**Total Stock Repurchased at $146.04 Per Share**

56.    From 2000-2001, pursuant to the 2000 Actual Repurchase Program and

Georgine's "discretionary" repurchases, the Company repurchased 305,636 shares of Class A

48

and Capital Stock at the rate of $146.04 per share, resulting in a total cost to the Company of

approximately $44.6 million, $30 million pursuant to the Actual 2000 Repurchase Program and

$14.6 million in Georgine's "discretionary" purchases. Of the $14.6 million in discretionary

repurchases made by Georgine, 62.6% were from senior officers and directors, with an aggregate

value of $9.2 million. None of the individual repurchases were disclosed to or approved by the

full Board, the Executive Committee or ULLICO shareholders.

57.    During the period 2000-2001, twenty directors and senior officers holding only

1.3% of ULLICO stock redeemed 93,923 shares of Class A and Capital shares at $146.04 per

share and received $13.7 million, or 31% of the total funds distributed by the Company, for stock

repurchases while the share price was set at $146.04. Approximately $9.6 million of the $13.7

million distributed to senior officers and directors was used to repurchase shares originally

purchased under the 1998 and 1999 Stock Offer programs. The directors and officers

participating in these purchases collectively realized pre-tax profits of at least $10.7 million.

### The 2001 Stock Repurchase Program

58.    On May 7, 2001 the Executive Committee, headed by Georgine and with

Carabillo's endorsement, approved a $15 million repurchase of ULLICO stock at the book value

price of $74.87.

59.    The 2001 repurchase program again provided that, if the offer were

oversubscribed, shareholders holding and tendering over 10,000 shares would be prorated, while

those possessing less than 10,000 shares would not be prorated provided they tendered all their

shares.

60.    The 2001 offer was again highly oversubscribed, and resulted in a proration rate

of 2.657% for holders of more than 10,000 shares.

61.    At least five shareholders holding fewer than 10,000 shares participated in the
2001 repurchase program and were not prorated, including Luce, who was allowed to redeem
1,100 of his 1,500 remaining Class A shares under the program without proration, despite the
requirement that shareholders holding less than 10,000 shares needed to tender all their stock to
avoid proration.

62.    The Qualified Plan also held more than 2% of ULLICO's outstanding stock at the
time of the 2001 repurchase program. However, rather than causing the Qualified Plan to take
steps to stop that transaction, the counterclaim defendant officers again caused the Qualified Plan
to tender its stock without objection during the 2001 repurchase program, thereby ensuring that
every holder of more than 2% of ULLICO stock tendered, and allowing 100% of the stock
tendered by Luce to be repurchased while the Qualified Plan and other large shareholders were
severely prorated.

63.    In addition to the programs as aforesaid, Georgine and Carabillo, with the
knowledge and acquiescence of Luce and Grelle, the senior most officers in the company who
controlled the operational and daily activities of the company, formulated, proposed and
implemented certain deferred compensation programs or amendments to existing deferred
compensation or pension plans in order to obtain windfall profits in addition to those obtained
through the 1998 and 1999 Stock Offer Programs and the 2000 and 2001 repurchase programs,
all in violation of fiduciary duties owed to ULLICO. These included a "Top Hat" Deferred
Compensation Plan and amendments to ULLICO's Qualified Plan that had the effect of
increasing benefits under the Qualified and Auxiliary Plans.

## The Deferred Compensation Plan

64.    On July 27, 1998, the Compensation Committee approved the Deferred

Compensation Plan effective August 1, 1998.

65.    Under the Deferred Compensation Plan, the counterclaim defendant officers were

allowed to defer up to 25% of their base salary and up to 100% of their bonuses (thereby

avoiding any current income tax on the deferred amounts), including incentive awards under the

Global Incentive Program, and to make "deemed investments" of those amounts into one or

more investment alternatives. Amounts deferred under the Deferred Compensation Plan were

not actually invested in the investment alternatives, which served only as a measure of return to

the plan participants. One of the investment alternatives available to the participants was

ULLICO stock, as valued each year.

66.    Georgine, Carabillo, Luce and Grelle deferred significant portions of their income

pursuant to this plan into a "deemed" investment in ULLICO stock. Specifically, Georgine

elected, as of the effective date of the plan, to "invest" all his deferred income in ULLICO stock

through "deemed" purchases of company stock at $28.70 per share. In December 1999, shortly

before the date used to calculate the ULLICO stock price for the next year (which would be

$146.04 per share) Carabillo, Grelle and Luce, as Georgine had since the beginning of the plan,

elected to move all of their "deemed investments" into ULLICO stock. As a result, Carabillo,

Grelle and Luce were "deemed" to have purchased ULLICO stock at $53.94 per share.

Thereafter, between January and May 2000, when the price of ULLICO stock was set at $146.04

based on the book value as of December 31, 1999, certain of the counterclaim defendant officers

continued to "purchase" shares through the Deferred Compensation Plan at the price of $53.94

per share.

51

67.    Shortly after the ULLICO share price was set at $146.04 in May 2000, based on

the audited book value as of December 31, 2000, Carabillo, Grelle, and Luce, shifted their

"deemed investments" out of ULLICO stock and into other "deemed investments" alternatives.

As a result, Carabillo, Grelle, and Luce were able to nearly triple their "investment" in less than

six months and realize gains during a period when the real value of ULLICO stock fell

dramatically and actual shareholders could not sell.

68.    In October 2001, Carabillo withdrew through a "hardship" distribution all his

"deemed investments" and deferred income from the Deferred Compensation Plan, totaling

approximately $606,000. This withdrawal was approved and authorized by Grelle.

69.    On March 28, 2003, Grelle withdrew all amounts from his deferred compensation

account. This withdrawal was approved and authorized by Carabillo, and occurred the same day

Carabillo went on "administrative leave" in advance of his termination "for cause."

### Qualified Plan Amendments

70.    By Resolution on May 5, 1997, the Executive Committee of the Board of

ULLICO Inc. authorized the creation of a Benefits Committee consisting of the senior officers of

ULLICO Inc., including counterclaim defendant officers (the "May 5, 1997 Executive

Committee Resolution"). Under the May 5, 1997, Executive Committee Resolution, the Benefits

Committee was " . . . authorized, directed and empowered to act as fiduciaries to all plans

created or to be created for the benefit and welfare of the corporation's employees and any

employees of each of its subsidiaries and affiliates in which the corporation or its subsidiaries

owns 80% or more of the outstanding stock and was to have full authority for the administration

of all such plans and also delegated authority for the administration of all such plans." The

Benefits Committee was not authorized to amend the terms of the plans themselves.

71.    On or about October 20, 1999, counterclaim defendant officers, who constituted

four of the five members of the Benefits Committee, purported to amend the definition of

"Sponsoring Employee ULLICO Group Compensation" as set forth in the Qualified Plan, as

amended and restated, to include "regularly established annual incentive compensation with no

maximum, effective January 1, 2000". Although the Benefits Committee appears to have

considered an actuarial study of the changes to the definition of compensation to include

incentive compensation up to a maximum of $50,000 per year, no study was apparently ever

done or considered by the Benefits Committee regarding the financial impact of including

incentive compensation "with no maximum" within the definition of compensation, as the

counterclaim defendant officers decided to adopt.

72.    On or about July 24, 2001, counterclaim defendants, as members of the Benefits

Committee, purported to amend the terms of the Qualified Plan by increasing the percentage of a

participant's average salary used to determine his normal retirement benefit from 2 to 2 1/2

percent, a 25% increase, applicable to any participant that retires effective on or after January 1,

2002, including counterclaim defendants. The October 20, 1999 and July 24, 2001 Amendments

to the Qualified Plans are referred hereinafter collectively as "the Amendments."

73.    As a result of the Amendments, counterclaim defendant officers' benefits payable

under the Qualified and Auxiliary Plan would increase significantly.

74.    The Benefits Committee did not have the authority to amend the terms of the

Qualified Plan.

**Georgine's Employment Agreement and Related Agreements**

75.    On September 22, 1999, the Board approved and authorized a five year Employment Agreement with Georgine and delegated to the Compensation Committee the authority to negotiate the terms and conditions of the contract.

76.    In December 1999, the Compensation Committee and Georgine entered into a five year Employment Agreement with an effective date of October 1, 1999. That Agreement included a provision providing for a Split Dollar Life Insurance Agreement, which was entered into on February 9, 2000, between ULLICO and the Robert A. and Mary Rita Georgine Life Insurance Trust, Ann J. O'Brien, Trustee.

77.    In addition to Georgine's Employment Agreement, on December 17, and again on December 27, 1999, the Compensation Committee, without authorization, approved a 40,000-share "bonus" to Georgine; and Georgine and each member of the Compensation Committee executed a Stock Purchase and Credit Agreement, whereby Georgine was allowed to purchase 40,000 shares of Class A stock at $53.94 per share, with a loan from the company of $2,157,600. According to the terms of the Agreement, the loan was to be forgiven at a rate of 20% per year for five years, so long as Georgine continued to serve as Chairman, President, and CEO.

78.    Pursuant to the Stock Purchase and Credit Agreement, Georgine received 40,000 shares on or about February 1, 2000, although the Stock Purchase and Credit Agreement was not fully executed by all parties until May 10, 2000. The Stock Purchase and Credit Agreement also contained a "put" option, allowing Georgine to, with 30 days written notice, require the Company to repurchase any portion of the 40,000 shares that no longer represented collateral for the loan made under the Agreement, at a "purchase price per share equal to the Fair Market

54

Value." Pursuant to this agreement, on February 14, 2001, Georgine sold 8,000 shares released from collateral at $146.04 per share.

79.    In addition to the 8,000 shares that Georgine sold back to ULLICO on February 14, 2001, under the "put" option of the Stock Purchase and Credit Agreement, Georgine sold back to ULLICO, pursuant to his own discretionary authority, 12,868 shares of ULLICO stock at $146.04 per share, 4,000 of which were repurchased by ULLICO on July 20, 2000, and the balance also on February 14, 2001.

80.    In the fall of 2000 in order to address the obvious conflict of interest associated with Georgine's sales of his stock back to ULLICO through the exercise of "discretion" in his favor, Carabillo presented to the Compensation Committee an Addendum to Georgine's Employment Agreement allowing Georgine to "put" to ULLICO his shares obtained other than through the Stock Purchase and Credit Agreement; and the Compensation Committee approved the Addendum. The Stock Purchase and Credit Agreement was never brought before the Executive Committee or full Board.

81.    The existence and terms of the Stock Purchase and Credit Agreement were never expressly disclosed to or approved by the entire Board of Directors or Executive Committee; and the Compensation Committee lacked the authority to issue stock and was not otherwise authorized to enter into agreements with Georgine in addition to the Employment Agreement.

### Corporate Waste and Conflicts of Interest

82.    As ULLICO's businesses were struggling, as the unrealized gains from Global Crossing stock were disappearing, and as ULLICO's senior executives were enriching themselves with special opportunities to dump their ULLICO stock at inflated prices, the company decided to lease an expensive corporate jet. During Georgine's tenure, beginning in

2000, the jet was used to shuttle ULLICO executives and their guests around the country.
Records of who used the jet do not reflect the name of every passenger on every flight.
However, the "primary passenger" is generally listed. By far, the most frequent flyer listed in the
flight logs is Georgine. Records reflect that he used the jet 248 times between April 2000 and
September 2002 averaging about two flights per week. The records list Georgine as the primary
passenger for flights on the corporate jet to and from destinations that included Italy,
Switzerland, and Fiji. Several of Georgine's trips appear to have been personal in nature, and
have no discernable business purpose.

83.    During this same time-frame, Georgine's nephew, Patrick J. Mertz, was a
Regional Marketing Director for ULLICO. Georgine, with Grelle's knowledge and consent,
caused ULLICO to make three unsecured loans to one of Mertz' companies, Planners & Insurers
totaling $380,000. The first two notes, for $250,000 and $90,000, were due in full on April 30,
2003. The third, for $40,000, was due in full on November 30, 2003. Mertz never repaid any
portion of the loans, and has no plans to do so. The loans were ostensibly working capital for a
business selling ULLICO insurance products, but Mertz instead used the proceeds to open a
brokerage account and engage in short-term trading of stocks. Despite the conflict of interest,
the Board was never asked to approve the transactions, and company files do not contain the sort
of loan documentation consistent with a bona fide, arms-length transaction.

84.    Also between February of 2000 and April of 2003, Carabillo caused ULLICO to
pay an entity known as "Capitol Link" a total of $326,000. An audit of these expenses revealed
that the limited services provided by Capitol Link were overpriced, incomplete and, in some
instances, appear to be related wholly to Carabillo's social activities outside ULLICO. More
distressing than this obvious waste of corporate assets, however, is that Capitol Link's

association with ULLICO revolved around Carabillo's wife, Karin Vaughn Carabillo, who was

at the time a "senior consultant" for Capitol Link. Despite this association, Carabillo did not

disclose this affiliation on the annual conflict of interest forms he completed for ULLICO

Management Company, Ulico Casualty Company, or The Union Labor Life Insurance Company,

even though each of these forms specifically asked whether Carabillo or any member of his

immediate family had any relationship with any organization that conducted business with

ULLICO.

### The Thompson Investigation and Its Aftermath

85.    In early 2002, press reports began to appear concerning self-dealing by ULLICO

corporate insiders, and in April, 2002, former Illinois Governor James Thompson was appointed

by the Board as Special Counsel to investigate the events surrounding ULLICO's 1998 and 1999

stock purchase offers to directors and several officers, its stock repurchase program, and the

Global Crossing investment. After seven months of investigations, with over 40 interviews and

the review of thousands of pages of documents, Governor Thompson issued, on November 26,

2002, the "Report of the Special Counsel on ULLICO Stock Purchase Offer and Repurchase

Programs and Global Crossing Investment" (the "Thompson Report"). One of that Report's

findings was that "a forceful argument exists that certain senior officers of the Company,

principally Georgine and Carabillo, violated their duties of loyalty and care to the company."

The Thompson Report further found that Georgine and Carabillo were "instrumental in creating

and implementing the stock offer and repurchase programs and . . . benefited from ULLICO

stock transactions."

86.    Even though the Board had approved the hiring of Winston & Strawn to conduct

an independent investigation, Georgine and Carabillo turned to the law firm of Sidley Austin

Brown & Wood to defend the company's insiders against the Board-authorized independent

investigation led by Governor Thompson, and to prepare a rebuttal to the Thompson Report.

Sidley was hired before the Thompson investigation was even complete, and unlike the decision

to hire Winston & Strawn, Sidley's hiring was not approved by the Board.  Ultimately, Sidley

was paid $1,569,065 for work consisting largely of reviewing the Thompson Report and

preparing a 29-page rebuttal.

   87. In addition to the $1.6 million spent on Sidley's services, Georgine and Carabillo

caused ULLICO to pay substantial amounts to others to review or criticize Winston & Strawn's

work.  For example, the company paid $107,071 to AON Consulting to prepare a report that was

submitted together with the Sidley rebuttal.  The AON report concluded that ULLICO officers

and directors were under-compensated, and this report was used, in effect, to try to justify the

stock profits made by many ULLICO officers and directors.

   88. Georgine and Carabillo also caused ULLICO to pay more than $300,000 to a

certain lobbyist to consult with management about the report.  The lobbyist was a friend of

Georgine's who worked on the ULLICO matter for over a year, billed the company for 647

hours at $500 per hour, and yet never produced a single piece of written work product for

ULLICO.  The lobbyist also did not review any of the documents ULLICO compiled and

produced to Congress, and never lobbied Congress regarding the ULLICO matter.

   89. At Georgine and Carabillo's direction, ULLICO also paid more than $2 million to

ten different law firms to represent officers and directors who were investigated by Winston &

Strawn.  Thus, prior to the arrival of new management in May 2003, ULLICO spent more than

$6 million on the internal investigation of the stock transactions.  Two thirds of that money was

spent either defending officers and directors in the investigation, or paying outside lawyers and consultants to review and criticize Thompson's work.

90.     In the aftermath of the Thompson Report, ULLICO became the subject of multiple state and federal investigations, including those conducted by the Department of Labor, the United States Securities and Exchange Commission, a District of Columbia Grand Jury, the Maryland Insurance Administration, and the United States Congress.

91.     Following the issuance of the Thompson Report, a number of the Board's members decided not to stand for reelection, and at their annual meeting on May 8, 2003, ULLICO's shareholders elected and installed a new Board of Directors that, for the first time since the 2000 Actual Repurchase Program, had a majority of directors who did not participate in any of the transactions that were the subject of the Thompson Report.

92.     Georgine resigned on May 8, 2003, shortly before the new Board was installed, recognizing that the new Board would otherwise terminate him "for cause." At the end of March 2003, Carabillo "stepped aside" as Chief Legal Officer, and on May 30, 2003, was terminated for cause. Grelle resigned on February 25, 2003; and Luce retired effective June 1, 2003.

93.     In May 2003, the new Board appointed former federal judge Abner Mikva as chairman of a special Regulatory and Litigation Oversight Subcommittee to review the recommendations of the Thompson Report and recommend whether claims should be asserted as a result of the events that took place during 1998-2001. After deliberation, Mr. Mikva and his Committee recommended to the Board that legal action be instituted, and pursuant to that recommendation the Board authorized such legal action.

59

## Count I -- Breach of Fiduciary Duty to the Qualified Plan

94.     Counterclaim Plaintiffs incorporate herein by reference and makes a part hereof the allegations of paragraphs 1 through 93.

95.     At all material times herein, counterclaim defendants, as members of the Benefits Committee, served as "fiduciaries" to the Qualified Plan and Welfare Plan within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the Plan Administrator of the Auxiliary Plan.

96.     At all material times herein, counterclaim defendants were under an obligation and duty in performing their duties and responsibilities to the Plans to, *inter alia,* (a) act solely in the interest of the Plans' participants and beneficiaries; (b) act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person skilled and expert in the professions of investment management or administration would use; (c) make appropriate disclosures of material information, including without limitation, appropriate disclosures to each other; and (d) act in accordance with the documents and instruments governing the Plans.

97.     As a result of their conduct as aforesaid, counterclaim defendants failed to act as prudent persons by failing to adequately consider the impact of the Amendments on the Qualified Plan before the Amendments were adopted.

98.     As a result of their conduct as aforesaid, counterclaim defendants failed to act solely in the interest of the Plans' participants and beneficiaries by proposing and purporting to adopt Amendments that disproportionately benefited themselves as ULLICO's most highly compensated employees.

99.     As a result of their conduct as aforesaid, counterclaim defendants failed to act in accordance with the documents and instruments governing the Plans by purporting to enact

Amendments contrary to the terms of the Qualified Plan and subsequently administering the

Plans as if the Amendments had been validly adopted, when they in fact had not.

100. Despite their obligations to the Plans as aforesaid, counterclaim defendants

engaged in a course of conduct that dealt with the Qualified Plan and the Qualified Plan assets

for their own benefit, in violation of the terms of the Qualified Plan, and the requirements of

ERISA, and otherwise failed to discharge their duties and obligations to the Qualified Plan and

its participants, and to each other, and to act to obtain the protections and benefits to which the

Qualified Plan was entitled to receive by virtue of the assets that it owned or controlled.

101. As a direct and proximate result of their conduct as aforesaid, counterclaim

defendant acted *ultra vires* and otherwise breached their fiduciary duties to the Qualified Plan,

including, without limitation, their duty of care, duty of loyalty, and duty to act in accordance

with the Plan documents, and instead acted with and in furtherance of personal interests and

objectives in conflict with their positions as fiduciaries.

102. At all material times herein, each counterclaim defendant was a "co-fiduciary"

and therefore jointly liable, pursuant to Section 405 of ERISA, 29 U.S.C. § 1105 and otherwise,

for all fiduciary breaches to the Qualified Plan committed by the other counterclaim defendants.

103. As a direct and proximate cause of their breach of fiduciary duty to the Qualified

Plan, the Qualified Plan was damaged and counterclaim defendants are not entitled to receive

benefits as a result of the invalid Amendments they purported to adopt.

104. Counterclaim defendant officers Luce and Georgine are currently receiving

benefits under the Qualified Plan.

105.    Counterclaim defendant Carabillo has claimed certain special early retirement benefits under the Qualified Plan and may seek regular early retirement benefits or regular retirement benefits under the Qualified Plan in the future.

106.    Counterclaim defendant Grelle has not yet elected benefits under the Qualified Plans, but is expected to do so in the future.

107.    As a result of their breaches of fiduciary duty to the Qualified Plan as aforesaid, counterclaim defendant officers have forfeited all or part of their rights to benefits under the Qualified Plan.

108.    As a direct and proximate result of their breaches of duty as aforesaid, the Qualified Plan is entitled to set off and/or recoup any damage sustained by the Qualified Plan as a result of counterclaim defendants' wrongful conduct.

109.    There is an actual, justiciable controversy between the parties, ripe for adjudication.

110.    Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, the Qualified Plan is entitled to a declaration that the Amendments to the Qualified Plan purportedly adopted on or about October 20, 1999 and July 24, 2001 are invalid as to counterclaim defendants and that counterclaim defendants are not entitled to receive benefits there under, that each counterclaim defendant is jointly and severally liable for all losses sustained by the Qualified Plan and is not entitled to any benefits that they have or may receive as a result of their breaches of duty and obligations to the Qualified Plan and order that each of them indemnify the Qualified Plan for all losses incurred by the Qualified Plan as a result of their violations and disgorge to the Qualified Plan an amount equal to the benefits they received in violation of their fiduciary duties owed to the Qualified Plan.

## COUNT II – Breach of Fiduciary Duty With Respect to the Welfare Plan

111.    Counterclaim Plaintiffs incorporate herein by reference and makes a part hereof the allegations of paragraphs 1 through 110.

112.    The Welfare Plan is an "unfunded" plan in that it holds no assets other than the insurance policies that provide benefits to Welfare Plan participants, and, as a result relies upon the plan sponsor, ULLICO Inc., for the payment of all premiums due under the policies held by the Welfare Plan.

113.    As a result of the critical role played by ULLICO Inc. with respect to the Welfare Plan, at all material times herein, counterclaim defendants, in their capacity as fiduciaries to the Welfare Plan, were under an obligation not to damage ULLICO Inc.

114.    Despite their obligations and duties as aforesaid, counterclaim defendants engaged in a course of conduct that damaged ULLICO Inc. and thereby threatened to impair, and, in fact, did impair, ULLICO Inc.'s ability to continue its financial support for the Welfare Plan.

115.    As a result of their conduct aforesaid, counterclaim defendants breached their fiduciary duties to the Welfare Plan, and are therefore not entitled to receive benefits under the Welfare Plan.

116.    There is an actual, justiciable controversy between the parties, ripe for adjudication.

117.    Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, the Welfare Plan is entitled to a declaration that each counterclaim defendant is not entitled to any benefits otherwise payable under the Welfare Plan.

## COUNT III- Breach of Fiduciary Duty With Respect to the Auxiliary Plan

118.    Counterclaim Plaintiffs incorporate herein by reference and makes a part hereof the allegations of paragraphs 1 through 117.

119.    Counterclaim defendants currently seek, or are expected to seek in the future, benefits under the Auxiliary Plan, including increased benefits as a result of the Amendments.

120.    As a result of their conduct as aforesaid, counterclaim defendants engaged in an unauthorized settlor function, and breached their fiduciary duties to the Qualified Plan in enacting the Amendments.

121.    The Auxiliary Plan is an "unfunded" "top-hat" plan, which holds no assets and is funded entirely out of the general accounts of its plan sponsor, ULLICO Inc.

122.    Because the Auxiliary Plan depends entirely upon ULLICO Inc. for funding, counterclaim defendants had a fiduciary obligation to the Auxiliary Plan not to damage or impair the financial capacity of ULLICO Inc.

123.    Despite their obligations and duties as aforesaid, counterclaim defendants engaged in a course of conduct that damaged ULLICO Inc. and thereby threatened to impair, and, in fact, did impair ULLICO Inc.'s ability to continue its financial support for the Auxiliary Plan.

124.    As a result of their conduct aforesaid, counterclaim defendants breached their fiduciary duties with respect to the Auxiliary Plan, and are therefore not entitled to benefits under the plan.

125.    There is an actual, justiciable controversy between the parties, ripe for adjudication.

126.    The Auxiliary Plan is entitled to a declaration that each counterclaim defendant is
not entitled to any benefits otherwise payable under the Auxiliary Plan.

### COUNT IV – Professional Negligence

127.    Counterclaim Plaintiffs incorporate herein by reference and makes a part hereof
the allegations of paragraphs 1 through 126.

128.    At all material times, Carabillo was a lawyer licensed in the District of Columbia
and as such was under a duty to the Plans to provide legal advice in accordance with the
prevailing standards of professional care.

129.    Despite his obligations as aforesaid, Carabillo engaged in a course of conduct that
caused the Plans to engage in improper and unauthorized transactions and other activities,
including, without limitation, those that violated the terms of the Qualified Plan.

130.    As a result of his conduct as aforesaid, Carabillo breached the applicable standard
of professional care and his duties and obligations owed to the Plans, all to the detriment and
damage of the Plans.

131.    As a direct and proximate result of Carabillo's breaches of duty as aforesaid, the
Plans have been damaged in an amount to be determined at trial.

### COUNT V – Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, and Civil Conspiracy: Auxiliary Plan

132.    Counterclaim Plaintiffs incorporate herein by reference and makes a part hereof
the allegations 1 through 131.

133.    In drafting, adopting and implementing the Amendments to the Qualified Plan,
under which benefits would increase under the Auxiliary Plan, the counterclaim defendant
officers, acting as members of the Benefits Committee, engaged in a settlor function that was

reserved for the Board of Directors and therefore beyond the scope of authority that was
delegated to the Benefits Committee.

134.    Section 402(b)(3) of ERISA, 29 U.S.C. § 1102(b)(3) requires every ERISA
covered plan to set forth procedures to amend a plan and to identify the persons or entities with
authority to amend the plan.

135.    Under Section 11.1 of the Qualified Plan, the Board of ULLICO Inc. retains the
right to amend that Plan; and under Article 9 of the Auxiliary Plan, The Union Labor Life
Insurance Company retains the right to amend the Auxiliary Plan.

136.    As a result of their conduct as aforesaid, counterclaim defendant officers acted
*ultra vires* and otherwise breached their fiduciary duties to ULLICO, and also aided and abetted
or otherwise conspired with each other in connection with those breaches of duty, including their
duties of loyalty and care, since, *inter alia*, each of the members of the Benefits Committee
would benefit personally from the Amendments and therefore acted with and in furtherance of an
interest in conflict with their positions as fiduciaries.

137.    As a result of counterclaim defendant officers' conduct as aforesaid, the
Amendments are invalid with respect to any claim for benefits payable as a result of the
Amendments to the members of the Benefits Committee that adopted it.

138.    Despite their conduct and the invalidity of the Amendments as to any claim for
benefits by the counterclaim defendant officers as aforesaid, counterclaim defendant officers
have claimed or are expected to claim that they are entitled to retirement benefits under the
Auxiliary Plan that are calculated with reference to the Amendments.

139.    As a result of their breaches of fiduciary duty as aforesaid, counterclaim
defendant officers have forfeited all or part of their rights to benefits under the Auxiliary Plan.

140.    As a direct and proximate result of their breaches of duty as aforesaid, the Auxiliary Plan is entitled to set off and recoup any damage sustained by the Auxiliary Plan as a result of counterclaim defendants' wrongful conduct.

141.    There is an actual, justiciable controversy between the parties, ripe for adjudication.

142.    As a result of the conduct of the counterclaim defendant officers, the invalidity of the Amendments and the claims or expected claims of the counterclaim defendant officers as aforesaid, ULLICO is entitled to a declaration that counterclaim defendant officers are not entitled to receive any benefits payable pursuant to the Auxiliary Plan as a result of the Amendments, that each counterclaim defendant is jointly and severally liable for all losses sustained by the Auxiliary Plan as a result of the Amendments, and further that each counterclaim defendant is jointly and severally obligated and responsible for indemnifying ULLICO for any amount it is or will be obligated to pay under the Auxiliary Plan as a result of the Amendments.

## Count VI – Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, and Civil Conspiracy: Deferred Compensation Plan

143.    Counterclaim Plaintiffs incorporate herein by reference and makes a part hereof the allegations 1 through 142.

144.    The Deferred Compensation Plan was enacted without Board approval and was otherwise administered in violation of fiduciary duties owed to ULLICO.

145.    The counterclaim defendant officers exploited the ULLICO share valuation system, adopted in connection with the 1997 Repurchase Program, in a manner and for a purpose never intended, such that their manipulation of their Deferred Compensation accounts in and out

of "deemed investments" in ULLICO stock allowed them to generate "profits" that under the
circumstances constituted a breach of their fiduciary duties and waste of corporate assets.

146.    The impact of ULLICO's investment in Global Crossing stock on the book value
of ULLICO stock resulted in large short-term changes in the value of ULLICO stock that had
never been anticipated by the Board, or the Compensation Committee when it established the
Deferred Compensation Plan and the "deemed investment" features of that program, or the price
valuation system enacted in 1997 for a purpose unrelated to the Deferred Compensation Plan.

147.    Counterclaim defendant officers, as fiduciaries of ULLICO and the Deferred
Compensation Plan, were under a duty to report or disclose to the Compensation Committee, the
Executive Committee, and the Board of Directors the unintended and unexpected impact that the
stock valuation system had on the benefits available under the Deferred Compensation Plan.
Specifically, they were under an obligation to disclose that the Deferred Compensation Plan, as
structured, allowed for the manipulation of investment options under the Deferred Compensation
Plan to generate enormous windfall profits for the participants in the Plan through the "purchase"
and "sale" of ULLICO stock in a manner that allowed participants to realize "profits" in a way
that actual shareholders could not.

148.    The counterclaim defendant officers, as the senior most executives of the
company, and as a fiduciaries of the Deferred Compensation Plan (in their capacity as members
of the Benefits Committee) were under a fiduciary obligation to disclose to the Board any
personal benefits that they would or could obtain as a result of the dramatic and unexpected rise
in ULLICO share value as a result of ULLICO's investment in Global Crossing stock.

149.    By failing to disclose and obtain approvals regarding the unintended benefits that
they would or did obtain under the Deferred Compensation Plan, counterclaim defendant officers

breached their fiduciary duties to ULLICO and the Deferred Compensation Plan, and also aided

and abetted or otherwise conspired with each other in connection with those breaches of duty,

including a breach of their duties of disclosure, loyalty, and care, and duty to avoid corporate

waste on the part of ULLICO.

150.    As implemented, the benefits under the Deferred Compensation Plan with respect

to the "deemed investments" in ULLICO stock resulted in the accrual of benefits that, if paid,

would constitute unjust enrichment, a waste of corporate assets, and a breach of fiduciary duty

owed to ULLICO and the shareholders.

151.    As a result of their conduct aforesaid, Carabillo, Grelle, Georgine and Luce have

improperly and unjustly enriched themselves through benefits under an improperly enacted and

administered deferred compensation plan and are otherwise barred from obtaining any benefits

there under based on "deemed investments" in ULLICO stock.

152.    In October 2001, Carabillo requested and with Grelle's approval, received a

"hardship" distribution from the Deferred Compensation Plan in the amount of approximately

$606,000.00.

153.    In March 2003, Grelle requested and with Carabillo's approval, received a

distribution from the Deferred Compensation Plan in the amount of $732,326.99.

154.    As a result of the events and conduct aforesaid, Carabillo and Grelle are obligated

to disgorge, return to ULLICO, and forfeit the amount of distributions they received under the

Deferred Compensation Plan by virtue of their "deemed investments" in ULLICO stock under

the Deferred Compensation Plan.

155.    As a result of their conduct aforesaid, ULLICO does not intend to disburse profits or benefits to Georgine and Luce from the Deferred Compensation Plan resulting from their "deemed" investments in ULLICO Stock.

156.    There is an actual, justiciable controversy, ripe for adjudication.

157.    ULLICO is entitled to a declaration that Georgine and Luce are not entitled to a distribution of profits or benefits under the Deferred Compensation Plan based on "deemed investments" in ULLICO stock, as they claim.

158.    As a result of their conduct aforesaid, Carabillo, Grelle, Georgine and Luce are jointly and severally liable for the amounts disbursed to Carabillo and Grelle. In addition to Carabillo and Grelle's disgorgement as aforesaid, Carabillo, Grelle, Georgine and Luce, because of their conduct as aforesaid, are obligated to disgorge or otherwise forfeit to ULLICO those amounts of compensation deferred under the deferred compensation plan through which they attempted to obtain improper benefits in breach of their fiduciary duties to ULLICO.

159.    As a result of their conduct aforesaid, Carabillo, Grelle, Georgine and Luce are jointly and severally liable for those amounts they are obligated to disgorge to ULLICO.

WHEREFORE, counterclaim plaintiffs demand the following relief:

1.    As to Count I, judgment against counterclaim defendants Carabillo, Georgine, Luce and Grelle in an amount to be determined at trial, and a declaration that the Amendments purportedly adopted by the Benefits Committee on or about October 20, 1999 and July 24, 2001 are invalid and unenforceable as to the counterclaim defendants, that counterclaim defendants Carabillo, Georgine, Luce and Grelle breached their fiduciary duties to the Qualified Plan, that such breaches caused losses and damages to the Qualified Plan in an amount to be determined at

70

trial, that counterclaim defendants are jointly and severally liable for such amounts that such amounts may be set off against any benefits properly payable under the Qualified Plan.

2.    As to Count II, a declaration that counterclaim defendants Carabillo, Georgine, Luce and Grelle are not entitled to benefits under the Welfare Plan.

3.    As to Count III, a declaration that counterclaim defendants Carabillo, Georgine, Luce and Grelle are not entitled to benefits under the Auxiliary Plan.

4.    As to Count IV, judgment against counterclaim defendant Carabillo in an amount to be determined at trial.

5.    As to Count V, judgment against counterclaim defendants Carabillo, Georgine, Luce and Grelle in an amount to be determined at trial and a judicial declaration that counterclaim defendants Georgine, Carabillo, Luce, and Grelle are not entitled to receive any benefits under the Auxiliary Plan based on the Amendments to the Qualified Plan adopted by the Benefits Committee, and shall indemnify ULLICO Inc. and The Union Labor Life Insurance Company with respect to any financial obligation incurred as a result of the Amendments.

6.    As to Count VI, judgment as to counterclaim defendants Carabillo, Grelle, Georgine and Luce jointly and severally in an amount to be determined at trial and a judicial declaration that counterclaim defendants Georgine and Luce are not entitled to receive any distributions or benefits under the Deferred Compensation Plan.

7.    Such other and equitable relief as the Court may deem appropriate, including set-offs, recoupments, and constructive trusts in favor of counterclaim plaintiffs, and prejudgment interest and the costs of this Action, including reasonable attorneys' fees pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

Dated:  July 13, 2005

MILLER & CHEVALIER CHARTERED

_____

James A. Bensfield (DC Bar #189-084)
Anthony J. Trenga (DC Bar #218255)
Mark J. Rochon (DC Bar #376042)
Brian A. Hill (DC Bar #456086)
Matthew T. Reinhard (DC Bar #474941)
MILLER & CHEVALIER, CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Telephone: (202) 626-5800
Facsimile: (202) 628-0858
Email:  atrenga@milchev.com
Attorneys for the ULLICO Defendants and
Counterclaim Plaintiffs

## PACIFIC LIFE'S ANSWER TO THE CONSOLIDATED COMPLAINT

### I.  PRELIMINARY STATEMENT

1.    Pacific Life Insurance Company ("Pacific Life") denies that any plaintiff is entitles to any relief from Pacific Life.  Pacific Life denies all remaining allegations contained in Paragraph 1 of the Consolidated Complaint.

### II.  JURISDICTION AND VENUE

2.    The allegations contained in paragraph 2 of the Consolidated Complaint are legal conclusions to which no response is required.  To the extent a response is required, Pacific Life denies all allegations contained in paragraph 2 of the Consolidated Complaint.

3.    The allegations contained in paragraph 3 of the Consolidated Complaint are legal conclusions to which no response is required.  To the extent a response is required, Pacific Life denies all allegations contained in paragraph 3 of the Consolidated Complaint.

4.    The allegations contained in paragraph 4 of the Consolidated Complaint are legal conclusions to which no response is required.  To the extent a response is required, Pacific Life denies all allegations contained in paragraph 4 of the Consolidated Complaint.

### III.  CARABILLO'S COMPLAINT

Plaintiff Joseph A. Carabillo brings no claims against Pacific Life, and as such no response is required from Pacific Life.

### IV.  LUCE'S COMPLAINT

Plaintiff James W. Luce brings no claims against Pacific Life, and as such no response is required from Pacific Life.

### V.    GRELLE'S COMPLAINT

Plaintiff John K. Grelle brings no claims against Pacific Life, and as such no response is required from Pacific Life.

### VI.    GEORGINE'S COMPLAINT

#### A.    PRELIMINARY STATEMENT

1.    Pacific Life admits that Georgine has brought this action seeking benefits and other relief under the terms of various pension and welfare plans. Pacific Life denies that Georgine is entitled to any relief from Pacific Life as to any of his claims. Pacific Life denies all remaining allegations contained in paragraph 1 of the Georgine's Complaint.

#### B.    PARTIES

2.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 2 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 2 of Georgine's Complaint.

3.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 3 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 3 of Georgine's Complaint.

4.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 4 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 4 of Georgine's Complaint.

5.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 5 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 5 of Georgine's Complaint.

6.    Pacific Life is without sufficient information to admit or deny the allegations

contained in paragraph 6 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 6 of Georgine's Complaint.

7.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 7 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 7 of Georgine's Complaint.

8.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 8 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 8 of Georgine's Complaint.

9.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 9 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 9 of Georgine's Complaint.

10.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 10 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 10 of Georgine's Complaint.

11.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 11 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 11 of Georgine's Complaint.

12.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 12 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 12 of Georgine's Complaint.

13.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 13 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 13 of Georgine's Complaint.

14.    Pacific Life admits that it issued an insurance policy, Policy No. 1A2373514-0 (the "Policy"), owned by the Robert A. and Mary Rita Georgine Insurance Trust. Pacific Life is without sufficient information to admit or deny the remaining allegations contained in paragraph 14 of the Counterclaim. To the extent a further response is required, Pacific Life denies all remaining allegations contained in paragraph 14 of the Counterclaim.

## C.    RELEVANT PLANS

15.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 15 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 15 of Georgine's Complaint.

16.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 16 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 16 of Georgine's Complaint.

17.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 17 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 17 of Georgine's Complaint.

18.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 18 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 18 of Georgine's Complaint.

19.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 19 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 19 of Georgine's Complaint.

20.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 20 of Georgine's Complaint. To the extent a response is required, Pacific

Life denies all allegations contained in paragraph 20 of Georgine's Complaint.

21.    Pacific Life denies the remaining allegations contained in paragraph 21 of Georgine's Complaint.

22.    No response is required to paragraph 22 of Georgine's Complaint because the documents referenced therein speak for themselves.  To the extent a response is required, Pacific Life denies all allegations contained in paragraph 22 of Georgine's Complaint.

23.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 23 of Georgine's Complaint.  To the extent a response is required, Pacific Life denies all allegations contained in paragraph 23 of Georgine's Complaint.

24.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 24 of Georgine's Complaint.  To the extent a response is required, Pacific Life denies all allegations contained in paragraph 24 of Georgine's Complaint.

25.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 25 of Georgine's Complaint.  To the extent a response is required, Pacific Life denies all allegations contained in paragraph 25 of Georgine's Complaint.

26.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 26 of Georgine's Complaint.  To the extent a response is required, Pacific Life denies all allegations contained in paragraph 26 of Georgine's Complaint.

27.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 27 of Georgine's Complaint.  To the extent a response is required, Pacific Life denies all allegations contained in paragraph 27 of Georgine's Complaint.

28.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 28 of Georgine's Complaint.  To the extent a response is required, Pacific

Life denies all allegations contained in paragraph 28 of Georgine's Complaint.

29.     Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 29 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 29 of Georgine's Complaint.

30.     Pacific Life denies that it has failed to comply with any of its obligations pursuant to the Policy, the Split-Dollar Life Insurance Agreement, the corresponding Collateral Assignment of Life Insurance, or any other applicable agreements. Pacific Life further denies that it has filed any claims seeking declaratory relief regarding the Policy. Pacific Life is without sufficient information to admit or deny the remaining allegations contained in paragraph 30 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 30 of Georgine's Complaint.

### D.    CLAIMS FOR RELIEF

**First Claim for Relief**
**Benefits Under the Terms of the Qualified Pension Plan and Trust**
**ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**

31.     In response to paragraph 31 of Georgine's Complaint, Pacific Life incorporates by reference its responses to paragraphs 1 through 30 of Georgine's Complaint.

32.     Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 32 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 32 of Georgine's Complaint.

33.     Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 33 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 33 of Georgine's Complaint.

34.     Pacific Life is without sufficient information to admit or deny the allegations

contained in paragraph 34 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 34 of Georgine's Complaint.

35.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 35 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 35 of Georgine's Complaint.

36.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 36 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 36 of Georgine's Complaint.

**Second Claim for Relief**
**Benefits Under the Terms of the Union Labor Life Auxiliary Retirement Benefits Plan**
**ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**

37.    In response to paragraph 37 of Georgine's Complaint, Pacific Life incorporates by reference its responses to paragraphs 1 through 36 of Georgine's Complaint.

38.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 38 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 38 of Georgine's Complaint.

39.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 39 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 39 of Georgine's Complaint.

40.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 40 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 40 of Georgine's Complaint.

41.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 41 of Georgine's Complaint. To the extent a response is required, Pacific

Life denies all allegations contained in paragraph 41 of Georgine's Complaint.

42.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 42 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 42 of Georgine's Complaint.

**Third Claim for Relief**
**Benefits Under the Terms of the SERP**
**ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**

43.    In response to paragraph 43 of Georgine's Complaint, Pacific Life incorporates by reference its responses to paragraphs 1 through 42 of Georgine's Complaint.

44.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 44 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 44 of Georgine's Complaint.

45.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 45 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 45 of Georgine's Complaint.

46.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 46 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 46 of Georgine's Complaint.

47.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 47 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 47 of Georgine's Complaint.

48.    Pacific Life is without sufficient information to admit or deny the allegations contained in paragraph 48 of Georgine's Complaint. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 48 of Georgine's Complaint.

**Fourth Claim for Relief**
**Benefits Under the Terms of the Deferred Compensation Plan**
**ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**

49.    In response to paragraph 49 of Georgine's Complaint, Pacific Life incorporates

by reference its responses to paragraphs 1 through 48 of Georgine's Complaint.

50.    Pacific Life is without sufficient information to admit or deny the allegations

contained in paragraph 50 of Georgine's Complaint. To the extent a response is required, Pacific

Life denies all allegations contained in paragraph 50 of Georgine's Complaint.

51.    Pacific Life is without sufficient information to admit or deny the allegations

contained in paragraph 51 of Georgine's Complaint. To the extent a response is required, Pacific

Life denies all allegations contained in paragraph 51 of Georgine's Complaint.

52.    Pacific Life is without sufficient information to admit or deny the allegations

contained in paragraph 52 of Georgine's Complaint. To the extent a response is required, Pacific

Life denies all allegations contained in paragraph 52 of Georgine's Complaint.

53.    Pacific Life is without sufficient information to admit or deny the allegations

contained in paragraph 53 of Georgine's Complaint. To the extent a response is required, Pacific

Life denies all allegations contained in paragraph 53 of Georgine's Complaint.

54.    Pacific Life is without sufficient information to admit or deny the allegations

contained in paragraph 54 of Georgine's Complaint. To the extent a response is required, Pacific

Life denies all allegations contained in paragraph 54 of Georgine's Complaint.

**Fifth Claim for Relief**
**Benefits Under the Terms of the Split Dollar Life Insurance Agreement**
**ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**

55.    In response to paragraph 55 of Georgine's Complaint, Pacific Life incorporates by

reference its responses to paragraphs 1 through 54 of Georgine's Complaint.

81

56.    Pacific Life admits that the Trustee of the Robert A. and Mary Rita Georgine Life Insurance Trust executed a document entitled "Split-Dollar Life Insurance Agreement." That document speaks for itself. The remaining allegations contained in paragraph 56 of Georgine's Complaint are legal conclusions to which no response is required. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 56 of Georgine's Complaint.

57.    The allegations contained in paragraph 57 of Georgine's Complaint are legal conclusions to which no response is required. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 57 of Georgine's Complaint.

58.    Pacific Life admits that ULLICO has filed several claims regarding the Split-Dollar Life Insurance Agreement and the Policy against various parties. Those claims speak for themselves. Pacific Life denies all remaining allegations contained in paragraph 58 of Georgine's Complaint.

59.    The allegations contained in paragraph 59 of Georgine's Complaint are legal conclusions to which no response is required. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 59 of Georgine's Complaint.

### Sixth Claim for Relief
### Attorney's Fees and Costs
### ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1)

60.    In response to paragraph 60 of Georgine's Complaint, Pacific Life incorporates by reference its responses to paragraphs 1 through 59 of Georgine's Complaint.

61.    No response is required to the allegations contained in paragraph 61 of Georgine's Complaint because the statute referenced therein speaks for itself. To the extent a response is required, Pacific Life denies all allegations contained in paragraph 61 of Georgine's Complaint.

82

62.    Pacific Life denies that Georgine is entitled to any recovery, including but not limited to attorneys' fees and costs, from Pacific Life. Pacific Life further states that it may be entitled to recovery of reasonable attorneys' fees and costs from Georgine and/or other parties to this litigation. Pacific Life denies all remaining allegations contained in paragraph 62 of Georgine's Complaint.

WHEREFORE, Pacific Life denies that Georgine is entitled to any of the relief requested in the Prayer for Relief.

Unless expressly admitted herein, Pacific Life denies each and every allegation set forth in Georgine's Complaint.

## AFFIRMATIVE DEFENSES

For its Affirmative Defenses, Pacific Life states as follows:

### First Affirmative Defense

Georgine's Complaint fails to state any claims against Pacific Life upon which relief can be granted.

### Second Affirmative Defense

Georgine's claims against Pacific Life are barred by the doctrines of unclean hands, waiver, laches and/or estoppel.

### Third Affirmative Defense

Georgine's claims against Pacific Life are barred by the applicable statutes of limitations.

### Fourth Affirmative Defense

Georgine's claims against Pacific Life are barred by failure to exhaust applicable administrative remedies.

### Fifth Affirmative Defense

Georgine's claims against Pacific Life are barred by a failure to mitigate damages.

### Sixth Affirmative Defense

Georgine's claims against Pacific Life are barred by insufficiency and/or defective service of process.

### Seventh Affirmative Defense

Georgine's claims against Pacific Life are barred by, or any award of damages must be offset under, the doctrines of contributory and/or comparative negligence.

### Eighth Affirmative Defense

Georgine's claims against Pacific Life are barred by the business judgment rule.

### Ninth Affirmative Defense

Georgine's claims against Pacific Life are barred by, or any damages award must be offset under, the doctrine of equitable indemnity.

### Tenth Affirmative Defense

Georgine's claims against Pacific Life are barred by applicable federal and state common law and statutes.

### Eleventh Affirmative Defense

Georgine's claims against Pacific Life are barred because Pacific Life was not a party to the Split-Dollar Life Insurance Agreement.

### Twelfth Affirmative Defense

Georgine's claims against Pacific Life are barred because Pacific Life has complied with all its obligations pursuant to the Policy.

### Thirteenth Affirmative Defense

Georgine's Claims against Pacific Life are barred because Pacific Life has not violated any of the provisions of the Policy.

WHEREFORE, Pacific Life requests that Georgine's claims against Pacific Life be dismissed with prejudice, and that Pacific Life be granted judgment against Georgine for costs and attorneys' fees, and any other relief this Court deems appropriate.

Dated:  July 13, 2005

JORDEN BURT LLP

By _____/s/_____
W. Glenn Merten (DC Bar # 461463)
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, DC  20007-5208
Tel. (202) 965-8100
Fax (202) 965-8104
wgm@jordenusa.com
Attorney for Defendant
Pacific Life Insurance Company