# AIG American International Companies®

### Employee Benefit Plan Fiduciary Liability Insurance

POLICY NUMBER: *495-38-35*
RENEWAL OF: *874-44-03*

☐ AIU Insurance Company
☐ American Home Assurance Company
☐ American International Pacific Insurance Company
☐ American International South Insurance Company
☐ Birmingham Fire Insurance Company of Pennsylvania

☐ Granite State Insurance Company
☐ Illinois National Insurance Company
☐ National Union Fire Insurance Company of Louisiana
☒ National Union Fire Insurance Co. of Pittsburgh, Pa.
☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: EXCEPT AS SET FORTH IN ITEM 3(b) OF THE DECLARATIONS, THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

NOTICE: THE INSURER HAS THE DUTY TO DEFEND; HOWEVER, THE INSURED MAY ELECT TO ASSUME THE DUTY TO DEFEND. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

NOTICE: TERMS APPEARING IN BOLD FACE TYPE HAVE SPECIAL MEANING. SEE CLAUSE 3 OF THE POLICY.

## DECLARATIONS

| ITEMS | | |
|---|---|---|
| | | (herein "Named Sponsor") |
| 1 | NAMED SPONSOR: *ULLICO INC. AND ITS SUBSIDIARIES* | |
| 1(a) | MAILING ADDRESS: *111 MASSACHUSETTS AVE NW WASHINGTON, DC 20001* | |
| 1(b) | SUBSIDIARY COVERAGE: | Any past, present or future Subsidiary of the Named Sponsor |
| 1(c) | PLAN COVERAGE: | Any past, present or future Plan |
| 2 | POLICY PERIOD: From: *October 30, 2002* To: *October 30, 2003* 12:01 A.M. standard time at the address stated in Item 1(a) of the Declarations. | |
| 3(a) | POLICY AGGREGATE LIMIT OF LIABILITY (herein "Limit of Liability") For all Loss, in the aggregate, under this policy including Defense Costs (other than Defense Costs (if any) set forth in Item 3(b) of the Declarations): *$5,000,000* | |

138200

| ITEMS (Continued) | |
|---|---|
| 3(b) | ADDITIONAL LIMIT OF LIABILITY FOR DEFENSE COSTS: *$0* |
| 3(c) | SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS<br><br>For all Voluntary Compliance Loss, in the aggregate, ☐ See endorsement #<br>under this policy including Defense Expenses  ☒ None<br><br>This Sublimit of Liability shall be part of and not in<br>addition to the **Policy Aggregate Limit of Liability**<br>set forth in Item 3(a) of the Declarations. |
| 4 | RETENTION:  Not applicable to: (i) non-Indemnifiable Loss of a Natural<br>Person Insured (ii) judgments and settlements (all Coverages);<br>and (iii) Voluntary Compliance Loss |
| 4(a) | Defense Costs: *$50,000*<br>☐ None |
| 5 | CONTINUITY DATE: *October 30, 1998* |
| 6 | PREMIUM:  *$40,000* |
| 7 | NAME AND ADDRESS OF INSURER (herein "Insurer"):<br>*National Union Fire Insurance Company of Pittsburgh, Pa.*<br>*175 Water Street*<br>*New York, NY 10038*<br><br>This policy Is issued only by the insurance company indicated in this Item 7. |

*138200*

**IN WITNESS WHEREOF**, the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

*Elizabeth M. Tuck*

———————————————
SECRETARY

*[signature]*

———————————————
PRESIDENT

———————————————
AUTHORIZED  REPRESENTATIVE

———————————————
COUNTERSIGNATURE  DATE

———————————————
COUNTERSIGNED  AT

*ARC EXCESS & SURPLUS INC*
*1122 FRANKLIN AVENUE. 3RD FL*
*GARDEN CITY. NY 11530*

138200

77893 (3/01)    **INSUArchive Copy**

**AIG** American International Companies®

Employee Benefit Plan Fiduciary Liability Insurance

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including any attachments and any materials incorporated therein which form a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

   (a) Solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** against an **Insured** for any actual or alleged **Wrongful Act** by any such **Insured** (or by any employee for whom such **Insured** is legally responsible).

   (b) Solely with respect to **CAP Penalties** and **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Fiduciary Correction Loss** incurred by an **Insured**, during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** during the **Policy Period** or the **Discovery Period** (if applicable) or within thirty (30) days after the end of the **Policy Period**  or the **Discovery Period** (if applicable), and subject to the other terms, conditions and limitations of this policy, this policy shall:

   (i) pay the **CAP Penalties** and **Delinquent Filer Penalties**; and
   (ii) reimburse the **Voluntary Fiduciary Correction Loss**,

   of each and every **Insured**, collectively not to exceed the amount of the **Sublimit of Liability** set forth in Item 3(c) of the Declarations; provided that the **Insured** shall select a Panel Counsel Firm as provided in Clause 9 of the policy.

   The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that a **Voluntary Compliance Loss** results in a **Claim**.

2. **DEFENSE AGREEMENT**

   (a) **INSURER'S DUTY TO DEFEND**

   Except as hereinafter stated, the **Insurer** shall have both the right and duty to defend any **Claim** against an **Insured** alleging a **Wrongful Act**, even if such **Claim** is groundless, false or fraudulent.

   The **Insured** shall have the right to effectively associate with the **Insurer** in the defense of any **Claim**, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 2. The **Insurer** shall not, however, be obligated to defend any **Claim** after either: (1) the **Limit of Liability** and any additional **Defense Costs** (if any) indicated in Item 3(b) of the Declarations have been exhausted; or (2) after the rejection of a settlement offer, pursuant to the terms of subparagraph (c) of this Clause 2.

   (b) **INSURED'S OPTION TO ASSUME DEFENSE**

   Notwithstanding the above, the **Insureds** shall have the right to assume the defense of any **Claim** made against them.  This right shall be exercised in writing by the **Named Sponsor** on the behalf of all **Insureds** within sixty (60) days of the reporting of the **Claim** to the **Insurer** pursuant to Clause 8 of the policy. Upon receipt of such

written request, the Insurer shall tender the defense of the Claim to the Insureds. Once the defense has been so tendered, the Insurer cannot re-assume the defense of the Claim. The Insurer shall have the right to effectively associate with the Insureds in the defense of any Claim, including but not limited to negotiating a settlement. Provided that the Insurer shall be permitted to effectively associate with the Insureds in the defense of any Claim, including but not limited to negotiating a settlement of any Claim, the Insurer's consent to settlements, stipulated judgments and Defense Costs shall not be unreasonably withheld.

(c)    GENERAL PROVISIONS (applicable to both (a) and (b) above)

The Insurer shall advance Defense Costs prior to the final disposition of a Claim, subject to the other provisions of this policy. Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds, severally according to their respective interests, in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insured(s) shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to in writing by the Insurer shall be recoverable as Loss under the terms of this policy.

The Insured(s) shall give the Insurer full cooperation and such information as the Insurer may reasonably require. The Insurer may make any settlement of any Claim it deems expedient with respect to any Insured, subject to such Insured's written consent. If any Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim, plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer. Further, in the event the Insurer is defending the Claim pursuant to Clause 2(a) above, then the Insurer shall tender the Claim to the Insureds who shall thereafter at their own expense and on their own behalf negotiate and defend such Claim independently of the Insurer.

Selection of counsel to defend the Claim made against the Insureds shall be governed by Clause 9 of the policy (if applicable).

3.    DEFINITIONS

"Administrator" means an Insured with respect to any Wrongful Act described in subparagraph (2) of the Definition of Wrongful Act.

"Benefits" means any obligation under a Plan to a participant or beneficiary under a Plan which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

"Breach of Fiduciary Duty" means a violation of the responsibilities, obligations or duties imposed upon Insureds by ERISA.

"Cafeteria Plan" means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

"CAP Penalties" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an Insured by the Internal Revenue Service (IRS) pursuant to a written agreement to correct an inadvertent Plan defect under an Employee Plans Compliance Resolution System, provided that such agreement to

correct such Plan defect was entered into in writing by the Insured with the IRS during the Policy Period (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal).

"Claim" means:

(1) a written demand for monetary, non-monetary or injunctive relief; or
(2) a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:
    (i) service of a complaint or similar pleading; or
    (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or
    (iii) receipt or filing of a notice of charges; or
(3) a formal agency or regulatory adjudicative proceeding to which an Insured is subject; or
(4) any fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency which is located outside of the United States.

"Cleanup Costs" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of Pollutants.

"Consulting Fees" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential Breach of Fiduciary Duty, but excluding any fees, costs or expenses associated with: (i) a Plan audit; or (ii) identifying, finding or assessing such Breach of Fiduciary Duty.

"Defense Costs" means reasonable and necessary fees, costs and expenses consented to in writing by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a Claim against an Insured, whether incurred under Clause 2(a), (b) or (c) of this policy, but excluding any compensation of Natural Person Insureds or employees of an Insured.

"Defense Expenses" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the Insurer resulting solely from the correction of an actual or potential Breach of Fiduciary Duty, but excluding any fees, costs and expenses associated with finding or assessing such Breach of Fiduciary Duty and any compensation of Natural Person Insureds or employees of an Insured.

"Delinquent Filer Penalties" means penalties assessed by the U.S. Department of Labor or the IRS under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the Policy Period (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal).

"Dependent Care Assistance Program" means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

"Domestic Partner" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the Named Sponsor or any Subsidiary.

"Employee Benefit Law" means ERISA or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a Plan is subject. Except to the extent set forth in subparagraph (2) of the Definition of Wrongful Act, Employee Benefit Law shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

"ERISA" means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

"ESOP" means any employee stock ownership plan as defined in ERISA, or any other Plan under which investments are made primarily in securities of the Sponsor Organization or whose assets at any time within twelve months prior to the inception date of this policy were comprised of 20% or more of securities of the Sponsor Organization.

"Fiduciary" means a fiduciary as defined in an Employee Benefit Law (if applicable), with respect to a Plan, or a person or entity who exercises discretionary control as respects the management of a Plan or the disposition of its assets.

"Foreign Jurisdiction" means any jurisdiction, other than the United States or any of its territories or possessions.

"Foreign Policy" means the Insured's or any other member company of American International Group, Inc.'s (AIG) standard fiduciary or pension trust liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a Foreign Jurisdiction, that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then Foreign Policy means the standard policy most recently registered in the local language of the Foreign Jurisdiction, or if no such policy has been registered, then the policy most recently registered in that Foreign Jurisdiction. The term Foreign Policy shall not include any directors and officers, partnership, managerial, comprehensive general liability, employment practices liability or professional liability coverage.

"Fringe Benefit" means any plan or benefit described in Section 132 of the Internal Revenue Code of 1986, as amended.

"Indemnifiable Loss" means Loss for which the Sponsor Organization has indemnified or is permitted or required to indemnify any natural person Insured.

"Insured(s)" means:

(1)  any Natural Person Insured;
(2)  any Plan(s);
(3)  the Sponsor Organization; and
(4)  any other person or entity in his, her or its capacity as a Fiduciary, Administrator or trustee of a Plan and included in the Definition of Insured by specific written endorsement attached to this policy.

"Loss" means damages, judgments (including pre/post-judgment interest on a covered judgment), settlements and Defense Costs; however, Loss shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in Item 3(c) of the Declarations page for Voluntary Compliance Loss, (ii) UK Fines and Penalties, (iii) the five percent or less civil penalty imposed upon an Insured under Section 502(i) of ERISA, and (iv) the 20 percent or less penalty imposed upon an Insured under Section 502(l) of ERISA, with respect to covered settlements or judgments; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an Insured is not financially liable or which is without legal recourse to the Insured; (5) Benefits, or that portion of any settlement or award in an amount equal to such Benefits, unless and to the extent that recovery of such Benefits is based upon a covered Wrongful Act and is payable as a personal obligation of a Natural Person Insured; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Where permitted by law, Loss shall include punitive or exemplary damages imposed upon any Insured (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to profit, deliberate fraud or criminal acts and knowing or willful violation of any statute, rule or law, including but not limited to **Employee Benefit Law**).

Defense Costs shall be provided for items specifically excluded from Loss pursuant to subparagraphs (1)-(6) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

Loss shall include **Voluntary Compliance Loss**.

**"Management Control"** means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; the general partners of a limited partnership; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the **Named Sponsor**, to elect, appoint or designate a majority of the Board of Directors of a corporation, the management committee of a joint venture, the general partners of a limited partnership, or the management board of a limited liability company.

**"Natural Person Insured"** means any:

(1) past, present or future natural person director, officer, governor, general partner, management committee member, member of the board of managers or employee of a **Sponsor Organization** or if applicable, of a **Plan**, and as to all of the above in his or her capacity as a **Fiduciary, Administrator** or **trustee** of a **Plan**; or

(2) past, present or future natural person in a position equivalent to a position listed in subparagraph (1) of this Definition in the event that the **Sponsor Organization** is operating in a **Foreign Jurisdiction**.

**"Non-qualified Plan"** means any of the following plans for a select group of management or highly compensated directors, officers and/or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan.
**"Pension Plan"** means a pension plan as defined in any **Employee Benefit Law**.

**"Plan"** means automatically, any qualified plan, fund, trust or program (including, but not limited to, any **Pension Plan, Welfare Plan, Cafeteria Plan, Dependent Care Assistance Program, Fringe Benefit,** and **VEBA**) or **Non-qualified Plan**, established anywhere in the world, which was, is or shall be sponsored solely by the **Sponsor Organization,** or sponsored jointly by the **Sponsor Organization** and a labor organization, solely for the benefit of the employees and/or the directors, officers, governors, management committee members, members of the board of managers or natural person general partners of the **Sponsor Organization**, subject to the following provisions:

(1) if such **Plan** is a **Pension Plan(s)**, other than an ESOP, stock option plan or **Pension Plan** described in subparagraphs (5)(a) and 5(b) below, then the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** prior to the inception date of this policy, unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal;

(2) if such **Plan** was sold, spun-off or terminated prior to the inception date of this policy the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the inception date of this policy, unless such sale, spin-off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this policy is a continuous renewal;

(3) if such **Plan** is sold, spun-off or terminated during the **Policy Period**, the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the end of the **Policy Period**;

(4) if such **Plan** is an **ESOP** or stock option plan, the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal and such **Plan** is added to the Definition of **Plan** by specific written endorsement attached to this policy; or

(5) if such **Plan** is a **Pension Plan** (other than an **ESOP**, or stock option plan) and:

    (a) is acquired during the **Policy Period** as a result of the **Sponsor Organization's** acquisition of a **Subsidiary** whose assets total more than 25% of the total consolidated assets of the **Sponsor Organization** as of the inception date of this policy; or

    (b) is acquired during the **Policy Period** and such **Plan's** assets total more than 25% of the total consolidated assets of all covered **Pension Plans** as of the inception date of this policy,

then, this policy shall apply to such **Plan** (but solely with respect to a **Wrongful Act(s)** occurring after the date of such acquisition), but only upon the condition that within 90 days of its acquisition, the **Named Sponsor** shall have provided the **Insurer** with a completed application for such new **Plan** and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new **Plan**. The 90 day reporting condition shall not apply if such new **Plan** does not constitute one of the five largest **Pension Plans** of the **Sponsor Organization** and the failure to report such **Plan** within the 90 day reporting period was due to inadvertent omission by the **Named Sponsor** and upon discovery of such **Plan**, the **Named Sponsor** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

The Definition of **Plan** shall also include: (i) the following government-mandated programs: unemployment insurance, Social Security, or disability benefits, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the Definition of **Wrongful Act** in this policy; (ii) any **Pension Plan** (other than an **ESOP** or stock option plan) considered or created by the **Sponsor Organization** during the **Policy Period**; or (iii) any other plan, fund or program, which is included in the Definition of **Plan** by specific written endorsement attached to this policy.

In no event, however, shall the Definition of **Plan** include any multiemployer plan as defined in **Employee Benefit Law**.

**"Policy Period"** means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

**"Pollutants"** include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

**"Sponsor Organization"** means the **Named Sponsor** designated in Item 1 of the Declarations and any **Subsidiary** thereof; and, in the event any bankruptcy proceeding shall be instituted by or against the **Named Sponsor** or any **Subsidiary** thereof, the resulting debtor in possession (or equivalent status outside the United States), if any.

**"Subsidiary"** means any past, present or future: (1) for-profit entity of which the **Named Sponsor** has **Management Control** either directly or indirectly through one or more other **Subsidiaries**; and (2) not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the **Named Sponsor**. The term **Subsidiary** shall automatically apply to any new **Subsidiary** acquired or created during the **Policy Period**.

A for-profit entity ceases to be a Subsidiary when the Named Sponsor no longer maintains Management Control of such Subsidiary. A not-for-profit entity ceases to be a Subsidiary when the Named Sponsor no longer exclusively sponsors such Subsidiary.

"UK Fines and Penalties" means civil fines and penalties assessed against an Insured by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom or by the Occupational Pensions Regulatory Authority in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of the policy.

"VEBA" means a voluntary employees' beneficiary association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended and the regulations thereunder, the purpose of which is to provide for life, sickness, accident or other benefits and that is funded solely by the Sponsor Organization, and provides benefits for voluntary members who are employees or former employees of the Sponsor Organization and/or their beneficiaries.

"Voluntary Compliance Loss" means CAP Penalties, Delinquent Filer Penalties and Voluntary Fiduciary Correction Loss.

"Voluntary Fiduciary Correction Loss" means damages, Defense Expenses and Consulting Fees incurred in connection with the U.S. Department of Labor's ("DOL") Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent Breach of Fiduciary Duty occurring during the Policy Period (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal), provided that such compliance with the DOL'S Voluntary Fiduciary Correction Program results in the Insured obtaining a "No Action" letter from the DOL; however, Voluntary Fiduciary Correction Loss shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an Insured is not financially liable or which is without legal recourse to the Insured; (6) Benefits, or that portion of damages equal to such Benefits; (7) matters of which the Insured had knowledge prior to the inception date of this policy or the first policy issued by the Insurer to the Named Sponsor of which this policy is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

"Welfare Plan" means a welfare plan as defined in Employee Benefit Law.

"Wrongful Act" means:

(1)  as respects an Insured: a violation of any of the responsibilities, obligations or duties imposed upon Fiduciaries by Employee Benefit Law with respect to a Plan; or any matter claimed against an Insured solely by reason of his, her or its status as a Fiduciary, the Plan or the Sponsor Organization, but only with respect to a Plan; and

(2)  as respects an Administrator, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a Plan:
   (i)   counseling employees, participants and beneficiaries; or
   (ii)  providing interpretations; or
   (iii) handling of records; or
   (iv)  activities affecting enrollment, termination or cancellation of employees, participants and beneficiaries under the Plan,
or any matter claimed against an Insured solely by reason of his, her or its status as an Administrator, the Plan or the Sponsor Organization, but only with respect to a Plan;

(3)  as respects a Natural Person Insured, any matter claimed against him or her arising out of his or her service as a Fiduciary or Administrator of any

multiemployer plan as defined by ERISA, but only if such service is at the specific written request or direction of the Sponsor Organization and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a Claim against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a Natural Person Insured.

4.   **WORLDWIDE EXTENSION**

Where legally permissible, this policy shall apply to a Claim made against any Insured anywhere in the world.

With regard to a Claim(s) brought and maintained solely in a Foreign Jurisdiction against an Insured formed and operating in such Foreign Jurisdiction, the Insurer shall apply to such Claim(s) those terms and conditions (and related provisions) of the Foreign Policy registered with the appropriate regulatory body in such Foreign Jurisdiction that are more favorable to such Insured than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1, 3- 5, 9- 13, and 16- 19 of this policy and the comparable provisions of the Foreign Policy. In addition, this paragraph shall not apply to the non- renewal or claims made and reported provisions of any policy.

All premiums, limits, retentions, Loss and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of Loss are stated or incurred in a currency other than United States of America dollars, payment of covered Loss due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the Insurer and if agreeable to the Named Sponsor) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the Insurer's obligation to pay such Loss is established (or if not published on such date the next publication date of The Wall Street Journal).

5.   **EXCLUSIONS**

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured(s):

(a)   arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

(b)   arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to Employee· Benefit Law;

(The Wrongful Act of any Insured shall not be imputed to any other Insured for the purpose of determining the applicability of the foregoing exclusions 5(a) and 5(b).)

(c)   for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of Employee Benefit Law;

(d)   alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Act alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which It may succeed in time;

(e)   alleging, arising out of, based upon or attributable to, as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an Insured had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f)    for failure to fund a Plan in accordance with **Employee Benefit Law** or the **Plan** instrument, or the failure to collect contributions owed to the **Plan**; except that this exclusion shall not apply to **Defense Costs**;

(g)    alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a **Fiduciary** or **Administrator** of any plan, fund or program, other than a **Plan** as defined in this policy, or by reason of his, her or its status as a **Fiduciary** or **Administrator** of such other plan, fund or program;

(h)    for bodily injury, sickness, disease, or death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof; except that this exclusion shall not apply to **Defense Costs** incurred in the defense of a **Claim** for Breach of **Fiduciary Duty**;

(i)    alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Sponsor Organization** did not sponsor such **Plan** or when the **Natural Person Insured** was not a **Fiduciary, Administrator**, trustee, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the **Sponsor Organization** or if applicable, a **Plan**;

(j)    alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly: (1) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, that this exclusion shall not apply to non-**Indemnifiable Loss** arising from a **Claim** alleging damage to a **Plan**, other than non-**Indemnifiable Loss** constituting **Cleanup Costs**;

6.    **LIMIT OF LIABILITY  (FOR ALL LOSS - INCLUDING DEFENSE COSTS)**

The **Limit of Liability** stated in Item 3(a) of the Declarations is the limit of the **Insurer's** liability for all **Loss**, including **Defense Costs**, under this policy arising out of all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** stated in Item 3(b) of the Declarations, if any, shall be an additional **Limit of Liability** for that part of **Loss** constituting **Defense Costs** incurred in connection with all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** for **Defense Costs** stated in Item 3(b) shall be in addition to and not part of the **Limit of Liability** stated in Item 3(a) of the Declarations. **Loss** constituting **Defense Costs** shall first reduce the additional **Limit of Liability** stated in Item 3(b). Should the **Limit of Liability** stated in Item 3(b) of the Declarations become exhausted, or should the **Limit of Liability** stated in Item 3(b) of the Declarations be stated as "none", then subsequent **Defense Costs** will reduce the **Limit of Liability** stated in Item 3(a).

The **Sublimit of Liability** set forth in Item 3(c) of the Declarations shall be part of and not in addition to the **Limit of Liability** set forth in Item 3(a).

The **Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Limit of Liability** for the **Policy Period**. Further, any **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable), which pursuant to Clause 8(b) or 8(c) is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the aggregate **Limit(s) of Liability** stated in Item 3 of the Declarations.

**Defense Costs**, whether incurred under Clause 2(a), (b) or (c) of this policy, are not payable by the **Insurer** in addition to the **Limit of Liability**; except that the separate limit, if any, listed in Item 3(b) of the Declarations shall be in addition to the aggregate **Limit of Liability** stated in Item 3(a) of the Declarations. **Defense Costs** are part of **Loss** and as such are subject to the **Limit of Liability** for **Loss**.

## 7. RETENTION CLAUSE

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 4 of the Declarations, such Retention amount to be borne by the Insured and shall remain uninsured, with regard to all Defense Costs other than: (1) non-Indemnifiable Loss of a Natural Person Insured; and (2) Voluntary Compliance Loss. A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

## 8. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the Insurer named in Item 7 of the Declarations at the address Indicated in Item 7 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

(a)  The Insured(s) shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim made against an Insured as soon as practicable after the Named Sponsor's risk manager or general counsel (or if no such position exists, then such equivalent position) first becomes aware of the Claim, but in all events no later than either:

(1)  the end of the Policy Period or during the Discovery Period (if applicable); or

(2)  within thirty (30) days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim was first made against an Insured within the final thirty (30) days of the Policy Period or the Discovery Period (if applicable).

(b)  If written notice of a Claim has been given to the Insurer pursuant to Clause 8(a) above, then a Claim which is subsequently made against an Insured and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered related to the first Claim and made at the time such notice was given.

(c)  If during the Policy Period or during the Discovery Period (if applicable) the Sponsor Organization or an Insured(s) shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured and shall give written notice to the Insurer of the circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then a Claim which is subsequently made against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

## 9. PRE-AUTHORIZED DEFENSE ATTORNEYS

This Clause 9 applies only to: (1) a Claim brought by any government entity; (2) a request for coverage for a Voluntary Compliance Loss; or (3) a Claim brought in the form of a class or representative action.

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("Panel Counsel Firm(s)") from which a selection of legal counsel shall be made to conduct the defense of any Claim against an Insured to which this Clause 9 applies and pursuant to the terms set forth below:

In the event the **Insurer** is operating under a duty to defend pursuant to Clause 2(a) of this policy, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. Upon the written request of the **Named Sponsor**, the **Insurer** may consent to a different **Panel Counsel Firm** selected by the **Named Sponsor** to defend the **Insureds**, which consent shall not be unreasonably withheld.

In the event the **Insureds** have assumed the defense of the **Claim** pursuant to Clause 2(b) of the policy, then the **Insureds** shall select a **Panel Counsel Firm** to defend the **Insured**. In addition, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, the **Insured** may select a **Panel Counsel Firm** different from that selected by other **Insureds** if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The selection of a **Panel Counsel Firm** from the attached list to defend the **Claim** against the **Insureds** shall not be restricted to the jurisdiction in which the **Claim** is brought.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made to the specific list attached to this policy during the **Policy Period** without the consent of the **Named Sponsor**. At the request of the **Named Sponsor**, the **Insurer** may in its discretion add one or more law firms to the attached list of **Panel Counsel Firms** for the purposes of defending the **Claim** made against the **Insureds**. The list of **Panel Counsel Firms** may also be amended to add, at the sole discretion of the **Insurer**, a non-**Panel Counsel Firm** for the purpose of acting as "local counsel" to assist an existing **Panel Counsel Firm**, which **Panel Counsel Firm** will act as "lead counsel" in conducting the defense of the **Claim**, for **Claims** brought in a jurisdiction in which the chosen **Panel Counsel Firm** does not maintain an office.

## 10. DISCOVERY CLAUSE

Except as indicated below, if the **Named Sponsor** shall cancel or the **Named Sponsor** or the **Insurer** shall refuse to renew this policy, the **Named Sponsor** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal ("Discovery Period"), upon payment of the respective "Additional Premium Amount" described below, in which to give to the **Insurer** written notice pursuant to Clauses 8(a) and 8(c) of the policy of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which the **Natural Person Insured** or an **Insured** shall become aware, in either case during said **Discovery Period** and solely with respect to a **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.

The Additional Premium Amount for: (1) one year shall be no more than 75% of the Full Annual Premium; (2) two years shall be no more than 150% of the Full Annual Premium; and (3) three years shall be no more than 225% of the Full Annual Premium. As used herein, "Full Annual Premium" means the premium level in effect immediately prior to the end of the Policy Period.

Notwithstanding the first paragraph of Clause 6, if the **Named Sponsor** shall cancel or the **Insurer** or the **Named Sponsor** shall refuse to renew this policy, then the **Named Sponsor** shall also have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the end of the **Policy Period**) with an aggregate limit of liability applicable to **Claims** made against the **Insured** during such **Discovery Period** which is in addition to, and not part of, the applicable **Limit of Liability** set forth in Item 3 of the Declarations. The **Insurer** shall quote such a **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as it deems appropriate in its sole and absolute discretion.

In the event of a Transaction, as defined in Clause 12(a), the Named Sponsor shall have the right to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction). The Insurer shall offer such Discovery Period pursuant to such terms, conditions, exclusions and additional premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The Discovery Period is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a Discovery Period, together with any additional premium due, is received by the Insurer no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or Transaction.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the Named Sponsor at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent. This policy may only be canceled by or on behalf of the Insurer in the event of non-payment of premium by the Named Sponsor. In the event of non-payment of premium by the Named Sponsor, the Insurer may cancel this policy by delivering to the Named Sponsor or by mailing to the Named Sponsor, by registered, certified, or other first class mail, at the Named Sponsor's address as shown in Item 1 of the Declarations, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender. The Insurer shall have the right to the premium amount for the portion of the Policy Period during which the policy was in effect.

If this policy shall be canceled by the Named Sponsor, the Insurer shall retain the customary short rate proportion of the premium herein. If the period of limitation relating to the giving of notice as set forth in this Clause 11 is also set forth in any law controlling the construction thereof, then such period shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

## 12. ORGANIZATIONAL CHANGES

(a) If during the Policy Period:

(1) the Named Sponsor shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2) any person or entity or group of persons or entities acting in concert shall acquire Management Control of the Named Sponsor;

(any of such events being a "Transaction"), then this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Sponsor shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of this policy.

(b) *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Sponsor Organization** and/or any **Insured** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Sponsor Organization** became a **Sponsor Organization** and such **Insured** became an **Insured**, and prior to the effective time that such **Sponsor Organization** ceases to be a **Sponsor Organization** or such **Insured** ceases to be an **Insured**.

With regard to any **Plan** that was sold, spun-off or terminated either prior to the inception date of this policy or during the **Policy Period**, this policy shall apply but solely with respect to a **Wrongful Act(s)** that occurred prior to the date of such sale or spin-off, or prior to the date that the **Sponsor Organization** or **Natural Person Insured** ceases to be a **Fiduciary** or **Administrator** of, a sold or spun-off **Plan**, or in the case of a terminated **Plan**, prior to the final date of asset distribution of such **Plan**, provided that notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**.

## 13. SUBROGATION AND WAIVER OF RECOURSE

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery thereof, and the **Insureds** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of the **Insureds**. In no event shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless such **Insured** has been convicted of a criminal act, or been determined to have in fact committed a deliberate fraudulent act or knowingly or willingly violated any statute, rule or law (including but not limited to **Employee Benefit Law**), or been determined to have in fact obtained any profit or advantage to which such **Insured** was not legally entitled.

In the event this policy has been purchased by an **Insured** other than a **Plan**, the **Insurer** shall have no right of recourse against an **Insured**. Notwithstanding the foregoing, the **Insurer** shall have a right of recourse against an **Insured** arising out of a **Claim** by an **Insured** against another **Insured** unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, assistance of or active participation by the **Insured** claimed against.

It is further provided that in the event of any recovery under this Clause 13, the **Limit of Liability** of this policy shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the **Insurer** in connection therewith.

## 14. OTHER INSURANCE

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the **Limit of Liability** provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

## 15. NOTICE AND AUTHORITY

It is agreed that the **Named Sponsor** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of **Claim**, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right under Clause 2(b) or Clause 10 of this policy.

### 16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

### 17. ACTION AGAINST INSURER

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against any Insured to determine the Insured's liability, nor shall the Insurer be impleaded by any Insured or his or her spouse or Domestic Partner or his, her or its legal representatives. Bankruptcy or insolvency of any Insured or of his, her or its estate shall not relieve the Insurer of any of its obligations hereunder.

### 18. SPOUSAL, DOMESTIC PARTNER AND LEGAL REPRESENTATIVE EXTENSION

If a Claim against a Natural Person Insured includes a Claim against: (i) the lawful spouse or Domestic Partner of such Natural Person Insured; or (ii) a property interest of such spouse or Domestic Partner, and such Claim arises from any actual or alleged Wrongful Act of such Natural Person Insured, this policy shall cover Loss arising from the Claim made against that spouse or Domestic Partner or the property of that spouse or Domestic Partner to the extent that such Loss does not arise from a Claim for any actual or alleged act, error or omission of such spouse or Domestic Partner. This policy shall cover Loss arising from a Claim made against the estate, heirs, or legal representatives of any deceased Natural Person Insured, and the legal representatives of any Natural Person Insured, in the event of incompetency, insolvency or bankruptcy, who was a Natural Person Insured at the time the Wrongful Act(s) upon which the Claim is based was committed.

### 19. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

## ENDORSEMENT# 1

This endorsement, effective *12:01 am     October 30, 2002*     forms a part of policy number *495-38-35*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

## WASHINGTON, D.C.
## CANCELLATION/NONRENEWAL ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the cancellation/nonrenewal provisions of this policy are amended to read as follows:

A)     Cancellation

   If this policy has been in effect for thirty (30) days or more, the Insurer may cancel this policy only if one or more of the following reasons apply:

   1)     Insured has refused or failed to pay a premium due under the terms of the policy;

   2)     Insured or Other Insured(s) have made a material and willful misstatement or omission of fact to the Insurer or its employees, agents or brokers in connection with any application to, or claim against the Insurer; or

   3)     Property or other interest of the Insured shall have been transferred to a person other than the Insured or beneficiary, unless the transfer is permissible under the terms of the policy, or unless the property, interest or use thereof shall have materially changed with respect to its insurability.

   The Insurer will mail or deliver to the named Insured notice of cancellation at least thirty (30) days prior to the date of cancellation. For cancellation as described under 2) and 3) above, the Insurer will mail or deliver a copy of the notice to the Superintendent of Insurance at least thirty (30) days before the date of cancellation.

B)     Nonrenewal

   If the Insurer decides not to renew this policy the Insurer will mail or deliver to the named Insured the Insurer's notice of nonrenewal at least thirty (30) days before the end of the policy period.

The Insurer will mail or deliver notice of cancellation or nonrenewal to the agent or broker at least five (5) days prior to the Insurer's mailing of notice to the named Insured.

*END 001*

## ENDORSEMENT# *1*   (continued)

The Notice of cancellation or nonrenewal will be mailed or delivered to Insured's last known address and will include the reason(s) for cancellation or nonrenewal. The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

All other terms, conditions and exclusions shall remain the same.

                                                          AUTHORIZED REPRESENTATIVE

*END 001*

## ENDORSEMENT# *2*

This endorsement, effective  *12:01 am     October 30, 2002*     forms a part of
policy number   *495-38-35*
issued to    *ULLICO INC. AND ITS SUBSIDIARIES*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### Failure to Effect/Or Maintain Insurance Exclusion

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** made against any **Insured** alleging, arising out of, based upon, attributable to any failure or omission on the part of the **Insureds** or the **Sponsor Organization** to effect or maintain adequate insurance.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*END 2*
INSU *Archive Copy*

_____
AUTHORIZED REPRESENTATIVE

### ENDORSEMENT# 4

This endorsement, effective   *12:01 am*      *October 30, 2002*      forms a part of
policy number   *495-38-35*
issued to    *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### TIE-IN OF LIMITS ENDORSEMENT

### (COMMON CLAIM)

In consideration of the premium charged, it is hereby understood and agreed that with respect to any **Claim(s)** alleging the same **Wrongful Act** or related **Wrongful Act(s)**, in which at least one person/entity claimed against is an **Insured** under this policy, and at least one person/entity claimed against is an **Insured** under the Directors, Officer and Private Company Liability Insurance Policy, 4953684 (or any successor or replacement thereof), issued by the **Insurer** to ULLICO INC., the combined limit of liability under both policies for such **Claim(s)** shall be $10,000,000. This limitation shall apply even if both policies have been triggered due to a **Claim** against the same person/entity but alleging **Wrongful Act(s)** both in his/her/its capacity as an **Insured** of ULLICO INC. and as an **Insured** of the **Sponsor Organization**.

Nothing in this endorsement shall be construed to increase the **Insurer's Limit of Liability** under this policy as stated in Item 3. of the Declarations page, which shall remain $5,000,000.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 4*
*INSUArchive Copy*

AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 5

This endorsement, effective 12:01 am    October 30, 2002    forms a part of
policy number  495-38-35
issued to   ULLICO INC. AND ITS SUBSIDIARIES

by    National Union Fire Insurance Company of Pittsburgh, Pa.

SPONSOR ORGANIZATION SECURITIES

SEPARATE RETENTION

In consideration of the premium charged herein, it is understood and agreed that the policy
is amended as follows:

1. Item 4. of the Declarations is amended by addition of the following at the end thereof:

| 4(b) | RETENTION: | Sponsor Organization, Plan, or Natural Person Insured for Indemnifiable Loss: $250,000 |
| | | For all Loss in connection with any Claim(s) made against any Insured, including but not limited to any derivative or representative class action, arising out of, based upon, attributable to or in any way related to any securities issued by the Sponsor Organization |

2. Clause 7. RETENTION CLAUSE is deleted in its entirety and replaced with the following:

    7.    RETENTION CLAUSE

    The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 4(a) and 4(b) of the Declarations, such Retention amount to be borne by the Insured and shall remain uninsured, with regard to all Defense Costs under Item 4(a) and with regard to all Loss under Item 4(b), other than: (1) non- Indemnifiable Loss of a Natural Person Insured; and (2) Voluntary Compliance Loss. A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

END 5

INSUArchive Copy

AUTHORIZED REPRESENTATIVE