**[COMMITTEE PRINT]**

# REPORT

ON

## INVESTIGATION OF ULLICO INC.

PREPARED FOR USE BY THE

## COMMITTEE ON
## EDUCATION AND THE WORKFORCE
## U.S. HOUSE OF REPRESENTATIVES

TOGETHER WITH MINORITY VIEWS

### ONE HUNDRED EIGHTH CONGRESS

FIRST SESSION



OCTOBER 2003

———

**Serial No. 108-A**

———

Printed for the use of the Committee on Education and the Workforce
JOHN A. BOEHNER, *Chairman*

This report has not been officially approved by the Committee and,
therefore, may not necessarily reflect the views of all of its members.

———

U.S. GOVERNMENT PRINTING OFFICE
90–179 PDF                    WASHINGTON : 2003

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

99

71

**Privileged and Confidential**
**Attorney-Client Privilege**
**Attorney Work Product**

*Report of the Special Counsel*
*ULLICO Stock Purchase Offer and Repurchase*
*Programs and Global Crossing Investment*

Governor James R. Thompson
Chairman
WINSTON & STRAWN

100

72

Privileged and Confidential                                              WINSTON & STRAWN
                                                                    Report of the Special Counsel

November 26, 2002

To the ULLICO Board of Directors:

On April 29, 2002, I accepted your appointment as Special Counsel to investigate the events surrounding ULLICO's 1998 and 1999 stock purchase offers to directors and senior officers, its stock repurchase programs and the Global Crossing investment. After seven months of investigation by Winston & Strawn, more than 40 interviews and the review of thousands of documents, I believe we have a sound understanding of the events at issue.

ULLICO recorded an extraordinary return of approximately $486 million on its $7.6 million investment in Global Crossing. The Global Crossing investment was consistent with ULLICO's philosophy of supporting investments which might create opportunities for its labor constituency.

In 1997, before the success of the Global Crossing investment became apparent, ULLICO's Board of Directors changed the manner in which ULLICO distributed profits to shareholders. It reduced, and eventually eliminated, dividends and adopted a formal stock repurchase program. ULLICO also continued its practice of repurchasing stock from time to time under an informal repurchase program administered by its Chairman.

As a result of the confluence of certain events, the repurchase programs as implemented in later years led to disproportionate distributions to certain officers and directors. What may have begun as appropriate programs supported by legitimate business purposes developed into programs that were not in the best interest of all the Company's shareholders.

Certain ULLICO officers and Board members arguably acted inappropriately and to the detriment of the rights of ULLICO institutional shareholders. As a result of their actions, certain officers and directors received preferential treatment in the sale of their ULLICO stock. It is important, in these times of highly publicized cases of deliberate corporate malfeasance, to distinguish what happened at ULLICO from these other cases by emphasizing that we have not found evidence of criminal intent.

In the following pages we set forth an executive summary of our report and thereafter the details of the evidence gathered in the investigation, our legal analysis thereof, and our findings and recommendations. The recommendations are designed to remedy what occurred, to prevent its reoccurrence and to guide future corporate governance of the Company. We emphasize that changes in ULLICO's corporate governance are essential and should be undertaken promptly.

101

73

We believe each director should have and take the opportunity to fully review the
Report in its entirety before deliberating and acting on our recommendations.
Because of the Report's length and detail, it may well be advisable for each director
to receive in advance a copy of the Report for study with the caveat that it contains
privileged information. In the meantime, we have made available to directors and
their counsel copies of the Report to review at our offices or elsewhere. It is essential
that each director read the full Report carefully.

My staff and I stand ready to make an in-person presentation of our findings and
recommendations at your convenience and, of course, to answer any questions any
Board member may have.

We appreciate the confidence you have entrusted in us to conduct this investigation,
and we are grateful to the Company's staff for their cooperation with our inquiry.

Respectfully submitted,

Governor James R. Thompson
Special Counsel

195

167

*Privileged and Confidential*                                                                    WINSTON & STRAWN
                                                                                          *Report of the Special Counsel*

meeting minutes, historically has been passive. The Audit Committee could benefit from the addition of more members with financial expertise.

The composition of the Board, and the manner in which it has discharged its responsibilities, has made it difficult for it to play a significant and active role in the governance and oversight of the Company. In connection with the matters under investigation, the extent of involvement by senior management (particularly Georgine and Carabillo) in Board and committee decisions, and the passiveness of the directors in discharging their duties, resulted in the inability of the Board to exercise independent and informed business judgments. This is particularly true with respect to the 1998 and 1999 stock offers and the 2000 formal and "discretionary" repurchase programs, where senior management had both conflicts of interest and substantial involvement.

■ **Fiduciary Obligations of Directors and Officers**

Under the facts discovered in the investigation, a compelling argument exists that directors, particularly those who benefited from self-interested transactions, did not satisfy their fiduciary duties to the Company and its shareholders in connection with these transactions. An equally forceful argument applies to the principal officers, Georgine and Carabillo, who were instrumental in creating and implementing the stock offer and repurchase programs, and who benefited from ULLICO stock transactions. Directors' fiduciary duties have been codified under Maryland state law. Officers' duties are governed by common law.

The Company's 1998 and 1999 stock offers and the 2000 stock repurchase programs resulted in numerous self-interested transactions. Under Maryland law, a transaction is not void or voidable solely because of the presence of an interested director at the meeting in which the transaction was approved if the transaction is approved by at least one fully informed, disinterested director. It is questionable whether any fully informed, disinterested director was present at the November 2000 Board meeting at which the 2000 formal repurchase program and the "discretionary" repurchase program were approved. However, the existence of a disinterested director at the November 2000 Board meeting is not at all dispositive of whether members of the Board satisfied their statutory fiduciary duties in approving the programs.

Compliance with the Maryland law provision concerning self-interested transactions means only that the transactions at issue are not void or voidable *solely* because of the involvement of interested directors. It does not excuse the requirement that directors fulfill their fiduciary duties under Maryland law, *i.e.*, that they act in good faith, in a manner they reasonably believe to be in the best interests of the company and with due care in approving the transactions.

Under the facts revealed in this investigation, a compelling argument exists that those directors who benefited from the transactions at issue did not satisfy these requirements. The exclusive stock offers and the 2000-01 repurchase programs, as structured and implemented, improperly benefited directors and officers at the

196

168

expense of ULLICO's larger shareholders. Our investigation uncovered no clear rationale for the approval of the exclusive stock offers or the Board's approval of the 2000 formal repurchase program containing the 10,000 share proration threshold. Moreover, the approval of the stock offers involved excessive, and perhaps impermissible, delegation of authority by the Board.

The process by which the Compensation Committee and the Board evaluated and approved the stock offer and repurchase programs raises questions of whether ULLICO's directors satisfied their duty of due care under Maryland law. Certain directors were either inadequately informed (through their own and management's fault) about the purposes and impact of the programs, or knowingly approved programs that a reasonably prudent director should have realized (under the circumstances existing at the time) were not in the best interests of the Company or its shareholders. In this regard, certain directors failed to give due consideration to, or provide an adequate justification for, the substantial and disproportionate benefits received by directors and officers under the stock offer and repurchase programs.

Outside Company counsel have argued that the directors would have the benefit of the business judgment rule. In a court case, the business judgment rule would provide a procedural presumption in favor of directors' actions. This procedural presumption can be rebutted by a showing of a lack of either good faith or an informed basis for the directors' decisions. Under the facts of this case, it cannot be said with any reasonable degree of certainty that the business judgment rule would protect the actions of those directors who benefited from the programs at issue.

A forceful argument exists that certain senior officers of the Company, principally Georgine and Carabillo, violated their duties of loyalty and care to the Company. Georgine and Carabillo were heavily involved in the creation, implementation and disclosure of the exclusive stock offer and repurchase programs, and personally profited from these programs. Georgine and Carabillo also failed to adequately disclose to the Board and the Company's shareholders the extent to which they (and other insiders) participated in and benefited from ULLICO stock transactions. In addition, Georgine and Carabillo should have been more forthcoming with members of the Board and shareholders regarding the reasons for, and the impact of, the stock offer and repurchase programs (including the 10,000 share proration threshold) and other matters that may have influenced the directors' decisions to approve the programs. Georgine and Carabillo were also primarily and most directly responsible for the Company's disclosure documents that were, in some cases, incomplete and potentially misleading. The law is unclear as to whether officers could even attempt to invoke the business judgment rule which, in any event as noted, can be overcome.

■ **Securities Law**

ULLICO is a private company not subject to most of the requirements of the federal securities laws relating to tender offers. However, the securities transactions under

201

173

As mentioned earlier, we are not compensation experts and a review of the reasonableness of the compensation or other amounts paid to ULLICO's directors and officers through the stock transactions, the Global Incentive Program, the Deferred Compensation Plan and other programs is outside our mandate. However, to the extent the disinterested committee finds it appropriate to conduct or commission this analysis, it should do so in a careful and impartial manner. For example, in evaluating the Company's operating and management performance over the past several years, compared to peer group companies, the committee should consider not only the Global Crossing investment success but also the apparent financial difficulties in certain of the Company's core operations. (Exhibit 4) Moreover, in constructing the appropriate peer group, the committee should carefully evaluate whether such companies are truly comparable to ULLICO. Given management's apparent involvement with the preliminary compensation study furnished to us, we would suggest that the disinterested committee give it little or no weight in considering and implementing our recommendations.

In addition to the compensation study, just prior to the release of this Report outside Company counsel provided the Special Counsel with a legal memorandum on certain issues of Maryland law prepared by Jim Hanks, a notable authority on Maryland law, and a legal memorandum prepared by outside Company counsel on the availability of a reliance on counsel defense to ULLICO's directors and officers under Maryland law. We were well aware of Hanks's treatise on Maryland corporate law prior to receiving his memorandum and, in preparing the Report, carefully considered the arguments made by Hanks and outside Company counsel in their respective memoranda. We also consulted extensively with our own expert on Maryland corporate law, Dean Mark A. Sargent. A summary of Dean Sargent's evaluation of the memoranda prepared by Hanks and outside Company counsel is attached as Exhibit 8. For the reasons outlined in this Report, we concur with Dean Sargent's evaluation.

Our specific remedial recommendations are as follows:

I. Directors and certain officers should return to the Company profits from sales of ULLICO stock purchased in 1998 and 1999. These pre-tax profits are as follows:

| | |
|---|---|
| Morton Bahr | $35,202 |
| John J. Barry | $280,730 |
| William G. Bernard | $326,780 |
| Marvin J. Boede | $234,680 |
| Kenneth J. Brown | $4,605 |
| Joseph A. Carabillo | $720,420 |
| Bill J. Casstevens | $603,080 |
| John E. Cullerton | $176,010 |
| John J. Gentleman | $29,335 |
| Robert A. Georgine | $837,760 |

202

174

| | |
|---|---|
| James LaSala | $88,005 |
| Martin J. Maddaloni | $234,680 |
| Joseph F. Maloney | $418,880 |
| Douglas J. McCarron | $418,880[75] |
| James F.M. McNulty | $95,189 |
| Jacob F. West | $837,760 |
| Roy Wyse | $23,025 |
| William H. Wynn | $234,680 |
| **Total** | **$5,599,701** |

*Commentary.* We strongly recommend that the return of the profits received by those directors who sold stock in 2000 and 2001 which they had purchased in 1998 and 1999 be the remedy in a matter where the directors and officers were so disproportionately favored.

We also strongly recommend that Chairman Georgine be asked to return the profits he received from the repurchases at the $146.04 price of the 8,000 shares of Class A Stock he purchased pursuant to the 1998 and 1999 stock offers. His pre-tax profits were $837,760. Georgine is the Chairman of the Board, administered the stock offer program, determined the timing of the stock offers, voted for and implemented the repurchase programs at issue and, as CEO and President, played a principal role in sponsoring these programs. The shares Georgine purchased in 1999 were also financed by a loan from Mellon Bank, for which the Company provided credit support that apparently was not authorized by the Board or any of its committees. Moreover, there is a serious question regarding whether Georgine was authorized by the Board to issue stock to himself.

Even if Georgine's profits from the sale of shares he acquired in 1998 and 1999 were deemed a form of compensation for the Global Crossing investment success, the return of such profits may well be appropriate given that the Compensation Committee (which purported to approve the stock offers) was not authorized to issue stock and Georgine received more than $2 million pursuant to the Global Incentive Program, which was intended to reward him for the Global Crossing investment success. He also (1) received approximately $4 million in profits between 1998 and 2000 under the Company's Deferred Compensation Plan, (2) received a 40,000 share stock bonus under the Stock Purchase and Credit Agreement, and (3) participated in several other compensation and fringe benefit programs. (Exhibit 2) Our conclusions would be the same whether the repurchases of Georgine's ULLICO stock occurred through the "discretionary" program or pursuant to the put option contained in the Addendum to Georgine's Employment Agreement, which was entered into under questionable circumstances.

---

[75] Before the issuance of this Report, Director McCarron voluntarily agreed to return to the Company the profits made on his stock purchases.

203

175

Finally, we strongly recommend that Chief Legal Officer Carabillo be asked to return the profits he received from the repurchases at the $146.04 price of the 7,000 shares of Class A Stock he purchased pursuant to the 1998 and 1999 stock offers. His pre-tax profits were $720,420. He was principally involved with, and benefited from, all of the transactions at issue—*i.e.*, the 1998 and 1999 stock offer programs, the formal 2000 stock repurchase program with its 10,000 share threshold and the "discretionary" stock repurchases from directors and officers. The shares Carabillo purchased in 1999 were also financed by a loan from Mellon Bank, for which the Company provided credit support that apparently was not authorized by the Board or any of its committees. Moreover, Carabillo supervised the preparation of the tender offer disclosure documents to ULLICO's shareholders. As the Company's Chief Legal Officer, Carabillo was the officer most directly responsible for ensuring that the programs and disclosures at issue were legal and proper.

Even if Carabillo's profits were deemed to be a form of compensation for the Global Crossing investment success, return of such profits may well be appropriate given that the Compensation Committee (which purported to approve the stock offers) was not authorized to issue stock and Carabillo has received about $750,000 under the Global Incentive Program, which was intended to reward him for the Global Crossing investment success. He also received approximately $320,000 in profits between 1998 and 2000 under the Company's Deferred Compensation Plan and participated in other compensation programs.

Assuming the special committee decides that return of the profits is the appropriate remedy, the Board should then decide whether to distribute the returned proceeds to other shareholders who tendered stock in the 2000 formal repurchase program and were prorated, or otherwise retain and reinvest these funds. If the committee ratifies some of the transactions at issue, it should decide whether shareholder ratification would also be prudent.

    2.   Determine whether a return of profits by Chairman Georgine is appropriate in connection with his Stock Purchase and Credit Agreement.

*Commentary.* The special committee should consider whether to recommend return of profits received by Georgine on the repurchase at $146.04 per share of 8,000 of the 40,000 shares he acquired under the Stock Purchase and Credit Agreement in December 1999 at the $53.94 stock price.

As discussed above, there is a serious question as to whether the issuance of the 40,000 shares acquired pursuant to the Stock Purchase and Credit Agreement was duly authorized. In addition, the timing of this bonus raises several questions that should be reviewed by the special committee.

In his interview, Carabillo explained that the Compensation Committee initially intended to grant a $2 million bonus to Georgine in 1999, but decided instead to offer Georgine the opportunity to purchase 40,000 shares financed by a loan provided by ULLICO, with the loan to be forgiven over a five-year period. According to

204

176

Carabillo, the stock issuance was more favorable to Georgine from a tax perspective. At the time the Stock Purchase and Credit Agreement was purportedly approved by the Compensation Committee (December 1999), ULLICO's stock price was $53.94 per share, based on the book value per share as of December 31, 1998. Accordingly, 40,000 shares would have been valued at $2,157,600. The Stock Purchase and Credit Agreement, however, is dated December 30, 1999, one day before the date used to calculate the 1999 "book value." At this point, it had to have been clear to those involved that, based on the increased value of ULLICO's Global Crossing investment, the 40,000 shares would be worth significantly more than $2,157,600.

In fact, the Stock Purchase and Credit Agreement was not executed by Georgine and the Compensation Committee members until well after December 31, 1999. Significantly, Director Cullerton, the last member of the Compensation Committee to execute the Stock Purchase and Credit Agreement, signed the agreement on May 10, 2000, the very same day the Executive Committee adopted a ULLICO stock price of $146.04 per share. Arguably, therefore, at the time the Stock Purchase and Credit Agreement was fully executed, the 40,000 shares acquired by Georgine were worth $5,841,600, almost triple the intended bonus of $2 million.

The special committee should evaluate these circumstances and determine whether the terms of the Stock Purchase and Credit Agreement are consistent with what the Compensation Committee and the Board of Directors intended. The committee should then decide whether to consider ratification of that agreement and the stock repurchases pursuant to that agreement or seek to amend that agreement and/or require a return of the profits to the Company. If the special committee chooses to ratify the redemption of Georgine's 8,000 bonus shares in February 2000 (under which Georgine received $1.17 million), it may wish to seek a limitation of the remaining shares he is entitled to redeem under the Stock Purchase and Credit Agreement. The committee should also consider whether to ratify or seek to invalidate the Addendum to Georgine's Employment Agreement to the extent that there is any question concerning the authorization for, and the repurchases under, that Addendum.

3. Determine whether a return of profits or ratification is the appropriate remedy for the director and officer redemptions of Capital Stock and Class A Stock acquired through the preferred certificate program ("Class A Preferred Stock"). The pre-tax profits from these redemptions are as follows:

William G. Bernard – $1,002,839 (Class A Preferred Stock)

Bill J. Casstevens – $166,604 (Class A Preferred Stock) and at least $39,943 (Capital)[78]

John F. Gentleman – at least $132,780 (Capital)

[78] We have been unable to determine the cost basis for those directors and officers who redeemed Capital Stock in 2000 and 2001. Although we assumed a cost basis of $25 per share, Capital Stock received as dividends would have a cost basis of zero, thus increasing the profits stated above.

205

177

Robert A. Georgine – $66,378 (Class A Preferred Stock) and at least $525,918 (Capital)

James F. M. McNulty – at least $185,796 (Capital)

Jacob F. West – at least $151,300 (Capital)

*Commentary.* The special committee should evaluate the repurchases of Capital Stock and Class A Preferred Stock from directors and officers at the $146.04 stock price. These transactions did not result from the 1998 and 1999 stock offers. However, these transactions may have nonetheless been inappropriate because: (1) most of the transactions occurred through the "discretionary" repurchase program, which was not fully disclosed to ULLICO's directors or shareholders; or (2) the repurchases occurred through the formal repurchase program and the directors benefited from the 10,000 share proration threshold. Again, the committee should decide whether to ratify these transactions or to recommend return of the profits to the Company.

4.  Determine whether a return of profits is appropriate in connection with the stock profits received by officers Luce and Grelle. These pre-tax profits are as follows:

John K. Grelle – $837,760 (all Class A from 1998 and 1999 stock offers)

James W. Luce – at least $789,299 ($582,270 Class A from 1998 and 1999 stock offers, $99,787 Class A Preferred Stock and at least $107,241 Capital Stock)

*Commentary.* The special committee of disinterested shareholders should determine the reasonableness of the "compensation" received by the senior officers other than Georgine and Carabillo (*i.e.*, Grelle and Luce[77]) in the form of stock sales. These executives did not appear to be significantly involved in the creation or promotion of the 1998 and 1999 stock offer programs, the 2000 stock repurchase program or the "discretionary" stock repurchase program. Nor does it appear that they were directly responsible for recommending or approving any of these programs. It is also unclear whether the overall compensation received by these executives (including gains on stock repurchases) is disproportionate to the market value of their respective services. Accordingly, even if the special committee recommends return of profits from the directors and other senior officers, it may nonetheless be reasonable for the committee to ratify the stock purchases and repurchases of these two officers.

The committee should pay particular attention, however, to those repurchases from senior officers pursuant to the "discretionary" stock repurchase program given that this program was not fully disclosed to ULLICO's directors or shareholders. Further, the committee should recognize that Luce and Grelle were already being compensated for the success of the Global Crossing investment through the Global Incentive Program, with each officer receiving aggregate bonuses of about $750,000

---

[77] Steed and Maloney were unable to participate in the 2000-01 stock repurchase program.