# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOSEPH A. CARABILLO,<br><br>       Plaintiff,<br><br>       v.<br><br>ULLICO INC.,<br><br>       Defendant. | CASE NUMBER: 1:03CV01556(RLJ)<br><br>DECK TYPE: Labor/ERISA (non-employment) |

ULLICO INC., THE UNION
LABOR LIFE INSURANCE
COMPANY, THE ULLICO INC.
NON-QUALIFIED DEFERRED
COMPENSATION PLAN,
THE UNION LABOR LIFE
AUXILIARY RETIREMENT
BENEFITS PLAN, and MARK
SINGLETON, in his capacity as
a Plan Administrator,

       Counterclaim Plaintiffs,

       v.

JOSEPH A. CARABILLO, ROBERT
A. GEORGINE, JOHN K. GRELLE,
JAMES W. LUCE; ANN J.
O'BRIEN, TRUSTEE,
ROBERT A. AND MARY RITA
GEORGINE TRUST; and PACIFIC
LIFE INSURANCE COMPANY,

       Counterclaim Defendants.

## AMENDED ANSWER AND COUNTERCLAIM

13.     Admits plaintiff cleaned out his desk and office; that there occurred certain correspondence with ULLICO employees concerning the June 1, 2003, Early Retirement Program and benefits under that program; that he had wound up all his ULLICO duties and responsibilities and ceased in all respects to function as an employee; and does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 13.

14.     Admits that by letter marked Friday, May 30, 2003, the Acting President of ULLICO terminated plaintiff's employment for cause and removed him as an officer of ULLICO and from any positions he may hold with any related or affiliated entities because, among other reasons, management had lost confidence in him; and denies the remaining allegations of paragraph 14.

15.     Denies the allegations of paragraph 15.

## As to Claim I – ERISA Violation:

16.     Denies the allegations of paragraph 16.

17.     Denies all allegations of direct and proximate result; and admits that plaintiff is being denied retirement benefits under the June 1, 2003 Early Retirement Program; that he is not receiving pension payments, health insurance coverage and life insurance coverage under the June 1, 2003 Early Retirement Program; and denies the remaining allegations of paragraph 17.

## As to Claim II – Breach of Contract:

18.     Denies the allegations of paragraph 18.

19.     Denies the allegations of paragraph 19.

20.     Denies the allegations of paragraph 20.

4

## As to Claim III – Wrongful Termination:

21.     Denies the allegations of paragraph 21.

22.     Denies the allegations of paragraph 22.

23.     Denies the allegations of paragraph 23.

### SEVENTH DEFENSE

Plaintiff is not entitled to the relief sought.

### COUNTERCLAIM
(Breach of Fiduciary Duty, Breach of Contract,
Declaratory Judgment)

1.     This counterclaim seeks compensatory and equitable relief in connection with millions of dollars in windfall profits and other benefits that plaintiff and counterclaim defendant Joseph Carabillo ("Carabillo") and certain other corporate insiders joined as counterclaim defendants reaped through self-dealing primarily during the period 1998-2001, all at the expense of, and in violation of their fiduciary and contractual duties to, ULLICO and its shareholders.

### Jurisdiction and Venue

2.     This Court has jurisdiction pursuant to Fed. R. Civ. P 13, 19 and 20, 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1332 (diversity of citizenship), 29 U.S.C. § 1132(a)(3) (ERISA), 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 2201 (Declaratory Judgment) and also under the doctrines of pendent and ancillary jurisdiction. The amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and 29 U.S.C. § 1132(e)(2). This Court has personal jurisdiction over the counterclaim defendants pursuant to Fed. R. Civ. P. 4(e) and (k) and 13, and D.C. Code §13-423.

5

## Parties

3.     Counterclaim Plaintiff ULLICO Inc. is a corporation formed under the laws of the state of Maryland, with its principal place of business in the District of Columbia ("ULLICO"). ULLICO was created in 1987 as a holding company in order to raise capital for its various subsidiaries that provide insurance, pension, health and management and lending services to unions, union members and their families, and benefit funds. Its subsidiaries include counterclaim plaintiff The Union Labor Life Insurance Company, formed in 1925, to provide life insurance to union members in high-risk jobs. ULLICO's Board of Directors has historically consisted primarily of present or former officers of unions affiliated with the AFL-CIO and their affiliated Taft-Hartley funds, who are major ULLICO shareholders. It also serves as a Plan Administrator for the Union Labor Life Auxiliary Retirement Benefits Plan, or its successor.

4.     Counterclaim Plaintiff The Union Labor Life Insurance Company ("Union Labor Life") is a Maryland corporation with its principle place of business in the District of Columbia, and created The Union Labor Life Auxiliary Retirement Benefits Plan.

5.     Counterclaim Plaintiff ULLICO Inc. Non-Qualified Deferred Compensation Plan is an employee benefits plan, purportedly established by ULLICO, effective as of August 1, 1998.

6.     Counterclaim Plaintiff Union Labor Life Auxiliary Retirement Benefits Plan is an employee benefits plan, established by Union Labor Life Insurance Company effective as of January 1, 1983.

7.     Counterclaim Plaintiff Mark Singleton if the Chief Financial Officer of ULLICO Inc., serves as a Plan Administrator for the Qualified Pension Plan and Trust and Deferred

6

Compensation Plan, and joins as a counterclaim plaintiff solely in his capacity as a Plan Administrator.

8.     Counterclaim Defendant Robert Georgine ("Georgine") is a citizen of the State of Maryland and served as Chairman of the Board of Directors of ULLICO and its Executive Committee. He was employed by ULLICO as its Chairman beginning on December 5, 1990, and as President and Chief Executive Officer beginning on May 6, 1997, until May 8, 2003, when he ceased to serve as Chairman and CEO and resigned as President under the imminent threat of dismissal for cause.

9.     Counterclaim Defendant Joseph Carabillo ("Carabillo") is a citizen of the Commonwealth of Virginia and was employed by ULLICO as the Company's Chief Legal Officer from March 2, 1987 until he was terminated for cause on May 30, 2003.

10.     Counterclaim Defendant John K. Grelle ("Grelle") is a citizen of the Commonwealth of Virginia and was employed by ULLICO as a Senior Vice President and Chief Financial Officer of the Company from January 2, 1996, until his resignation on February 25, 2003.

11.     Counterclaim Defendant James W. Luce ("Luce") is a citizen of the Commonwealth of Virginia and was employed by ULLICO as an Executive Vice President of the Company from February 14, 1983, until his retirement, effective June 1, 2003. For the purposes of the counterclaim, counterclaim defendants Georgine, Carabillo, Grelle and Luce are collectively referred to as the "counterclaim defendant officers."

12.     Counterclaim Defendant Ann J. O'Brien, Trustee is named as a counterclaim defendant solely in her capacity as Trustee of the Robert A. and Mary Rita Georgine Life Insurance Trust and solely for the purposes of adjudicating the rights of ULLICO and

7

counterclaim defendant Robert A. Georgine under the Split Dollar Life Insurance Agreement and related insurance policy.

13. Counterclaim Defendant Pacific Life Insurance Company is the issuer of Pacific Estate Preserver, Policy No. 1A23725140, which is owned by the Robert A. and Mary Rita Georgine Trust and issued in connection with the Split Dollar Life Insurance Agreement between ULLICO Inc. and the Robert A. and Mary Rita Georgine Life Insurance Trust entered into as part of defendant Robert A. Georgine's Employment Agreement, effective October 1, 1999.

**Facts**
**(General Allegations As To All Counts)**

14. During the relevant period, ULLICO was a privately held corporation with three classes of stock that consist of (i) voting Capital Stock; (ii) Class A voting stock; and (iii) Class B non-voting stock. By June 1998, ULLICO had issued and outstanding approximately 256,000 shares of Capital Stock, 6.7 million shares of Class A stock, and 753,000 shares of Class B stock.

**ULLICO Invests in Global Crossing**

15. In February 1997, the Board approved as part of a private equity investment program an investment of $7.6 million in a new non-public company called Nautilus LLC, the predecessor of Global Crossing.

16. In August 1998, Global Crossing became a publicly traded company with its initial public offering, at which time ULLICO's share of Global Crossing was worth more than 30 times its initial investment; over the life of that investment, ULLICO realized a gross profit of approximately $486 million on its original investment.

17. Throughout 1998 and 1999, Global Crossing's value continued to rise dramatically so that by the end of 1999, ULLICO's unrealized and after tax realized gains on its Global Crossing investment was more than $1 billion or 85% of ULLICO's total stockholders'

8

equity. Because of the skyrocketing value of Global Crossing stock, the book value of ULLICO's stock increased nearly 600% between December 31, 1997 and December 31, 1999.

## ULLICO Adopts a Formal Repurchase Program in 1997

18.    Before 1997, ULLICO paid high annual cash and stock dividends, typically in the range of an annual 8% cash and 10% stock dividend. However, in the spring of 1997 the Board decided to use a share redemption program to replace dividends as the principal means to distribute to shareholders a return on their investment and also to provide liquidity for ULLICO's larger shareholders.

19.    In May 1997, in order to implement its decision to transition away from dividends to shareholder distributions through stock redemptions, the ULLICO Board approved a formal stock repurchase program, under which ULLICO would repurchase shares of ULLICO Class A and B stock that had been acquired through what had been known as the preferred certificate program (the "1997 Repurchase Program"). The 1997 Repurchase Program envisioned that ULLICO would be allowed to repurchase $180 million in Class A and B stock over 11 years, with $30 million of stock being repurchased in 1997 and $15 million in each of the following 10 years. Consistent with the business purpose for the 1997 Repurchase Program, ULLICO decreased its dividend from 8% in 1996 to 2% in 1997 and 1998 and eliminated dividends completely in 1999.

20.    Consistent with its business objective to replace dividends with other types of distributions, the Board envisioned that to the extent more shares were tendered than could be repurchased with the funds allocated for any particular repurchase program, the share redemptions would be prorated based on the total number of shares tendered, thereby ensuring the proportionate and equitable distribution of ULLICO's funds among shareholders. The only

9

exception authorized by the Board would be among holders of 10 or fewer shares who tendered shares, all of which would be repurchased without proration. However, prior to the actual commencement of the 1997 Repurchase Program, the proration threshold was raised from 10 to 10,000 shares. This change in threshold was never approved by the Board or the Executive Committee.

## ULLICO Adopts a New Share Price Valuation System in Connection With the 1997 Repurchase Program

21.    Historically, the price of ULLICO's stock had been set at $25 per share. In order to facilitate the 1997 Repurchase Program, the Board decided that beginning in May 1997, it would abandon its method of valuing its stock at $25 per share, and would set the price per share annually under a "book value" method based on ULLICO's prior year-end audited book value per share. Under this method, the stock price was determined by taking the "Total Shareholder Equity," as reflected on the Company's audited December 31 balance sheet, and dividing it by the total number of outstanding shares of Capital, Class A and B stock. The initial price set in May 1997, based on the book value of the stock as of December 1, 1996, was $27.06 per share.

22.    Based on the pricing formula adopted in connection with the 1997 Repurchase Program, ULLICO adopted the following prices per share for the period 1997 – 2003:

a.    May, 1997 - May, 1998: $27.06

b.    May, 1998 - May, 1999: $28.70

c.    May, 1999 - May, 2000: $53.94

d.    May, 2000 - May, 2001: $146.04

e.    May, 2001 - May, 2002: $74.87

f.    May, 2002 - May, 2003: $46.58

## Corporate Insiders Utilize the New Price Formula
## to Reap Personal Benefits from the Run Up of ULLICO Stock

23.    With the clear prospects for the dramatic rise in ULLICO stock as a result of the Global Crossing investment, a series of programs were put into place that allowed the senior officers and directors of ULLICO to unjustly enrich themselves by exploiting for purposes never intended ULLICO's method of determining share value in connection with the 1997 Repurchase Program. These programs were either to the exclusion of ULLICO's other shareholders or structured to benefit counterclaim defendant officers and other insiders disproportionately in relationship to other larger shareholders and were proposed and implemented either through *ultra vires* or other improper actions, including without limitation, material misrepresentations and omissions in certain legally required disclosures.

24.    Beginning in 1998, the management of ULLICO, acting principally through Georgine and Carabillo, designed, sponsored, endorsed, and implemented a series of programs and transactions to divert to the senior officers and directors of the company corporate profits and other distributions generated by the Global Crossing investment. These programs included:

(1)    the 1998 and 1999 Stock Offer Programs, available only to senior officers and directors;

(2)    the 1998, 1999, 2000, and 2001 Formal Repurchase Programs, which had the effect of exempting officers and directors from any proration and which, in fact, allowed certain officers and directors, including the counterclaim defendant officers, to receive disproportionate distributions of ULLICO funds;

(3)    an improperly authorized program of "discretionary" repurchases in 2000 and 2001, under which Georgine and Carabillo caused ULLICO to

11

repurchase nearly $15 million of ULLICO stock from corporate insiders, including all of the counterclaim defendant officers;

(4)     a non-qualified "Top Hat" Deferred Compensation Plan, under which certain corporate officers could "defer" portions of their compensation, including incentive payments, into "deemed investments" of ULLICO stock that was "deemed" purchased and sold using the price formula adopted for the 1997 Repurchase Program;

(5)     special Global Crossing "incentive payments" to the most senior officers, under which more than $4.75 million was paid to counterclaim defendant officers as bonuses;

(6)     expanded retirement benefits for the senior most corporate officers under an Auxiliary Retirement Benefits Plan, accomplished through a purported amendment of the Qualified Pension Plan and Trust, adopted by the counterclaim defendant officers without Board or Executive Committee approval; and

(7)     a Stock Purchase and Credit Agreement for Georgine, never approved by the Board or Executive Committee, under which Georgine received without cost 40,000 shares of ULLICO stock, with special "put" provisions obligating ULLICO to repurchase those shares at Georgine's request.

A key feature to many of these programs was the use of the price formula, adopted by the Board in May 1997 for the purpose of distributing to shareholders a return on their investment in

replacement of dividend distribution, to improperly direct millions of dollars to corporate insiders.

## The 1998 and 1999 Stock Offer Programs to Corporate Insiders

25.    On February 11, 1998, the Board's Executive Committee, headed by Georgine and with Carabillo's endorsement, appointed purportedly pursuant to Article VI, Section 1 of the By-Laws, a Compensation Committee to ". . . act on all matters concerning compensation and the establishment and administration of all programs and agreements relating to compensation, whether current or deferred," provided, however, that "[n]o member of the Committee shall participate in the determination of any matter affecting his own compensation."

26.    On July 27, 1998, purportedly pursuant to the Executive Committee's February 11, 1998 resolution, and motivated by the remarkable performance of ULLICO's Global Crossing investment, the Compensation Committee, at the request and with the approval of Georgine and Carabillo, authorized the offer of up to 2,000 shares of Class A stock to each director and officer of ULLICO and directed Georgine to implement the program "at the earliest opportunity" (the "1998 Stock Offer Program").

27.    On February 13, 1999, the Executive Committee again appointed a Compensation Committee to act on all matters concerning the compensation of officers and employees (omitting any mention of directors); and on May 13, 1999, the Compensation Committee authorized defendant Georgine to offer up to 4,000 shares of ULLICO stock to senior officers and directors at "book value" of $53.94 per share based on the Company's 1998 year-end financials, (the "1999 Stock Offer Program"). The offers were to occur at "some time during the course of the year 1999 at the Chairman's [Georgine's] discretion."

28.     On December 17, 1999, despite warning from outside counsel that there were "issues involved in any sale" of ULLICO stock to officers and directors, Georgine with Carabillo's approval offered each senior officer and director the right to purchase up to 4,000 shares of Class A stock at $53.94 per share.

29.     In connection with the 1999 Stock Offer Program, Georgine and Carabillo, without any Board or Compensation Committee approval, caused ULLICO to enter into certain stock buy-back agreements with lenders to whom ULLICO stock had been pledged as security in order to provide credit support for loans to counterclaim defendants Georgine, Carabillo and Grelle for the purchase of ULLICO stock.

30.     Because the members of the Compensation Committee were eligible to participate in the 1998 and 1999 Stock Offer Programs, the actions of the Compensation Committee violated the February 11, 1998 and February 13, 1999 Executive Committee resolutions that expressly prohibited the Compensation Committee from participating in matters directly affecting their own compensation. In addition, the Compensation Committee exceeded the delegation of authority pursuant to the February 13, 1999, Executive Committee resolution when it included directors as eligible participants under the 1999 Stock Offer Program.

31.     In addition to its aforesaid *ultra vires* actions , the Compensation Committee also exceeded the scope of permissible activity with respect to the 1998 and 1999 Stock Offer Programs under Article VI, Section 2 of ULLICO's by-laws. Under that provision of the by-laws, the Executive Committee, which established the Compensation Committee, did not have the authority to authorize the issuance of stock and therefore could not have delegated any such authority to the Compensation Committee. Moreover, prior Board resolutions and other provisions of ULLICO's by-laws allowed only those directors and officers that had been granted

14

the right of purchase to buy ULLICO stock; and none of the directors or officers that were eligible to participate in the 1998 and 1999 Stock Offer Programs had been so designated.

32.     Following the actions of the Compensation Committee with respect to the 1998 and 1999 Stock Offer Programs as aforesaid, Georgine and Carabillo offered to each director and senior officer of ULLICO the opportunity to buy 2,000 shares of ULLICO stock in July 1998 and an additional 2,000 shares in October 1998 at a price of $28.70, and an additional 4,000 shares in December 1999 at a price of $53.94. These prices were based on the book value price for the shares as of December 31 preceding the actual dates of purchase.

33.     All of the counterclaim defendant officers purchased stock pursuant to the 1998 and 1999 Stock Offer Program. The counterclaim defendant officers were able to purchase ULLICO stock with knowledge that the purchase price was substantially below the book value that would likely be determined as of December 31, 1998 and 1999 and adopted by the Board the following May as the price for ULLICO stock.

34.     The 1998 and 1999 Stock Purchase Programs approved by the Compensation Committee resulted in self-interested transactions between ULLICO and its officers and directors in violation of Maryland law and the fiduciary duties of those directors who participated in the Compensation Committee decision. Specifically, the Programs were used for the purposes of providing corporate insiders with an opportunity not available to other shareholders generally to buy stock and realize large quick profits with little or no risk by using a pricing formula that had been adopted by the Board to replace dividend distributions to shareholders and to provide a return on shareholders' investment.

35.     The actions of the Compensation Committee in approving the 1998 and 1999 stock offers were not reported to ULLICO's Board of Directors or Executive Committee, were

not approved by either the Board or its Executive Committee, and to the extent that the Compensation Committee was deemed to have been delegated such authority, that delegation constituted a violation of Section 2-411 of the Maryland Code and otherwise violated the standards for fiduciary duties under Section 2-405.1.

### The 1998, 1999, 2000 and 2001 Repurchase Programs

36.    On May 4, 1998, the Executive Committee, headed by Georgine and with the approval of Carabillo, authorized a $15 million repurchase program for Class A and B stock at $28.70 a share – the book value as of December 31, 1997. On June 30, 1998, Georgine, with Carabillo's endorsement, sent a letter to company shareholders announcing the program; and on November 9, 1998, Georgine, again with Carabillo's approval, formally offered to repurchase stock under the program. As in 1997, the 1998 repurchase program included a provision exempting holders of 10,000 or fewer shares from the program's proration provisions.

37.    On May 17, 1999, the Executive Committee – again headed by Georgine and with the approval of Carabillo – authorized a $15 million repurchase of ULLICO stock at the "book value" price of $53.94 per share. On November 16, 1999, Georgine formally offered to repurchase $15 million of Class A and B stock at $53.94 a share. The repurchase offer closed on December 17, 1999, the same day Georgine offered stock to senior officers and directors under the 1999 stock offering. Like the 1997 and 1998 repurchase programs, the 1999 repurchase program again exempted from proration holders of fewer than 10,000 shares who tendered such shares. The repurchase offer was oversubscribed, and resulted in shareholders of more than 10,000 shares being allowed to redeem only 91.93% of shares tendered. Despite the doubling of Company stock price in a single year, no officer or director sold stock acquired pursuant to the 1998 stock offer in the 1999 Repurchase Program.

16

38.    As of December 31, 1999, Global Crossing stock had risen to approximately $50 per share ($100 per share before adjustments for stock splits). However, by May, 2000, Global Crossing stock had fallen to nearly half its December 31, 1999 price levels and accordingly the actual book value of ULLICO was falling precipitously.

39.    Despite the quickly declining value of ULLICO's Global Crossing investment, on May 10, 2000, the Executive Committee of the Board led by Georgine, and with the approval of Carabillo, once again set the price of ULLICO stock based on its book value as of the preceding December 31, and thereby approved a record high ULLICO stock price of $146.04 per share, a price nearly three times the price of $53.94 adopted by the Board the previous May.

40.    In light of the declining value of ULLICO's Global Crossing investment and its predictable effect on the value of ULLICO stock, the Executive Committee recognized that the stock price of $146.04 represented a premium over its actual value and on May 10, 2000, approved an "extraordinary" repurchase program in order to distribute equitably to all shareholders some of the returns on the Global Crossing investment (the "extraordinary" repurchase plan).

41.    Under the "extraordinary" repurchase plan, ULLICO would repurchase up to 20% of ULLICO's outstanding stock, including Capital Stock, from all shareholders. The program had an aggregate value of approximately $240 million and ULLICO planned to sell $360 million of its shares of Global Crossing by the end of 2000 in order to obtain the necessary cash to implement the program.

42.    The "extraordinary" repurchase plan was subject to a number of conditions, including that the market price of Global Crossing stock, then trading at about $33 per share, had to be not less than $43 per share, a price within approximately 15% of Global Crossing's stock

17

price on December 31, 1999. In the event that the program was oversubscribed, which was anticipated, all shareholders, including officers and directors, would be treated equally by having the same percentage of their stock holdings redeemed, except that tenders of shares by shareholders holding 100 shares or less would be accepted in total, without proration.

43.    On May 11, 2000, the Board approved this "extraordinary" repurchase plan with the conditions established by the Executive Committee after receiving from Credit Suisse First Boston an opinion that the program was favorable to stockholders and has been balanced in a manner so that it will not jeopardize ULLICO's "well-being."

44.    By the end of August 2000, the market value of ULLICO's Global Crossing investment had lost over $475 million since December 31, 1999. By November, 2000, the stock price of Global Crossing had failed to reach the $43 level; and on November 3, 2000, with Global Crossing stock trading at only $23 5/8 per share, the Board abandoned the "extraordinary" repurchase program. In its place, the Board approved a $30 million repurchase program at $146.04 per share, limited to holders of Class A and Class B shares (the "Actual 2000 Repurchase Program"). This Program together with Georgine's unprecedented use of "discretionary" repurchases, discussed infra, provided grossly disproportionate redemptions to senior officers and directors.

45.    The Actual 2000 Repurchase Program had a number of features that worked to counterclaim defendant officers' benefit. In order to implement the program, all shareholders holding more than 2% of outstanding Class A and Class B Stock had to tender 100% of their holdings. Given the high premium reflected in the purchase price of $146.04 and the 2% rule, it was likely that over $800 million of stock would be tendered in an offering capped at $30 million, and that as a result, severe proration would occur. Nevertheless, with Georgine and

18

Carabillo's approval, an exemption from proration was adopted for shareholders owning 10,000 shares or less. Moreover, Georgine, at his "discretion", further benefited such insiders by agreeing to repurchase ULLICO shares (at $146.04 per share), outside the formal repurchase program, from May to October 2000, even though none of the counterclaim defendant officers ever disclosed the details of those discretionary repurchases to the Board.

46.     On November 21, 2000, Georgine, with Carabillo's approval, sent a letter to ULLICO's shareholders announcing the Actual 2000 Repurchase Program. In his letter, Georgine misrepresented that all shareholders would "share ratably in the offering" and failed to disclose that shareholders holding fewer than 10,000 shares could avoid proration or that such shareholders could sell their shares outside the program at Georgine's "discretion" at the price of $146.04. On the contrary, Georgine stated that the company "continues to reserve its right, pursuant to the bylaws, to repurchase shares outside the Repurchase Program at $25 per share."

47.     On December 14, 2000, ULLICO, through Georgine and with Carabillo's approval, formally offered to repurchase $30 million of Class A and Class B Stock, but not Capital Stock. In the legally required tender offer documents that accompanied the offer, the exemption from proration for holders of less than 10,000 shares was disclosed, although there was no disclosure that Georgine intended or might repurchase shares from holders of 10,000 or less shares outside the formal program at $146.04, that all ULLICO senior officers and directors except Georgine held less than 10,000 shares, and that several senior officers and directors, including Georgine, had already redeemed shares at $146.04 through various "discretionary" repurchases in 2000 before the tender offer commenced. To the contrary, the tender offer documents represented that "[t]he Company has not been advised that any of its directors and executive officers presently intend to tender any Shares personally owned by them pursuant to

19

the Offer" and that shares of the company "represented[ed] an excellent long-term investment opportunity."

48.    As one would have expected, the Actual 2000 Repurchase Program was wildly oversubscribed and, as a result, under the Program's proration rules ULLICO could only repurchase 2.2% of the stock tendered by each shareholder owning more than 10,000 shares. In contrast, the senior officers and directors who tendered shares had all of their shares repurchased without proration at $146.04. As a result, those senior officers and directors who tendered shares received more under the $30 million Actual 2000 Repurchase Program than they would have received under the abandoned $240 million "extraordinary" repurchase plan, which did not provide for any significant proration.

49.    The Actual 2000 Repurchase Program was adopted in violation of the fiduciary duties and obligations owed to the Board and ULLICO by the senior executives who sponsored and presented those proposals to the Board, specifically counterclaim defendants Georgine and Carabillo. As in the 1998 and 1999 Stock Offer Programs, it used the same price formula to provide a return on investments to shareholders in lieu of dividends to provide windfall profits and disproportionate corporate distribution to shareholders who were corporate insiders. It resulted in substantial self-interested transactions disproportionately benefiting the counterclaim defendant officers.

### Georgine's "Discretionary" Repurchases in 2000-2001

50.    There had existed for some time an informal "discretionary" repurchase program, whereby ULLICO stock was eligible for repurchase at the discretion of the Board Chairman. Historically, this "discretionary" program had been used to address unusual situations such as shareholder emergencies or hardship, or to redeem shares upon the death of a shareholder.

20

Though in existence for many years, this discretionary program was not formally presented to the Board for approval until November 2000.

51.    Following the Board's adoption of the $240 million "extraordinary" repurchase plan in May 2000 (which would have exempted from proration only holders of 100 or less shares) but before the satisfaction of those conditions imposed on that program, such as a rise in Global Crossing stock to $43 per share, and in advance of any authorization to go forward with any replacement repurchase program, Georgine undertook a series of unprecedented "discretionary" repurchases of ULLICO stock, where, at his sole discretion, the company repurchased shares from certain officers and directors at a price Georgine determined to be appropriate.

52.    Between May 2000 and November 2000, when the Actual 2000 Repurchase Program was authorized, Georgine, pursuant to this "discretionary" program, caused ULLICO to repurchase nearly 30,000 shares of company stock from senior officers and directors at $146.04 per share, including the repurchase of his own shares. None of these purchases were ever disclosed to the full Board or to the shareholders in the tender offer documents that accompanied the later Actual 2000 Repurchase Program. In addition, Georgine knew, or should have known, at the time these discretionary repurchases were made, that Global Crossing stock had not reached the price level on which the Board conditioned the "extraordinary" repurchase of ULLICO stock at $146.04 per share.

53.    Following the expiration of the Actual 2000 Repurchase Program on January 16, 2001, and before the May 2001 Board meeting at which a substantially lower ULLICO share price was adopted, Georgine, with Carabillo's approval, continued to exercise his "discretion"

21

and caused ULLICO to repurchase an additional 31,212 shares of ULLICO stock at $146.04 per share, including shares of Capital Stock, from corporate insiders.

54.    The existence of these discretionary repurchases was not advertised to ULLICO shareholders, nor was it ever adequately disclosed to the full Board. At the November 3, 2000, Board meeting, an attempt was made to authorize these discretionary repurchases by passing resolutions permitting Georgine to approve stock repurchases outside the formal programs and ratifying "any and all actions taken by the Chairman or other appropriate officers of the Corporation falling within the scope of any of the preceding resolutions . . . taken at any time." However, details concerning the specific discretionary purchases purportedly ratified were never disclosed to the Board in connection with the ratification.

### Total Stock Repurchased at $146.04 Per Share

55.    From 2000-2001, pursuant to the 2000 Actual Repurchase Program and Georgine's "discretionary" repurchases, the Company repurchased 305,636 shares of Class A and Capital Stock at the rate of $146.04 per share, resulting in a total cost to the Company of approximately $44.6 million, $30 million pursuant to the Actual 2000 Repurchase Program and $14.6 million in Georgine's "discretionary" purchases. Of the $14.6 million in discretionary repurchases made by Georgine, 62.6% were from senior officers and directors, with an aggregate value of $9.2 million. None of the individual repurchases were disclosed to or approved by the full Board, the Executive Committee or ULLICO shareholders.

56.    During the period 2000-2001, twenty directors and senior officers holding only 1.3% of ULLICO stock redeemed 93,923 shares of Class A and Capital shares at $146.04 per share and received $13.7 million, or 31% of the total funds distributed by the Company, for stock repurchases while the share price was set at $146.04. Approximately $9.6 million of the $13.7

22

million distributed to senior officers and directors was used to repurchase shares originally purchased under the 1998 and 1999 Stock Offer programs. The directors and officers participating in these purchases collectively realized pre-tax profits of at least $10.7 million.

## The 2001 Stock Repurchase Program

57.    On May 7, 2001 the Executive Committee, headed by Georgine and with Carabillo's endorsement, approved a $15 million repurchase of ULLICO stock at the book value price of $74.87.

58.    The 2001 repurchase program again provided that, if the offer were oversubscribed, shareholders holding and tendering over 10,000 shares would be prorated, while those possessing less than 10,000 shares would not be prorated provided they tendered all their shares.

59.    The 2001 offer was again highly oversubscribed, and resulted in a proration rate of 2.657% for holders of more than 10,000 shares.

60.    At least five shareholders holding fewer than 10,000 shares participated in the 2001 repurchase program and were not prorated, including Luce, who was allowed to redeem 1,100 of his 1,500 remaining Class A shares under the program without proration, despite the requirement that shareholders holding less than 10,000 shares needed to tender all their stock to avoid proration.

61.    In addition to the programs as aforesaid, Georgine and Carabillo, with the knowledge and acquiescence of Luce and Grelle, the senior most officers in the company who controlled the operational and daily activities of the company, formulated, proposed and implemented certain deferred compensation programs or amendments to existing deferred

23

compensation or pension plans in order to obtain windfall profits in addition to those obtained through the 1998 Stock Offer Program and the 2000-2001 repurchase programs, all in violation of fiduciary duties owed to ULLICO. These included a "Top Hat" Deferred Compensation Plan and amendments to ULLICO's qualified Pension Plan that had the effect of increasing benefits under ULLICO's non-qualified Auxiliary Retirement Benefits Plan.

### The Non-Qualified Deferred Compensation Plan

62.    On July 27, 1998, the Compensation Committee approved the Non-Qualified Deferred Compensation Plan effective August 1, 1998 ("the Deferred Compensation Plan").

63.    Under the Deferred Compensation Plan, the counterclaim defendant officers were allowed to defer up to 25% of their base salary and up to 100% of their bonuses (thereby avoiding any current income tax on the deferred amounts), including incentive awards under the Global Incentive Program, and to make "deemed investments" of those amounts into one or more investment alternatives. Amounts deferred under the Deferred Compensation Plan were not actually invested in the investment alternatives, which served only as a measure of return to the plan participants. One of the investment alternatives available to the participants was ULLICO stock, as valued each year.

64.    Georgine, Carabillo, Luce and Grelle deferred significant portions of their income pursuant to this plan into a "deemed" investment in ULLICO stock. Specifically, Georgine elected, as of the effective date of the plan, to "invest" all his deferred income in ULLICO stock through "deemed" purchases of company stock at $28.70 per share. In December 1999, shortly before the date used to calculate the ULLICO stock price for the next year (which would be $146.04 per share) Carabillo, Grelle and Luce, as Georgine had since the beginning of the plan, elected to move all of their "deemed investments" into ULLICO stock. As a result, Carabillo,

24

Grelle and Luce were "deemed" to have purchased ULLICO stock at $53.94 per share. Thereafter, between January and May 2000, when the price of ULLICO stock was set at $146.04 based on the book value as of December 31, 1999, certain of the counterclaim defendant officers continued to "purchase" shares through the Deferred Compensation Plan at the price of $53.94 per share.

65.    Shortly after the ULLICO share price was set at $146.04 in May 2000, based on the audited book value as of December 31, 2000, Carabillo, Grelle, and Luce, shifted their "deemed investments" out of ULLICO stock and into other "deemed investments" alternatives. As a result, Carabillo, Grelle, and Luce were able to nearly triple their "investment" in less than six months and realize gains during a period when the real value of ULLICO stock fell dramatically and actual shareholders could not sell.

66.    In late 2001 or early 2002, Carabillo withdrew through a "hardship" distribution all his "deemed investments" and deferred income from the Deferred Compensation Plan, totaling approximately $606,000.

67.    On March 28, 2003, Grelle withdrew all amounts from his deferred compensation account. This withdrawal was approved and authorized by Carabillo, and occurred the same day Carabillo went on "administrative leave" in advance of his termination "for cause."

### Auxiliary Retirement Benefits Plan

68.    By Resolution on May 5, 1997, the Executive Committee of the Board of ULLICO Inc. authorized the creation of a Benefits Committee consisting of the senior officers of ULLICO Inc., including counterclaim defendant officers (the "May 5, 1997 Executive Committee Resolution"). Under the May 5, 1997, Executive Committee Resolution, the Benefits Committee was " . . . authorized, directed and empowered to act as fiduciaries to all plans

25

created or to be created for the benefit and welfare of the corporation's employees and any employees of each of its subsidiaries and affiliates in which the corporation or its subsidiaries owns 80% or more of the outstanding stock and was to have full authority for the administration of all such plans and also delegated authority for the administration of all such plans." The Benefits Committee was not authorized to amend the terms of the plans themselves.

69.     On or about October 20, 1999, counterclaim defendant officers, who constituted four of the five members of the Benefits Committee, purported to amend the definition of "Sponsoring Employee ULLICO Group Compensation" as set forth in the ULLICO Inc. Qualified Pension Plan and Trust, as amended and restated, to include "regularly established annual incentive compensation with no maximum, effective January 1, 2000" (the "Amendment").

70.     As a result of the Amendment, counterclaim defendant officers' benefits payable under the Auxiliary Retirement Benefits Plan would increase significantly.

71.     The Benefits Committee did not have the authority to amend the terms of the ULLICO Inc. Qualified Pension Plan and Trust.

### Georgine's Employment Agreement and Related Agreements

72.     On September 22, 1999, the Board approved and authorized a five year Employment Agreement with Georgine and delegated to the Compensation Committee the authority to negotiate the terms and conditions of the contract.

73.     In December 1999, the Compensation Committee and Georgine entered into a five year Employment Agreement with an effective date of October 1, 1999. That Agreement included a provision providing for a Split Dollar Life Insurance Agreement, which was entered

26

into on February 9, 2000, between ULLICO and the Robert A. and Mary Rita Georgine Life Insurance Trust, Ann J. O'Brien, Trustee.

74.    In addition to Georgine's Employment Agreement, on December 17, and again on December 27, 1999, the Compensation Committee, without authorization, approved a 40,000-share "bonus" to Georgine; and Georgine and each member of the Compensation Committee executed a Stock Purchase and Credit Agreement, whereby Georgine was allowed to purchase 40,000 shares of Class A stock at $53.94 per share, with a loan from the company of $2,157,600. According to the terms of the Agreement, the loan was to be forgiven at a rate of 20% per year for five years, so long as Georgine continued to serve as Chairman, President, and CEO.

75.    Pursuant to the Stock Purchase and Credit Agreement, Georgine received 40,000 shares on or about February 1, 2000, although the Stock Purchase and Credit Agreement was not fully executed by all parties until May 10, 2000. The Stock Purchase and Credit Agreement also contained a "put" option, allowing Georgine to, with 30 days written notice, require the Company to repurchase any portion of the 40,000 shares that no longer represented collateral for the loan made under the Agreement, at a "purchase price per share equal to the Fair Market Value." Pursuant to this agreement, on February 14, 2001, Georgine sold 8,000 shares released from collateral at $146.04 per share.

76.    In addition to the 8,000 shares that Georgine sold back to ULLICO on February 14, 2001, under the "put" option of the Stock Purchase and Credit Agreement, Georgine sold back to ULLICO, pursuant to his own discretionary authority, 12,868 shares of ULLICO stock at $146.04 per share, 4,000 of which were repurchased by ULLICO on July 20, 2000, and the balance also on February 14, 2001.

27

77.    In the fall of 2000 in order to address the obvious conflict of interest associated with Georgine's sales of his stock back to ULLICO through the exercise of "discretion" in his favor, Carabillo presented to the Compensation Committee an Addendum to Georgine's Employment Agreement allowing Georgine to "put" to ULLICO his shares obtained other than through the Stock Purchase and Credit Agreement; and the Compensation Committee approved the Addendum. The Stock Purchase and Credit Agreement was never brought before the Executive Committee or full Board.

78.    The existence and terms of the Stock Purchase and Credit Agreement were never expressly disclosed to or approved by the entire Board of Directors or Executive Committee; and the Compensation Committee lacked the authority to issue stock and was not otherwise authorized to enter into agreements with Georgine in addition to the Employment Agreement.

79.    In early 2002, press reports began to appear concerning self-dealing by ULLICO corporate insiders, and in April, 2002, former Illinois Governor James Thompson was appointed by the Board as Special Counsel to investigate the events surrounding ULLICO's 1998 and 1999 stock purchase offers to directors and several officers, its stock repurchase program, and the Global Crossing investment. After seven months of investigations, with over 40 interviews and the review of thousands of pages of documents, Governor Thompson issued, on November 26, 2002, the "Report of the Special Counsel on ULLICO Stock Purchase Offer and Repurchase Programs and Global Crossing Investment" (the "Thompson Report"). One of that Report's findings was that "a forceful argument exists that certain senior officers of the Company, principally Georgine and Carabillo, violated their duties of loyalty and care to the company." The Thompson Report further found that Georgine and Carabillo were "instrumental in creating

28

and implementing the stock offer and repurchase programs and . . . benefited from ULLICO stock transactions."

80.    In the aftermath of the Thompson Report, ULLICO became the subject of multiple, ongoing, state and federal investigations, including those conducted by the Department of Labor, the United States Securities and Exchange Commission, a District of Columbia Grand Jury, the Maryland Insurance Administration, and the United States Congress.

81.    Following the issuance of the Thompson Report, a number of the Board's members decided not to stand for reelection, and at their annual meeting on May 8, 2003, ULLICO's shareholders elected and installed a new Board of Directors that, for the first time since the 2000 Actual Repurchase Program, had a majority of directors who did not participate in any of the transactions that were the subject of the Thompson Report.

82.    Georgine resigned on May 8, 2003, shortly before the new Board was installed, recognizing that the new Board would otherwise terminate him "for cause." At the end of March 2003, Carabillo "stepped aside" as Chief Legal Officer, and on May 30, 2003, was terminated for cause. Grelle resigned on February 25, 2003; and Luce retired effective June 1, 2003.

83.    In May 2003, the new Board appointed former federal judge Abner Mikva as chairman of a special Regulatory and Litigation Oversight Subcommittee to review the recommendations of the Thompson Report and recommend whether claims should be asserted as a result of the events that took place during 1998-2001. After deliberation, Mr. Mikva and his Committee recommended to the Board that legal action be instituted, and pursuant to that recommendation the Board authorized such legal action.

29

**Count I – Breach of Fiduciary Duty; Aiding and Abetting
Breaches of Fiduciary Duty and Unjust Enrichment
(Against Georgine and Carabillo)**

84.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 83.

85.    At all material times herein, Georgine, in his capacity as a ULLICO director, was under statutory and other fiduciary obligations to ULLICO, including, without limitation, those obligations set forth in Md. Code, Section 2-405.1(a) to perform his duties as a member of the Board (i) in good faith; (ii) in a manner he reasonably believed to be in the best interests of the company; and (iii) with the care that an ordinarily prudent person in a like position would use under similar circumstances.

86.    At all material times herein, Georgine, in his capacity as an officer, was under a fiduciary duty and other legal obligations to ULLICO, including, without limitation, a duty of care, loyalty and obedience, the obligation to ensure legal compliance with all applicable legal requirements pertaining to ULLICO's operations, and the obligation to report to the Board of Directors all pertinent information concerning company transactions and any personal interest he may have in those transactions.

87.    At all material times herein, Carabillo, in his capacity as Chief Legal Officer, was under a fiduciary duty and other legal obligations to ULLICO, including, without limitation a duty of care, loyalty and obedience, the obligation to ensure legal compliance with all applicable legal requirements pertaining to ULLICO's operations, and the obligation to report to the Board of Directors all pertinent information concerning company transactions and any personal interest he may have in those transactions.

30

88.    Georgine and Carabillo created, designed, sponsored, presided over and implemented the 1998 and 1999 Stock Offer Programs, the Actual 2000 Repurchase Program, the 2001 Repurchase Program, the 2000 and 2001 discretionary repurchases, the Amendment to the Pension Plan and Trust, and the Non Qualified Deferred Compensation Plan. They also personally profited from all of those programs except in the case of Georgine, the Actual 2000 Repurchase Program and the 2001 Repurchase Program, and in the case of Carabillo, the 2001 discretionary repurchases, all in violation of their duties and obligations to ULLICO.

89.    As a result of the programs as aforesaid, self-interested transactions took place between ULLICO and Georgine and Carabillo and certain other senior officers and directors, through which they improperly benefited or profited in money, property or services.

90.    During the period 1998-2001 and despite their duties and obligations as aforesaid, Georgine and Carabillo preferred their own interests and those of other insiders over those of ULLICO through:

a.    obtaining profits for themselves from improper and self-interested transactions and permitting other senior officers and directors to do the same.

b.    improperly profiting or otherwise benefiting from "deemed investments" in ULLICO stock under the Non-Qualified Deferred Compensation Plan.

c.    improperly increasing their benefits under the Auxiliary Retirement Benefits Plan.

d.    failing to report as required and otherwise withholding and concealing from the Board certain information material to stock transactions and corporate operations, including, without limitation, information pertaining

31

> to their own self-dealing and that of the other counterclaim defendants; and
>
> e.   failing to disclose to the Board and ULLICO shareholders the fact, substance, import and reasons for the stock offer and repurchase program through which they profited.

91.   As a result of their acts and omissions, including, without limitation, those in connection with the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program and the discretionary repurchase programs in 2000 and 2001, Georgine and Carabillo breached their duties and obligations to ULLICO and also aided and abetted each other in connection with those breaches of duty.

92.   As a direct and proximate cause of Georgine's and Carabillo's breaches of duty and aiding and abetting as aforesaid, Georgine and Carabillo:

> a.   profited personally on ULLICO stock transactions in the amount of approximately $2.6 million and approximately $720,000 respectively;
>
> b.   permitted other insiders to obtain profits improperly on ULLICO stock transactions in the approximate amount of $10.4 million;
>
> c.   caused ULLICO to become the subject of ongoing state, federal and congressional investigations, including grand jury proceedings and proceedings before various regulatory agencies, and to spend and continue to spend large sums of money in response to and defense of those state, federal and congressional investigations;

    d.     created potential obligations to other ULLICO employees under the

            ULLICO Qualified Pension Plan and Trust and Auxiliary Retirement

            Benefits Plan; and

    e.     otherwise caused ULLICO to engage in a waste of corporate assets.

93.    As a direct and proximate cause of Georgine's and Carabillo's breaches of duties and aiding and abetting as aforesaid, Georgine and Carabillo, as well as other senior officers and directors, have been unjustly enriched.

94.    As a direct and proximate cause of Georgine's and Carabillo's breaches of duties and aiding and abetting as aforesaid, ULLICO has been damaged.

95.    As a direct and proximate cause of their breaches of duty and aiding and abetting as aforesaid, Georgine and Carabillo are jointly and severally liable and obligated to ULLICO with respect to the following amounts:

    a.     their own profits of approximately $3.3 million from stock transactions

            with ULLICO;

    b.     profits that were unfairly, improperly, and disproportionately distributed to

            other directors and officers, in the total amount of approximately $10.4

            million;

    c.     the costs and expenses incurred (including attorney's fees) in connection

            with past, ongoing and any future investigations of ULLICO transactions

            over which these defendants presided and resulting litigation (including,

            but not limited to, this action);

    d.     all compensation and benefits including bonuses and Global Crossing

            Incentive bonuses received between 1998 and 2001, the period during

which they engaged in willful breaches of fiduciary and other duties owed to ULLICO, in the approximate amount of $6.1 million;

e.    those amounts distributed or to be distributed to themselves or others under the Non-Qualified Deferred Compensation Plan as a result of the "deemed investment" in ULLICO stock;

f.    those increased amounts ULLICO will be required to pay to others under the Auxiliary Retirement Benefit Plan as a result of the Amendment to the Qualified Pension Plan and Trust, in an amount to be determined; and

g.    such other amounts, to be determined, that adequately compensate ULLICO for damages and injuries it has sustained, including, without limitation, damage to its credit and financial rating and reputation.

## COUNT II – Professional Negligence
### (Against Carabillo)

96.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 95.

97.    At all material times, Carabillo was a lawyer licensed in the District of Columbia and as such was under a duty to ULLICO to provide legal advice in accordance with the prevailing standards of professional care applicable to lawyers employed as in-house chief legal counsel.

98.    Despite his obligations as aforesaid, Carabillo engaged in a course of conduct that caused ULLICO to engage in improper and unauthorized stock transactions and other transactions and activities, including, without limitation, those that violated ULLICO's Articles of Incorporation and bylaws.

34

99.    As a result of his conduct as aforesaid, Carabillo breached the applicable standard of professional care and his duties and obligations owed to ULLICO, all to the detriment and damage of ULLICO.

100.    As a direct and proximate result of Carabillo's breaches of duty as aforesaid, ULLICO has been damaged in an amount to be determined at trial, but in an amount no less than $20,000,000.

## COUNT III-Breach of Fiduciary Duty; Aiding and Abetting
### Breaches of Fiduciary Duty and Unjust Enrichment
#### (Against Grelle)

101.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 100.

102.    As a result of his position as a senior executive officer and Chief Financial Officer of ULLICO, Grelle was under fiduciary duties of care, loyalty and obedience, and other legal obligations to ULLICO, including, without limitation, a duty not to permit or cause corporate waste, or to benefit or profit from self interested transactions with ULLICO, and was further obligated to report to the Board of Directors all pertinent information concerning company transactions and any personal interest he may have in those transactions.

103.    As a result of the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program and the discretionary repurchase programs in 2000, Grelle improperly participated and profited in self-interested, unfair stock transactions with ULLICO, which unjustly enriched him and resulted in a waste of corporate assets.

104.    As a direct and proximate cause of his acts and omissions in connection with the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program and the

discretionary repurchase program in 2000, Grelle breached his duties and obligations to ULLICO or aided and abetted such breaches by others or otherwise improperly benefited and profited from tainted, unfair and improper stock transactions.

105.    As a direct and proximate cause of his breach of duties and obligations to ULLICO and aiding and abetting such breaches as aforesaid, ULLICO has been damaged and injured.

106.    As a result of the events and his conduct as aforesaid, Grelle is obligated, *inter alia*, to disgorge and return to the ULLICO any and all profits and benefits he obtained in connection with, or as a result of the 1998 and 1999 Stock Offer Program, the Actual 2000 Repurchase Program and the 2000 discretionary repurchases and also any other amounts of damage or injury to counterclaim plaintiffs that are shown to be a direct and proximate cause of any breaches of duty on the part of Grelle.

### Count IV – Breach of Fiduciary Duty; Aiding and Abetting Breaches of Fiduciary Duty and Unjust Enrichment
### (Against Luce)

107.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 106.

108.    As a result of his position as a senior executive officer of ULLICO, Luce was under fiduciary duties of care, loyalty and obedience, and other legal obligations to ULLICO, including, without limitation, a duty not to permit or cause corporate waste, or benefit and profit from self interested transactions with ULLICO, and was further obligated to report to the Board of Directors all pertinent information concerning company transactions and any personal interest he may have in those transactions.

36

109.    As a result of the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program, the 2001 Repurchase Program and the discretionary repurchase programs in 2000, Luce improperly participated in and profited from self-interested, unfair stock transactions with ULLICO that unjustly enriched him and resulted in a waste of corporate assets.

110.    As a direct and proximate cause of his acts and omissions in connection with the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program, the 2001 Repurchase Program and the discretionary repurchase program in 2000, Luce breached his duties and obligations to ULLICO or aided and abetted such breaches by others or otherwise improperly benefited and profited from tainted, unfair and improper stock transactions.

111.    As a direct and proximate cause of his breach of duties and obligations to ULLICO and aiding and abetting such breaches as aforesaid, ULLICO has been damaged and injured.

112.    As a result of the events and his conduct as aforesaid, Luce is obligated, *inter alia*, to disgorge and return to the ULLICO any and all profits and benefits be obtained in connection with or as a result of the 1998 and 1999 Stock Offer Programs, the Actual 2000 Repurchase Program, and the 2000 discretionary repurchases and also any other amounts of damage or injury to counterclaim plaintiffs that are shown to be a direct and proximate cause of any breaches of duty on the part of Luce.

## COUNT V – Breach of Employment Agreement
### (Against Georgine, O'Brien and Pacific Life Insurance Co.)

113.    ULLICO incorporates herein by reference and makes a part hereof its allegations set forth in paragraphs 1 through 112.

114.    Under the Employment Agreement, Georgine's duties included those specified in ULLICO's by-laws and "such other duties as are reasonable and customary for a chairman of the board, president and chief executive officer."

115.    ULLICO's by-laws impose upon Georgine the obligation to make "regular reports to the Board of Directors and the Executive Committee on Company operations and conformance thereof to all legal requirements."

116.    As a result of the events and his acts and omissions as aforesaid, Georgine failed to discharge his express and implied duties and obligations under or arising out of the Employment Agreement and his employment relationship with ULLICO, and as a result failed, *inter alia*, to adequately advise the Board and to prevent ULLICO from engaging in actions that failed to comply with all applicable legal requirements, all in breach of his express and implied contractual duties under the Employment Agreement.

117.    As a result of Georgine's acts and omissions as aforesaid, Georgine materially and substantially breached his contract of employment with ULLICO.

118.    As a result of his substantial and material breaches of his contract of employment as aforesaid, ULLICO had been damaged.

119.    As a result of his substantial and material breaches of his contract of employment as aforesaid, ULLICO is entitled to cancel and rescind the Employment Agreement and all related contracts, including his Split Dollar Life Insurance Agreement, his Stock Purchase and Credit Agreement, and his Agreement dated August 20, 1994, providing certain supplemental excess retirement plan benefits, and be discharged of all duties and obligations thereunder, and also to receive a disgorgement of those benefits paid to and received by Georgine under those agreements or as part of his employment relationship during the period 1998-2001.

38

120.    In addition to a disgorgement of the benefits he has received under his Employment Agreement, and all related agreements, benefits, bonuses and incentive plans, ULLICO is entitled to a declaration that the Employment Agreement, the Stock Purchase and Credit Agreement, the Split Dollar Life Insurance Agreement, and related life insurance policy, and the agreement providing supplemental retirement benefits are cancelled and of no further effect, that all stock held by Georgine pursuant to those agreements are cancelled and of no further validity or effect, that counterclaim plaintiffs have no duties or obligations to Georgine under those agreements and Georgine has no rights or entitlement under those agreements and that all funds being held related to those agreements are to be returned to ULLICO with no further right, title, interest, or claim to them by Georgine.

## COUNT VI – Declaratory Judgment: Auxiliary Retirement Benefits Plan
### (Against Georgine, Carabillo, Grelle and Luce)

121.    ULLICO incorporates herein by reference and makes a part hereof its allegations set forth in paragraphs 1 through 120.

122.    In drafting, adopting and implementing the Amendment to the Qualified Pension Plan and Trust, under which benefits would increase under the Auxiliary Retirement Benefits Plan, the counterclaim defendant officers, acting as members of the Benefits Committee, engaged in a settlor function that was reserved for the Board of Directors and therefore beyond the scope of authority that was delegated to the Benefits Committee.

123.    Section 402(b)(3) of ERISA, 29 U.S.C. § 1102(b)(3) requires every ERISA covered plan to set forth procedures to amend a plan and to identify the persons or entities with authority to amend the plan.

39

124.    Under Section 11.1 of the ULLICO Inc. Qualified Pension Plan and Trust, the
Board of ULLICO Inc. retains the right to amend that Plan; and under Article 9 of the Auxiliary
Retirement Benefits Plan, The Union Labor Life Insurance Company retains the right to amend
the Auxiliary Retirement Benefits Plan.

125.    As a result of their conduct as aforesaid, counterclaim defendant officers acted
*ultra vires* and otherwise breached their fiduciary duties to ULLICO, including their duty of
loyalty and care, since, *inter alia*, each of the members of the Benefits Committee would benefit
personally from the Amendment and therefore acted with and in furtherance of an interest in
conflict with their positions as fiduciaries.

126.    As a result of counterclaim defendant officers' conduct as aforesaid, the
Amendment is invalid with respect to any claim for benefits payable as a result of the
Amendment to the members of the Benefits Committee that adopted it.

127.    Despite their conduct and the invalidity of the Amendment as to any claim for
benefits by the counterclaim defendant officers as aforesaid, counterclaim defendant officers
have claimed or are expected to claim that they are entitled to retirement benefits under the
Auxiliary Retirement Benefits Plan that are calculated with reference to the Amendment.

128.    There is an actual, justiciable controversy between the parties, ripe for
adjudication.

129.    As a result of the conduct of the counterclaim defendant officers, the invalidity of
the Amendment and the claims or expected claims of the counterclaim defendant officers as
aforesaid, ULLICO is entitled to a declaration that counterclaim defendant officers are not
entitled to receive any benefits payable pursuant to the Auxiliary Retirement Benefits Plan as a
result of the Amendment, and further that they are obligated and responsible for indemnifying

40

ULLICO for any amount it is or will be obligated to pay under the Qualified Pension Plan and Trust and the Auxiliary Retirement Benefits Plan as a result of the Amendment.

## Count VII – Declaratory Judgment: The Deferred Compensation Plan
### (Against Georgine and Luce)

130.    ULLICO incorporates herein by reference and makes a part hereof its allegations set forth in paragraphs 1 through 129.

131.    The 1998 Non-Qualified Deferred Compensation Plan was enacted without Board approval and was otherwise administered in violation of fiduciary duties owed to ULLICO by the Benefits Committee on which the counterclaim defendant officers served.

132.    The counterclaim defendant officers exploited the ULLICO share valuation system, adopted in connection with the 1997 Repurchase Program, in a manner and for a purpose never intended, such that their manipulation of their Deferred Compensation accounts in and out of "deemed investments" in ULLICO stock allowed them to generate "profits" that under the circumstances constituted a breach of their fiduciary duties and waste of corporate assets.

133.    The impact of ULLICO's investment in Global Crossing stock on the book value of ULLICO stock resulted in large short-term changes in the value of ULLICO stock that had never been anticipated by the Board, or the Compensation Committee when it established the Deferred Compensation Plan and the "deemed investment" features of that program, or the price valuation system enacted in 1997 for a purpose unrelated to the Deferred Compensation Plan.

134.    Counterclaim defendant officers, as a fiduciaries of ULLICO and the Deferred Compensation Plan, were under a duty to report or disclose to the Compensation Committee, the Executive Committee, and the Board of Directors the unintended and unexpected impact that the stock valuation system had on the benefits available under the Deferred Compensation Plan.

41

Specifically, they were under an obligation to disclose that the Deferred Compensation Plan, as structured, allowed for the manipulation of investment options under the Deferred Compensation Plan to generate enormous windfall profits for the participants in the Plan through the "purchase" and "sale" of ULLICO stock in a manner that allowed participants to realize "profits" in a way that actual shareholders could not.

135.    The counterclaim defendant officers, as the senior most executives of the company, and as a fiduciaries of the Deferred Compensation Plan (in their capacity as members of the Benefits Committee) were under a fiduciary obligation to disclose to the Board any personal benefits that they would or could obtain as a result of the dramatic and unexpected rise in ULLICO share value as a result of ULLICO's investment in Global Crossing stock.

136.    Counterclaim defendant officers' failure to disclose and obtain approvals regarding the unintended benefits that they would or did obtain under the Deferred Compensation Plan was, under the circumstances, a breach of their fiduciary duties to ULLICO and the Deferred Compensation Plan, including a breach of their duties of disclosure, loyalty, and care, and duty to avoid corporate waste on the part of ULLICO.

137.    As implemented, the benefits under the Deferred Compensation Plan with respect to the "deemed investments" in ULLICO stock resulted in the accrual of benefits that, if paid, would constitute unjust enrichment, a waste of corporate assets, and a breach of fiduciary duty owed to ULLICO and the shareholders.

138.    As a result of their conduct aforesaid, Georgine and Luce have improperly and unjustly enriched themselves through benefits under an improperly enacted and administered deferred compensation plan and are otherwise barred from obtaining any benefits thereunder based on "deemed investments" in ULLICO stock.

42

139. As a result of their conduct aforesaid, ULLICO does not intend to disburse profits or benefits to Georgine and Luce from the Deferred Compensation Plan resulting from their "deemed" investments in ULLICO Stock.

140. There is an actual, justiciable controversy, ripe for adjudication.

141. ULLICO is entitled to a declaration that Georgine and Luce are not entitled to a distribution of profits or benefits under the Deferred Compensation Plan based on "deemed investments" in ULLICO stock, as they claim.

### COUNT VIII - Breach of Fiduciary Duty and Return of Profits: Deferred Compensation Plan (Against Georgine and Carabillo)

142. ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 141.

143. As a result of the events and conduct as aforesaid, Carabillo is obligated to disgorge, return to ULLICO and forfeit the amounts he received through a "hardship" distribution he received in late 2001 and early 2002 by virtue of his "deemed investments" in ULLICO stock under the Deferred Compensation Plan.

144. In addition to Carabillo's disgorgement as aforesaid, Georgine and Carabillo, because of their conduct as aforesaid, are obligated to disgorge or otherwise forfeit to ULLICO those amounts of compensation deferred under the deferred compensation plan through which they attempted to obtain improper benefits in breach of their fiduciary duties to ULLICO.

145. As a result of their conduct aforesaid, Georgine and Carabillo are jointly and severally liable for those amounts they are obligated to disgorge to ULLICO.

43

## COUNT IX – Breach of Fiduciary Duty and
## Return of Profits: Deferred Compensation Plan
### (Against Georgine, Carabillo and Grelle)

146.   ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 145.

147.   In March 2003, Grelle requested and with Carabillo's approval, received a distribution from the Deferred Compensation Plan in the amount if $732,326.99.

148.   As a result of the events and conduct aforesaid, Grelle is obligated to disgorge, return to ULLICO, and forfeit the amount of distributions he received under the Deferred Compensation Plan on March 28, 2003, by virtue of his "deemed investments" in ULLICO stock under the Deferred Compensation Plan.

149.   As a result of their conduct aforesaid, Georgine and Carabillo are jointly and severally liable with Grelle for the amounts disbursed to Grelle.


## COUNT X –Declaratory Judgment: SERP
### (Against Georgine)

150.   ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 149.

151.   ULLICO and Georgine entered into an Agreement dated August 30, 1994, under which Georgine would receive under certain circumstances supplemental retirement benefits (the "SERP").

152.   Pursuant to the SERP, ULLICO entered into a trust agreement dated November 5, 1994 with First Union National Bank of Virginia (the "Rabbi Trust") and pursuant to that agreement, have made deposits over time into the Rabbi Trust, which has a current value in excess of $6 million.

44

153.    As a result of the events and his conduct aforesaid, Georgine willfully engaged in a course of conduct that was demonstrably and materially injurious to ULLICO, monetarily or otherwise. This course of conduct by Georgine was not in good faith and was without a reasonable belief that it was in the best interests of ULLICO.

154.    As a result of all of the events and his conduct as aforesaid, Georgine would have been terminated for cause, through an appropriate resolution of the Board, but for his resignation on May 8, 2003 in the face of certain dismissal for cause that precluded and frustrated that process.

155.    As a result of his conduct as aforesaid, Georgine is not entitled to or has otherwise forfeited any right or entitlement to any benefits under the SERP.

156.    As a result of his conduct as aforesaid, ULLICO is entitled to a declaration that Georgine has no rights or entitlement to any benefits under his SERP or related Rabbi Trust.

157.    There is an actual and justiciable controversy, ripe for adjudication concerning Georgine's rights under his SERP.

## COUNT XI – Declaratory Judgment: Split Dollar Life Insurance Agreement
### (Against Georgine, O'Brien, and Pacific Life Insurance Co.)

158.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 157.

159.    As part of the Employment Agreement, ULLICO and the Robert A. and Mary Rita Georgine Life Insurance Trust entered into a Split Dollar Life Insurance Agreement dated February 9, 2000, pursuant to which Pacific Life Insurance Company issued a certain Pacific Estate Preserver, Policy No. 1A23725140.

45

160.    As a result of his material breach of his Employment Agreement, his breach of fiduciary and other duties owed to ULLICO and ULLICO's cancellation and rescission of that Agreement as aforesaid, Georgine has no right or entitlement to any benefits under the Split Dollar Life Insurance Agreement or related insurance policy.

161.    As a result of his conduct as aforesaid, ULLICO is entitled to a declaration that Georgine has forfeited and is not otherwise entitled to any benefits under his Split Dollar Life Agreement or related insurance policy, and that ULLICO is entitled to receive any surrender or cash value under that insurance policy.

162.    There is an actual and justiciable controversy, ripe for adjudication concerning ULLICO and Georgine's rights under his Split Dollar Life Insurance Agreement and the related insurance policy.

## COUNT XII – Declaratory Judgment: Stock Purchase and Credit Agreement
### (Against Georgine)

163.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 162.

164.    In February of 2000, Georgine and ULLICO executed a Stock Purchase and Credit Agreement, which purported to transfer 40,000 shares of ULLICO Class A stock to Georgine. In consideration for this transfer, and pursuant to the Stock Purchase and Credit Agreement, Georgine borrowed $2,157,600 from ULLICO, which was to be forgiven at a rate of 20% per year, for the next five years, so long as Georgine continued to serve as Chairman, CEO, and President. The Stock Purchase and Credit Agreement was conceived as a way to provide a "bonus" to Georgine.

46

165.    As a result of his breach of fiduciary and other duties owed to ULLICO, Georgine has no right or entitlement to any benefits under the Stock Purchase and Credit Agreement.

166.    As a result of his conduct as aforesaid, ULLICO is entitled to a declaration that Georgine has forfeited and is not otherwise entitled to any benefits under the Stock Purchase and Credit Agreement, that all remaining shares issued and outstanding under the Agreement are rescinded and cancelled, and that ULLICO has no further obligation towards Georgine pursuant to the Stock Purchase and Credit Agreement. Alternatively, ULLICO is entitled to recover the outstanding amount of the loan extended to Georgine under the Stock Purchase and Credit Agreement and also the amount previously forgiven.

167.    There is an actual and justiciable controversy, ripe for adjudication concerning Georgine's rights under the Stock Purchase and Credit Agreement.

## COUNT XIII – Breach of Fiduciary Duty: P&I Loans
### (Against Georgine and Grelle)

168.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 167.

169.    On or about February 28, 2001, May 31, 2001, and October 31, 2001, Georgine, with Grelle's knowledge and consent, approved, and caused ULLICO to make, a series of loans in the total amount of $380,000 to Planners and Insurers, Inc., d/b/a Union Specialists ( "P&I ), an insurance brokerage and sales agency located in Omaha, Nebraska.

170.    At the times the loans were made, P&I was owned or controlled by Patrick J. Mertz, a nephew of Georgine; and the loans were not supported by appropriate due diligence, loan agreements, personal guarantees or other indicia of arms-length transactions. Since the

47

loans were made, P&I has defaulted on the loans, without any repayment of principal, and legal counsel for P&I has advised ULLICO that P&I has been dissolved.

171.    As a result of Georgine's and Grelle's conduct aforesaid in connection with the P&I loans, Georgine and Grelle breached their duties and obligations to ULLICO.

172.    As a direct and proximate cause of their breach of duty aforesaid, ULLICO has been damaged and injured.

WHEREFORE, Plaintiff ULLICO Inc. demands the following relief:

1.    As to Count I, judgment against counterclaim defendants Robert Georgine and Joseph A. Carabillo jointly and severally in an amount to be determined at trial, but in any event no less than Twenty Million Dollars ($20,000,000).

2.    As to Count II, judgment against counterclaim defendant Joseph A. Carabillo in an amount to be determined at trial, but in any event no less than Twenty Million Dollars ($20,000,000).

3.    As to Count III, judgment against counterclaim defendant John K. Grelle in an amount to be determined at trial, but in any event no less than $837,760.

4.    As to Count IV, judgment against counterclaim defendant James W. Luce in an amount to be determined at trial, but in any event no less than $789,299.

5.    As to Count V, judgment against counterclaim defendant Robert A. Georgine in an amount to be determined at trial but in any event no less than $6,114,226; and a judicial declaration that ULLICO is under no further obligation to counterclaim defendant officer Georgine as a result of the Employment Agreement, or related agreements, including the Split Dollar Life Insurance Policy, the Stock Purchase and Credit Agreement, or the SERP.

48

6.    As to Count VI, a judicial declaration that counterclaim defendants Robert A.
Georgine, Joseph A. Carabillo, James W. Luce, and John K. Grelle are not entitled to receive any
benefits under the Auxiliary Retirement Benefits Plan based on the Amendment to the ULLICO
Qualified Pension Plan and Trust, adopted by the Benefits Committee on October 20, 1999, and
shall indemnify ULLICO Inc. and The Union Labor Life Insurance Company with respect to any
financial obligation incurred as a result of the Amendment.

7.    As to Count VII, a judicial declaration that counterclaim defendants Robert A.
Georgine and James W. Luce are not entitled to receive any distributions or benefits under the
Non-Qualified Deferred Compensation Plan based on earnings realized through the "deemed
investments" in ULLICO stock.

8.    As to Count VIII, judgment as to counterclaim defendants Robert A. Georgine
and Joseph A. Carabillo jointly and severally in an amount to be determined at trial but in any
event no less than $1,906,000.

9.    As to Count IX, judgment against Georgine, Carabillo and Grelle jointly and
severally in an amount to be determined at trial, but in any event no less than $732,326.99.

10.    As to Count X, a judicial declaration that ULLICO has no further financial or
other obligation, and counterclaim defendant Robert A. Georgine has no rights, entitlements or
benefits, under the SERP.

11.    As to Count XI, a judicial declaration that counterclaim defendant Robert A.
Georgine, or anyone claiming through him, has no right, title or interest under the Split Dollar
Life Insurance Agreement and related life insurance policy, that such Agreement and related
policy are cancelled and that any surrender value, cash value or funds that he accumulated

49

thereunder be returned to ULLICO with no further right, title or interest on the part of counterclaim defendant Robert A. Georgine or anyone that claims an interest through him.

12. As to Count XII, a judicial declaration that counterclaim defendant Georgine has forfeited and is not otherwise entitled to any benefits under the Stock Purchase and Credit Agreement, that all remaining shares issued and outstanding under the Agreement are rescinded and cancelled, and that ULLICO has no further obligation towards Georgine pursuant to the Stock Purchase and Credit Agreement. Alternatively, ULLICO is entitled to a judgment in the amount of $2,157,600.

13. As to Count XIII, judgment against counterclaim defendants Robert A. Georgine and John K. Grelle jointly and severally in an amount to be determined at trial, but in any event no less than $380,000 plus accumulated interest due and owing on the outstanding promissory notes from P&I.

14. Such other and equitable relief as the Court may deem appropriate, including set-offs, recoupments, and constructive trusts in favor of counterclaim plaintiffs, and prejudgment interest and the costs of this Action, including reasonable attorneys' fees.

MILLER & CHEVALIER CHARTERED

By _____/s/_____
James A. Bensfield (DC Bar #189-084)
Anthony J. Trenga (DC Bar #218255)
Mark J. Rochon (DC Bar #376042)
Matthew T. Reinhard (DC Bar # 474941)
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
atrenga@milchev.com

50

Attorneys for Defendant/Counterclaim
Plaintiffs

51