# Exhibit 5

Case 1:06-cv-00080-RJL   Document 44-7   Filed 01/18/2007   Page 2 of 12
10/18/2004 11:14  2124582401                    AIG                         PAGE  02/24
Case 1:06-cv-00080-RJL-AK   Document 41   Filed 12/05/2006   Page 1 of 22

# AIG American International Companies®

Employee Benefit Plan Fiduciary Liability Insurance

POLICY NUMBER: *495-38-35*
RENEWAL OF: *874-44-03*

☐ AIU Insurance Company
☐ American Home Assurance Company
☐ American International Pacific Insurance Company
☐ American International South Insurance Company
☐ Birmingham Fire Insurance Company of Pennsylvania

☐ Granite State Insurance Company
☐ Illinois National Insurance Company
☐ National Union Fire Insurance Company of Louisiana
☒ National Union Fire Insurance Co. of Pittsburgh, Pa.
☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: EXCEPT AS SET FORTH IN ITEM 3(b) OF THE DECLARATIONS, THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

NOTICE: THE INSURER HAS THE DUTY TO DEFEND; HOWEVER, THE INSURED MAY ELECT TO ASSUME THE DUTY TO DEFEND. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

NOTICE: TERMS APPEARING IN BOLD FACE TYPE HAVE SPECIAL MEANING. SEE CLAUSE 3 OF THE POLICY.

## DECLARATIONS

| ITEMS | | (herein "Named Sponsor") |
|---|---|---|
| 1 | NAMED SPONSOR: | *ULLICO INC. AND ITS SUBSIDIARIES* |
| 1(a) | MAILING ADDRESS: | *111 MASSACHUSETTS AVE NW WASHINGTON, DC 20001* |
| 1(b) | SUBSIDIARY COVERAGE: | Any past, present or future Subsidiary of the Named Sponsor. |
| 1(c) | PLAN COVERAGE: | Any past, present or future Plan |
| 2 | POLICY PERIOD: | From: *October 30, 2002*   To: *October 30, 2003* 12:01 A.M. standard time at the address stated in Item 1(a) of the Declarations. |
| 3(a) | POLICY AGGREGATE LIMIT OF LIABILITY (herein "Limit of Liability") For all Loss, in the aggregate, under this policy including Defense Costs (other than Defense Costs (if any) set forth in Item 3(b) of the Declarations): $5,000,000 | |

*138200*

| ITEMS (Continued) | | |
|---|---|---|
| 3(b) | ADDITIONAL LIMIT OF LIABILITY FOR DEFENSE COSTS: $0 | |
| 3(c) | SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS<br>For all Voluntary Compliance Loss, in the aggregate, under this policy including Defense Expenses<br><br>This Sublimit of Liability shall be part of and not in addition to the Policy Aggregate Limit of Liability set forth in Item 3(a) of the Declarations. | ☐ See endorsement #<br>☒ None |
| 4 | RETENTION: Not applicable to: (i) non-Indemnifiable Loss of a Natural Person Insured (ii) judgments and settlements (all Coverages); and (iii) Voluntary Compliance Loss | |
| 4(a) | Defense Costs: $50,000<br>☐ None | |
| 5 | CONTINUITY DATE: October 30, 1998 | |
| 6 | PREMIUM: $40,000 | |
| 7 | NAME AND ADDRESS OF INSURER (herein "Insurer"):<br>National Union Fire Insurance Company of Pittsburgh, Pa.<br>175 Water Street<br>New York, NY 10038<br><br>This policy is issued only by the insurance company indicated in this Item 7. | |

138200

77893 (3/01)   INSUArchive Copy                                    2

Case 1:06-cv-00080-RJL   Document 44-7   Filed 01/18/2007   Page 4 of 12
10/18/2004  11:14  2124582401   AIG   PAGE  04/24
Case 1:06-cv-00080-RJL-AK   Document 41   Filed 12/05/2006   Page 3 of 22

IN WITNESS WHEREOF, the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

*Elizabeth M. Tuck*
SECRETARY

*[signature]*
PRESIDENT

———————————————
AUTHORIZED REPRESENTATIVE

———————————        ———————————
COUNTERSIGNATURE DATE        COUNTERSIGNED AT

ARC EXCESS & SURPLUS INC
1122 FRANKLIN AVENUE, 3RD FL
GARDEN CITY, NY 11530

138200

77893 (3/01)   INSURArchive Copy

Case 1:06-cv-00080-RJL   Document 44-7   Filed 01/18/2007   Page 5 of 12
10/18/2004  11:14   2124582401                AIG                    PAGE  05/24
Case 1:06-cv-00080-RJL-AK   Document 41   Filed 12/05/2006   Page 4 of 22

**AIG** American International Companies®

## Employee Benefit Plan Fiduciary Liability Insurance

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application, including any attachments and any materials incorporated therein which form a part of this policy, the Insurer agrees as follows:

1. **INSURING AGREEMENTS**

   (a) Solely with respect to Claims first made against an Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the Loss of each and every Insured arising from a Claim against an Insured for any actual or alleged Wrongful Act by any such Insured (or by any employee for whom such Insured is legally responsible).

   (b) Solely with respect to CAP Penalties and Delinquent Filer Penalties assessed against an Insured, and Voluntary Fiduciary Correction Loss incurred by an Insured, during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer during the Policy Period or the Discovery Period (if applicable) or within thirty (30) days after the end of the Policy Period or the Discovery Period (if applicable), and subject to the other terms, conditions and limitations of this policy, this policy shall:

   (i) pay the CAP Penalties and Delinquent Filer Penalties; and
   (ii) reimburse the Voluntary Fiduciary Correction Loss,

   of each and every Insured, collectively not to exceed the amount of the Sublimit of Liability set forth in Item 3(c) of the Declarations; provided that the Insured shall select a Panel Counsel Firm as provided in Clause 9 of the policy.

   The payment of any Voluntary Compliance Loss under this policy shall not waive any of the Insurer's rights under this policy or at law, including in the event that a Voluntary Compliance Loss results in a Claim.

2. **DEFENSE AGREEMENT**

   (a) **INSURER'S DUTY TO DEFEND**

   Except as hereinafter stated, the Insurer shall have both the right and duty to defend any Claim against an Insured alleging a Wrongful Act, even if such Claim is groundless, false or fraudulent.

   The Insured shall have the right to effectively associate with the Insurer in the defense of any Claim, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 2. The Insurer shall not, however, be obligated to defend any Claim after either: (1) the Limit of Liability and any additional Defense Costs (if any) indicated in Item 3(b) of the Declarations have been exhausted; or (2) after the rejection of a settlement offer, pursuant to the terms of subparagraph (c) of this Clause 2.

   (b) **INSURED'S OPTION TO ASSUME DEFENSE**

   Notwithstanding the above, the Insureds shall have the right to assume the defense of any Claim made against them. This right shall be exercised in writing by the Named Sponsor on the behalf of all Insureds within sixty (60) days of the reporting of the Claim to the Insurer pursuant to Clause 8 of the policy. Upon receipt of such

written request, the Insurer shall tender the defense of the Claim to the Insureds. Once the defense has been so tendered, the Insurer cannot re-assume the defense of the Claim. The Insurer shall have the right to effectively associate with the Insureds in the defense of any Claim, including but not limited to negotiating a settlement. Provided that the Insurer shall be permitted to effectively associate with the Insureds in the defense of any Claim, including but not limited to negotiating a settlement of any Claim, the Insurer's consent to settlements, stipulated judgments and Defense Costs shall not be unreasonably withheld.

(c) GENERAL PROVISIONS (applicable to both (a) and (b) above)

The Insurer shall advance Defense Costs prior to the final disposition of a Claim, subject to the other provisions of this policy. Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds, severally according to their respective interests, in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insured(s) shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to in writing by the Insurer shall be recoverable as Loss under the terms of this policy.

The Insured(s) shall give the Insurer full cooperation and such information as the Insurer may reasonably require. The Insurer may make any settlement of any Claim it deems expedient with respect to any Insured, subject to such Insured's written consent. If any Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim, plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer. Further, in the event the Insurer is defending the Claim pursuant to Clause 2(a) above, then the Insurer shall tender the Claim to the Insureds who shall thereafter at their own expense and on their own behalf negotiate and defend such Claim independently of the Insurer.

Selection of counsel to defend the Claim made against the Insureds shall be governed by Clause 9 of the policy (if applicable).

3. DEFINITIONS

"Administrator" means an Insured with respect to any Wrongful Act described in subparagraph (2) of the Definition of Wrongful Act.

"Benefits" means any obligation under a Plan to a participant or beneficiary under a Plan which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

"Breach of Fiduciary Duty" means a violation of the responsibilities, obligations or duties imposed upon Insureds by ERISA.

"Cafeteria Plan" means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

"CAP Penalties" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an Insured by the Internal Revenue Service (IRS) pursuant to a written agreement to correct an inadvertent Plan defect under an Employee Plans Compliance Resolution System, provided that such agreement to

correct such Plan defect was entered into in writing by the Insured with the IRS during the Policy Period (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal).

"Claim" means:
(1) a written demand for monetary, non-monetary or injunctive relief; or
(2) a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:
   (i) service of a complaint or similar pleading; or
   (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or
   (iii) receipt or filing of a notice of charges; or
(3) a formal agency or regulatory adjudicative proceeding to which an Insured is subject; or
(4) any fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency which is located outside of the United States.

"Cleanup Costs" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of Pollutants.

"Consulting Fees" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential Breach of Fiduciary Duty, but excluding any fees, costs or expenses associated with: (i) a Plan audit; or (ii) identifying, finding or assessing such Breach of Fiduciary Duty.

"Defense Costs" means reasonable and necessary fees, costs and expenses consented to in writing by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a Claim against an Insured, whether incurred under Clause 2(a), (b) or (c) of this policy, but excluding any compensation of Natural Person Insureds or employees of an Insured.

"Defense Expenses" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the Insurer resulting solely from the correction of an actual or potential Breach of Fiduciary Duty, but excluding any fees, costs and expenses associated with finding or assessing such Breach of Fiduciary Duty and any compensation of Natural Person Insureds or employees of an Insured.

"Delinquent Filer Penalties" means penalties assessed by the U.S. Department of Labor or the IRS under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the Policy Period (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal).

"Dependent Care Assistance Program" means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

"Domestic Partner" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the Named Sponsor or any Subsidiary.

"Employee Benefit Law" means ERISA or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a Plan is subject. Except to the extent set forth in subparagraph (2) of the Definition of Wrongful Act, Employee Benefit Law shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

77892 (3/01)   INSUArchive Copy                           3

"ERISA" means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

"ESOP" means any employee stock ownership plan as defined in ERISA, or any other Plan under which investments are made primarily in securities of the Sponsor Organization or whose assets at any time within twelve months prior to the inception date of this policy were comprised of 20% or more of securities of the Sponsor Organization.

"Fiduciary" means a fiduciary as defined in an Employee Benefit Law (if applicable), with respect to a Plan, or a person or entity who exercises discretionary control as respects the management of a Plan or the disposition of its assets.

"Foreign Jurisdiction" means any jurisdiction, other than the United States or any of its territories or possessions.

"Foreign Policy" means the Insured's or any other member company of American International Group, Inc.'s (AIG) standard fiduciary or pension trust liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a Foreign Jurisdiction, that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then Foreign Policy means the standard policy most recently registered in the local language of the Foreign Jurisdiction, or if no such policy has been registered, then the policy most recently registered in that Foreign Jurisdiction. The term Foreign Policy shall not include any directors and officers, partnership, managerial, comprehensive general liability, employment practices liability or professional liability coverage.

"Fringe Benefit" means any plan or benefit described in Section 132 of the Internal Revenue Code of 1986, as amended.

"Indemnifiable Loss" means Loss for which the Sponsor Organization has indemnified or is permitted or required to indemnify any natural person Insured.

"Insured(s)" means:

(1) any Natural Person Insured;
(2) any Plan(s);
(3) the Sponsor Organization; and
(4) any other person or entity in his, her or its capacity as a Fiduciary, Administrator or trustee of a Plan and included in the Definition of Insured by specific written endorsement attached to this policy.

"Loss" means damages, judgments (including pre/post-judgment interest on a covered judgment), settlements and Defense Costs; however, Loss shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in Item 3(c) of the Declarations page for Voluntary Compliance Loss, (ii) UK Fines and Penalties, (iii) the five percent or less civil penalty imposed upon an Insured under Section 502(i) of ERISA, and (iv) the 20 percent or less penalty imposed upon an Insured under Section 502(l) of ERISA, with respect to covered settlements or judgments; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an Insured is not financially liable or which is without legal recourse to the Insured; (5) Benefits, or that portion of any settlement or award in an amount equal to such Benefits, unless and to the extent that recovery of such Benefits is based upon a covered Wrongful Act and is payable as a personal obligation of a Natural Person Insured; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

10/18/2004 11:21 2104592461   Case 1:06-cv-00080-RJL-AK   Document 41   Filed 12/05/2006   Page 8 of 22   AIG   PAGE 09/24

Where permitted by law, Loss shall include punitive or exemplary damages imposed upon any Insured (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to profit, deliberate fraud or criminal acts and knowing or willful violation of any statute, rule or law, including but not limited to Employee Benefit Law).

Defense Costs shall be provided for items specifically excluded from Loss pursuant to subparagraphs (1)-(6) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

Loss shall include Voluntary Compliance Loss.

"Management Control" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; the general partners of a limited partnership; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the Named Sponsor, to elect, appoint or designate a majority of the Board of Directors of a corporation, the management committee of a joint venture, the general partners of a limited partnership, or the management board of a limited liability company.

"Natural Person Insured" means any:

(1) past, present or future natural person director, officer, governor, general partner, management committee member, member of the board of managers or employee of a Sponsor Organization or if applicable, of a Plan, and as to all of the above in his or her capacity as a Fiduciary, Administrator or trustee of a Plan; or

(2) past, present or future natural person in a position equivalent to a position listed in subparagraph (1) of this Definition in the event that the Sponsor Organization is operating in a Foreign Jurisdiction.

"Non-qualified Plan" means any of the following plans for a select group of management or highly compensated directors, officers and/or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan.

"Pension Plan" means a pension plan as defined in any Employee Benefit Law.

"Plan" means automatically, any qualified plan, fund, trust or program (including, but not limited to, any Pension Plan, Welfare Plan, Cafeteria Plan, Dependent Care Assistance Program, Fringe Benefit, and VEBA) or Non-qualified Plan, established anywhere in the world, which was, is or shall be sponsored solely by the Sponsor Organization, or sponsored jointly by the Sponsor Organization and a labor organization, solely for the benefit of the employees and/or the directors, officers, governors, management committee members, members of the board of managers or natural person general partners of the Sponsor Organization, subject to the following provisions:

(1) if such Plan is a Pension Plan(s), other than an ESOP, stock option plan or Pension Plan described in subparagraphs (5)(a) and 5(b) below, then the Named Sponsor shall provide written notice of such Plan to the Insurer prior to the inception date of this policy, unless such Plan was already covered under a policy issued by the Insurer of which this policy is a continuous renewal;

(2) if such Plan was sold, spun-off or terminated prior to the inception date of this policy the Named Sponsor shall provide written notice of such sale, spin-off or termination to the Insurer prior to the inception date of this policy, unless such sale, spin-off or termination had already been reported to the Insurer under a policy issued by the Insurer of which this policy is a continuous renewal;

(3) if such Plan is sold, spun-off or terminated during the Policy Period, the Named Sponsor shall provide written notice of such sale, spin-off or termination to the Insurer prior to the end of the Policy Period;

(4) if such Plan is an ESOP or stock option plan, the Named Sponsor shall provide written notice of such Plan to the Insurer unless such Plan was already covered under a policy issued by the Insurer of which this policy is a continuous renewal and such Plan is added to the Definition of Plan by specific written endorsement attached to this policy; or

(5) if such Plan is a Pension Plan (other than an ESOP, or stock option plan) and:

   (a) is acquired during the Policy Period as a result of the Sponsor Organization's acquisition of a Subsidiary whose assets total more than 25% of the total consolidated assets of the Sponsor Organization as of the inception date of this policy; or

   (b) is acquired during the Policy Period and such Plan's assets total more than 25% of the total consolidated assets of all covered Pension Plans as of the inception date of this policy,

then, this policy shall apply to such Plan (but solely with respect to a Wrongful Act(s) occurring after the date of such acquisition), but only upon the condition that within 90 days of its acquisition, the Named Sponsor shall have provided the Insurer with a completed application for such new Plan and agreed to any additional premium or amendment of the provisions of the policy required by the Insurer relating to such new Plan. The 90 day reporting condition shall not apply if such new Plan does not constitute one of the five largest Pension Plans of the Sponsor Organization and the failure to report such Plan within the 90 day reporting period was due to inadvertent omission by the Named Sponsor and upon discovery of such Plan, the Named Sponsor shall notify the Insurer as soon as practicable, provide any information required by the Insurer relating to such Plan and pay any premium required by the Insurer relating to such Plan.

The Definition of Plan shall also include: (i) the following government-mandated programs: unemployment insurance, Social Security, or disability benefits, but solely with respect to a Wrongful Act defined in subparagraph (2) of the Definition of Wrongful Act in this policy; (ii) any Pension Plan (other than an ESOP or stock option plan) considered or created by the Sponsor Organization during the Policy Period; or (iii) any other plan, fund or program, which is included in the Definition of Plan by specific written endorsement attached to this policy.

In no event, however, shall the Definition of Plan include any multiemployer plan as defined in Employee Benefit Law.

"Policy Period" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

"Pollutants" include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

"Sponsor Organization" means the Named Sponsor designated in Item 1 of the Declarations and any Subsidiary thereof; and, in the event any bankruptcy proceeding shall be instituted by or against the Named Sponsor or any Subsidiary thereof, the resulting debtor in possession (or equivalent status outside the United States), if any.

"Subsidiary" means any past, present or future: (1) for-profit entity of which the Named Sponsor has Management Control either directly or indirectly through one or more other Subsidiaries; and (2) not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the Named Sponsor. The term Subsidiary shall automatically apply to any new Subsidiary acquired or created during the Policy Period.

Case 1:06-cv-00080-RJL   Document 44-7   Filed 01/18/2007   Page 11 of 12
10/18/2004  11:14   2124582401             AIG                     PAGE 11/24
Case 1:06-cv-00080-RJL-AK   Document 41   Filed 12/05/2006   Page 10 of 22

A for-profit entity ceases to be a Subsidiary when the Named Sponsor no longer maintains Management Control of such Subsidiary. A not-for-profit entity ceases to be a Subsidiary when the Named Sponsor no longer exclusively sponsors such Subsidiary.

"UK Fines and Penalties" means civil fines and penalties assessed against an Insured by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom or by the Occupational Pensions Regulatory Authority in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of the policy.

"VEBA" means a voluntary employees' beneficiary association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended and the regulations thereunder, the purpose of which is to provide for life, sickness, accident or other benefits and that is funded solely by the Sponsor Organization, and provides benefits for voluntary members who are employees or former employees of the Sponsor Organization and/or their beneficiaries.

"Voluntary Compliance Loss" means CAP Penalties, Delinquent Filer Penalties and Voluntary Fiduciary Correction Loss.

"Voluntary Fiduciary Correction Loss" means damages, Defense Expenses and Consulting Fees incurred in connection with the U.S. Department of Labor's ("DOL") Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent Breach of Fiduciary Duty occurring during the Policy Period (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal), provided that such compliance with the DOL'S Voluntary Fiduciary Correction Program results in the Insured obtaining a "No Action" letter from the DOL; however, Voluntary Fiduciary Correction Loss shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an Insured is not financially liable or which is without legal recourse to the Insured; (6) Benefits, or that portion of damages equal to such Benefits; (7) matters of which the Insured had knowledge prior to the inception date of this policy or the first policy issued by the Insurer to the Named Sponsor of which this policy is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

"Welfare Plan" means a welfare plan as defined in Employee Benefit Law.

"Wrongful Act" means:

(1) as respects an Insured: a violation of any of the responsibilities, obligations or duties imposed upon Fiduciaries by Employee Benefit Law with respect to a Plan; or any matter claimed against an Insured solely by reason of his, her or its status as a Fiduciary, the Plan or the Sponsor Organization, but only with respect to a Plan; and

(2) as respects an Administrator, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a Plan:
    (i) counseling employees, participants and beneficiaries; or
    (ii) providing interpretations; or
    (iii) handling of records; or
    (iv) activities affecting enrollment, termination or cancellation of employees, participants and beneficiaries under the Plan,
or any matter claimed against an Insured solely by reason of his, her or its status as an Administrator, the Plan or the Sponsor Organization, but only with respect to a Plan;

(3) as respects a Natural Person Insured, any matter claimed against him or her arising out of his or her service as a Fiduciary or Administrator of any

Case 1:06-cv-00080-RJL   Document 44-7   Filed 01/18/2007   Page 12 of 12
10/18/2004 11:14   2124582401        AIG                    PAGE 12/24
Case 1:06-cv-00080-RJL-AK   Document 41   Filed 12/05/2006   Page 11 of 22

multiemployer plan as defined by ERISA, but only if such service is at the specific written request or direction of the Sponsor Organization and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a Claim against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a Natural Person Insured.

4. **WORLDWIDE EXTENSION**

   Where legally permissible, this policy shall apply to a Claim made against any Insured anywhere in the world.

   With regard to a Claim(s) brought and maintained solely in a Foreign Jurisdiction against an Insured formed and operating in such Foreign Jurisdiction, the Insurer shall apply to such Claim(s) those terms and conditions (and related provisions) of the Foreign Policy registered with the appropriate regulatory body in such Foreign Jurisdiction that are more favorable to such Insured than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1, 3-5, 9-13, and 16-19 of this policy and the comparable provisions of the Foreign Policy. In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.

   All premiums, limits, retentions, Loss and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of Loss are stated or incurred in a currency other than United States of America dollars, payment of covered Loss due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the Insurer and if agreeable to the Named Sponsor) or, in United States of America dollars, at the rate of exchange published in <u>The Wall Street Journal</u> on the date the Insurer's obligation to pay such Loss is established (or if not published on such date the next publication date of <u>The Wall Street Journal</u>).

5. **EXCLUSIONS**

   The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured(s):

   (a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

   (b) arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to Employee Benefit Law;

   [The Wrongful Act of any Insured shall not be imputed to any other Insured for the purpose of determining the applicability of the foregoing exclusions 5(a) and 5(b).]

   (c) for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of Employee Benefit Law;

   (d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Act alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

   (e) alleging, arising out of, based upon or attributable to, as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an Insured had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;