**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ULLICO INC.,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : **Civil Action No. 1:06cv00080 (RJL/AK)** |
| | : |
| **NATIONAL UNION FIRE INSURANCE** | : |
| **COMPANY OF PITTSBURGH, PA., et al.,** | : |
| | : |
| **Defendants.** | : |

**DECLARATION OF SHANNON W. CONWAY IN FURTHER SUPPORT OF**
**NATIONAL UNION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

SHANNON W. CONWAY, of full age, hereby declares as follows:

1.      I am an attorney licensed to practice in the District of Columbia, an associate in

the law firm of Patton Boggs LLP, and am admitted to appear before this Court as counsel for

Defendants/Counterclaim Plaintiffs American International Specialty Lines Insurance Company

("AISLIC") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union").

2.      This Declaration is submitted in further support of National Union's Cross-

Motion for Partial Summary Judgment.

3.      Annexed to this Declaration as **Exhibit A** are true and correct copies of the cover

page and pages 56, 57, and 78 of the Report on Self-Dealing and Breach of Duty at Ullico, Inc.

by the Majority Staff of the Committee on Governmental Affairs, United States Senate, 108th

Cong. (S. Prt. 108-45) (the "Senate Majority Report").

4.      Annexed to this Declaration as **Exhibit B** is a true and correct copy of a reprint of

an article that appeared in *The Wall Street Journal* on April 5, 2002, entitled "Inside Deal: How

397543

Union Bosses Enriched Themselves On an Insurer's Board," by Tom Hamburger and John Harwood, as cited in the Senate Majority Report.

5.       Annexed to this Declaration as **Exhibit C** is a true and correct copy of an article that appeared in *The Wall Street Journal* on March 6, 2003, entitled "Finance Chief of Unions' Ullico Quits in Protest," by Tom Hamburger, as cited in the Senate Majority Report.

6.       Annexed to this Declaration as **Exhibit D** is a true and correct copy of a letter dated January 10, 2005, from Patrick McGlone of Ullico, Inc. to Samuel F. Paniccia, Esq. of D'Amato & Lynch.

7.       I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 5, 2007.

 

*Shannon Conway*
_____
Shannon W. Conway

# EXHIBIT A

| 108th Congress 2d Session | COMMITTEE PRINT | S. Prt. 108–45 |
| --- | --- | --- |

# SELF-DEALING AND BREACH OF DUTY AT ULLICO, INC.

---

# R E P O R T

### PREPARED BY THE

## MAJORITY STAFF

#### OF THE

## COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE



### JUNE 2, 2004

Printed for the use of the Committee on Governmental Affairs

---

U.S. GOVERNMENT PRINTING OFFICE

93–992 PDF     WASHINGTON : 2004

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250  Mail: Stop SSOP, Washington, DC 20402–0001

expressed no concern about the 10,000-share threshold, but stated that if he had known about the severe proration, he would have considered whether it raised fiduciary duty issues.[287] Directors Sweeney and Chavez-Thompson expressed concern about whether the repurchases were consistent with positions taken by the AFL-CIO.[288] Several other Directors, including Wilhelm, Hanley, and Chavez-Thompson expressed surprise or shock at the $13.7 million in director and officer repurchases.[289] Other Directors, however, including Brown, Hurt, Kruse, Casstevens, and Joyce, indicated that they were either not surprised, not troubled, or saw no problem with the repurchases.[290]

## IV.    THE INVESTIGATION AND REPORT BY GOVERNOR JAMES THOMPSON

### A. The Initiation of the Thompson Investigation

The ULLICO stock trades were reportedly uncovered during a federal grand jury investigation of the Ironworkers Union and Jacob West, its president, who was also a member of ULLICO's Board of Directors. The United States Attorney's office in Washington, D.C. had been investigating West on charges of embezzling from the Ironworkers' Union. During this investigation, questionable stock trades were discovered when investigators were trying to determine the source of some of West's money.[291] Ultimately, West pled guilty in October 2002 to charges of embezzlement and falsifying a financial report and was sentenced to three years in prison and fined $125,000. As a result of the broader probe into the Ironworkers Union, seven union officials, two outside accountants, and an insurance broker all pled guilty.[292]

In mid-March, 2002, the media reported that the grand jury's investigation was broadening to include ULLICO stock trades. On March 15, 2002, *The Wall Street Journal* reported that the grand jury was investigating ULLICO and that at least two ULLICO officers had been subpoenaed to appear before the grand jury and testify regarding the stock trades.[293] Over the next several weeks, more details about the ULLICO stock transactions emerged in the press.

---

[287] Memorandum from Charles B. Klein to ULLICO File regarding July 10, 2002 Interview of James F. M. McNulty, General Counsel of Union Labor Life Insurance Company at 4 (July 18, 2002) (Exhibit 101).
[288] Memorandum from Timothy M. Broas to ULLICO File regarding May 31, 2002 Interview of John Sweeney, President AFL-CIO at 2 (June 1, 2002) (Exhibit 102); Memorandum from Charles B. Klein, Winston & Strawn, to ULLICO File Re: July 11, 2002 Interview of Linda Chavez-Thompson (July 17, 2002) at 3 (Exhibit 13).
[289] Thompson Report at 47–48 (Appendix 1).
[290] *Id.* at 48.
[291] Aaron Bernstein, "Global Crossing: Labor's Questionable Windfall," *Business Week Online*, March 18, 2002; Tom Hamburger and John Harwood, "Inside Deal: How Union Bosses Enriched Themselves On An Insurer's Board," *The Wall Street Journal*, April 5, 2002.
[292] Allan Lengel, "Ex-Boss Of Ironworkers Union Sentenced," *The Washington Post*, October 9, 2003.
[293] Tom Hamburger and John Harwood, "Grand Jury Reviews Stock Transactions By Insurance Firm," *The Wall Street Journal*, March 15, 2002; Tom Hamburger and John Harwood, "Inside Deal: How Union Bosses Enriched Themselves On An Insurer's Board," *The Wall Street Journal*, April 5, 2002; Memorandum from Raymond W. Mitchell, Winston & Strawn to ULLICO File, regarding May 9, 2002

The notoriety of ULLICO's stock trades was particularly embarrassing for labor unions because the news reports and investigations came at approximately the same time corporate problems at Enron and Arthur Anderson were surfacing. One report in *Business Week* stated that the controversy over the stock trades "undercut" the AFL-CIO's clout while it was preparing to push for corporate governance reforms.

A variety of other investigations of ULLICO were opened in this time period, adding to the company's troubles. In addition to the federal grand jury investigation, the Department of Labor, the Maryland Insurance Administration ("MIA"), the Securities and Exchange Commission, and the National Labor Relations Board all opened investigations of ULLICO. The Department of Labor investigation focused on whether certain stock transactions violated the Employee Retirement Income Security Act ("ERISA").[294] The MIA investigation focused on whether the stock transactions should have a bearing on ULLICO's ability to sell insurance in Maryland.[295] The SEC investigation reportedly focused on whether any of the stock transactions violated federal securities laws.[296] The NLRB investigation sought to determine whether ULLICO engaged in unfair labor practices under sections 8(a)(1) or 8(a)(2) of the National Labor Relations Act.[297]

On April 29, 2002, approximately a month-and-a-half after the initial stories on the ULLICO stock trades appeared, Chairman and CEO Robert Georgine called a special meeting of the ULLICO Board of Directors to discuss the appointment of an independent counsel to investigate the ULLICO stock trades.[298] This meeting followed the release of a proxy statement in late April confirming what had been previously reported in the press and a March 21, 2002, letter from AFL-CIO President John Sweeney to Chairman Georgine calling for an independent investigation of the controversy. The meeting also resulted from concerns among many union members and leaders that the controversy would continue to harm labor's reputation until it was resolved.[299] On April 26, 2002, the

Interview of Joseph A. Carabillo, Former Vice President and Chief Legal Officer, ULLICO, at 4–5 (May 11, 2002) (Exhibit 103).
[294] Tom Hamburger, "Finance Chief Of Unions' Ullico Quits in Protest," *The Wall Street Journal*, March 6, 2003; Tom Hamburger and John Harwood, "Inside Deal: How Union Bosses Enriched Themselves On An Insurer's Board," *The Wall Street Journal*, April 5, 2002; ULLICO, Inc., Subpoena, (U.S. Department of Labor Pension and Welfare Benefits Administration, April 11, 2002) (Exhibit 104).
[295] Tom Hamburger, "Maryland Joins Investigations Into Deals by ULLICO Directors," *The Wall Street Journal*, December 4, 2002; Letter from Steven B. Larsen, Insurance Commissioner, State of Maryland, to Joseph A. Carabillo, Esq., Vice President and Chief Legal Officer, ULLICO, Inc. (October 18, 2002) (Exhibit 105).
[296] Custodian of Records — ULLICO, Inc., Attachment to Subpoena (United States Securities and Exchange Commission, July 25, 2002) (Exhibit 106).
[297] Charge Against Employer, National Right to Work Legal Defense Fdtn. against ULLICO, Inc. (National Labor Relations Board, August 2, 2002) (Exhibit 107).
[298] Board of Directors Meeting Minutes, April 29, 2002 (Exhibit 108).
[299] Tom Hamburger and John Harwood, "ULICO [sic] Officials Plan To Seek Probe Of Stock Deals," *The Wall Street Journal*, April 26, 2002; Aaron Bernstein, "A Black Eye For Labor," *Business Week*, April 8, 2002. AFL-CIO Executive Vice President Linda Chavez-Thompson noted in her interview with the Winston & Strawn investigators that "there was talk" of appointing a special committee of the board to investigate the stock trades instead of an independent counsel, but AFL-CIO President Sweeney opposed

### 3.    ERISA

As noted, Governor Thompson did not investigate or draw any conclusions regarding whether the transactions at issue may have violated the Employment Retirement Income Security Act ("ERISA") because he was advised that ERISA was beyond his mandate.[396] Nevertheless, there are two theories under which ERISA could conceivably be implicated by the facts in the ULLICO matter. First, it could be alleged that ULLICO directors and officers who were trustees of pension plans that invested in ULLICO breached the fiduciary duties they owed to those pension plans by participating in stock transactions that deprived the plans of potential profits. Under this theory, it could be alleged that certain directors bought stock cheaply and then participated disproportionately in the 2000 repurchase, therefore using up a disproportionate amount of the $30 million allocated for repurchases in 2000. By doing so, these directors and officers denied these funds to larger shareholders, including the very pension plans of which they are also trustees. However, courts generally require that a breach of fiduciary duty by a pension plan trustee involve some misuse of plan assets, an element that is arguably lacking in the ULLICO case. The second theory that could be pursued under ERISA is focused on the failure to disclose relevant information. One of the primary responsibilities of a fiduciary is to disclose relevant information. Even if a named plan fiduciary has properly delegated investment decisions to another fiduciary, the named fiduciary still has an obligation to provide material information to those making investment decisions. Therefore, one could attempt to make a claim against ULLICO directors who are also pension plan trustees based on those directors' failure to disclose to other fiduciaries or plan participants details regarding the 2000 formal repurchase program and the discretionary repurchases of ULLICO stock.[397]

Similar arguments were made in a lawsuit filed by a participant in the Ironworkers Pension Plan against Jacob West, a trustee of that plan and a former ULLICO director, as well as other former ULLICO directors. In a decision in March 2004, the court held that ULLICO directors who were not trustees of the Ironworkers Pension Plan did not have a fiduciary duty towards the plan.[398] The court refused to dismiss the complaint against West, finding that West was a fiduciary of the plan, and that the plaintiff had stated an adequate claim to survive a motion to dismiss based on West's self-dealing in ULLICO stock and his failure to disclose these transactions to plan participants.[399] The court also allowed the lawsuit to proceed against other ULLICO directors to the extent the plaintiff could demonstrate those directors knowingly participated in fiduciary breaches by West.[400]

---

[396] 29 U.S.C. §1100 *et seq.*; Thompson at 65 (Appendix 1).

[397] *See* Memorandum from Jon O. Shimabukuro, Legislative Attorney, American Law Division, Congressional Research Service, to James R. McKay, U.S. Senate Governmental Affairs Committee, regarding ULLICO and the Disclosure of Material Information Under ERISA (May 12, 2003) (Exhibit 118).

[398] *Barry v. Trustees of Ironworkers Pension Plan* at 10 (D.D.C. 2004).

[399] *Id.* at 18.

[400] *Id.* at 15.

# EXHIBIT B

# THE WALL STREET JOURNAL

## Inside Deal: How Union Bosses Enriched Themselves On an Insurer's Board -- - Their Shares of Ullico Inc. Suddenly Grew Valuable Amid Telecom Bubble --- A Global Crossing Connection

*By Tom Hamburger and John Harwood.* **Wall Street Journal.** (Eastern edition). New York, N.Y.: Apr 5, 2002. pg. A.1

| | |
|---|---|
| Subjects: | Congressional investigations,  Shareholders equity,  Union leadership |
| Companies: | American Federation of Labor-Congress of Industrial Organizations (NAICS: 813930 ) ,  Ullico Inc |
| Author(s): | By Tom Hamburger and John Harwood |
| Document types: | News |
| Publication title: | Wall Street Journal. (Eastern edition). New York, N.Y.: Apr 5, 2002.  pg. A.1 |
| Source type: | Newspaper |
| ISSN: | 00999660 |
| ProQuest document ID: | 112942957 |
| Text Word Count | 2581 |
| Document URL: | https://libproxy.library.unt.edu:2576/login?url=http://proqu est.umi.com/pqdweb?did=112942957&Fmt=3&clientId=87&RQT=309&V Name=PQD |

**Abstract** (Document Summary)

Ullico, which bought its shares at the "founders" price of about $1, saw the stock go to $18 at the IPO. Then the stock split, and eventually it peaked in May 1999, at $64.25. At the peak, Ullico's Global Crossing stake was worth $2.1 billion -- nearly 10 times the entire value of the insurance company when it first invested in Atlantic Crossing about two years earlier, according to a person familiar with Ullico's finances. Mr. [John Sweeney], the AFL-CIO chief, took to praising Ullico's financial success as a model for boosting labor's muscle.

The stratospheric rise in the Global Crossing investment produced the opportunity for the labor leaders on Ullico's board to profit personally. In 1997, the company hired Credit Suisse First Boston to help set up a plan under which the insurance company would repurchase its stock from shareholders as a way to allow them to benefit from Ullico's new investment success, according to Ullico internal documents. As a part of this plan, Ullico abandoned its old fixed valuation of $25 a share and began adjusting its share price annually, as determined by a year-end accountant's review.

The Global Crossing stake quickly drove up the value of Ullico's stock. In late 1998, with Global Crossing trading at more than $22 a share after the split, the year-end audit by PricewaterhouseCoopers pointed to a share price of $53.94 for Ullico, according to Ullico board minutes. Once that adjustment was ratified by the board in May 1999, it remained in effect until the board acted again a year later. In keeping with a stock-repurchase schedule it had set previously, the board offered to have Ullico buy back as much as $15 million worth of shares from investors seeking an immediate return.

**Full Text** (2581   words)

*Copyright Dow Jones & Company Inc Apr 5, 2002*

WASHINGTON -- AFL-CIO President John Sweeney denounces "Enron Economics" that enrich corporate executives at the expense of ordinary workers. But some of his fellow labor leaders have turned their board membership at a union-owned insurance company into a source of personal gain.

Consider how Martin Maddaloni, president of the plumbers union, has benefited from his role as a director of Ullico Inc. The privately held company, formerly known as Union Labor Life Insurance Co., was founded in 1925 to provide low-cost life and health insurance to blue-collar union members. In the late 1990s, guided by a politically connected financial adviser, the formerly staid Ullico bet on the technology boom. It invested in Global Crossing Ltd. As the telecommunications start-up exploded in value, Ullico's own closely held shares ballooned, too.

In 2000, Mr. Maddaloni says, he reaped a profit of roughly $184,000 by selling 2,000 of his Ullico shares back to the insurer. He did so after serving on its board for two years. "I didn't think there was anything wrong with it," says the 61-year-old union veteran. Ullico's in-house lawyers had blessed the transaction, he says. "I just took advantage of the process."

He and other labor leaders could lock in profits because of the company's method of fixing its stock price annually. A platoon of union chiefs responsible for serving their members used Ullico as a means of enriching themselves.

Their actions are now the subject of a federal grand-jury investigation here. The probe's focus, according to people familiar with it: Did certain Ullico repurchases of its stock in 2000 and 2001 illegally confer benefits on some board members at the expense of their unions, which also invested in the company?

Apart from potential criminal liability, there is the question of whether union leaders' dealings in Ullico stock created a conflict of interest that violated civil labor law. The U.S. Department of Labor is separately investigating that question -- a probe that potentially could lead to removal of union officials and civil fines.

Internal Ullico documents show that officers and board members cashed in some 71,000 shares of company stock from January 2000 to September 2001. Like Mr. Maddaloni, they had the opportunity to benefit from the insurer's practice of fixing its stock price annually -- and holding the price in place -- even if Ullico's investments were declining in value. That is in fact what happened when Global Crossing stock, after skyrocketing initially, wilted last year as the company spiraled toward bankruptcy court. The Ullico story offers another example of the vast ripple effects of the epochal telecom collapse.

Company proxy statements reviewed by The Wall Street Journal don't record the precise dates on which directors sold their shares. But based on the fixed price at which Ullico shares traded during most of that 21-month period, those transactions may have earned half a dozen or more sellers hundreds of thousands of dollars each -- a total of $6.5 million or more in profits. Board members themselves approved the prices and rules that governed these sales. (As a private company, Ullico generally isn't required to make public filings with the Securities and Exchange Commission.)

Ullico Chairman Robert Georgine, former head of the AFL-CIO's building-trades division, sold 4,000 shares, the proxy statements show. William Bernard, another director and former head of the asbestos-workers union, sold 8,664 shares. Board members Jacob West, former president of the ironworkers union, and Douglas McCarron, president of the carpenters union, sold 5,250 and 3,000 shares, respectively.

Messrs. Bernard, West and Georgine declined to comment. Through a spokesman, Mr. McCarron said, "We think the transactions were conducted properly" and declined to elaborate. A company spokesman for Washington-based Ullico declined to comment.

Mr. Sweeney, who is also a Ullico board member, said through a spokesman that he has never sold any company shares. A handful of other board members say the same thing.

"My interest is to see that workers are given proper [insurance] coverage," not to profit from board service, says Lenore Miller, a Ullico director and former president of the retail-workers union. Ms. Miller says she hasn't touched the token 42 shares she bought years ago, now valued at about $3,100. If other board members reaped big profits, she adds, "that is for them to answer for their own morality."

In the universe of privately held companies, the way the Ullico board fixed the price of its stock and structured stock repurchases "is absolutely standard-operating procedure," says Robert Willens, an analyst with Lehman Brothers Holdings Inc. in New York who specializes in the area. Directors of such companies routinely take the windfalls those procedures can produce, Mr. Willens says.

But such lucrative paydays for directors raise questions at Ullico, which wasn't an ordinary commercial company. Its stated mission: to "answer the needs of unions and their members."

Global Crossing's swift demise has left Ullico without the financial buffer it had previously enjoyed. That, in part, has led to a lowering of the company's rating by A.M. Best Co. and other insurance-rating firms. The reduction could discourage unions from investing in Ullico and from buying its policies for its members.

The company did make an aftertax profit of $330 million when it sold part of its Global Crossing stake in 1999 and 2000. But it didn't sell all of its holdings in the telecom company, holdings that are now virtually worthless.

Seventy-seven years ago, when the American Federation of Labor created Ullico, many blue-collar union members couldn't afford basic life and health insurance, or didn't know where to obtain it. Over the decades, general-purpose insurance carriers encroached on the union market. Ullico, which today provides a range of financial services, competes against big names in the industry such as Cigna Corp. and the union-owned Amalgamated Life Insurance Co., among others.

Since its founding, Ullico has ensured labor-movement control of the company by making its stock available for purchase only to unions and officers and directors of the company. While rank-and-file union members are technically eligible to buy

stock, few if any of them are thought to own shares. All stock purchases have to be approved by the 32-person board. Unions hold the vast majority of the stock. But the precise ownership structure isn't public information and couldn't be determined.

For most of its history, Ullico hewed to a conservative investment strategy and kept its own stock at the fixed price of $25 a share. There was little trade in the stock. But the company shifted its approach in 1991, when it hired Michael Steed, first as an outside financial adviser and later as a senior executive.

Mr. Steed had worked with labor leaders as an official at the Democratic National Committee. He quickly introduced an aggressive strategy to modernize Ullico's finances and raise capital to compete for more business. Ullico raised some $220 millon by selling additional stock to union entities and took a bolder approach toward investing that capital. Later, the company introduced a new stock-repurchase plan to replace its long-standing 10% annual dividend to shareholders.

The company's 32-member board, mostly current and retired union presidents with little finance expertise, went along with these proposals. The new strategy paid off quickly.

In 1992, Ullico joined forces with the Carlyle Group, a politically plugged-in merchant-banking firm in Washington. Carlyle's principals at the time included David Rubenstein, who had served in the Carter White House, and Frank Carlucci, former secretary of defense during the Reagan administration. Ullico and Carlyle bought the aircraft division of defense contractor LTV Corp., which was then in bankruptcy-court proceedings.

Ullico used its clout as an investor to force an extension of a collective-bargaining agreement with LTV workers, according to a study published by Cornell University Press. The insurer sold its stake for $14.3 million, nearly tripling its investment two years earlier.

But the investment that would alter Ullico's fortunes more dramatically involved a start-up then known as Atlantic Crossing. The company sought to lay a broadband cable beneath the ocean to Europe that could carry high-speed Internet traffic. Later the venture adopted world-wide ambitions and became Global Crossing.

In the late 1990s, Gary Winnick, the California-based financier who launched Global Crossing, was looking for early investments in the company from a variety of politically connected figures. These included Terry McAuliffe, now Democratic national chairman, who chipped in $100,000, and former President Bush, who accepted Global Crossing stock as a speaking fee. In 1997, Ullico agreed to get in on the ground floor as well, investing $7.6 million in the venture. The labor investment gave the new company credibility with other investors and political clout with state and federal regulators.

Ullico and other early Global Crossing investors initially saw spectacular growth as the company went public in 1998 and rode the wave of Internet enthusiasm. The stakes of Messrs. McAuliffe and Bush swelled to more than $10 million apiece.

Ullico, which bought its shares at the "founders" price of about $1, saw the stock go to $18 at the IPO. Then the stock split, and eventually it peaked in May 1999, at $64.25. At the peak, Ullico's Global Crossing stake was worth $2.1 billion -- nearly 10 times the entire value of the insurance company when it first invested in Atlantic Crossing about two years earlier, according to a person familiar with Ullico's finances. Mr. Sweeney, the AFL-CIO chief, took to praising Ullico's financial success as a model for boosting labor's muscle.

The stratospheric rise in the Global Crossing investment produced the opportunity for the labor leaders on Ullico's board to profit personally. In 1997, the company hired Credit Suisse First Boston to help set up a plan under which the insurance company would repurchase its stock from shareholders as a way to allow them to benefit from Ullico's new investment success, according to Ullico internal documents. As a part of this plan, Ullico abandoned its old fixed valuation of $25 a share and began adjusting its share price annually, as determined by a year-end accountant's review.

The Global Crossing stake quickly drove up the value of Ullico's stock. In late 1998, with Global Crossing trading at more than $22 a share after the split, the year-end audit by PricewaterhouseCoopers pointed to a share price of $53.94 for Ullico, according to Ullico board minutes. Once that adjustment was ratified by the board in May 1999, it remained in effect until the board acted again a year later. In keeping with a stock-repurchase schedule it had set previously, the board offered to have Ullico buy back as much as $15 million worth of shares from investors seeking an immediate return.

But as the months went by, an opportunity for an even-bigger payoff for individual stock holders appeared to lie in buying Ullico shares rather than selling them. On Dec. 16, 1999, two weeks before the books would close for Ullico's annual audit, Global Crossing closed at $52.56 a share.

On Dec. 17, Mr. Georgine, the Ullico chairman and former AFL-CIO official, sent a confidential written invitation to Ullico senior officers and directors: the chance to buy as many as 4,000 additional Ullico shares at the current price of $53.94. It

couldn't be determined whether any unions received similar invitations.

Given Global Crossing's still-high share price, it looked like the value of Ullico shares was about to rise substantially, making the purchase a prelude to near-certain profits. In case colleagues doubted whether Mr. Georgine considered this a wise investment, he wrote, "I intend to purchase additional shares at this time."

Sure enough, the Pricewaterhouse audit pointed to an increase in Ullico's share value to $146, nearly triple its previous level, according to board minutes. At its May 2000 meeting, the board ratified that price.

But by the time the board acted, the tech bubble was already beginning to burst. Global Crossing shares had fallen 45% from their 1999 peak, to less than $35. The drop reflected severe overcapacity and general weakening among many new telecom companies.

Yet even as Global Crossing continued to slump as 2000 wore on, Ullico directors approved another stock repurchase. In November 2000, with Global Crossing having dropped below $25 a share, the board voted to buy back $30 million in stock from shareholders at $146 a share -- the value the Pricewaterhouse audit had suggested nearly a year earlier, according to board minutes.

In other words, the directors authorized themselves to sell back to the company millions of dollars of Ullico stock that hadn't yet been subjected to an imminent, unavoidable reduction in price related to Global Crossing's accelerating fall.

All shareholders were eligible to participate, according to the tender offer. But owners of more than 10,000 shares -- mostly the unions -- faced certain complicated restrictions on how many shares they could sell. Those with comparatively small stakes -- such as board members -- were invited to sell all of their shares.

Board members took advantage of the opportunity. By the end of 2000, the labor leaders -- Messrs. Bernard, West, Georgine, McCarron and Maddaloni -- had made their stock sales.

In November 2000, Ullico's board even authorized Mr. Georgine to extend the deadline for selling shares at $146 by five months -- through early May 2001. That meant the new deadline came months after Pricewaterhouse performed an annual audit that was sure to reduce Ullico's share value, in keeping with Global Crossing's decline. The audit did lead to a cut in the share price, to $74, which the board ratified in May.

Morton Bahr, president of the Communications Workers of America and a board member, sold all 300 of his shares in early 2001, for a profit of more than $27,000, a union spokeswoman says. Since then, Mr. Bahr has become concerned about the propriety of stock trading by Ullico board members, the spokeswoman adds. (Certain Wall Street Journal employees, including its reporters, are represented by an affiliate of the CWA.)

Mr. Sweeney of the AFL-CIO last month wrote a letter to Mr. Georgine, asking him to set up a formal review of Ullico stock trading that includes independent legal counsel. "Ullico must live up to the standards we ask others to meet," he wrote. Mr. Georgine so far hasn't responded, but several union presidents, including Mr. Bahr, are supporting the Sweeney request.

Other Ullico board members dismiss concerns about the stock transactions. "I didn't give it a thought," says Mr. Maddaloni of the plumbers union. He adds that his union also sold Ullico's stock back to the company at a gain, providing indirect benefits to rank-and-file members.

Ullico's chief in-house legal officer, Joseph Carabillo, declined to comment. He has been subpoenaed by the grand jury now examining the transactions, according to people familiar with the situation.

The grand-jury investigation grew out of a separate criminal probe of Mr. West, the former ironworkers president, according to a person familiar with the inquiries. Mr. West was indicted last year and is awaiting trial in Washington on charges of embezzling funds from the union he once headed.

Mr. Steed, the financial adviser, left Ullico's employ in early December 1999, not long after Global Crossing's share price peaked. He went to work for a separate investment company run by Global Crossing's Mr. Winnick. Mr. Steed has since left that job and runs his own investment firm in Washington. Complaints filed in state and federal court in Maryland show that he has sued Ullico, alleging its top officers improperly denied him pension and stock benefits.

Credit: Staff Reporters of The Wall Street Journal

Copyright © 2007 ProQuest Information and Learning Company. All rights reserved. Terms and Conditions

Text-only interface



# EXHIBIT C

ProQuest

Databases selected:  Multiple databases...

## THE WALL STREET JOURNAL.
# Finance Chief Of Unions' Ullico Quits in Protest

*By Tom Hamburger.* **Wall Street Journal.** (Eastern edition). New York, N.Y.: Mar 6, 2003. pg. C.14

| | |
|---|---|
| Subjects: | Chief financial officers,  Resignations |
| Classification Codes | 8130,  6300 |
| People: | Grelle, John |
| Companies: | ULLICO INC (NAICS: 524113 ) |
| Author(s): | By Tom Hamburger |
| Document types: | News |
| Publication title: | Wall Street Journal. (Eastern edition). New York, N.Y.: Mar 6, 2003.  pg. C.14 |
| Source type: | Newspaper |
| ISSN: | 00999660 |
| ProQuest document ID: | 300846091 |
| Text Word Count | 397 |
| Document URL: | https://libproxy.library.unt.edu:2576/login?url=http://proqu est.umi.com/pqdweb?<br>did=300846091&Fmt=3&clientId=87&RQT=309&V Name=PQD |

**Abstract** (Document Summary)

"Your failure to act . . . puts the survival of Ullico in greater and greater jeopardy with each day that passes," John Grelle wrote Ullico's president and board in his resignation letter last week. "There is precious little time left and the absence of any written real actionable plan could cause the demise of Ullico in the relatively near future."

**Full Text** (397  words)

Copyright Dow Jones & Company Inc Mar 6, 2003

WASHINGTON -- The chief financial officer of Ullico Inc. has stepped down, criticizing top management for an "unwillingness to face the financial crisis" confronting the union-owned financial-services company.

"Your failure to act . . . puts the survival of Ullico in greater and greater jeopardy with each day that passes," John Grelle wrote Ullico's president and board in his resignation letter last week. "There is precious little time left and the absence of any written real actionable plan could cause the demise of Ullico in the relatively near future."

The company has seen ongoing operating losses at its life and property/casualty insurance subsidiaries as well as substantial operating deficits in each of the past two years in several of its business lines. Mr. Grelle said proposals he developed to help shore up the finances were largely ignored. He declined to respond to requests for comment on his letter.

Ullico President Robert Georgine, former head of the Building Trades division of the AFL-CIO, rejected Mr. Grelle's criticism, saying that the company was developing a clear plan to resolve current financial difficulties. In a letter responding to Mr. Grelle, he said he has brought in an outside consultant to develop a "Corporate Action Plan" within 30 days. "It strikes me as remarkable" that "you attribute none of our current difficulties to any errors, omissions or misjudgments of your own," Mr. Georgine wrote. "Your opinion, moreover, that I am unwilling to face Ullico's problems is as mistaken as it is unfounded."

Days after the exchange, A.M. Best Co. downgraded Ullico's life-insurance divisions from B-plus (very good) to B (fair) due in part to "the limited financial flexibility of the parent holding company."

In addition to the downgrade, Ullico is facing stepped-up state and federal investigations into its operations, particularly the lucrative stock deals offered exclusively to top officers and board members. The Labor Department is investigating whether Ullico board members enriched themselves with the questionable stock deals at the expense of several unions and their pension funds. A federal court hearing is set for next week as the Labor Department seeks company documents.

A.M. Best financial analyst Joseph Zazzera said Ullico has "a fair ability to meet obligations" but the firm is "financially vulnerable to adverse changes."

Ullico spokesman John Rodgers noted: "We are not unique. Many other companies have suffered similar fates at the hands of the rating agencies."

Copyright © 2007 ProQuest Information and Learning Company. All rights reserved. Terms and Conditions

Text-only interface



# EXHIBIT D



**ULLICO Inc.**

1625 Eye Street, NW
Washington, DC 20006
202.682.0900

*101-69615*

www.ullico.com
**Patrick McGlone**
Senior Attorney
Tel: 202/682-6967
Facsimile: 202/682-6784
E-mail: pmcglone@ullico.com

January 10, 2005

<u>BY FACSIMILE AND U.S. MAIL</u>

Samuel F. Paniccia, Esq.
D'Amato & Lynch
70 Pine Street
New York, NY 10270-0110

Re: **Insured:**     **ULLICO Inc. and its Subsidiaries ("ULLICO")**
    **Matter:**      **Carabillo**
    **A.I. File No.:** 434-003952
    **Your File No.:** 101-69615
    _____

Dear Sam:

     I am responding to your October 21, 2004, letter to Allison Eisenberg in which National Union Fire Insurance Company of Pittsburgh, Pa agreed to defend ULLICO Inc. under a reservation of rights in the lawsuits captioned: (1) *Joseph A. Carabillo v. ULLICO Inc.* Case No. 03CV01556 (D.D.C. July 18, 2003) ("Carabillo I"); and (2) *Joseph A. Carabillo v. ULLICO Inc. Pension Plan and Trust, et al.,* Case No. 04CV00776 (D.D.C. May 13, 2004) ("Carabillo II"). While recognizing certain of ULLICO's coverage rights, National Union has placed improper restrictions on ULLICO's coverage rights that are not supported by the Policies. Specifically, National Union purports to restrict ULLICO's rights to select Miller & Chevalier as its defense counsel. ULLICO requests that National Union revise its position by January 31, 2005, by agreeing to reimburse the defense costs of Miller & Chevalier in both of these lawsuits.

     Section 9 in each of the 2001-02, 2002-03 and 2003-04 Policies provides in substantially similar language that "Pre-Authorized Defense Attorneys" is required only for "(1) a Claim brought by any government entity; (2) a request for coverage for a Voluntary Compliance Loss; or (3) a Claim brought in the form of a class or representative action." 2003 Policy, Section 9. The Carabillo I and II Actions are individual actions that do not meet any of the three categories for which pre-authorized panel counsel may be required. Accordingly, ULLICO has the right to choose its own defense counsel, and National Union is obligated to reimburse all reasonable fees and expenses from ULLICO's chosen law firm.

     National Union does not appear to dispute that the Carabillo I and Carabillo II actions do not meet any of the three types of claims in Section 9 of the Policies for which pre-authorized defense

Samuel F. Paniccia, Esq.
January 10, 2005
Page 2

counsel may be required. Instead, you improperly attempt to require panel counsel by asserting that "both the Carabillo I Complaint and the Carabillo II Complaint constitute a Claim alleging Wrongful Acts which are the same as or related to the Wrongful Acts alleged or contained in the DOL investigation." The DOL investigation for which ULLICO is seeking separate coverage from National Union under the 01-02 Policy and the Carabillo I and II lawsuits do not constitute interrelated wrongful acts as you contend. To the contrary, the claims are being asserted by different parties and the claims themselves are completely different.

Before two claims can be considered "interrelated," the overriding presumption is that the claims must be asserted by the same Plaintiff. *See National Union Fire Ins. Co. v. Ambassador Group, Inc.*, 691 F. Supp. 618, 623 (E.D.N.Y. 1988). Obviously, the DOL and Mr. Carabillo have no relationship and are not acting in concert. But even more importantly, the claims must bear a close substantive relationship to qualify as "interrelated wrongful acts," and that is not the case here. *See Lehigh Valley Health Network v. Executive Risk Indem. Inc.*, 2001 WL 21505 *9 (E.D. Pa. 2001); *National State Bank v. American Home Assur. Co.*, 429 F. Supp. 393, 397 (S.D.N.Y. 1980) (finding separate claims despite the fact that both claims alleged wrongdoing related to the demise of the company). The DOL subpoena for which ULLICO has sought insurance coverage under the 01-02 Policy is addressed to the ULLICO Pension Plan and Trust and relates to the actions of Plan Fiduciaries involving the purchases of ULLICO stock. By contrast, Mr. Carabillo filed his lawsuits to obtain early retirement benefits under the Pension Plan and other benefits under an Auxiliary Plan, and alleges that those benefits were improperly denied by the plans' respective fiduciaries. The DOL and Carabillo claims cannot be interrelated because the DOL is not investigating whether the ULLICO Trustees improperly denied benefits to Mr. Carabillo. [Moreover, Mr. Carabillo's claims relating to the Auxiliary Plan can bear no relationship to the purportedly interrelated DOL subpoena, because we have no information to suggest that the DOL is investigating that Plan, or that the subpoena relates to that Plan.]

Second, you further assert that the Carabillo II Complaint arises out of the DOL subpoena that is identified as Event (2) of Endorsement #12 to the 03-04 Policy: "[T]he insurer shall not be liable for any Loss in connection with . . . any Claim . . . in any way related, directly or indirectly, to . . . (2) United States Department of Labor issued a subpoena directed to the ULLICO, Inc. relating to the investigation of ERISA covered plans that are eligible to purchase ULLICO, Inc. stock (as per DOL subpoena dated April 11, 2002)." Again, the Carabillo Complaints have no connection to the DOL subpoena identified as Event (2) in the Policy because the DOL is not investigating whether Mr. Carabillo is entitled to any early retirement benefits or Auxiliary Plan benefits. National Union has no basis to assume any connection between the two separate and distinct claims based on mere conjecture or speculation.

Third, you assert on page 4 of your letter that "there is no coverage for the second and third causes of action to the Carabillo I Complaint (breach of contract and wrongful termination, respectively) because these causes of action do not fall within the 01-02 Policy's definition of Wrongful Act or within the scope of coverage afforded." We note, however, that Gene Domanico, Director, Financial Institutions Complex Claims for AIG Technical Services, Inc., has previously acknowledged coverage for the Carabillo wrongful termination claim in his letter dated April 7, 2004

)

Samuel F. Paniccia, Esq.
January 10, 2005
Page 3

to ULLICO's broker Allison Eisenberg of Frank Cystal & Company (Claim Nos. 654-001401 and 654-001400) under Directors, Officers and Private Company Liability Insurance Policies No. 299-96-17 and 495-36-84 (hereinafter the "AIG D&O Policies"). While we recognize that panel counsel may be required for certain employment claims under the D&O policy, the crux of the Carabillo I and II lawsuits are his ERISA claims, and thus ULLICO's right to appoint its own counsel for the ERISA claims necessarily overrides any requirement for panel counsel of the ancillary employment claims.

ULLICO proposes to continue using Miller & Chevalier as counsel in all aspects of Carabillo I and Carabillo II. For the reasons stated above, there clearly is no applicable panel counsel requirement under the 2001-02, 2002-03, or 2004-05 Policies. Moreover, the only truly efficient manner in which ULLICO can be represented in its defense against Carabillo's affirmative ERISA claims, for which coverage is affirmed (subject to reservations) in your letter, in its defense against the employment claim for which coverage is available under the AIG D&O Policies, and in its pursuit of the Company's affirmative claims against Mr. Carabillo and other former officers, is for ULLICO to have the Miller & Chevalier act as counsel in all respects. Retention of new and additional counsel, particularly these many months into this litigation, would result in severe inefficiencies, overlap of efforts and, ultimately, waste of both ULLICO's and AIG's resources.

ULLICO is defending Carabillo's claims in both his lawsuits in part on the grounds that Carabillo breached his fiduciary duties to the company by engaging in a series of improper stock transactions between 1998 and 2001, which caused ULLICO to terminate him. ULLICO has also asserted affirmative claims against Carabillo and three other former ULLICO executives, which are intertwined with ULLICO's defense to Carabillo's affirmative claim. Namely, ULLICO seeks to recover certain improper stock profits recognized by Carabillo as a result of his breach of fiduciary duties, and to recover other damages. As a result, substantially the same set of facts and issues will control both the defense of Carabillo's claims and the pursuit of ULLICO's counterclaims.

Moreover, two other federal lawsuits pending between ULLICO and former executives involve, in significant respect, the stock transactions at issue in the Carabillo lawsuits: a suit filed by former executive vice-president James Luce (*Luce v. Union Labor Life Auxiliary Retirement Benefits Plan, et al.*, D.D.C., Case No. 04-118), who seeks certain enhanced retirement plan benefits; and a suit filed by ULLICO against Luce alleging breach of fiduciary duty relating to his involvement in various ULLICO stock transactions (*ULLICO Inc. v. Luce*, D.D.C. Case No. 04-1830). As in Carabillo I and Carabillo II, a central issue in each of these cases is whether certain stock transactions engaged in by the former executives were proper or whether the transactions represented a breach of the executives' duties and therefore relieve ULLICO and the pertinent benefit plans of the benefits sought by the executives.

As this description demonstrates, the single claim asserted in Carabillo I for which there may be a valid AIG panel counsel requirement is one of many claims and counterclaims in a total of four lawsuits, and involving four former ULLICO officers, for which there is no panel counsel requirement. Miller & Chevalier has been capably representing ULLICO for many months on all these matters. Introducing additional counsel at this time would be inefficient, wasteful and duplicative. Carabillo I has now been pending for over a year and a half and the case already has

Samuel F. Paniccia, Esq.
January 10, 2005
Page 4

ninety-eight separate docket entries, including three pending motions to dismiss.  Miller & Chevalier currently has assembled 798 bankers boxes of potentially discoverable materials.  For new counsel to become familiar with the complex claims in these matters, their procedural history, and the facts that underlie the claims and defenses, would be a costly and time consuming process that benefits neither AIG nor ULLICO.  Adding separate counsel would also create substantial future costs associated with coordinating all counsels' activities, particularly since we expect that the court will require either consolidated or coordinated discovery among all pending matters.

ULLICO requests that National Union revise its coverage position and begin to meet its full duty to defend ULLICO under the Policy by January 31, 2005.  Further, we advise you that we are requesting the claims analyst assigned to the Carabillo I claim under the AIG D&O Policies to consent to ULLICO's continued retention of Miller & Chevalier under those policies.  The analyst is Gene Domanico, Director, Financial Institutions Complex Claims, AIG Technical Services, Inc., 175 Water Street, 4th Fl., New York, NY 10038 (212.458.3498).  Because AIG's interest in the efficient use of defense counsel will ultimately be served by retention of Miller & Chevalier for all aspects of these various lawsuits, including the claims for which there is no panel counsel requirement, I propose that AIG's representatives on these matters confer and agree on the use of Miller & Chevalier.

I look forward to hearing from you.

Very truly yours,

Patrick McGlone /cmc

Patrick McGlone

cc:    Gene Domanico

Docs/300/100/ULLICO Officer-Director Claims/Carabillo v. ULLICO
L011005SPanicciaReJCarabillo.doc